**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

GWG MCA CAPITAL, INC.

                                                     Plaintiff,

vs.

NULOOK CAPITAL, LLC,
INTERNATIONAL PROFESSIONAL
SERVICES INC, dba PSC, PSC FINANCIAL,
a division of PSC, ANTHONY MANNINO,
JOEL NAZARENO, and ROBERT
AURIGEMA

                                                     Defendants.

-------------------------------------------------------- x

Case No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff GWG MCA Capital, Inc. ("GWG" or "Plaintiff") by and through its undersigned attorneys, for its Complaint against defendants Nulook Capital, LLC, International Professional Services Inc, dba PSC, PSC Financial, a division of PSC, Anthony Mannino, Joel Nazareno, and Robert Aurigema  hereby alleges as follows:

## NATURE OF THE CASE

1.       This Complaint is brought against Defendant Nulook Capital, LLC to collect all amounts owing under a Revolving Credit Agreement and related transaction documents ("Loan") between Nulook as Borrower and GWG as Lender.   GWG also brings this action to seek redress for certain Defendants' egregious illicit scheme to defraud GWG out of millions of dollars. Beginning sometime in 2014, and continuing through today, Defendants, in bad faith, through the use of fraud and deceit and with the specific intent to cause harm to GWG, embarked upon a series of related and continuous transactions that ultimately resulted in the outright theft of GWG's collateral and the diversion of earmarked cash belonging to GWG into certain Defendants' own pockets.  Certain Defendants' fraudulent conduct triggers not only the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961-1968, but also the fraudulent conveyance provisions under the New York Debtor Creditor Law §§ 270-281, § 349 of the New York General Business Law pertaining to deceptive acts and practices, and Defendants' conduct definitively breaches various contractual, fiduciary and other duties owed to GWG.   Moreover, certain Defendants have been unjustly enriched at GWG's expense.  Certain of the Defendants herein are modern day scam artists whose illicit scheme to defraud GWG falls squarely within the very racketeering conduct that the RICO statute was intended to redress.

## PARTIES

2.      Plaintiff GWG MCA Capital, Inc. is a Delaware corporation.  On or about February 15, 2016, GWG MCA Capital, Inc. purchased all of the assets of MCA Capital, LLC, including the Loan with Nulook Capital LLC ("Nulook") that is at the core of this dispute as described in more detail below and related Collateral pledged by Nulook as security for the Loan.  Any references to GWG herein include MCA Capital, LLC by virtue of GWG's acquisition of the assets of MCA Capital, LLC.

3.      Defendant Nulook is a New York limited liability company with, upon information and belief, an address at 1979 Marcus Avenue, Suite 206, New Hyde Park, NY 11042. Nulook's registered agent in the State of New York is Anthony Mannino, with an address at 243 Harbor Lane, Massapequa, NY 11762.

4.      International Professional Services Inc. dba PSC ("PSC") is a New York corporation with its principal place of business at 1979 Marcus Avenue, Suite 206, New Hyde Park, NY 11042.

5.      PSC Financial ("PSCF") is a division of PSC, with its principal place of business at 1979 Marcus Avenue, Suite 206, New Hyde Park, NY 11042.

6.      Anthony Mannino ("Mannino") is an individual residing at 243 Harbor Lane, Massapequa, NY 11762 and is the founder and Chief Executive Officer at Nulook.

7.      Robert Aurigema ("Aurigema") is an individual residing at 2731 Landing Avenue, Bellmore, New York 11710 and has close personal ties to Mannino.  At all times relevant to this dispute, Aurigema held himself out as one of the founders and a part owner of Nulook.

8.      Joel Nazareno ("Nazareno") is an individual residing at 266 Battery Ave, Brooklyn, NY 11209 and is the Executive Director at PSC.

## JURISDICTION, VENUE, AND STANDING

**9.** This Court has subject matter jurisdiction over GWG's federal law claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964 (c). This Court has supplemental subject matter jurisdiction over GWG's state law claims pursuant to 28 U.S.C. § 1367 (a) because those claims are so closely related to the federal claims brought herein as to form a part of the same case or controversy.

**10.** Personal jurisdiction is proper over all Defendants in this district pursuant to C.P.L.R. § 302 (a)(1) and § 302 (a)(3), 18 U.S.C. § 1965 (b), and Federal Rule of Civil Procedure 4(k).

**11.** The exercise of personal jurisdiction over Defendants is reasonable and proper because Defendants either reside in the State of New York, regularly transact business in the State of New York or because Defendants committed tortious acts in the State of New York.

**12.** Venue is proper in this district pursuant to 18 U.S.C. § 1965 and 28 USC § 1391(b)(2). The acts and transactions complained of herein occurred in this District, Defendants reside or conduct business in this Judicial District and most Defendants have consented to jurisdiction or waived objection to venue in this Judicial District.

## FACTUAL ALLEGATIONS

**13.** On or about May 22, 2014, Nulook entered into a $2.5 million dollar Loan with MCA Capital, LLC as lender ("Lender") that called for MCA Capital, LLC to be the senior source of funding for Nulook to make merchant cash advances to independent merchants. Thereafter, the Loan was amended by way of a rider executed on or about September 30, 2014 that increased the

Borrowing Limit under the Loan to $3.5 million and then increased again to $3,750,000 by way of an additional rider executed on or about December 22, 2014.

14.     The Loan was secured by a pledge and first priority perfected security interest and lien, free and clear of any adverse claims, in and to all of Nulook's future receivables purchase agreements ("FRPA"), all Merchant Cash Advance ("MCA") agreements, all General Intangibles and all Proceeds, including Cash Proceeds ("Collateral").

15.     To document its lien on Borrower's Collateral, Lender filed UCC financing statements as follows:

    **a.** UCC-1 Filing Number 201405235537443 on May 23, 2014 by MCA Capital, LLC against Nulook Capital, LLC (the "Nulook UCC").
    **b.** UCC-3 Filing Number 201602188065365 on February 18, 2016 assigning the Nulook UCC from MCA Capital, LLC to GWG.

16.     In addition, on or about May 22, 2014, GWG, Nulook and PSC entered into a Collection Subordination Agreement pursuant to which PSC specifically agreed as follows:

> The undersigned, IPS, Inc., a New York corporation, being the Servicer named in the foregoing Collection Subordination Agreement, hereby accepts and consents hereto and agrees to be bound by all of the provisions hereof and to recognize all priorities and other rights granted thereby to MCA Capital, LLC ("Lender") and Nulook Capital, LLC ("Borrower") and to deposit Collections received pursuant hereto in accordance with the RCA, a copy of which it acknowledges has been provided to it.

> INTERNATIONAL PROFESSIONAL SERVICES, INC.

> By: _____
> Joel Nazareno,
> Executive Director
> Dated: May 2 2, 2014

17.     As clearly set forth above, Nazareno signed this agreement as Executive Director of International Professional Services, Inc. and Joel Nazareno was, at all times relevant to this

dispute, aware of GWG's Loan and Security interest and lien on Nulook's Collateral.  As set forth above, International Professional Services, Inc. does business as PSC.

18.     Merchant cash advances, known as MCA's, are factored purchases of future receivables, at a discount, from merchants or other small businesses ("Merchants").

19.     Nulook's business model involves providing short-term cash advances to Merchants in need of funds in return for an assignment of a portion of the Merchant's future credit card receipts, debit card receipts, cash, or other receipts.

20.     Typically, Nulook Merchants either authorize their credit card processor to send the agreed upon portion of daily sales receipts to Nulook or Merchants authorize Nulook to debit the agreed amount from the Merchant's checking account directly.

21.     In order to manage accounts with multiple Merchants, Nulook contracted with PSC to act as servicer for its MCA business.  Nulook entered into one or more written servicing agreements with PSC that allowed Nulook access to the PSC platform and the merchant cash advance exchange described more fully below.

22.     On its website at https://pscny.us/ and in promotional materials, PSC claims to be in the business of providing a "front-end to back-end relationship management solution system with service and support."  PSC claims that its services allow members to "rely on their support staff and technology to track all applications, documents, deals, commissions and provides members with management reports to manage their business efficiently."

23.     PSC receives substantial fees for providing these administrative services.

24.     In addition to the Collection Subordination Agreement referenced above, GWG also contracted with PSC directly in order to gain access to PSC's electronic merchant cash advance exchange platform ("Exchange") to participate or syndicate transactions to other funding

5

sources. From time to time, GWG agreed to allow Nulook to syndicate merchant cash advances that were larger than what GWG agreed to fund under its Loan.

25.     On or about June 5, 2014, GWG and PSC entered into PSC's ARMS agreement pursuant to which PSC agreed to provide certain services to GWG, including collecting amounts owed to GWG and other syndication participants, allocating proceeds and remitting proceeds to the appropriate parties.

26.     PSC earned fees and brokerage commissions on all transactions that went through the Exchange.

27.     Through its web-based MCA platform and the Exchange, PSC had access to Confidential Information belonging to Nulook and GWG, including bank account details and the identity, viability, and financial condition of all of the Nulook Merchants who had entered into Merchant Cash Advance agreements with Nulook and pledged receivables as security to GWG.

28.     As a component of its ARMS package, PSC obtains ACH authorizations from Merchants and by virtue of these authorizations, PSC becomes entitled to debit Merchant accounts directly or to subcontract this processing function to a third party. PSC performs this debiting of cash as a trustee or fiduciary for its clients or members and PSC owes its members fiduciary duties.

29.     PSC engaged T$$, LLC ("ACHWorks") to debit Nulook Merchant accounts for the benefit of GWG. Under its agreement with PSC and GWG, ACHWorks agreed to perform services for the benefit of GWG and to inform GWG of any changes to any instructions made with respect to the Nulook Merchants.

30.     Upon information and belief, from May 22, 2014 through February 16, 2017, PSC authorized ACHWorks to debit Nulook Merchant accounts and PSC gave daily instructions to ACHWorks with respect to all Nulook Merchants until on or about February 17, 2017 when all

cash "sweeps" by ACHWorks into Nulook's operating account ceased.  ACHWorks did not notify GWG that it had ceased receiving daily debit instructions from PSC.

31.     PSC also offers syndication investment opportunities to its members.  Syndications involve more than one party factoring a Merchant's future receivables in exchange for a pari-passu share of the collections.  For example, if Nulook identified a Merchant interested in a $100,000.00 Merchant Cash Advance and GWG would only agree to make $25,000.00 available under the Loan, then Nulook could use PSC's platform to secure syndication investors for the additional $75,000.00.  All of the collections, allocations and repayments were controlled by PSC and PSC paid itself its "fees" out of cash collections.

32.     In connection with the syndication business, PSC acts as an intermediary, soliciting and matching merchant advance companies to participate in jointly-funded transactions.

33.     All parties rely upon PSC, and its agent ACHWorks, to collect cash proceeds in trust and to properly and accurately account for all cash collections, allocations and distributions.

34.     By virtue of PSC's agreements, software, systems, and its Exchange platform, PSC had unique knowledge of all Nulook Merchants and direct responsibility with respect to all cash collections and allocations coming from these Nulook Merchants.

35.     Beginning in early 2016, GWG identified Borrowing Base deficiencies and irregularities with respect to the Nulook Loan.

36.     Specifically, GWG determined that the value of pledged MCA's had deteriorated to the point where they, in combination with the amount of cash in the Nulook bank account, no longer supported the amount borrowed by Nulook.  GWG concluded that there was a serious Borrowing Base Deficiency under the Loan.  The Borrowing Base Deficiency was exacerbated by Nulook double counting pledged MCA's and including defaulted MCA's and other ineligible

receivables on their Borrowing Base and generally overstating the amount of Collateral available to support Nulook's obligations to GWG under the Loan.

37.     Beginning in March 2016 and continuing through December of 2016, GWG attempted to resolve the aforementioned Borrowing Base deficiencies with Nulook's CEO, Mannino and more specifically Nulook's de-facto CFO and part owner, Aurigema.

38.     Nulook made numerous false and misleading representations to GWG regarding the Borrowing Base deficiencies that were brought to their attention by GWG.

39.     For example, email communications from Mannino to GWG dated 4/8/16, 4/12/16, and 4/15/16 all contained false and misleading representations.  Similarly, emails from Aurigema dated 4/8/16, 4/14/16, 4/18/16, 4/26/16, 4/28/16, 5/2/16, 5/20/16, 6/8/16, and 7/11/16 were also false and misleading.  For example, Aurigema's April 8, 2016 email is set forth below:

**From:** Robert Aurigema, CPA [mailto:RAurigema@BAMFUNDS.COM]
**Sent:** Friday, April 08, 2016 3:34 PM
**To:** Patrick Preece <patrick@gwgmca.com>
**Subject:** FW: Portfolio update

FYI

I went through.  The items your colleague noted are valid concerns in that the reports don't show collections updated since 12/31. Anthony has been beating up PSC for some time now to get their reporting ironed out bc the minute items go NSF the reporting gets a bit screwy.  There are 98 line items representing ~$1.467M in pledged collateral. 30 of those (representing $469K) show up on the default tab and 68 (representing $998K) are the items being reviewed thoroughly at the moment. See Anthony's note below.  I don't think they are all defaults.  I think several are reporting issues but this is Anthony's arena so he will figure it out with PSC and come back to us.   Just a tooth pull.  We get one piece of the puzzle hashed out and something else breaks down.  We'll get there.  Sorry for the confusion.



**Robert Aurigema, CPA**
Chief Operating Officer

**BALYASNY ASSET MANAGEMENT L.P.**
767 5th Avenue
35th Floor
New York NY 10153

Direct: 212 808 2368
Main:  212 808 2300
Fax:   212 808 2301
Email: RAurigema@BAMFUNDS.COM
Web: www.bamfunds.com

40.     Mannino and Aurigema specifically represented to GWG, that Nulook had secured an equity investment from an owner of PSC and that certain proceeds from the equity investment would be used to cure certain Borrowing Base Deficiencies and shore-up Nulook's financial condition.

41.     GWG relied on Mannino's and Aurigema's representations with respect to the equity infusion and was generally encouraged that the Borrowing Base deficiency was being addressed and that Nulook had actually secured a strong new investor with an interest in Nulook's long term viability.

42.     In an effort to cure the Borrowing Base Deficiency, Nulook made a $500,000.00 payment to GWG on or about June 20, 2016. Mannino and Aurigema both represented to GWG that the proceeds from this $500,000.00 payment came from an equity investment in Nulook that was made by an investor in PSC. This critical representation turned out to be false. In fact, GWG has learned that the $500,000.00 represented proceeds from a factoring deal with PSCF that came at a high price and caused further erosion to the value of the Nulook Collateral. It turns out that this was one of many factoring deals done with PSCF in blatant disregard of the GWG Loan and in violation of GWG's perfected security interest in the Collateral.

43.     Not surprisingly, the payment referenced above did not cure the Borrowing Base deficit. That is at least in part due to the fact that borrowings under the GWG Loan were no longer supported by actual Collateral and collections appear to have been used by Nulook to repay competing unlawful, and at any rate, junior, factoring transactions at the direction of PSC. Nulook's rampant and illicit factoring created irreconcilable Borrowing Base issues. Nulook was unable to cure its Borrowing Base deficit and GWG gave Nulook notice of a Borrowing Base Deficit and Event of Default on or about July 13, 2016 and then again on July 28, 2016.

44.     Based on Mannino's and Aurigema's representations with respect to anticipated collections and a payment of $125,000.00 on or about October 21, 2016, GWG and Nulook entered into negotiations that ultimately led to the execution of a Forbearance Agreement dated December 21, 2016.

45.     The Forbearance Agreement called for certain minimum loan pay down payments to be made to GWG in exchange for GWG's agreement to forbear in exercising its rights and remedies under the Loan.

46.     Shortly after the Forbearance Agreement was signed on December 16, 2016, GWG learned that the following non-ordinary course payments had been made to Nulook insiders or subordinated creditors:

| Date | To | Debits | Check # |
|------|-----|--------|---------|
| 11/16/2016 | Vito Dragonetti | $100,616.44 | 700099233 |
| 11/17/2016 | Nick Dragonetti | $100,698.63 | 700011937 |
| 11/18/2016 | Calkidso Trust | $102,013.69 | 700047502 |
| **TOTAL DEBITS:** | | **$303,328.76**. | |

47.     These payments were made in direct violation of the Loan and GWG's security interest in Nulook's Collateral.

48.     In fact, the non-ordinary course payments were never disclosed to GWG throughout all of the negotiations about Borrowing Base deficiencies and operating cash needs of Nulook, nor were these payments disclosed or referenced in the Forbearance Agreement.

49.     These non-ordinary course payments made with the intent to defraud GWG.  Had GWG known about the non-ordinary course payments it would not have agreed to enter into the Forbearance Agreement.

50.     GWG believes that Nulook may have made other non-ordinary course payments.

51.     The Forbearance Agreement was not negotiated in good faith and Nulook was in default prior to and at the time of execution.

52.     The non-ordinary course payments were made while Nulook was insolvent or the payments when made left Nulook with unreasonably small capital.

53.     Meanwhile, from December 21, 2016 until February 16, 2017, Nulook was receiving regular daily cash sweeps into its collection account and transferring those payments to GWG's account in the amount of approximately $16,000.00 per business day.  In accordance with the Forbearance Agreement, 50% of all cash collections were to be paid into GWG's account until the amounts retained by Nulook equaled $20,000.00 per month after which all amounts were to be sent directly to GWG's account

54.     Section 2.2 of the Forbearance Agreement specifically states:

> 2.2 Required Payments. Commencing on the Effective Date and on each and every date payment is received from T$$, LLC dba ACHWorks, or any other collection agencies or credit card companies (collectively, "Collection Agent") or through your own collections process, whether such payment is received through Automated Clearing House ("ACH"), cash or check, from and after the Effective Date through the date of any Termination Event, Borrower shall make a biweekly payment to Lender (such amount, the "Payment Amount") equal to 50% (fifty percent) of the amount received from such Collection Agent or received directly by the Borrower into Lender's account as specified in Section 9.1, until such amounts retained by Borrower equal $20,000 (twenty thousand) for the calendar month; thereafter all amounts received by Borrower shall be sent directly to Lender's account.

55.     At some point after February 16, 2017, GWG realized that all ACH sweeps that had previously been made by ACHWorks into Nulook's collections account had ceased.  Neither ACHWorks, Nulook, nor PSC informed GWG of any changes to their servicing or collections procedures or the instructions (or lack thereof) given to ACHWorks. However, PSC knew that funds were being diverted to other accounts for the benefit of PSC or PSC affiliates and Nulook

should have known of any changes to the servicing and collections procedures impacting its Merchants.

56.     GWG representatives inquired of Nulook and Defendant Nazareno as to what had happened to disrupt the regular payments from Nulook's Merchant accounts and they were told that other investors were "tired of waiting on Nulook".  Specifically, after learning that the ACHWorks cash pulls from Nulook Merchants had ceased, a GWG representative, Patrick Preece, called Defendant Nazareno on March 1, 2017 and left a message on Nazareno's voice mail to the effect that he (Preece) had learned of the fact that ACHWorks was no longer pulling cash from Nulook Merchant accounts and that GWG had a perfected security interest and first lien on all of Nulook's Collateral.

57.     On March 3, 2017, Mr. Preece received a phone call from Defendant Mannino informing him that Nazareno was planning on calling Mr. Preece in the evening.  In fact, Nazareno did call Mr. Preece on March 3, 2017 on his cell phone at approximately 7:00 p.m.  Mr. Preece informed, and reminded, Nazareno of GWG's security interest and first lien and expressed concerns over the intentional disruption in payments to GWG.  Mr. Preece stressed the legality of GWG's UCC-1 financing statement that documented GWG's security interest.  Nazareno claimed that Nulook had given him a security interest as well.  Mr. Preece attempted to explain that Nulook could not grant PSC a perfected security interest in Collateral that had already been pledged to GWG in connection with the Loan.  Mr. Preece specifically stated to Nazareno that GWG had not released its lien on Nulook's Collateral and that it had a valid perfected first priority security interest in all Nulook Collateral. Mr. Preece further stated that PSC was well aware of GWG's Loan and perfected security interest.  Nazareno's only defense to this was that PSCF's investors were "tired of waiting for their money from Nulook and tired of their promises".

58.     Since that time, GWG has discovered that Defendant Nazareno previously pled guilty for his role in a massive "pump and dump" securities fraud scheme, and was sentenced to sixty months' imprisonment, and three years' supervised release on or about January 24, 2002.  In addition, Nazareno was personally ordered to pay restitution in the amount of $10,000,000.00.

59.     GWG also inquired of ACHWorks and was told that on or about February 16, 2017 it stopped receiving daily instructions to debit merchant accounts on behalf of Nulook.  GWG also stated that both Nulook – specifically Maninno – and PSC were authorized and able to send the daily debit instructions to ACHWorks.  ACHWorks confirmed that if debit instructions are not received it is unable to process any merchant debits and this was the case post February 16, 2017.  ACHWorks did not notify GWG that instructions had ceased.

60.     Finally, after efforts to get payments back on track failed, GWG engaged counsel and counsel attempted to send litigation hold notices and demand letters to PSC, PSCF, Nulook and ACHWorks.

61.     Efforts to deliver hold notices and demand letters to PSC and PSCF at the address listed in the operative documents were initially unsuccessful as it appears that PSC, PSCF and Nulook had all relocated into the same office, without providing notice to GWG, as required under various agreements.

62.     To ensure that PSC and PSCF knew about GWG's claims, an email was sent on March 8, 2017 to Joel Nazareno, Executive Director of PSC, to the email address GWG had on file: jn@pscny.us.  A read receipt for this email was obtained on March 8, 2017.

63.     On or about March 10, 2017, counsel for GWG learned that PSC and Nulook had allegedly both relocated to new offices located at 1979 Marcus Avenue, Suite 206, New Hyde

Park, NY 11042.  Counsel for GWG was also informed by a Nulook representative that Nulook had recently "merged" with "the Marketplace".

64.     Upon information and belief, the "Marketplace" is a common name used for the PSC Exchange described above.

65.     According to Nulook's CEO and according to Nulook's counsel, PSC caused the diversion of payments that were subject to GWG's lien and security interest to an affiliate of PSC known as PSCF.  A copy of a demand letter that was apparently sent by Nulook's attorney to PSC and Defendant Nazareno dated March 21, 2017 is attached hereto as **Exhibit A**.

66.     Despite knowledge of the Loan and GWG's Security Interest, PSCF nefariously entered into a number of undisclosed "factoring" transactions with Nulook.  These undisclosed transactions were done at extremely high rates and purported to give PSCF a lien on the same Nulook Collateral that was expressly pledged to GWG in connection with the Loan in violation of applicable law.

67.     GWG now believes that the "equity" contribution that was supposed to have been made by an owner of PSC to entice GWG to enter into the Forbearance Agreement was not an equity infusion at all but rather a high rate factoring transaction done by its affiliate PSCF without GWG's consent and in direct violation of the Loan, GWG's security interest, and applicable law.

68.     From February 17, 2017 through and including March 20, 2017 it appears that approximately $300,000 was improperly diverted from GWG's account by PSC and paid over to someone other than GWG.

69.     GWG believes that these diverted funds were directed to PSCF by PSC or the Enterprise described below in direct violation of GWG's security interest and applicable law.

70.     PSC and PSCF have not returned the daily sweep deposits they diverted from Nulook Merchants – notably cash payments due under FRPA's and MCA's; nor have they responded to any of GWG's demand letters, emails or phone calls other than the one conversation between Preece and Nazareno described above.

71.     Upon information and belief, after giving daily instructions to ACHWorks to sweep funds into Nulook's account, PSC, or someone acting in concert with PSC and PSCF, ceased giving instructions to ACHWorks, with the intent to cause harm to GWG.

72.     On or about March 17, 2017, GWG was able to access PSC's web-based portal showing all MCA's that PSC was allegedly servicing for Nulook. PSC's own daily collections report from March 1 through March 21, 2017 shows daily debits from Nulook Merchants, all of which were pledged as Collateral to GWG. None of those Nulook Merchant debits made it into Nulook's operating account nor were any payments made to GWG from those Nulook Merchant debits.  As of February 17, 2017 there were more than 100 such Nulook Merchant accounts. Nulook Merchants that were debited after all payments ceased to GWG on February 17, 2017 include, but are not limited, to the following randomly selected merchants: *Mohawk Services*, *Cameron Motor Sports*, and *4 Wheel Junkies*.

73.     GWG believes that PSC deliberately and intentionally ceased giving instructions to ACHWorks so that PSC, or someone acting in concert with or on behalf of PSC or PSCF could divert GWG's Collateral – notably cash payments due under FRPA's and MCA's into secret accounts under PSC's dominion and control in derogation of GWG's rights and ownership interest in the Nulook Collateral.

74.     Demand has been duly made upon Nulook, PSC, PSCF and ACHWorks to restore or direct PSC or ACHWorks to preserve all pledged Collateral and direct payments into GWG's collection account.

75.     Because all of Nulook's information and merchant data is housed on PSC's system, and operated independently, GWG's ability to service the Collateral has been irreparably harmed and the Collateral is quickly wasting.  FRPA's and MCA's are short term in nature, and their value is based upon an ability to timely service and collect receipts from Merchants.

## FIRST CAUSE OF ACTION
## BREACH OF THE LOAN AND FORBEARANCE AGREEMENT

### *(Against Nulook)*

76.     GWG repeats and realleges the allegations set forth above as though fully set forth herein.

77.     Nulook received a demand for payment of all amounts due under the Loan on or about March 16, 2017.  As of March 16, 2017 the amount owed under the Loan was $2,073,398.13.

78.     In addition, default interest in the amount of 35% per annum is due under the terms of the Loan.

79.     Under the terms of the Loan, Section XVI, Nulook is responsible for paying all costs of collection, including reasonable attorneys' fees and court costs, incurred or paid by GWG in collecting amounts due under the Loan.

80.     Despite receiving the demand for payment, Nulook has failed to pay any of the amounts due and owing to GWG under the Loan.

81.     Under the Loan and the Forbearance Agreement, Nulook is required to indemnify GWG "of and from all damage, loss, claims (including both direct claims and third-party claims),

16

demands, liabilities, obligations, actions and causes of action whatsoever that any third party may

now have or claim to have ... whether presently known or unknown, and of every nature and extent

whatsoever on account of or in any way touching, concerning, relating to, arising out of or founded

upon the Loan ... that may arise as a consequence of the dealings between the Parties ...."

     **82.**     All conditions precedent to maintenance of this action have been met.

**SECOND CAUSE OF ACTION**
**VIOLATION OF 18 U.S.C. § 1962 (C) THE RACKETEER INFLUENCED AND**
**CORRUPT ORGANIZATIONS ACT ("RICO")**

*(Against Nulook, PSC, PSCF, Mannino and Nazareno (the "RICO Defendants"))*

     **83.**     GWG repeats and realleges the allegations set forth above as though fully set forth

herein.

     **84.**     At all relevant times, GWG was and is a person within the meaning of 18 U.S.C.

§§ 1961 (3) and 1962 (c).

     **85.**     At all relevant times, Nulook, PSC and PSCF were and are each a person within

the meaning of 18 U.S.C. §§ 1961 (3) and 1962 (c).

     **86.**     At all relevant times, each of the RICO Defendants was, and is, a person that exists

separate and distinct from the RICO enterprise, described below.

     **87.**     Each of the corporate entities, Nulook, PSC and PSCF are distinct entities, with

their own independent existence and functions.

     **88.**     Nulook, PSC, PSCF, Mannino and Nazareno constitute an association-in-fact

enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961 (4) and 1962 (c).

     **89.**     Nulook, PSC, PSCF, Mannino and Nazareno are a group of persons associated

together in fact for the common purpose of carrying on an ongoing criminal enterprise.  In

particular, the Enterprise has a common goal of defrauding GWG out of millions of dollars through

a sophisticated, coordinated, sustained, and well-orchestrated scheme of deceptive conduct; material misrepresentations and omissions and conversion of assets made in connection with the Nulook Collateral and the PSC Exchange.

90.     The Enterprise has used a sophisticated, coordinated, sustained, and well-orchestrated scheme of deceptive conduct, material misrepresentations and omissions related to the Nulook Collateral and PSC's Exchange to siphon off Merchant payments that were supposed to be routed to GWG to entities controlled by the Enterprise.

91.     The Enterprise has used Nulook, the PSC platform and the PSC Exchange to further the criminal activities of the Enterprise and to frustrate efforts to recover the RICO Defendants' illegal profits by making it difficult or impossible for GWG to trace and collect the funds.  MCA's have an average duration of six months and the ability to collect MCA's is directly related to the ability to timely service and collect Merchant accounts.

92.     While pretending to be working towards curing Nulook's default under the Loan, the RICO defendants were actually looting the assets of Nulook, making non-ordinary course cash payments to insiders and/or subordinated creditors and repeatedly and systematically pledging Nulook Collateral to other entities and diverting funds away from GWG so the RICO defendants could profit.

93.     Numerous representations made by Mannino leading up to the execution of the Forbearance Agreement were false and misleading when made and material breaches of the Loan and related transaction documents were systematically concealed from GWG.

94.     For example, notwithstanding all Defendants knowledge of the GWG Loan and perfected security interest, each of the RICO Defendants knowingly allowed Nulook to falsely pledge receivables to PSCF that were already subject to GWG's security interest.  Many of the

PSCF transactions were consummated during the alleged negotiations of the Forbearance Agreement and while Nulook was in default of its obligations to GWG under the Loan. Not one of the PSCF transactions was disclosed to GWG or referenced in the Forbearance Agreement.

95.     Each and every PSCF MCA transaction was a predicate act in furtherance of the conspiracy to defraud GWG. GWG has recently been made aware of multiple transactions between Nulook and PSCF involving hundreds of thousands of dollars, all of which violate GWG's perfected first priority security interest in the Nulook Collateral.

96.     Other predicate acts in furtherance of the conspiracy to defraud GWG included the non-ordinary course payments to Nulook insiders, the misrepresentations made to GWG about an equity investment from a PSC shareholder, the misrepresentations made to GWG about the Borrowing Base deficiencies, the use of the PSC platform to divert funds to PSCF or other entities in violation of GWG's security interest.

97.      All of the RICO Defendants knew of the existence of, and conducted or participated in the operation or management of, the Enterprise and its affairs.

98.     Defendants associated together for the common purpose of defrauding GWG out of its Collateral in violation of the Loan so the association could profit.

99.     While members of the Enterprise participate in and are part of the Enterprise, they also have an existence separate and distinct from the Enterprise.  PSC solicits entities in the Merchant Cash Advance business and PSC also solicits members and investors to participate in its Exchange.  Nulook is a limited liability company engaged in the Merchant Cash Advance business. Defendant Mannino is the CEO of Nulook.    Defendant Nazareno is the Executive Director of PSC and the leader of the Enterprise.

**100.** Defendants PSC and Nazareno concealed the nature and existence of the Enterprise through their marketing and advertising materials. For example, in connection with the Exchange, PSC claims to provide a "front-end-to-back-end relationship management solution system" designed to "track all applications, documents, deals, commissions and provide members with management reports to manage their business efficiently".

**101.** PSC receives fees for arranging transactions on the Exchange and PSC claims to conduct due diligence on the members of the Exchange and to provide "full transparency" with respect to all material information it posts on the Exchange regarding all Syndication members. PSC also actively solicits members to participate in syndications through the use of the mail and wires typically by sending emails referred to as "Member Referrals."

**102.** Among other things, PSC represented to its members that any specific company referenced in these Member Referral emails had passed a background check and that neither the company nor its principals were involved in past fraudulent or criminal activity. These representations were false and misleading when made. By way of example, PSC promoted transactions with a company called American Funding Group, an entity that is controlled by Mark Mancino. Mancino was indicted and convicted for his role in the same "pump and dump" scheme described above involving Defendant Nazareno. Upon information and belief, many of the transactions listed on the Exchange involving Mancino result in defaults and investor losses.

**103.** Not only did Nazareno fail to disclose his own prior criminal activity but he failed to disclose the criminal backgrounds of other entities on the Exchange.

**104.** The PSC platform and the PSC Exchange are used by the Enterprise, at the direction of Nazareno, to obtain Confidential Information from third parties, including protected banking

information and authorizations, so the Enterprise can funnel cash into its own coffers or the coffers of its co-conspirators.

105.    Defendants' systematic scheme to defraud GWG and others as described above, was facilitated by the use of the United States mail and wires.

106.    Each of the misrepresentations and omissions described herein constitute acts of mail and/or wire fraud for purposes of 18 U.S.C. § 1341.

107.    By using the internet, telephone, and facsimile transmissions to communicate false and misleading information about the PSC platform and the PSC Exchange to members in order to perpetuate their fraudulent scheme, Defendants engaged in repeated acts of wire fraud in violation of 18 U.S.C. § 1343.

108.    The predicate acts specified above constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 (5) and 1962 (c).

109.    Plaintiff has been harmed by these acts of racketeering and has already lost in excess of $300,000.00 in pledged receivables that were paid into Nulook's account and diverted by PSC in direct violation of the Loan and the Forbearance Agreement and GWG's rights in the Nulook Collateral.

110.    GWG's Collateral has been irreparably harmed by the activity of the Enterprise and the Enterprise in continuing to divert funds in derogation of GWG's rights. GWG's ability to collect on the Nulook Collateral is uncertain at best and the Collateral is being eroded at a rapid pace.

111.    As a direct and proximate result of these violations of 18 U.S.C. § 1962 (c) and (d), Plaintiff has suffered substantial and ongoing damages and been injured in its business or property

by the predicate acts which make up Defendants' pattern of racketeering activity that comprises Defendants deliberate and unlawful scheme.

112.    Accordingly, Defendants are liable to Plaintiff for treble damages, together with all costs of this action, plus reasonable attorneys' fees and costs under 18 U.S.C. §§ 1964 (c) and (d).

### THIRD CAUSE OF ACTION
### VIOLATION OF 18 U.S.C. § 1962 (C) THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")

*(Against Nulook, PSC, PSCF, Mannino and Nazareno (the "RICO Defendants"))*

113.    GWG repeats and realleges the allegations set forth above as though fully set forth herein.

114.    As set forth in the First Cause of Action and in the paragraphs incorporated by reference herein, in violation of 18 U.S.C. § 1962 (d), Defendants conspired to violate the provisions of 18 U.S.C. § 1962 (c).

115.    Defendants, having directed and controlled the affairs of the Enterprise, were aware of the nature and scope of the Enterprise's unlawful scheme and all agreed to participate in it.

116.    As a direct and proximate result of these violations of 18 U.S.C. § 1962 (c) and (d), GWG has suffered substantial damages and been injured in its business and property by the predicate acts which make up Defendants' pattern of racketeering activity that comprise Defendants deliberate and unlawful scheme.

117.    Accordingly, Defendants are liable to Plaintiff for treble damages, together with all costs of this action, plus reasonable attorneys' fees and costs under 18 U.S.C. §§ 1964 (c) and (d).

## FOURTH CAUSE OF ACTION
## VIOLATION OF NEW YORK GENERAL BUSINESS LAW SECTION 349

### *(against PSC)*

118.     GWG repeats and realleges the allegations set forth above as though fully set forth herein.

119.     N.Y. Gen. Bus. Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

120.     Defendants failed to disclose that they were systematically taking action in derogation and violation of GWG's rights, including but not limited to entering into MCA agreements that were expressly prohibited by the Loan and Forbearance Agreements.

121.     Defendants also used the PSC Platform and the PSC Exchange in a false, misleading and deceptive manner that would lead a reasonable business such as GWG to conclude that PSC was allocating and accounting for Merchant funds as a collateral custodian or fiduciary when in fact, PSC was using the Platform and the Exchange to obtain Confidential Information and bank account details so it could divert funds belonging to GWG into accounts owned and controlled by certain or all of the Defendants herein.

122.     Defendants' deceptive actions impact the public generally as Merchants, other MCA companies and investors using the Exchange have been or will be impacted.

123.     As a result of PSC's unlawful, false, deceptive, and misleading conduct, GWG has suffered ascertainable losses in the form of direct and ongoing monetary losses.

124.     A causal relationship exists between PSC's unlawful, false, deceptive, and misleading conduct and GWG's losses.

## FIFTH CAUSE OF ACTION – CONVERSION

### *(Against PSC, PSCF and Nazareno)*

**125.**   GWG repeats and realleges the allegations set forth above as though fully set forth herein.

**126.**   PSC has exercised dominion and control over GWG's assets, which assets can be specifically identified by Nulook's own Borrowing Base reports showing all Merchant collateral accounts pledged as collateral to GWG in connection with the Loan.  As set forth in paragraph 16 above, PSC was at all times relevant to this dispute fully aware of GWG's Loan and security interest in Merchant accounts.

**127.**    PSC's conduct was deliberate and intentional.

**128.**   PSCF and Nazareno directly benefitted from or orchestrated the conversion of the GWG collateral.

**129.**   As a result of PSC's conduct, GWG has suffered substantial damages, and continues to suffer damages as more and more Merchant collateral is converted by PSC for the benefit of PSC, PSCF and/or Nazareno.

## SIXTH CAUSE OF ACTION NEGLIGENT MISREPRESENTATION

### *(Against Robert Aurigema)*

**130.**   GWG repeats and realleges the allegations set forth above as though fully set forth herein.

**131.**   At all times relevant to this dispute, Aurigema held himself out as a sophisticated business man, Chief Operating Officer of Balyasny Asset Management L.P. and as a founder and investor in Nulook.

**132.**     GWG believed that Aurigema added depth to the Nulook management team and that Aurigema was acting as the de-facto CFO of Nulook until he could turn over the financial reporting functions to someone else.  Aurigema regularly prepared Borrowing Base reports and submitted same to GWG with representations that they were prepared truthfully and that they accurately reflected Nulook's financial position.  They did not.

**133.**     Despite knowing full well that Nulook was in default under the Loan, Defendant Aurigema made a number of specific representations to GWG that were false and misleading when made.  Certain of these specific communications were made via email on the follow dates:  4/8/16, 4/14/16, 4/18/16, 4/26/16, 4/28/16, 5/2/16, 5/20/16, 6/8/16, and 7/11/16.  An example of one such representative email is set forth below:

From: Robert Aurigema <RAurigema@BAMFUNDS.COM
Sent: Tuesday, April 26, 2016 10:42 PM
To: Patrick Preece <patrick@gwgmca.com>
Subject:

your mailbox is full. I have to leave so if you need, speak with Anthony on his cell. I spoke to the guys. they think we're in better shape than MN thinks but to be safe we are doing 3 things 1) working on about 400-500k in cash deposit to be parked in yhe account 2 ) packaging up active deals to sell them off at a discount. the net profits will increase the pledge and 3) these guys have been super active on collections and we had several deals pay off and several others agree to payment plans going forward to get back on track. we need the next few days to put this all together. tell these guys to seriously fuck off for a week. there have been half a dozen conversations about the fact that ant was away this week, what we have been working on etc. they keep waiting a day and freaking out over and over. I don't want the original line pulled but I'm not sure I personally want more money from these guys. Anthony and John may disagree but I want an equity injection. I want nothing to do with more credit.

**134.**     Note that Aurigema specifically represents that Nulook is in "better shape than MN [a reference to GWG's head office in Minnesota] thinks" and the specific reference to an "equity injection" and wanting "nothing to do with more credit".

**135.**     Again, in an April 28, 2016 email Aurigema makes specific, false, representations about GWG having "excess collateral"

From: Robert Aurigema, CPA [mailto:RAurigema@BAMFUNDS.COM]
Sent: Thursday, April 28, 2016 3:29 PM
To: Patrick Preece <patrick@gwgmca.com>
Subject: Copy of Collections Example (2).xlsx

This is 4/21 versus 3/31. Items that PSC adjusted would have fallen off bc it shows payments. This is
net, what is left right now and why we think its ok. Some we fully expect to collect but can't pledge it to
you bc you guys look at things differently (items in red of approx. $290K). BTW, there are also defaulted
deals from prior reports that are now back on and some that have paid off during this month. I know
these guys are really skittish on this but the reality is we have ~8-9MM in outstanding RTR. Even if we
said, we won't collect half of it (which would be extreme), you guys still have excess collateral. I
understand they don't care and want this all to fit in a box but I can honestly say they're in the wrong
business.

I also think its stupid to look at this in isolation because so much of the other factors have changed over
the course of a month. Tell them to knock themselves out but if they want more info, call anthony on his
cell 516 510 2700. Im done with this for the last 3 weeks. I wont even look at this again until Monday
when I start putting together the April 30 BB and scrub this yet again. Also, we've gotten payments as
recently as today so even some of the items attached could get added back in if the collections agencies
(Mas, WCS) are successful in getting these merchants back up.

136.    By engaging with GWG on a regular basis and by preparing Borrowing Base
reports and negotiating reporting terms and procedures, and personally changing the elements of
the Borrowing Base, Aurigema assumed a duty to truthfully disclose all material information in
his possession regarding Nulook.

137.    Aurigema failed to disclose the following material information, among other things,
which rendered the above representations false:  (i) that Nulook did not in fact receive an equity
investment from a partner at PSC but in fact double pledged the Nulook Collateral to PSCF and
potentially others; (ii) that the Nulook Collateral had been significantly impaired by the non-
ordinary course payments in the amount of **$303,328.76**; (iii) that Nulook would be unable to meet
its obligations under the Forbearance Agreement after making the $303,328.76 in non-ordinary
course payments to insiders or subordinate creditors; and (iv) that Nulook was likely rendered
insolvent by these payments.

138.     Aurigema also failed to notify GWG that his prior representations to the effect that most of the Borrowing Base deficiencies were simple "reporting errors" as opposed to Collateral impairments were all false and misleading.

139.     Finally, it is highly implausible that Aurigema did not learn about the systematic factoring of Nulook receivables in direct violation of the Loan, GWG' first priority perfected security interest and applicable law.   Aurigema never brought these fraudulent transactions to GWG's attention.

140.     Aurigema made the false representations and material omissions knowing that GWG would use and rely upon his representations and omissions in agreeing to forbear in exercising its rights under the Loan.

141.     GWG justifiably relied upon Aurigema's misrepresentations and/or omissions and agreed to forbear in taking action against Nulook and the Collateral securing the Loan.

142.     Aurigema knew and understood that GWG was relying upon the false and misleading statements and that GWG did forbear in exercising its rights against Nulook and the Collateral based largely on his assertions.

143.     Shortly after the Forbearance Agreement was signed, Nulook and Aurigema were notified of the non-ordinary course payments described herein.  Aurigema did absolutely nothing to cause Nulook to properly account for the missing funds or to otherwise correct any other false or misleading statements made by Aurigema leading up to the execution of the Forbearance Agreement, nor did he correct known prior misrepresentations of fact.

144.     As a direct and proximate result of GWG's reliance upon Aurigema's specific misrepresentations and omissions set forth above, GWG has suffered substantial damages, and

continues to suffer damages as the value of the Collateral erodes and GWG's ability to collect directly from Nulook's Merchants has been irreparably impaired.

145.    But for Aurigema's misrepresentations or omissions in connection with, inter- alia, the Borrowing Base deficits, the equity infusion into Nulook that never occurred, the undisclosed factoring transactions with PFCF and the non-ordinary course payments made to insiders by Nulook, GWG would not have entered into the Forbearance Agreement and GWG would have been able to mitigate its damages.

146.    Accordingly, Aurigema should be held liable and accountable for all damages that GWG incurred due to his negligent misrepresentations and omissions.

## SEVENTH CAUSE OF ACTION
## FRAUDULENT CONVEYANCES
## UNDER THE NEW YORK DEBTOR AND CREDITOR LAWS

### *(against Nulook)*

147.    GWG repeats and realleges the allegations set forth above as though fully set forth herein.

148.    On or about July 13, 2016, Nulook was notified, in writing, of the existence of a Borrowing Base Deficit and Event of Default under the Loan.

149.    Again, on July 28, 2016, Nulook was notified, in writing, of the continuing Borrowing Base Deficit and Event of Default under the Loan.

150.    After receiving the aforementioned notices, Nulook claimed to be securing additional equity capital and working on curing all of the Borrowing Base Deficits identified by GWG.

151.    Without GWG's knowledge or consent, Nulook made the following non-ordinary course payments:

| Date | To | Debits | Check # |
|------|-----|--------|---------|
| 11/16/2016 | Vito Dragonetti | $100,616.44 | 700099233 |
| 11/17/2016 | Nick Dragonetti | $100,698.63 | 700011937 |
| 11/18/2016 | Calkidso Trust | $102,013.69 | 700047502 |
| **TOTAL DEBITS:** | | **$303,328.76**. | |

152. These payments were made when Nulook was insolvent or Nulook was rendered insolvent by virtue of these payments.

153. These payments were made without fair consideration and left Nulook with unreasonably small capital to carry out its business and constitute fraudulent conveyances as to creditors.

154. Finally, to the extent that Nulook has been absorbed by PSC or the Marketplace as represented to GWG's counsel, such a transfer of assets to PSC would also independently constitute a fraudulent conveyance.

155. Accordingly, under §273-275 of the New York Debtor Creditor law, the aforementioned transfers were fraudulent as to GWG.

## EIGHTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH CONTRACTS

### (*against PSC*)

156. GWG repeats and realleges the allegations set forth above as though fully set forth herein.

157. GWG entered into a number of valid, binding and enforceable contracts with Nulook, including the Loan and that certain Collection Subordination Agreement referenced in paragraph 16 above.

158. Among other things, the Loan prohibited Nulook from pledging MCA's, FRPA's or other Collateral to any third party, incurring any other Material indebtedness or transferring substantially all of its assets to another entity without the written consent of GWG.

**159.**    At all times relevant to this dispute, PSC and Nazareno were aware of the Loan and GWG's security interest in Nulook's Collateral.  In fact, Nazareno specifically acknowledged his receipt of the Loan documentation as noted in paragraph 16 above.

**160.**    Notwithstanding PSC's knowledge of the Loan and the Subordination Agreement, among other documents, PSC purported to arrange more than five separate Merchant Cash Advance agreements between PSCF and Nulook that called for PSCF to receive its alleged "purchase price" plus a "factoring rate".  These agreements purport to transfer Nulook's future accounts, contract rights and other obligations arising from or relating to the payment of monies from the member's customers to ***PSCF*** - the ***very same Collateral pledged to GWG in connection with the Loan***.

**161.**    It appears that PSC was systematically arranging these factoring transactions with Nulook even while Nulook was in default of its obligations to GWG under the Loan.

**162.**    The actions of PSC in arranging these transactions with Nulook constituted a knowing, intentional and unjustified inducement of Nulook to breach its contracts with GWG.

**163.**    The actions of PSC in connection with the procurement of these General Agreements, or MCA's, constituted a knowing, intentional and unjustified interference with GWG's contractual relationships with Nulook.

**164.**    Accordingly, GWG should be entitled to an award of punitive damages against PSC and Nazareno for their wanton, malicious, deliberate conduct described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in her favor and against Defendants as follows:

**A.** Awarding GWG damages in an amount to be determined at trial, but in no event less than the outstanding Loan balance together with interest at the default rate according to proof at trial;

**B.** Treble damages according to statute;

**C.** Necessary and appropriate injunctive relief, including an order directing PSC to cease and desist from interfering with GWG's rights in the Nulook Collateral;

**D.** Declarations that:

    **a.** The RICO Defendants have violated 18 U.S.C. § 1962 (c)  and 18 U.S.C. § 1962 (d);

    **b.** PSC's and Nulook's corporate veils are pierced;

    **c.** Anthony Maninno is deemed the alter ego of Nulook;

    **d.** Joel Nazareno is deemed the alter ego of PSC;

    **e.** Nulook must indemnify GWG for its losses, costs, fees, and expense in accordance with the Loan and Forbearance Agreement, and an order directing same.

**E.** Disgorgement of all amounts converted by PSC, Nazareno and/or PSCF;

**F.** An award of GWG's reasonable attorney fees' and litigation costs and expenses, according to statute;

**G.** Punitive damages;

**H.** Pre- judgment interest; and

**I.** Such other equitable relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands trial by jury, and pays the requisite jury fee concurrent with filing of this Complaint.

DATED this 28th day of March, 2017

/s/Edward S. Stone

_____

EDWARD STONE LAW P.C.
Edward S. Stone
*Attorney for Plaintiff*
99 Madison Avenue, Suite 5008
New York, New York 10016
(203) 504-8425