**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------- x

GWG MCA CAPITAL, INC.

Case No.  17-cv-1724-ADS-GRB

**FIRST AMENDED COMPLAINT**

Plaintiff,

vs.

**JURY TRIAL DEMANDED**

NULOOK CAPITAL, LLC,
JOEL NAZARENO, ROBERT
AURIGEMA, JOHN GUZZETTI
ANTHONY MANNINO, H. RUSSELL HEISER,
and HEISER ENTERPRISES, LLC

Defendants.

---------------------------------------------------- x

Plaintiff GWG MCA Capital, Inc. ("GWG" or "Plaintiff") by and through its undersigned attorneys, for its First Amended Complaint against defendants Nulook Capital, LLC, Joel Nazareno. Robert Aurigema, John Guzzetti, Anthony Mannino, H. Russell Heiser, and Heiser Enterprises, LLC hereby alleges as follows:

**NATURE OF THE CASE**

1.      This case is brought by GWG, a commercial lending company, for damages it incurred through a series of fraudulent schemes, orchestrated and perpetrated by Defendants to convert GWG's collateral to their personal use.  GWG has lost in excess of $2.5 Million to date and its losses continue to accrue.  Nulook Capital LLC ("Nulook") borrowed money from GWG's predecessor in 2014 and pledged its accounts receivable as security for the loan.  Nulook surreptitiously re-pledged the same collateral in favor of another creditor, PSC Financial ("PSCF")

1

which operated as a division of International Professional Services, Inc. ("PSC").  PSC and PSCF now appear to be insolvent, and the collateral is gone.  Two of Nulook's principals, John Guzzetti and Anthony Mannino, conspired with PSC's principal, Joel Nazareno, H. Russell Heiser, Heiser Enterprises dba PSCF, and others, to loot both entities. They are all guilty of conspiring to harm GWG through a series of violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961-1968 ("RICO").    Moreover, certain Defendants have wrongfully converted property that rightfully belongs to GWG, have been unjustly enriched at GWG's expense, and have otherwise caused GWG to incur substantial damages.  Many of the Defendants herein are modern day scam artists whose illicit scheme to defraud falls squarely within the very racketeering conduct that the RICO statute was intended to redress.

## THE PARTIES

2.    Plaintiff GWG MCA Capital, Inc. is a Delaware corporation, with its principal place of business located in Minneapolis, Minnesota.  On February 15, 2016, GWG MCA Capital, Inc. purchased all of the assets of MCA Capital, LLC, including the Loan with Nulook that is at the core of this dispute.   Any references to GWG herein include MCA Capital, LLC by virtue of GWG's acquisition of the assets of MCA Capital, LLC.

3.    Defendant Nulook Capital, LLC is a New York Limited Liability Company owned by Defendants Aurigema, Guzzetti, and, Mannino, with a principal place of business at 25 Hemmingway Drive, Melville, NY 11747.

4.    Defendant Anthony Mannino ("Mannino") is a citizen of the State of New York residing at 243 Harbor Lane, Massapequa, NY 11762 and is the Chief Executive Officer at Nulook.

5.    Defendant John Guzzetti ("Guzzetti") is a citizen of the State of New York residing at 25 Hemmingway Drive, Melville, New York 11746.  Guzzetti served as Nulook's Chief Operating Officer.

2

6.    Defendant Robert Aurigema ("Aurigema") is a citizen of the State of New York residing at 2731 Landing Avenue, Bellmore, New York 11710 and has close personal ties to Mannino.

7.    Defendant Joel Nazareno ("Nazareno") is a citizen of the State of New York residing at 266 Battery Ave, Brooklyn, NY 11209 At all times relevant to this dispute, Nazareno was a principal of and the Executive Director of PSC.

8.    Defendant H. Russell Heiser ("Heiser") is a citizen of the State of Florida residing at 200 E. Palmetto Park Road, Apt. 417, Boca Raton, FL 33432. On September 29, 2015 Heiser was appointed the Chief Executive Officer of PSC. Upon information and belief Heiser or Heiser Enterprises has an ownership stake in PSC or the PSC affiliate or division known as PSCF.

9.    Defendant Heiser Enterprises, LLC is a limited liability company organized under the laws of the State of Florida, and has also been referred to in previous public filings as Heiser Enterprises dba PSCF (both are collectively referred to herein as "Heiser Enterprises" or "PSCF").

## JURISDICTION, VENUE, AND STANDING

10.    This Court has subject matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964 (c) and (d).  This Court has supplemental subject matter jurisdiction over GWG's state law claims pursuant to 28 U.S.C. § 1367 (a) because those claims are so closely related to the federal claims brought herein as to form a part of the same case or controversy.

11.    Personal jurisdiction is proper over all Defendants in this district pursuant to C.P.L.R. § 302 (a)(1) and § 302 (a)(3), 18 U.S.C. § 1965 (b), and Federal Rule of Civil Procedure 4(k).

12.    This Court also has subject matter jurisdiction over this action based on diversity of citizenship, pursuant to 28 U.S. C. § 1332. Plaintiff is a Delaware corporation with its principal place of business located in Minneapolis, Minnesota. Defendants Nulook, Aurigema, Guzzetti, Mannino, and Nazareno are located in or reside in or have their principal places of business in the State of New York. Upon information and belief and based on public records, Heiser and Heiser Enterprises reside, were formed or have their principal place of business in the State of Florida. The exercise of personal jurisdiction over all Defendants is reasonable and proper because Defendants either reside in the State of New York, regularly transact business in the State of New York or because Defendants committed tortious acts in the State of New York.

13.    Venue is proper in this district pursuant to 18 U.S.C. § 1965 and 28 USC § 1391(b)(2). The acts and transactions complained of herein occurred in this District, Defendants reside or conduct business in this Judicial District and most Defendants have consented to jurisdiction or waived objection to venue in this Judicial District.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

## THE NULOOK LOAN

14.    Nulook makes financing available to small businesses who are otherwise not credit worthy. In exchange for an advance of funds, the merchants ("Nulook Merchants") allow Nulook to debit a certain amount of money from their bank accounts on a daily or weekly basis. Defendants Aurigema, Guzzetti, and Mannino each own a one-third an interest in Nulook.

15.    On May 22, 2014, Nulook borrowed $2.5 Million (the "Loan") from MCA Capital, LLC ("Lender") to make merchant cash advances to the Nulook Merchants. The Loan was amended twice, increasing the borrowing limit each time. By December 22, 2014, Nulook owed $3,750,000 to Lender.

16.     The Loan was secured by a pledge and first priority perfected security interest and lien, free and clear of any adverse claims, in and to all of Nulook's revenue from Nulook Merchants, including future receivables purchase agreements, all merchant cash advance agreements, all general intangibles and all proceeds, including cash proceeds (collectively, the "Collateral").

17.     To document its lien on the Collateral, Lender filed UCC financing statements as follows:

a.  UCC-1 Filing Number 201405235537443 on May 23, 2014 by MCA Capital, LLC against Nulook Capital, LLC.
b.  UCC-3 Filing Number 201602188065365 on February 18, 2016 assigning the Nulook UCC from MCA Capital, LLC to GWG.

18.     At the same time that it entered into the Loan with Lender, Nulook contracted with PSC to perform all of the back-office servicing for its portfolio of merchant advances.

19.      Specifically, Nulook hired PSC to conduct data gathering and compilation, perform cash management and payment setups with credit card processing vendors, collections and vendor follow up, documentation collection and retention, funding coordination and deal management, and to provide reporting and other key services.

20.     In addition to performing servicing functions for companies like Nulook, PSC also operated an electronic merchant cash advance exchange platform which allowed investors to participate in syndicated deals brokered by PSC or PSC members.  Syndicated deals involve more than one party factoring a merchant's future receivables in exchange for a *pari-passu* share of the collections.  For example, if Nulook identified a merchant interested in a $100,000 cash advance, but only wanted to advance $25,000, Nulook could use the PSC's exchange to secure syndication investors for the additional $75,000.  In a factoring arrangement, the funding company or "factor" is paid back from future receivables.  It differs from a loan because the "factor" has no recourse

against the "borrower" if the receivables are insufficient to pay back the amount advanced. In connection with the syndication business, PSC acted as an intermediary, soliciting and matching merchant advance companies to participate in jointly-funded transactions. The back-office servicing and the exchange platform are collectively referred to hereinafter as the "PSC Platform". The PSC Platform gave PSC access to detailed confidential information belonging to Nulook, Nulook Merchants, Plaintiff, and other participants in the merchant cash advance business. This confidential information included bank account details, contact details, credit reports and the identity, viability, and financial condition of all of the underlying merchants who enter into merchant cash advance agreements with Nulook and other companies in this business (the "Confidential Information"). The PSC Platform also allowed PSC to control all cash transactions, allocations, and collections electronically using the automated clearing house ("ACH") network.

21.     The PSC Platform is a web-based, electronic system hosted in the cloud using Amazon Web Services; GoDaddy.com; Twilio.com (to notify users via text message for identity verification purposes; and Rackspace. Servers for these systems are located in Irvine, CA; Clifton, NJ; Farmingdale, NY; Dallas, TX; Chicago, IL; Hong Kong, London, and Sydney. PSC Platform members and syndication partners such as America's Business Capital, LLC (headquartered in NJ) and Nulook used the PSC Platform to upload and download documents, manage merchant accounts, and give daily ACH instructions to ACH processors, including T$$, LLC dba ACHWorks (headquartered in Gold River, CA).

## GWG, NULOOK, AND PSC ENTER INTO
## THE COLLECTION AND SUBORDINATION AGREEMENT

22.     As part of the Loan documentation, Lender, Nulook and PSC entered into a Collection Subordination Agreement (signed by Nazareno as Executive Director of PSC) pursuant

to which PSC specifically agreed to recognize Lender's security interest in, and rights to proceeds from, the Collateral as follows:

> The undersigned, IPS, Inc., a New York corporation, being the Servicer named in the foregoing Collection Subordination Agreement, hereby accepts and consents hereto and agrees to be bound by all of the provisions hereof and to recognize all priorities and other rights granted thereby to MCA Capital, LLC ("Lender") and Nulook Capital, LLC ("Borrower") and to deposit Collections received pursuant hereto in accordance with the RCA, a copy of which it acknowledges has been provided to it.

**INTERNATIONAL PROFESSIONAL SERVICES, INC.**

By: _____
　　Joel Nazareno,
　　Executive Director
Dated: May 2 2, 2014

23.　　By signing the Collection and Subordination Agreement, Nazareno (on behalf of PSC) expressly accepted and acknowledged Plaintiff's security interest in all of the Collateral pledged to Plaintiff by Nulook.  In other words, Nazareno, Mannino, Guzzetti, and Aurigema knew that their companies (PSC and Nulook) were obligated to accurately account for the proceeds of Nulook's merchant loans and turn them all over to GWG on a regular basis.

24.　　Most importantly, Nazareno, Mannino, Guzzetti, and Aurigema all knew that as of May 26, 2014, Plaintiff's interest was first in line, first in time, and first in right.

25.　　However, PSC, Nulook, Nazareno, Guzzetti, and Mannino never intended to honor the terms of the Collection and Subordination Agreement, but rather signed the agreement to induce Lender (MCA Capital, LLC) into lending Nulook millions of dollars so PSC and others could profit at Lender's expense.

26.     MCA Capital, LLC (Lender) relied upon the representations of Nulook and PSC and executed the Loan Documents, including the Collection and Subordination Agreement on May 24, 2014.

27.     Thereafter MCA Capital, LLC (Lender), with offices in Delray Beach, Florida wired funds from its account at Bank of America (headquartered in Charlotte, NC) to Nulook's bank account at TD Bank (headquartered in Cherry Hill, NJ) beginning with an initial wire transfer of $49,680 on June 3, 2014.  Multiple wire transfers amounting to in excess of $3,700,000.00 were sent to Nulook from MCA Capital, LLC (Lender) to Nulook from May 2014 through February 2016.

**THE FIRST CONSPIRACY:**

**NULOOK CONSPIRES WITH PSC TO STEAL GWG'S COLLATERAL THROUGH A SERIES OF WIRE FRAUDS**

28.     Although GWG was unaware of it at the time, the Nulook and PSC conspiracy to defraud GWG began on May 22, 2014.

29.     The Nulook trio – Mannino, Guzzetti and Aurigema wanted access to more and more cash, but after increasing the Loan amount to $3.75 Million on December 22, 2014, Lender was no longer willing to advance additional funds.

30.     PSC was willing to enter into a factor agreement with Nulook for $200,000, but demanded collateral.

31.     Nulook asked Lender (GWG's predecessor, MCA Capital) to confirm that entering into this $200,000 factor agreement would not be a breach of the Loan.  Lender confirmed that entering into this **one factor agreement** at a time when the Loan was performing would not breach the Loan agreements.   Nulook never provided a copy of this factor agreement to Lender.

32.     At all times relevant hereto, GWG, based on its first priority perfected security interest and lien in the Collateral, believed this $200,000 loan was *subordinated* debt, like a second mortgage is to a first mortgage. Any creditor performing a simple lien search after May 23, 2014 would have been made aware of Plaintiff's lien.

33.     Neither Lender (GWG's predecessor, MCA Capital) nor GWG ever relinquished their status as first priority secured creditor with a validly perfected security interest in all of Nulook's receivables, nor did GWG enter into any form of inter-creditor agreement, participation agreement, carve-out agreement, or other arrangement with respect to GWG's first priority perfected security interest in the Collateral

34.     Notwithstanding the foregoing, in the May 29, 2015 factor agreement Nulook impermissibly pledged the very same Collateral to PSC that it had already pledged to Lender.  This agreement was signed by Mannino and emailed to PSC.  Both Nulook and PSC were aware that the Collateral had already been pledged to Lender, and was being impermissibly "double-pledged" in violation of the Loan, Collection and Subordination Agreement, and Article 9 of New York's Uniform Commercial Code.

35.     To make matters worse, unbeknownst to Plaintiff, Nulook entered into five (5) additional factor agreements with PSC, each time pledging to PSC the very same Collateral it had already pledged to GWG.  None of the Defendants disclosed these factor agreements or the double-pledging of the Collateral to Plaintiff until just prior to the commencement of this litigation. See Email dated March 8, 2017 from Erin Kim to Heiser regarding Mannino's request for copies of the agreements, a copy of which is attached hereto as **Exhibit A**. Each factor agreement is described below:

(a) On July 29, 2015 Nulook borrowed another $350,000 from PSC, with Nulook pledging to repay $420,000 to PSC, permitting PSC to debit $1,750 from its bank account at TD Bank (headquartered in NJ) on a regular basis (agreement signed by Defendant Mannino).

(b) October 30, 2015 Nulook borrowed another $150,000 from PSC, with Nulook pledging to repay $175,500 to PSC, permitting PSC to debit $731.25 from its bank account at TD Bank (headquartered in NJ) on a regular basis (agreement signed by Defendant Mannino and emailed to PSC). In connection with this transaction, PSC wired $149,970 from its account at Bank of America (headquartered in NC) to Nulook's TD Bank account on November 2, 2015.

(c) On November 5, 2015 Nulook borrowed another $150,000 from PSC, with Nulook pledging to repay $175,500 to PSC, permitting PSC to debit $731.25 from its bank account at TD Bank (headquartered in NJ) on a regular basis (agreement signed by Defendant Mannino and emailed to PSC).  In connection with this transaction, PSC wired $149,970 from its account at Bank of America (headquartered in NC) to Nulook's TD Bank account on November 6, 2015.

(d) On January 19, 2015 Nulook borrowed another $100,000 from PSC, with Nulook pledging to repay $116,000 to PSC, permitting PSC to debit $483.33 from its bank account at TD Bank (headquartered in NJ) on a regular basis.  In connection with this transaction, PSC wired $99,970 from its account at Bank of America (headquartered in NC) to Nulook's TD Bank account on January 21, 2016.

(e) On April 29, 2016 Nulook borrowed an additional $500,000 from PSC, pledging to repay $555,000 to PSC, permitting PSC to debit $6,937.50 from its bank account at TD

Bank (headquartered in NJ) on a regular basis (agreement signed by Defendant Guzzetti and emailed to PSC). In connection with this transaction, PSC wired $499,970 from its account at Bank of America (headquartered in NC) to Nulook's TD Bank account on April 29, 2016.

36.    In total, Nulook double pledged $1,450,000 of receivables previously pledged to GWG and committed to repaying $1,674,000 to PSC pursuant to the factor agreements dated May 29, 2015, July 29, 2015, October 30, 2015, November 6, 2015, January 19, 2016, and April 29, 2016 (collectively the "PSCF Agreements").

37.    In September 2015 Heiser was named as the new Chief Executive Officer of PSC. Upon information and belief, after his hire, he and Nazareno ran PSC as a team, continuing to conspire to steal GWG's Collateral through a series of wire frauds. Upon information and belief, Heiser also loaned money to PSC and Nazareno.

38.    PSC, Nazareno, Mannino, Guzzetti, Aurigema, Heiser and Heiser Enterprises were all aware that Nulook was not permitted to double-pledge the Collateral as both PSC and Nulook were parties to the Collection Subordination Agreement.

39.    PSC, Nulook, Aurigema, Mannino, and Nazareno all participated in negotiating the terms of the Collection and Subordination Agreement. In fact, on May 22, 2014 Randall Jacobs, Esq., emailed a copy of the Collection and Subordination Agreement to Nazareno, Mannino, and Aurigema. This was the first evidence, uncovered to date, of collusion among Aurigema, Mannino, and Nazareno, aided and abetted by Jacobs, who purports to represent Mannino in this matter. Plaintiff believes that Jacobs has a fatal and non-waivable conflict of interest and that Jacobs will either be named as a party in this case at a later date, or will be called as a fact witness.

40.     To carry out their fraudulent scheme, PSC would email the agreements to Nulook. Mannino or Guzzetti would sign the agreements and email the PSCF Agreements and the related debit authorizations back to Nazareno or Heiser at PSC. This was done on or about May 29, 2015, July 29, 2015, October 30, 2015, November 6, 2015, January 19, 2016 and April 29, 2016.

41.     PSC would then electronically send these debit authorizations to Nulook's TD Bank account, headquartered in Cherry Hill, New Jersey. TD Bank would then electronically debit funds from Nulook's account and wire the money to PSC's bank account at Bank of America, headquartered in Charlotte, North Carolina. From May, 2015 through February, 2017 this occurred more than 1,000 times as can be seen by the spreadsheet summarizing many of these debits, a copy of which is attached hereto as **Exhibit B**. Thus, the conspiracy to harm Plaintiff necessitated the continuous use of interstate wires.

42.     A PSC representative would telephone Nulook in connection with each of the PSCF Agreements, confirming their agreement with the terms of the specific PSCF Agreement. The telephone calls were recorded. A transcript of the telephone call from PSC representative "Kevin" to Guzzetti made on or about April 29, 2016, and associated with the PSCF Agreement dated April 29, 2016 is attached hereto as **Exhibit C**.

43.     PSC and Nulook carried out this scheme to defraud GWG, by double pledging the Collateral, and then paying out proceeds from that Collateral to PSCF, despite GWG's first priority perfected security interest in the Collateral, with the full knowledge that this violated the terms of the Loan and the Collection and Subordination Agreement.

44.     PSC and Nulook (and their principals) managed to disguise these bank debits by using a notation that made them look like any other Nulook Merchant debit on Nulook's bank statements. For example, the debits for Nulook Merchant, Roland Super Taco, appears on

Nulook's bank statements under the notation "CCD Debit, International PR 6878".  PSC used a similar notation for all of the factor agreements to conceal the daily debiting from Nulook's account by using the notation "CCD Debit, International PR Deal_96" when debiting Nulook's account under the fraudulent PSCF Agreements.   An example of these two, almost identical, notations are set forth below:

```
CCD DEBIT, INTERNATIONAL PR DEAL_96
CCD DEBIT, INTERNATIONAL PR 6878
```

45.     From May, 2015 through February, 2017, PSC, Nazareno, Guzzetti, Mannino, Aurigema, and Heiser used the wires on more than 1,000 occasions in violation of the federal wire fraud statute, 19 U.S.C. § 1343, to carry out their scheme to defraud GWG, taking in excess of $1,000,000 of receivables that had been pledged by Nulook to GWG. (See **Exhibit B** attached hereto.)

46.     Upon information and belief, Defendants and their affiliates (including, but not limited to, Summit Processing, JJ and AA Enterprise LLC, American Funding, LLC a/k/a American Funding Group f/k/a Community Funding) continue to collect payments from Nulook Merchants whose receivables were pledged as Collateral to Plaintiff.

**THE SECOND CONSPIRACY:**

**NULOOK CONSPIRES TO DEFRAUD
GWG INTO A FORBEARANCE AGREEMENT**

47.     In early 2016, Plaintiff identified a number of material deficiencies and irregularities with respect to the Loan. Specifically, Plaintiff determined that the value of pledged Collateral had deteriorated to the point where the receivables, in combination with the amount of cash in the Nulook bank account (referred to hereafter as the "Borrowing Base"), no longer supported the amount borrowed by Nulook.

48.     For months (April, 2016 – July, 2016) GWG attempted to resolve the Borrowing Base deficiencies with Nulook's CEO, Mannino and more specifically Nulook's de-facto Chief Financial Officer, Aurigema.

49.     From March, 2016 – December, 2016, Aurigema and Mannino emailed Borrowing Base Reports to Plaintiff on at least twenty (20) occasions.  Each Borrowing Base Report sent to Plaintiff was false and misleading as it failed to disclose to Plaintiff that Nulook was permitting PSC to debit its bank account on a daily basis, taking cash proceeds (Collateral) that belonged to Plaintiff.

50.     Aurigema was the point person for Nulook, responding to Plaintiff's requests for information regarding the Borrowing Base deficiencies, and even in one instance (September 16, 2016), wiring funds in the amount of $47,000 to Nulook from his personal bank account at J.P. Morgan to reduce the Borrowing Base deficiency. See Email from Aurigema to GWG dated September 15, 2016, a copy of which is attached hereto as **Exhibit D**.

51.     Nulook represented to GWG that Nulook had secured an equity investment from an owner of PSC and that proceeds from the equity investment would be used to cure certain Borrowing Base deficiencies and shore-up Nulook's financial condition.

52.     On June 20, 2016 Nulook, from New York, made a $500,000 payment by wire transfer to GWG in Minnesota to reduce the Loan balance. The purpose of the wire transfer was to deceive GWG into believing that the $500,000 was an "equity" investment from PSC.   This was not the case.  There was no equity investor in Nulook. GWG later discovered that the $500,000 was money Nulook borrowed from PSC as part of its fraudulent scheme to defraud GWG, secured by the double-pledged collateral and re-paid without Plaintiff's consent through the daily debit scheme described above.

53.    On July 13, 2016, Patrick Preece sent an email to the GWG team memorializing a conversation that he had with Nulook, in which Preece stated that Nulook has "a financial commitment from their original 'friends and family' investors to guarantee the capital infusion over time to pay down the deficit by $125,000 per month."  Aurigema then emailed Preece, Mannino and other Plaintiff employees confirming that "our facility begins august 15 as discussed with Pat. That's when we can start drawing up to 125k per month to deposit into the account."  Plaintiff relied upon these representations and held off foreclosing on its Collateral.

54.    Plaintiff sent a final default letter to Nulook on July 28, 2016 notifying Nulook that an event of default under the Loan had occurred and demanded that Nulook take certain steps to accelerate repayment of the Loan.

55.    On September 19, 2016, Aurigema emailed Nazareno and stated:

> Ant [Mannino] told me you were committing a loan this week. thanks for that and we'll make sure you get it back along with the pscf money owed once we get rid of these guys. . I prefunded what we needed Friday so we didn't get shut down … I'm sure he [Mannino] explained how ridiculous these guys [GWG] have been.

A copy of the September 19, 2016 email from Aurigema to Nazareno is attached hereto as **Exhibit E.**

56.     By early December, 2016, in order to induce forbearance, Nulook agreed to several provisions to cure its defaults under the Loan.  Nulook agreed to limit its operating expenses to $20,000 per month and remit all funds it collected in excess of that amount to GWG by wire transfer to GWG's bank account at Bell State Bank and Trust in Minneapolis, Minnesota.  During these negotiations, none of the Defendants revealed that hundreds of thousands of dollars a month of revenue coming in from Nulook Merchants was double-pledged, and was being diverted on a daily or near daily basis to PSCF.  As a result, much of the revenue that Nulook claimed would be

available to pay down Plaintiff's loan was already going to pay off a subordinated lender, PSCF, which used its Confidential Information and the PSC Platform to jump in front of first lien holder, GWG, and help itself to cash that was comingled in Nulook's TD Bank account.

57.    As a result of this "cash grab" Nulook's financial picture was far bleaker than reported by Defendants Mannino, Guzzetti, Aurigema and Nulook.

58.    The Forbearance Agreement was reviewed and negotiated by Aurigema with the assistance of counsel and signed by Mannino in New York and was emailed to Plaintiff in Minneapolis, Minnesota by the use of interstate wires on December 21, 2016.

59.    Not content with the money they had already taken from Plaintiff by virtue of their daily debit scheme, Mannino, Guzzetti, Aurigema, Nazareno, and Heiser then conspired to commit a new scheme to defraud Plaintiff and used the interstate wires to execute it.

## THE THIRD CONSPIRACY:

## PSC, NAZARENO, AND HEISER STEAL HUNDREDS OF THOUSANDS OF DOLLARS FROM GWG IN FEBRUARY, 2017

60.    In November, 2016, while seemingly busy negotiating the Forbearance Agreement with GWG, Nulook principals, Mannino and Guzzetti were instead closing down Nulook's offices, paying off insiders, and preparing to go into business with PSC.  See Email chain dated November 16, 2016, a copy of which is attached hereto as **Exhibit F.**  In this email chain, a PSC employee (Andrew Ragavanis) tells Guzzetti that "Desks come in on Wednesday the 23rd and Chairs on the 28th.  You can bring in your computers on Wednesday…".

61.    Without disclosing any of this to Plaintiff, Nulook signed off on the Forbearance Agreement on December 21, 2016 and for a few weeks Plaintiff received payments from Nulook which served to reduce the Loan balance.

16

62.     Then, in early February, 2017 the payments to Plaintiff dwindled and then stopped altogether.

63.     Upon information and belief, and without informing Plaintiff, in February, 2017 Nazareno and Heiser deliberately ceased sending daily debit instructions to Nulooks' automated clearing house (ACH) processor, T$$, LLC dba ACHWorks headquartered in Gold River, California. PSC then engaged a new ACH processor to carry out its scheme to steal the receivables from the Nulook Merchants.

64.     Beginning in early February, 2017 PSC directed the new processing agent ("New Agent") to debit Nulook Merchant accounts and deposit the money into other bank accounts controlled by Nazareno.

65.     Upon information and belief, some of the Nulook Merchants whose bank accounts were debited by the New Agent on a daily basis after February, 2017 are as follows:

| Name | Address | City | State | Zip |
|---|---|---|---|---|
| Aber Nails & Spa, LLC | 903 Hartford Turnpike | Waterford | CT | 06385 |
| Albia Golf & Leisure Inc | 300 Country Club Lane | Albia | IA | 52531 |
| American Flooring Concepts Inc. | 274 Bangor St | Lindenhurst | NY | 11757 |
| Antonios On The Green LLC | 137 East Hill Road | Southbury | CT | 06488 |
| Atlas Recycling LLC | 18555 SW 295 Terrace | Homestead | FL | 33030 |
| Auction Cars Imports LLC | 3000 E Lake Mead Blvd. | Las Vegas | NV | 89030 |
| Better Credit Solutions USA Corp. | 165 King Road | Rocky Point | NY | 11778 |
| Don's Tree Experts Inc | 925 Main Street | Stone Mountain | GA | 30083 |
| Dry Canyon Industries LLC | 2498 S. Highway 97 STE F | Redmond | OR | 97756 |
| Greer Logging, LLC | 303 Cox Rd | Sarepta | LA | 71071 |
| Innovate Logistics LLC | 9 Paddock Street | Avenel | NJ | 07001 |
| Iron Work Design LLC | 5964 SW 43rd St | Davie | FL | 33314 |
| Jersey Shore Bread & Cake Inc. | 3125 Woodbridge Ave | Edison | NJ | 08837 |
| JM2 Construction, LLC. | 612 HWY 75 N. | Willis | TX | 77378 |
| K&S Automotive Professionals LLC | 1317 E Fry Blvd | Sierra Vista | AZ | 85635 |
| Mr. Waffle Cafe LLC | 1518 West Highland Ave | Selma | AL | 36701 |
| Pittman Automotive Phoenix, LLC | 8643 W Kelton Lane STE 101 | Peoria | AZ | 85382 |
| Printarama Inc | 4515 Nesconset Highway | Port Jefferson Station | NY | 11776 |
| Sharkys Pool Service Inc. | 48 Nesconset Highway | Port Jefferson Station | NY | 11776 |
| Sharkys Pool Service Inc. | 48 Nesconset Highway | Port Jefferson Station | NY | 11776 |
| SK Certified Auto Sales .com Inc | 701 East Gude Drive STE 100 | Rockville | MD | 20850 |
| Virginia Home Centers, LLC | 10875 Wards Road | Rustburg | VA | 24588 |

66.    Upon information and belief, these Nulook Merchants have bank accounts in Connecticut, Iowa, Florida, Georgia, Oregon, New Jersey, Louisiana, Arizona, Maryland and Virginia. Nazareno and Heiser used interstate wires to process banking debits from accounts in these, and other states to bank accounts and entities controlled by Nazareno on a daily basis beginning in early February, 2017.

67.    Upon information and belief Nazareno, Heiser and Heiser Enterprises, and individuals and entities acting in concert with them, continue to debit or cause the debiting of funds

from Nulook Merchants using the mails and wires, directing the proceeds to the bank accounts of other merchant cash advance companies they own or control.  Thus, the pattern of wire fraud is open and ongoing.

68.    Nulook was well aware that PSC was going to begin taking cash from its account – *again* – as Mannino had discussed this with Nazareno.  On February 21, 2017 Nazareno emailed Heiser and told him:

> As far as Nulook I have been dealing with Anthony all day about it. "Surprise! We took over…. It's all good he understands just needs reporting and figuring a way that he can deal with the credit facility [GWG]. Their probably going to want to talk to someone at PSC. I told him to direct the call to corporate and we'll handle it as such. The game plan is of course to run it as long as we can to grab the rest of the money he owes and move on he has no issues with that.

A copy of the February 21, 2017 email from Nazareno to Heiser is attached hereto as **Exhibit G.**

69.    Nulook did not take any steps to stop their fellow Defendants at that time, and only a month later on March 15th, despite knowing the specific phone number and email for Nazareno, did Mannino finally take an orchestrated and contrived step by following Nazareno's advice to notify "corporate" by sending an email to Accounting@PSCNY.us as follows:

**From:** Anthony Mannino
**Sent:** Wednesday, March 15, 2017 2:35 PM
**To:** Accounting <Accounting@PSCNY.us>
**Cc:** 'Patrick Preece' <patrick@gwgmca.com>
**Subject:** RE: Nulook Collections

To Whom it May Concern,

As you are aware, MCA Capital LLC has a perfected security interest in all Nulook receivables. A copy of MCA Capital's UCC-1 financing statement is attached hereto.

It appears that on or about February 17, 2017 all cash sweeps that were previously directed to the Nulook account ceased:

Prior to February 17, 2017, Nulook Capital was receiving approximately $14,000.00 per business day.

Please take all steps to direct all Nulook originated receivables, including but not limited all MCA's, FRPA's, General Intangibles, Proceeds and Cash Proceeds (as such terms are generally known in the merchant cash advance industry or as defined by the Uniform Commercial Code of the State of New York) to the Nulook account.

Please send copies of any instructions that you may have given to ACHWorks, or any third party regarding Nulook's receivables to my attention immediately.

Please note that all of MCA Capital's rights are expressly reserved.


Anthony Mannino
Nulook Capital LLC
Phone:516-444-3499 ext.1001
Toll Free:888-484-1004
Fax:516-765-9184
amannino@nulookcapital.com
www.nulookcapital.com

70.    Nulook claimed that PSC was taking money from it by making "unauthorized sweeps of an estimated $400,000" and claimed, through counsel, to have been unaware of the diversions until "about a month [March, 2017] ago."

71.    Of course, none of this was true.  Nulook was well aware that PSC was diverting cash from its TD Bank account as it had knowingly acquiesced all along.

72.    When Plaintiff determined that the Nulook Loan payments were not going to resume, Plaintiff commenced this action.

73.    The original Complaint herein [ECF Doc. 1] was served on Defendants PSC, PSCF and Nazareno on April 7, 2017. By order to show cause, Plaintiff moved to have a receiver appointed, and on April 26, 2017 this Court appointed Michael Cardello III, Esq. as Receiver of PSC ("Receiver"). Upon his appointment, the Receiver terminated the employment of Nazareno [ECF Doc. 47-1] and subsequently wrote to Nazareno's counsel on June 29, 2017 [ECF Doc. 69] to apprise them that:

(i)      after funding the PSC payroll for June, there was a total of **$2,755.47** in PSC's three bank accounts;

(ii)     rent had not been paid for the month of June;

(iii)    PSC had failed to record revenues in its books and records after August, 2015;

(iv)     the assets and liabilities recorded in the books and records could not be reconciled with the representations made by PSC on its tax returns for the period of 2012 – 2015;

(v)      there were substantial movements of funds from PSC to other entities that are not recorded in PSC's books and records, including transfers of funds from PSC to companies known to be owned by or otherwise affiliated with Nazareno; and

    (vi)    Nazareno routinely used funds from PSC's operating account to pay his personal expenses and borrowed large sums of money from PSC which he has not repaid.

74.    In the summer of 2017, after the appointment of a Receiver to run PSC, Nulook, Mannino, Guzzetti, JJ & AA, PSC, Nazareno, Heiser, and Heiser Enterprises (defined hereinafter in paragraph 81 as the "Enterprise") took additional steps to continue operating, controlling and profiting from their prize cash cow, the Marketplace, by diverting money away from PSC, which they no longer controlled, and towards another entity controlled by Enterprise members Mannino and Guzzetti, JJ and AA Enterprises LLC ("JJ & AA").

75.    A September 6, 2017 email from an MCA funding company to GWG demonstrates that the Enterprise instructed MCA funders to direct PSC earned commissions to JJ & AA instead:

> "PSC (The Marketplace) referred 2 merchants to us for funding…PSC (The Marketplace) were paid the commission into the International Professional Services account by error. . . . We used to pay PSC commissions into the International Professional Services account until July 19th and after July 19th we are paying PSC in the JJ & AA Account."

76.    Then, a September 11, 2017 email from **_another_** MCA funder states plainly that JJ & AA is now the Marketplace.  Referencing a payment that was meant for JJ & AA going instead into a PSC account, the email states plainly:

> "On sep 8th we sent you a payment of $800 to account [PSC account number] by mistake it was meant to go to marketplace. On sep 5th we sent you a payment of $500 to account [PSC account number] by mistake it was meant to go to marketplace"

77.    These emails plainly demonstrate that Enterprise members, on an ongoing basis, are holding themselves out to the merchant cash advance industry as the Marketplace, operating now as JJ & AA rather than PSC, but continuing to use the same Marketplace they used to scam GWG and others, and continuing to divert funds from their rightful recipients and to themselves.

The activities of the corrupt enterprise are clear: First, Nulook defaults in its payment obligations to GWG, then Nulook merges into the Marketplace and operates out of PSC's offices, then the Marketplace suddenly morphs into JJ & AA, an entity that is purportedly in the same businesses as Nulook and PSC, run by two out of three of Nulook's former principals using former PSC employees and assets to perpetuate the scheme. Meanwhile, the millions and millions of dollars in RTR that was pledged to secured GWG's loan has vanished.

78.    Thus, the conspiracy to harm GWG has been ongoing continuously since 2014 and continues to this day.

**FIRST CAUSE OF ACTION**
**VIOLATION OF 18 U.S.C. § 1962 (C) THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")**

***Against Mannino, Guzzetti, Nazareno, Heiser, and Heiser Enterprises***
***(the "RICO Defendants")***

79.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

80.    At all relevant times, Plaintiff was and is a person within the meaning of 18 U.S.C. §§ 1961 (3) and 1962 (c).

81.    At all relevant times, each of the RICO Defendants were and are each a person within the meaning of 18 U.S.C. §§ 1961 (3) and 1962 (c).

82.    At all relevant times, each of Mannino, Guzzetti, Nazareno, Heiser, and Heiser Enterprises was, and is, a person that exists separate and distinct from the RICO enterprises described below.

83.    Alternatively, PSC is a corporation and therefore an enterprise pursuant to 18 USC 1961 (5). Also, alternatively, Nulook is a limited liability company and therefore an additional enterprise pursuant to 18 USC 1961 (5).

84.    PSC solicits entities in the merchant cash advance business and PSC also solicits members and investors to participate in its "Marketplace" which uses the PSC Platform to bring together investors and merchant cash advance companies.  Nulook is a limited liability company engaged in the merchant cash advance business.  Defendant Mannino is a one-third owner of Nulook and the CEO of Nulook.  Mannino also controls another entity that operates in the merchant cash advance industry, called JJ and AA Enterprises ("JJ & AA") Defendant Guzzetti is a one-third owner of Nulook, is the Chief Operating Officer of Nulook, and also a part owner or operator of JJ & AA.  Defendant Nazareno was the Executive Director of PSC and the leader of the Enterprise.  Heiser controlled Heiser Enterprises, invested money in Nulook, held himself out as the CEO of PSC, and operated Heiser Enterprises dba PSCF.

85.    Each of the corporate entities, Nulook, PSC, and Heiser Enterprises are distinct entities, with their own independent existence and functions.

86.    Nulook, Mannino, Guzzetti, JJ & AA, PSC, Nazareno, Heiser, and Heiser Enterprises are a group of persons associated together in fact for the common purpose of carrying on an ongoing criminal enterprise. Nulook, Mannino, Guzzetti, JJ & AA, PSC, Nazareno, Heiser, and Heiser Enterprises, constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961 (4) and 1962 (c).

87.    The Enterprise has a common goal of defrauding GWG, and other merchant cash advance providers, investors, and shareholders out of millions of dollars through a sophisticated, coordinated, sustained, and well-orchestrated scheme of deceptive conduct that intended to, and used wire transfers to perpetuate the scheme including; material misrepresentations and omissions and conversion of assets made in connection with merchant cash advance receivables and the PSC Platform.

88.    The Enterprise used the PSC Platform to gain access to all pertinent merchant financial information, and the means to control the flow of merchant cash advance payments, through a sophisticated, coordinated, sustained, and well-orchestrated scheme of deceptive conduct, material misrepresentations and omissions that allowed the Enterprise to hijack Nulook receivables by using the PSC Platform to siphon off merchant wire payments that were supposed to be routed to Plaintiff, but were instead sent  to entities and or persons controlled by the Enterprise.

89.    Members of the Enterprise built the PSC Platform to look like a reliable and secure portal through which investors could take part in merchant cash advance deals.  Their advertising the PSC Platform to the public through the internet was a predicate act, which brought in clients like Plaintiff's predecessor in 2014.  The next predicate act was agreeing to the Collection and Subordination Agreement in May 2014, even though Nazareno and his Defendant associates had no intention of following it, and indeed, broke that agreement early and often, including by entering into each PSCF Agreement.

90.    The true purpose of the PSC Platform was to access all the information related to the merchants, including their bank accounts, and secure all rights to withdraw payments from these merchants on behalf of investors, and then use this power to facilitate the theft of funds from those investors, including Plaintiff.

91.    While pretending to be working towards curing Nulook's default under the Loan, Nulook, Mannino, Guzzetti, Nazareno, Heiser, and Heiser Enterprises were actually looting the Nulook receivables, paying off insiders, repeatedly and systematically double pledging Nulook receivables to Enterprise members, and diverting funds away from Plaintiff so the RICO Defendants could profit.

92.    For example, notwithstanding all Defendants knowledge of the GWG Loan and perfected security interest, each of the RICO Defendants knowingly allowed Nulook to falsely pledge receivables to PSCF that were already subject to GWG's security interest.  Nulook knowingly authorized PSC to debit its accounts, on a daily basis, using wire transfers.  Nulook also falsified Borrowing Base Reports to show its collections, without showing that most of the collected money was being automatically debited by PSC and or PSCF, despite those collections being subject to GWG's security interest.  During this period, Nazareno and Mannino had already signed the Collection Subordination Agreement, evidencing their awareness of, and agreement to recognize the GWG Loan and GWG's lien priority and perfected security interest.

93.    Heiser worked closely with Nazarneo and held himself out as the CEO of PSC, and later made a UCC filing which identified GWG's perfected, first security interest as taking priority over his claim to those same Nulook receivables. Five of the six PSCF Agreements were not disclosed to GWG at all, and none were referenced in the Forbearance Agreement. Nor were any obligations to "insiders" identified or disclosed to Plaintiff.

94.    Each and every PSC debit from the Nulook bank account involved ACH interbank wire transactions that moved money from Nulook's TD Bank account (headquartered in Cherry Hill, NJ) to PSC's Bank of America account (headquartered in Charlotte, North Carolina). Therefore, each and every debit transaction was a predicate act in furtherance of the racketeering activity and conspiracy to defraud GWG. (See **Exhibit B** attached hereto).

95.    Beginning on or prior to February 17, 2017, PSC, Nazareno, Heiser and Heiser Enterprises used their control over the PSC Platform to re-direct wire transfer payments from Nulook Merchants that were rightfully owed to Plaintiff, and divert those interstate, ACH wire payments to other members of the Enterprise.

26

96.     This improper diversion of funds to Heiser, Heiser Enterprises, PSC and or PSCF occurred multiple times per day, and each and every day from February 17, 2017 to date.

97.     Recent filings in the Southern District of New York against PSC by America's Business Capital, LLC (Case No. 1:17-cv-01208) ("ABC"), another merchant cash advance provider that signed up to use the PSC Platform, allege nearly identical conduct on the part of PSC, Nazareno and other Enterprise members, with the same resulting use of ACH wire transfers to divert funds owed to ABC to members of the Enterprise instead. See Email chain dated January 16, 2017 between Hesier and Nazareno, a copy of which is attached hereto as **Exhibit H** where Nazareno tells Heiser:

> We have taken over all merchant debits from American Business Capital all deposits from their merchants are now being deposited into the PSCF Account….To facilitate this we eliminated their ACH provider from the equation….

98.     The diversion of ABC funds to other members of the Enterprise at almost the same time that PSC began to divert GWG collateral away from GWG and towards other Enterprise members, paints a picture of a coordinated effort by Enterprise members to use their access to information and fiduciary role as the entity that controlled the flow of merchant payments, to steal as much money from various lenders and merchants as possible, before legal processes such as the instant lawsuit caught up to them.

99.     The ABC allegations highlight predicate acts from March 2015 to the present which include PSC's failure to disclose that Nazareno and Plamenco were pushing ABC into deals with Mancino, their co-conspirator in a prior, massive securities fraud, and the later diversion, beginning daily in January 2017, of wire payments from ABC to Mancino, or other PSC syndicate members.

100.     The Enterprise has used Nulook, PSC, Heiser Enterprises, and the PSC Platform to further the criminal activities of the Enterprise, including predicate acts that took place in 2014 like advertising the PSC Platform in intentionally dishonest ways that were meant to deceive investors and lenders, like GWG and ABC, into providing PSC and its fellow Enterprise members, with access to their funds, and the means to control the repayment of funds loaned to merchants, including the Nulook Merchants.  Looking forward, even after discovery of the misappropriated funds, the Enterprise continues to use its control over the merchant account information to frustrate efforts to recover the illegal profits taken in by its members by making it difficult or impossible for GWG to trace and collect the funds, and upon information and belief, by setting up new entities that can continue the Enterprise's deception and theft.  Merchant cash advances have an average duration of six months and the ability to collect from merchants is directly related to the ability to timely service and collect from the merchant's receivables.

101.     Upon information and belief, Enterprise members used their information regarding the Nulook Merchants to continue diverting payments from these merchants to other members of the Enterprise, including through other merchant cash advance companies created and controlled by Enterprise members, using ill-gotten gains, and/or misappropriated or stolen merchant information.

102.     Upon information and belief, Enterprise members used the PSC Platform to divert not only money, but also customers from the old Nulook, once bankrupt, so Enterprise members could continue making money, leaving GWG seeking to collect payments owed by innocent merchants who may become further caught up in, and suffer from, the role played by Enterprise members to divert their daily cash payments and transfer their loan agreements to other merchant cash advance companies.

103.     Other predicate acts, related to the Enterprise, and undertaken in furtherance of the conspiracy that occurred between 2014 and 2017 to defraud Plaintiff included:

(a) the payments to Nulook insiders as described in greater detail in the Fifth Cause of Action, *infra*;

(b) the more than 1,000 daily debits by PSC from Nulook's bank accounts set forth on **Exhibit B** attached hereto;

(c) the misrepresentations made to Plaintiff about an equity investment from a PSC shareholder and "a friends and family investment that would provide Nulook with an extra $125,000 a month beginning in August 2016";

(d) the misrepresentations made to GWG about the Borrowing Base deficiencies; including that Nulook was allowing PSC to divert upwards of $10,000 per day in receivables from Nulook Merchants to PSCF, despite the knowledge of Nazareno, Mannino and Guizetti that Plaintiff had a perfected first security interest that entitled Plaintiff to those receivables before PSCF;

(e) the omission of material facts, including the criminal, fraudulent history of PSC principals Nazareno and Plamenco; and

(f) the use of the PSC Platform to conceal the diversion of funds owed to Plaintiff to PSC or other entities in violation of Plaintiff's security interest on a regular basis.

(g) Diversion of commission payments owed to the PSC Receiver to JJ & AA

104.     By using the internet, telephone, and facsimile transmissions to communicate false and misleading information about the PSC platform and the PSC Exchange to members in order to perpetuate their fraudulent scheme, Defendants engaged in repeated acts of wire fraud in violation of 18 U.S.C. § 1343.

105.    By diverting ACH wire transfer payments from their intended final recipients, including Plaintiff, beginning on or about May 29, 2015, and occurring daily or almost daily until on or about February 17, 2017, and continuing each and every day after that for a period of at least three months, Defendants engaged in repeated acts of wire fraud in violation of 18 U.S.C. § 1343.

106.    The predicate acts specified above, including the solicitation of merchant cash advance investors via the PSC platform, the creation of agreements that gave PSC the power to collect those daily cash advance payments on behalf of investors, and subsequent diversion of those daily cash advance payments from the rightful owner and to other PSC investors, including Enterprise Members Heiser and PSC, knowing that such diversion was unlawful and would materially damage Plaintiff and other investors like ABC, constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 (5) and 1962 (c).

107.    Plaintiff has been harmed by these acts of racketeering and has already lost in excess of $1,200,000 in pledged receivables that were paid into Nulook's account and stolen by PSC, Nazareno, Heiser, Guzzetti, and Mannino in direct violation of the Collection Subordination Agreement the Loan, the Forbearance Agreement, and applicable law.

108.    Plaintiff's Collateral has been irreparably harmed by the activity of the Enterprise and the Enterprise in continuing to divert funds and interfere with Plaintiff's ability to proceed directly against its Collateral as contemplated by the Loan, Collection and Subordination Agreement, Forbearance Agreement, and Article 9 of New York's Uniform Commercial Code, in derogation of Plaintiff's rights. Plaintiff's ability to collect on the Nulook Collateral is uncertain at best, the Collateral has been eroded at a rapid pace, while the Enterprise continues to operate the Marketplace and divert funds.

109.    As a direct and proximate result of these violations of 18 U.S.C. § 1962 (c) and (d), which adversely affected interstate commerce, Plaintiff has suffered substantial and ongoing damages and been injured in its business or property by the predicate acts which make up the RICO Defendants' pattern of racketeering activity that comprises the RICO Defendants deliberate and unlawful scheme.

110.    Accordingly, Defendants are liable to Plaintiff for treble damages, together with all costs of this action, plus reasonable attorneys' fees and costs under 18 U.S.C. §§ 1964 (c) and (d).

## SECOND CAUSE OF ACTION
## VIOLATION OF 18 U.S.C. § 1962 (D) THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")

### *Against Mannino, Guzzetti, Nazareno, Heiser, and Heiser Enterprises*

111.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

112.    Nulook is a limited liability company and PSC is a corporation, and therefore each are separate enterprises pursuant to 18 USC 1961(5) (the "Corporate Enterprises").

113.    Mannino, Guzzetti, Nazareno, and Heiser (the "Corporate RICO Defendants") were each employed by or associated with one or both of the Corporate Enterprises, and conducted, or participated in the conduct of the Corporate Enterprises affairs through the commission of a sustained pattern of the multiple and interrelated criminal acts outlined above, including mail and wire fraud.

114.    As set forth in the First Cause of Action and specifically in paragraphs 92 – 101, *supra*, incorporated by reference herein, in violation of 18 U.S.C. § 1962 (c), the Corporate RICO Defendants engaged in a pattern of racketeering activity which affected interstate commerce.

115.    In addition, each of the Corporate RICO Defendants and the Association in fact enterprise conspired to violate the provisions of 18 U.S.C. § 1962 (c).

116.    The Corporate RICO Defendants, having directed and controlled the affairs of the Enterprise, were aware of the nature and scope of the Enterprise's unlawful scheme and all agreed to participate in it.

117.    As a direct and proximate result of these violations of 18 U.S.C. § 1962 (c) and (d), which adversely affected interstate commerce, Plaintiff has suffered substantial damages and been injured in its business and property by the predicate acts which make up the Corporate RICO Defendants' pattern of racketeering activity that comprise Defendants deliberate and unlawful scheme.

118.    ABC, MCA Capital, LLC (Lender), and Lender's parent company, Walker-Preston Capital, LLC were also damaged by Defendants' pattern of racketeering activity as were numerous merchants and other merchant advance companies participating on the PSC Platform, unrelated individuals and creditors of PSC and Nulook.

119.    Accordingly, the Corporate RICO Defendants are liable to Plaintiff for treble damages, together with all costs of this action, plus reasonable attorneys' fees and costs under 18 U.S.C. §§ 1964 (c) and (d).

### THIRD CAUSE OF ACTION
### FRAUDULENT MISREPRESENTATION
### *(Against Robert Aurigema)*

120.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

121.    In late 2013, Aurigema was introduced to Patrick Preece, who worked with GWG's predecessor, MCA Capital. In order to induce Lender (predecessor to Plaintiff) to loan Nulook

money for its merchant cash advance business, Aurigema emailed with Preece over a period of several months, providing Preece with: (a) spreadsheets outlining Nulook merchant funding transactions; (b) biographies of himself, Mannino and Guzzetti; (c) a summary of Nulook's business plan; (d) a non-disclosure agreement; (e) answers to a due diligence questionnaire; and (f) Nulook financials for the year 2013.

122.    At all times relevant to this dispute, Aurigema, a certified public accountant, held himself out as a sophisticated businessman, the Chief Operating Officer of Balyasny Asset Management L.P., and as a founder and one-third owner of Nulook. Aurigema handled the financial reporting for Nulook and supervised and interfaced with Nulook's accountants.

123.    In 2013, when providing Lender with a "deal outline" Aurigema stated that: "The members of Nulook include 2 principals [Mannino and Guzzetti] with over 3 decades of combined sales and underwriting experience and a third member with over 20 years in key roles in the financial services industry including the roles of Chief Financial, Chief Operating and Chief Compliance Officer. All 3 [Mannino, Guzzetti, and Aurigema] understand the importance of customers and investors and hold themselves to the highest of _**fiduciary standards**_." (Emphasis added).

124.    After Plaintiff purchased the Loan from Lender, Aurigema became the point person at Nulook responsible for providing Borrowing Base reports to Plaintiff on a regular basis. Aurigema regularly prepared Borrowing Base reports and submitted them to Plaintiff with representations that they were prepared truthfully and that they accurately reflected Nulook's financial position. They did not.

125.    These Borrowing Base reports were sent by Aurigema to Plaintiff from March, 2016 through February, 2017. Each of these Borrowing Base reports was false and misleading in

that each report failed to reflect that the "deals" (Collateral) listed on these reports had been double-pledged to PSC in violation of the Loan. The Borrowing Base reports were also false and misleading in that none of the reports revealed daily cash sweeps being made by PSC, which served to reduce the proceeds pledged to Plaintiff.

126. GWG had a special relationship with Aurigema based on his high level of experience accounting for the value of the merchant loans made by Nulook and his superior access to, and understanding of the information he reported to Plaintiff in the Borrowing Base reports, and emails discussing the meaning of those reports, which information included older accounts that were going through collection, very recent payments from defaulted or other accounts that GWG did not have the backup information needed to characterize or place on the Borrowing Base report, and the amount to discount each non-paying Nulook merchant, which required information and expertise held by Aurigema.

127. Aurigema had a unique or special expertise with regard to the information he provided to GWG in the Borrowing Base reports, and emails discussing the meaning of those reports, and GWG relied on that information, which was only available from Aurigema and which could not possibly be separately ascertained by Plaintiff as Plaintiff had no access to the raw data used to compile these reports.

128. Aurigema knew or should have known that Plaintiff would rely upon the reports and email summaries' accuracy in determining whether to continue extending credit to Nulook or to call the Loan in default and act immediately to seize the encumbered Nulook assets required to pay off the Plaintiff's loan, pursuant to the terms of the Loan.

129. Aurigema further knew or should have known that Plaintiff relied on the accuracy of the Nulook financial picture provided by Aurigema, including the purported infusion of new

capital investment (which was false), when it agreed to enter into the Forbearance Agreement, and that Plaintiff relied on his representations, and would not have entered into the Forbearance Agreement if Plaintiff knew that the Nulook financial picture painted by Aurigema was inaccurate, and much bleaker than he repeatedly reported through Borrowing Base reports and emails describing those reports.

130.    By actively soliciting GWG's participation in deals that involved PSC, Nulook defendants, including Aurigema, assumed a duty to disclose any material information in its possession regarding PSC and its principal, Nazareno, including that he, along with PSC employee, Thomas Plamenco, were charged and convicted of securities fraud.

131.    Neither Aurigema, nor any member of Nulook disclosed that PSC was run by individuals with felony convictions involving securities fraud.

132.    In an email sent to Plaintiff on April 15, 2016, Aurigema stressed that perceived issues with the Borrowing Base stemmed from reporting issues, not the lack of incoming cash payments: "[M]any of the issues (regarding how much Nulook was collecting and how much it was reporting), to my knowledge, revolved around reporting issues and the fact that many deals did in fact collect money at certain times . . ."  Again, Aurigema failed to disclose that the Borrowing Base Report was false because it failed to report that Nulook had double-pledged the Collateral to PSC and that PSC was debiting much of the incoming funds from Nulook's bank account on a daily basis.

133.    On April 18, 2016, Aurigema provided another updated version of the Borrowing Base report to Preece at GWG, noting that the "pledge tab" shows every deal, and that with the fully updated information, Nulook "have a surplus of $70k."  Again, this representation was false

and misleading because the Borrowing Base Report failed to disclose that Nulook had double-pledged the Collateral and that PSC was debiting Nulook's operating account on a daily basis.

134.    Aurigema expanded his efforts to convince Plaintiff that its money loaned to Nulook was safe through an April 28, 2016 email to Patrick Preece stating that "I know these guys [Plaintiff] are really skittish on this but the reality is we have ~8-9MM in outstanding RTR [Right to Receive].  Even if we said, we won't collect half of it (which would be extreme), you guys still have excess collateral." Again, Aurigema never disclosed, and actively concealed, the double-pledging and daily debiting described herein.

135.    On May 2, 2016, Aurigema attached another Borrowing Base report to an email to Preece at GWG that stated that he and Mannino had gone done by deal and taken the most conservative approach possible, defaulting $400-500k in deals more than they believed would actually default.  He then presented an extremely positive message, stating that "[W]ith all of that, we are still in a surplus of $140,091 and very comfortable it can only get better from here. Collections are going up.  Expenses are going down.  Reporting getting better."  This representation was false and misleading because the Borrowing Base Report failed to disclose that Nulook had double-pledged the Collateral and that beginning only days before, on April 29, 2016, had agreed to allow PSC to auto-debit almost $7,000 per day from Nulook merchant receivables to pay back PSCF for the latest factor transaction.

136.    During this same mid-July 2016 period, GWG worked with Aurigema to ascertain the extent of the deficiency, and to work out a plan for Nulook to make monthly payments to eliminate the deficiency within 4-5 months.  In a July 11, 2016 email to Preece at GWG, Aurigema reiterated that collections were going up and costs were going down, and that management fees for syndicated deals and expense reduction would reduce the deficit over a four-month period by

at least 45%, and that Nulook could add $80k month towards reducing the deficit per month, eliminating the deficit by year end. He then noted, once again, that Nulook expected to recover far more money owed to it than the entire $3.2M GWG line: "Nulook has a total uncollected RTR of around $8.5M in addition to a cash balance. Even if half of that (50%) was bad deals (which it's not), that's still around $4/5M in assets needed to pay down a $3.2M line." This email was false and misleading because its content, and the Borrowing Base reports it referred to, did not disclose the double pledging of Collateral, or the daily debits by PSC related to the PSCF Factor Agreements.

137.    In that same July 11, 2016 email to Preece at GWG, Aurigema detailed that Nulook collected $800,000 per month, would need $150-$200k for expenses, and would fund $200-250k per month in new deals, stating "That leaves $400k per month we'd like to start using to pay down GWG." This representation was knowingly and materially false because Aurigema knew that Nulook was allowing PSC carry out its daily debit scheme, stealing thousands of dollars on a daily basis that should have been paid to GWG, which left far less than "400k per month" available to "pay down GWG."

138.    The September 29, 2016 email from Aurigema to Nazareno (**Exhibit E** attached hereto) clarifies that Aurigema was aware of the loan from PSC to Nulook and the additional monies it owed to PSCF, all of which Aurigema hid on the many Borrowing Base reports he sent to GWG. His email also duly notes his commitment to pay PSC and PSCF "once we get rid of these guys."

139.    In sum, Aurigema made false and misleading misrepresentations:

(a) on and with respect to each of the more than twenty (20) Borrowing Base reports he submitted to Plaintiff by failing to disclose material information, including the double

37

pledging of the Collateral, and subsequent payment of over a million dollars in receivables directly to PSCF and/or Heiser, making the actual Collateral securing GWG's Loan materially different than reported by Aurigema;

(b) by failing to disclose that Nulook was double pledging Collateral allowing Nazareno and Heiser to directly debit and pay to PSCF and or Heiser, $5,000-$10,000 per day in receivables from Nulook Merchants, rather than using those receivables, over which Plaintiff had a first priority perfected security interest, to either shore up its Borrowing Base, or pay down the Loan;

(c) by failing to disclose that principals at PSC were convicted con artists, whose securities fraud convictions made suspect their role as both a lender to Nulook and the entity who controlled where payments from Nulook Merchants were directed; and

(d) by failing to disclose the insider payments made in November, 2016 during the negotiations of the Forbearance Agreement in the amount of **$303,328.76**.

140.    Plaintiff relied on these false and misleading representations and omissions to its detriment, including by not acting sooner to foreclose on its Loan.

141.    Accordingly, Plaintiff is entitled to damages against Aurigema based on his fraudulent misrepresentations in an amount to be proven at trial, believed to be in excess of $1,200,000.

## FOURTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
### (Against Robert Aurigema)

142.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

143.    Aurigema made the false representations and material omissions knowing that Plaintiff would use and rely upon his representations and omissions in agreeing to forbear in exercising its rights under the Loan.

144.    Plaintiff justifiably relied upon Aurigema's misrepresentations and/or omissions and agreed to forbear in taking action against Nulook and the Collateral securing the Loan.

145.    Aurigema knew and understood that Plaintiff would rely upon the false and misleading statements and that Plaintiff would likely forbear in exercising its rights against Nulook and the Collateral.

146.    As a direct and proximate result of Plaintiff's reliance upon Aurigema's specific misrepresentations and omissions set forth above in the Third Cause of Action herein, Plaintiff has suffered substantial damages, and continues to suffer damages as the value of the Collateral erodes and Plaintiff's ability to collect directly from Nulook's Merchants has been irreparably impaired.

147.    But for Aurigema's misrepresentations or omissions in connection with, inter-alia, the Borrowing Base deficits, the equity infusion into Nulook that never occurred, the undisclosed factoring transactions with PFCF and the non-ordinary course payments made to insiders by Nulook, Plaintiff would not have entered into the Forbearance Agreement and GWG would have been able to mitigate its damages.

148.    Accordingly, Aurigema should be held liable and accountable for all damages that GWG incurred due to his negligent misrepresentations and omissions in an amount to be proven at trial but believed to be in excess of $1,200,000.

## FIFTH CAUSE OF ACTION
## FRAUDULENT CONVEYANCES
## UNDER THE NEW YORK DEBTOR AND CREDITOR LAWS

### *(against Nulook)*

149.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

150.    On or about July 13, 2016, Nulook was notified, in writing, of the existence of a Borrowing Base Deficit and Event of Default under the Loan.

151.    Again, on July 28, 2016, Nulook was notified, in writing, of the continuing Borrowing Base Deficit and Event of Default under the Loan.

152.    After receiving the aforementioned notices, Nulook claimed to be securing additional equity capital and working on curing all of the Borrowing Base Deficits identified by Plaintiff.

153.    Without Plaintiff's knowledge or consent, Nulook made the following non-ordinary course payments:

| Date | To | Debits | Wire # |
|------|-----|--------|--------|
| 11/16/2016 | Vito Dragonetti | $100,616.44 | 700099233 |
| 11/17/2016 | Nick Dragonetti | $100,698.63 | 700011937 |
| 11/18/2016 | Calkidso Trust | $102,013.69 | 700047502 |
| **TOTAL DEBITS:** | | **$303,328.76**. | |

154.    These payments were made when Nulook was insolvent or Nulook was rendered insolvent by virtue of these payments.

155.    These payments were made without fair consideration and left Nulook with unreasonably small capital to carry out its business and constitute fraudulent conveyances as to creditors.

156.    Accordingly, under §273-275 of the New York Debtor Creditor law, the aforementioned transfers were fraudulent as to GWG.

157.    In addition, each and every daily debit that Nulook authorized PSC to pull from its operating account from at least July 28, 2016 through December 7, 2016 was made without fair consideration and left Nulook with unreasonably small capital to carry out its business.

158.    Accordingly, under under §273-275 of the New York Debtor Creditor law, the aforementioned transfers were fraudulent as to GWG and GWG should be entitled to recover damages from PSC and any other transferee, including but not limited to other defendants herein, in an amount to be proven at trial but believed to be in excess of $1,000,000.00 plus punitive damages for fraud.

## SIXTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH CONTRACTS

### (*against Nazareno, Heiser, Heiser Enterprises*)

159.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

160.    Plaintiff entered into a number of valid, binding and enforceable contracts with Nulook, including the Loan and that certain Collection Subordination Agreement referenced herein.

161.    Among other things, the Loan prohibited Nulook from pledging its Collateral to any third party, incurring any other material indebtedness or transferring substantially all of its assets to another entity without the written consent of GWG.

162.    At all times relevant to this dispute, Aurigema, Guzzetti, Mannino, Nazareno, Heiser and Heiser Enterprises were aware of the Loan and GWG's security interest in the Collateral.  In fact, Nazareno specifically acknowledged his receipt of the Loan documentation when he executed the Collection and Subordination Agreement.  Aurigema and Mannino were also aware of the Loan and the Collection and Subordination Agreement, having received an email from Randall Jacobs, Esq. enclosing a markup of the agreement.   A copy of Jacobs' email dated May 22, 2014, a copy of which is attached hereto as **Exhibit I** was also sent to Defendant Nazareno

163.    Notwithstanding their knowledge of the Loan and the Subordination Agreement, among other documents, Aurigema, Guzzetti, Mannino, Nazareno, Heiser, and Heiser Enterprises purported to arrange six (6) separate merchant cash advance (factor) agreements between PSC and Nulook that called for PSC to receive its alleged "purchase price" plus a "factoring rate".  These agreements purport to transfer Nulook's future accounts, contract rights and other obligations arising from or relating to the payment of monies from the member's customers to PSC - the ___very same Collateral pledged to Plaintiff in connection with the Loan___.

164.    PSC, Nazareno, Heiser, and Heiser Enterprises were systematically arranging these factoring transactions with Nulook even while Nulook was in default of its obligations to GWG under the Loan.

165.    The actions of PSC, Nazareo, Heiser, and Heiser Enterprises in connection with the procurement of these PSC Agreements, constituted a knowing, intentional and unjustified interference with Plaintiff's contractual relationships with Nulook.

166.    Accordingly, GWG should be entitled to an award of punitive damages against PSC and Nazareno for their wanton, malicious, and deliberate conduct described herein.

## SEVENTH CAUSE OF ACTION
## CONVERSION

### *(Against Nazareno, Heiser, and Heiser Enterprises)*

167.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

168.    Nazareno, Heiser and Heiser Enterprises have exercised dominion and control over Plaintiff's assets, which assets can be specifically identified by Nulook's own Borrowing Base reports showing all Nulook Merchant collateral accounts pledged as collateral to GWG in connection with the Loan.  As set forth herein, Nazareno, Heiser and Heiser Enterprises were at all times relevant to this dispute fully aware of Plaintiff's Loan and security interest in the Nulook Merchant accounts.

169.    Nazareno's conduct was deliberate and intentional.

170.    Nazareno directly benefitted from or orchestrated the conversion of the Collateral.

171.    As a result of Nazareno's conduct, Plaintiff has suffered substantial damages, and continues to suffer damages as more and more Nulook receivables are converted by Nazareno, Heiser, and Heiser Enterprises.

## EIGHTH CAUSE OF ACTION
## BREACH OF THE LOAN AND FORBEARANCE AGREEMENT

### *(Against Nulook)*

172.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

173.    Nulook received a demand for payment of all amounts due under the Loan on or about March 16, 2017.    As of March 16, 2017, the amount owed under the Loan was $2,073,398.13.

174.    In addition, default interest in the amount of 35% per annum is due under the terms of the Loan.

175.    Under the terms of the Loan, Section XVI, Nulook is responsible for paying all costs of collection, including reasonable attorneys' fees and court costs, incurred or paid by Plaintiff in collecting amounts due under the Loan.

176.    Despite receiving the demand for payment, Nulook has failed to pay any of the amounts due and owing to Plaintiff under the Loan.

177.    Under the Forbearance Agreement, Nulook agreed to indemnify Plaintiff "of and from all damage, loss, claims (including both direct claims and third-party claims), demands, liabilities, obligations, actions and causes of action whatsoever that any third party may now have or claim to have ... whether presently known or unknown, and of every nature and extent whatsoever on account of or in any way touching, concerning, relating to, arising out of or founded upon the Loan ... that may arise as a consequence of the dealings between the Parties ...."

178.    All conditions precedent to maintenance of this action have been met.

179.    Accordingly, Nulook is liable to GWG for all damages and expenses incurred by GWG in connection with the Loan and all additional damages and expenses incurred in prosecuting or defending this action, including, but not limited to the costs and expenses associated with the appointment of the Receiver and all of GWG's expenses, including its attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in its favor and against Defendants as follows:

**A.** Awarding Plaintiff damages in an amount to be determined at trial, but in no event less than the outstanding Loan balance together with interest at the default rate according to proof at trial;

**B.** Treble damages according to statute;

**C.** Declarations that:

    **a.** The RICO Defendants have violated 18 U.S.C. § 1962 (c) and 18 U.S.C. § 1962 (d);

    **b.** Nulook must indemnify Plaintiff for all of its losses, costs, fees, and expense in accordance with the Loan and Forbearance Agreement, and an order directing same.

**D.** Disgorgement of all amounts converted by Nazareno and/or Heiser or Heiser Enterprises;

**E.** An award of Plaintiff's reasonable attorney fees' and litigation costs and expenses, according to statute;

**F.** Punitive damages for conversion and fraud;

**G.** Pre- judgment interest; and

**H.** Such other equitable relief as the Court deems appropriate.

### JURY DEMAND

Plaintiff hereby demands trial by jury.

DATED this 16th day of October, 2017

/s/ Edward S. Stone

_____

EDWARD STONE LAW P.C.
Edward S. Stone, Esq.
*Attorneys for Plaintiff*
99 Madison Avenue, Suite 5008
New York, New York 10016
(203) 504-8425
Email: eddie@edwardstonelaw.com