UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
GWG MCA CAPITAL, INC.,

                    Plaintiff,

                                           **MEMORANDUM & ORDER**

        -against-                              17-CV-1724 (GRB)


NULOOK CAPITAL, LLC, JOEL
NAZARENO, ROBERT AURIGEMA,
JOHN GUZZETTI, ANTHONY MANNINO,
H. RUSSELL HEISER, and HEISER
ENTERPRISES, LLC,

                      Defendants.
--------------------------------------------------------X
**GARY R. BROWN, United States Magistrate Judge:**

      This hard-fought action involves allegations that defendants misappropriated millions of dollars from plaintiff through a complex fraudulent scheme, and, upon consent of the parties, is before the undersigned for all purposes. Docket Entry No. ("DE") 216. Pending before the Court are the following motions:

1. Defendants Nulook Capital, LLC ("Nulook"), John Guzzetti, and Anthony Mannino each move under Rule 12(b)(6) to dismiss the Racketeer Influenced and Corrupt Organizations ("RICO") claims against them;

2. Defendant Joel Nazareno moves under Rule 12(b)(6) to dismiss the RICO claims against him, and asks the Court to decline supplemental jurisdiction over the state law claims against him;

3. Defendant Robert Aurigema moves under Rule 12(b)(6) to dismiss the fraudulent misrepresentation and negligent misrepresentation claims against him;

4. Defendants H. Russell Heiser and Heiser Enterprises LLC ("Heiser Enterprises") both

move under Rule 12(b)(6) to dismiss the RICO claims, tortious interference with contracts claims, and conversion claims against them;

5. Defendants Nulook, Guzzetti, and Mannino (collectively, the "Nulook Defendants") move pursuant to Rule 12(f) to strike paragraph 39 from the First Amended Complaint;

6. Defendant Nazareno moves to have Edward Stone, Esq. disqualified as counsel for Plaintiff.

*See* DE 144, 149, 150, 160.

## STATEMENT OF FACTS

### I.  THE UNDERLYING TRANSACTION

The following facts are taken from the First Amended Complaint and accepted as true for the purposes of the motions to dismiss. *Sung Cho v. City of N.Y.*, 910 F.3d 639, 642, n.1 (2d Cir. 2018) ("Because a court that rules on a defendant's motion to dismiss a complaint must accept as true all of the factual allegations contained in the complaint . . . we describe the facts as alleged in the complaint, drawing all reasonable inferences in the plaintiff's favor") (citation and quotations omitted).

This case centers around funds which defendant Nulook borrowed from MCA Capital, LLC ("MCA"), a company later purchased by GWG MCA Capital, Inc. ("Plaintiff").  DE 114, ("Comp.") at ¶¶ 2, 15.  Nulook is owned by defendants Aurigema, Guzzetti, and Mannino.  *Id.* at ¶ 3.  Mannino was Nulook's CEO and Aurigema was Nulook's "de-facto" CFO.  *Id.* at ¶ 48.

Nulook provides merchant cash advances to small businesses in exchange for the right to receive the businesses' future accounts receivable on a daily or weekly basis.  *Id.* at ¶ 14.  To finance its own operations, Nulook borrowed $3.75 million from MCA (the "Loan").  *Id.* at ¶ 15.  To memorialize the terms of the Loan, Nulook and MCA executed a Revolving Credit Agreement (the "Credit Agreement") on September 20, 2014.  DE 14-6.  To protect MCA's interest, the Credit

Agreement provided MCA with a security interest.  *Id.*, § 4.

In issuing merchant cash advances, Nulook contracted with former defendant International Professional Services, Inc. ("PSC") which provided back-office servicing for Nulook's portfolio. Comp. at ¶¶ 18–19.  Defendant Nazareno is a principal and Executive Director of PSC.  *Id.* at ¶ 7. In September 2015, H. Russell Heiser became the new CEO of PSC.  *Id.* at ¶ 37.  Heiser also loaned money to PSC and Nazareno.  *Id.*  In addition to back-office servicing, PSC operated a platform from which it allowed multiple investors to syndicate a merchant cash advance.  *Id.* at ¶ 20.  At some point after Nulook contracted with PSC, MCA, Nulook, and PSC executed a Collection Subordination Agreement, in which PSC "recognize[d] all priorities and other rights granted thereby to MCA" as a result of the Credit Agreement.  *Id.* at ¶ 22.  Randall Jacobs, counsel for Nulook, emailed a copy of the Subordination Agreement to Nazareno, Mannino, and Aurigema. *Id.* at ¶ 39.

## II.     ALLEGED CONSPIRACIES

Plaintiff alleges three interrelated conspiracies.  The first, beginning on December 22, 2014, occurred when Mannino, Guzzetti, and Aurigema wanted access to more funds for Nulook from MCA, but MCA declined.  *Id.* at ¶ 29.  Instead, Nulook turned to PSC, which was willing to extend loans totaling $200,000.  *Id.* at ¶ 30.  MCA confirmed that this single agreement would not be a breach of the Credit Agreement.  *Id.* at ¶ 31.  Neither MCA, nor plaintiff, ever waived or relinquished their rights in the security interest created by the Credit Agreement.  *Id.* at ¶ 33.  In that agreement with PSC, Nulook impermissibly "double pledged" collateral in which MCA had a security interest.  *Id.* at ¶ 34.  Nulook then entered into five additional agreements with PSC, double pledging collateral to support additional loans totaling $1,450,000.  *Id.* at ¶¶ 35–36.  To conceal funds paid to PSC, Nulook used a notation resembling those used to record payments to plaintiff in Nulook's bank statements.  *Id.* at ¶¶ 44–46.

The second alleged conspiracy began in early 2016, when plaintiff determined that Nulook's receivables and cash reserves (the "Borrowing Base") was insufficient to support the outstanding debt to plaintiff.[1]  *Id.* at ¶ 47.  Throughout 2016, Aurigema and Mannino emailed Borrowing Base reports to plaintiff at least 20 times—all of which plaintiff alleges were false and misleading because they failed to show that Nulook allowed PSC to collect cash proceeds to which plaintiff was entitled.  *Id.* at ¶¶ 48–49.  Aurigema was the "point person" for sending Borrowing Base Reports, and once wired $47,000 to Nulook from his personal bank account to positively affect the Borrowing Base.  *Id.* at ¶ 50.  Nulook also represented to plaintiff that it had received an equity investment, which Plaintiff alleges was false, and wired $500,000 to plaintiff to reduce the Loan balance.  *Id.* at ¶¶ 51–52.  Instead, the $500,000 was borrowed from PSC as part of the first conspiracy and secured by a double pledge.  *Id.* at ¶ 52.

In July 2016, Patrick Preece[2] confirmed a conversation he had with Nulook, in which Nulook had received a commitment from "friends and family" investors that would allow Nulook to pay down the Loan balance by $125,000 per month.  *Id.* at ¶ 53.  Plaintiff sent a default letter to Nulook on July 28, 2016, and in December 2016, Nulook agreed to certain provisions to cure its defaults, including limiting its operating expenses to $20,000 per month and remitting all funds in excess of that amount to plaintiff, in exchange for plaintiff not foreclosing on the Loan.  *Id.* at ¶ 56. None of the defendants told plaintiff that hundreds of thousands of dollars each month were being diverted to PSC.  *Id.*  Plaintiff signed a Forbearance Agreement on December 21, 2016, as a result of these negotiations.  *Id.* at ¶ 61.

The third, and last, conspiracy commenced within two months of the execution of the Forbearance Agreement when Nulook ceased making payments to plaintiff.  *Id.* at ¶ 62.  At that

---

[1] Plaintiff purchased all of MCA's assets on February 15, 2016.  Comp. at ¶ 2.
[2] It appears, but is not entirely clear, that Patrick Preece was employed by plaintiff.

time, Nazareno and Heiser intentionally ceased sending debit instructions to Nulook's automated clearinghouse ("ACH"). *Id.* at ¶ 63. PSC then engaged a new ACH processor to debit Nulook merchants and deposit money in bank accounts controlled by Nazareno. *Id.* at ¶ 64. Plaintiff alleges Nazareno, Heiser, and Heiser Enterprises continue to debit funds from Nulook merchants and that the conspiracy is ongoing. *Id.* at ¶ 67. On April 26, 2017, this Court appoints a receiver over PSC. *See* DE 38. The court-appointed Receiver identified several issues with PSC's financial situation, which are now included in the amended allegations. Comp. at ¶ 73; *see also* DE 217. Specifically, plaintiff alleges:

- PSC failed to record revenues in its books and records after August 2015,

- PSC's assets and liabilities in the existing books and records cannot be reconciled with representations it made in its tax filings,

- PSC moved funds from PSC to entities owned or affiliated with Nazareno, and did not record those movements in its books and records, and

- Nazareno routinely used funds from PSC's operation account for personal expenses and personal loans.

Comp. at ¶ 73. After the receiver was appointed, defendants diverted any incoming money to non-party JJ and AA Enterprises, LLC ("JJ & AA"), which is owned by Mannino and Guzzetti, to continue their scheme. *Id.* at ¶¶ 74–75.

The complaint then purports to set forth eight claims for relief: (1) RICO violations under 18 U.S.C. § 1962(c), (2) RICO violations under 18 U.S.C. § 1962(d) (together the "RICO claims"), (3) fraudulent misrepresentation, (4) negligent misrepresentation, (5) fraudulent conveyances, (6) tortious interference with contracts, (7) conversion, and (8) breach of contracts.

## MOTIONS TO DISMISS

The motions to dismiss involve five of the claims for relief: (1) the RICO claims, (2)

fraudulent misrepresentation, (3) negligent misrepresentation, (4) tortious interference with contract, and (5) conversion. Each is discussed in turn.

Motions to dismiss are decided under the well-established standard of review for such matters. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). In addition to the face of the complaint, "the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6). Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (citation omitted).

Fraud claims are subject to a heightened pleading standard under Fed. R. Civ. P. 9(b). To meet this heightened pleading standard, the complaint "must: (1) specify the statement that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).

## I. RICO CLAIMS

Defendants Nazareno, Guzzetti, Mannino, Heiser, and Heiser Enterprises each move to dismiss the RICO claims against them. They each advance several arguments to explain why the RICO claims are flawed. However, as the Nulook Defendants correctly argue, the RICO claims must be dismissed for a more fundamental reason: plaintiff has not yet sustained "clear and definite" damages, and, therefore, does not yet have statutory standing to bring RICO claims.

Under RICO, it is "unlawful for any person employed by or associated with any enterprise

engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). The statute provides two private causes of action. First, "'any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court.'" *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003) (quoting 18 U.S.C. § 1964(c)). Second, "[s]ection 1962(d) makes it 'unlawful for any person to conspire to violate . . . the provisions of subsection . . . (c).'" *Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 220 (E.D.N.Y. 2014) (quoting 18 U.S.C. § 1962(d)).

"RICO standing is a more rigorous matter than standing under Article III." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d. Cir. 2006). "To satisfy RICO's standing requirements, a plaintiff must demonstrate (1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *Uzan*, 322 F.3d at 135 (internal quotations and citation omitted). Under the injury requirement, "a cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *Id.* (citing *First Nationwide Bank v. Gelt Funding Corp*, 27 F.3d 763, 768 (2d Cir. 1993)). "The 'clear and definite' amount of damages suffered by a secured creditor who is fraudulently induced to make a loan and seeks to recover the value of the loan itself, cannot be established until it is finally determined whether the collateral is insufficient to make the plaintiff whole, and if so, by how much. That is because the RICO damages are netted against recovery obtained from collateral and other sources." *Id.* (internal quotations and citation omitted). "In short, a plaintiff who claims that a debt is uncollectible because of the defendant's conduct can only pursue the RICO treble damages remedy after his contractual rights to payment have been frustrated. We therefore conclude[] that until the secured creditor foreclose[s] on the loans, the creditor's claims [are] not ripe for suit." *Id.* (internal

quotations and citation omitted); *see also D'Addario v. D'Addario*, 901 F.3d 80, 93 (2d Cir. 2018) ("[O]ur jurisprudence on this point is long—and well—established").

Here, plaintiff is undeniably a secured creditor. *See e.g.*, Comp. at ¶ 1. Nulook does not dispute that plaintiff has security interest, only the extent of it. *See* DE 149 at 13–14. Plaintiff does not allege that it has foreclosed on the loans it made to Nulook that were secured by receivables. In fact, plaintiff alleges the opposite; it commenced this action once it became aware that payments from Nulook would not resume. Comp. at ¶ 72. Plaintiff's contractual rights have not yet been frustrated because it has not pursued contractual remedies against Nulook. *See Uzan*, 322 F.3d at 135. Even more, plaintiff alleges that defendants directed—and are currently directing—receivables from PSC to JJ & AA. *Id.* at ¶¶ 74–77. In other words, there are avenues for plaintiff to foreclose on its loans, exercise its legal rights, and minimize damages. As a result, Plaintiff cannot yet show that its damages are "clear and definite." *See Uzan*, 322 F.3d at 135.

Plaintiff attempts to argue that this result is not warranted, but its arguments fail. Plaintiff argues that "discovery will reveal the exact amounts" of damages. DE 156 at 21. First, that argument ignores binding case law, which mandates that plaintiff show more at the pleading stage for a RICO claim. *Denney*, 443 F.3d at 266 ("RICO standing is a more rigorous matter than standing under Article III."). Second, the caselaw to which plaintiff cites is distinguishable. In two of the three cases, the courts explained that the cases did not involve "uncollectible debts" or "out of pocket" loss. *Allstate Ins. Co. v. Lyons*, 873 F. Supp. 2d 358, 374 (E.D.N.Y. 2012) ("The case before me is easily distinguishable. Allstate is not seeking redress for an uncollectible debt"); *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 310 (S.D.N.Y. 2010) ("[T]he Complaint does not allege the sort of "out-of-pocket" loss often present in a fraud-based RICO action. Instead, Plaintiffs allege that, as a result of Defendants' fraudulent scheme, they suffered 'a loss of subscription revenue'—specifically, the difference between the individual rates Plaintiffs actually

received, and the higher rates they would have received if the institutional end users had subscribed to the journals. In other words, Plaintiffs allege lost profits."). The third case partially dismissed claims because the damages were not yet clear and definite. *Lima LS PLC v. PHL Variable Ins. Co.*, No. 3:12-cv-1122 (WWE), 2013 WL 3327038 at *13 (D. Conn. July 1, 2013) ("Such injury is premised upon the contingency that plaintiff will not recover the benefits of the Policies. Accordingly, the Court will dismiss any claimed injuries that are hinged upon facts that have yet to be determined.").

Because plaintiff cannot yet show clear and definite damages, it lacks standing to bring the RICO claims. Therefore, the RICO claims are dismissed without prejudice.

## II.     FRAUDULENT MISREPRESENTATION

Defendant Aurigema argues that plaintiff's fraudulent misrepresentation claim must be dismissed because it is duplicative of the breach of contract action against Nulook or, alternatively, that the pleading does not satisfy Rule 9(b). For the reasons that follow, the fraudulent misrepresentation claim is dismissed in part.

### A. Duplicative of Breach of Contract Claim

"Under New York law, parallel fraud and contract claims may be brought if the plaintiff (1) demonstrates a legal duty separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation that is collateral or extraneous to the contract; or (3) seeks special damages that are unrecoverable as contract damages." *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183–84 (2d Cir. 2007) (citation omitted). As Aurigema correctly notes, the first or third prongs are not at issue here. DE 169 at 7; *see also* DE 163 at 10–12.

Intentionally false statements indicating an intent to perform under the contract are "not sufficient to support a claim of fraud under New York law." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 95 F.3d 13, 19 (2d. Cir. 1996). However, "New York distinguishes

between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement." *Allegheny Energy*, 500 F.3d at 184. "A misrepresentation of present facts is collateral to the contract (though it may have induced the plaintiff to sign the contract) and therefore involves a separate breach of duty." *Id.* (citing *First Bank of the Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 291–92, 690 N.Y.S.2d 17, 21 (1st Dep't 1999)). "That the alleged misrepresentations would represent, if proven, a breach of the contractual warranties as well does not alter the result. A plaintiff may elect to sue in fraud on the basis of misrepresentations that breach express warranties." *Id.*

Plaintiff's allegations can be broken down into two categories: misrepresentations in Borrowing Base reports pursuant to the Credit Agreement and misrepresentations to induce the Forbearance Agreement. *See* Comp. at ¶ 139. Because the Borrowing Base reports are provided pursuant to the Credit Agreement, any misrepresentation therein would be a breach of the terms and warranties of the Credit Agreement. *See* DE 14-6 at II(A), XII(C). Any fraud claims related to the Borrowing Base reports, then, are pursuant to—not collateral to— the Credit Agreement. As a result, these misrepresentations cannot form the basis of a fraud claim because it is duplicative of the breach of contract claim.

However, plaintiff includes claims that the same misrepresentations pursuant to the Credit Agreement also induced Plaintiff to enter into the Forbearance Agreement. As a result, misrepresentations not collateral to the Credit Agreement would, in fact, be collateral to the Forbearance Agreement. *See Capax Discovery, Inc. v. AEP RSD Inv'rs., LLC*, 286 F. Supp. 3d 579, 587 (W.D.N.Y. 2018) ("[B]ecause New York law allows Plaintiffs to pursue a claim for fraudulent inducement if those same statements induced them to sign the Agreement, their presence in the Agreement does not negate a fraud claim."). Thus, fraud claims based on

statements that induced plaintiff to enter into the Forbearance Agreement are not duplicative of any claims that the Forbearance Agreement was breached.

Accordingly, fraudulent misrepresentation claims are dismissed in part, as duplicative of the breach of the Credit Agreement claim.

### B. Failure to State a Claim

Aurigema also moves to dismiss the fraudulent misrepresentation claim on that ground that it is not pleaded with the particularity required under Rule 9(b). "Under New York law, '[t]he elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages.'" *IKB Int'l S.A. v. Bank of Am. Corp.*, 584 F. App'x 26, 27 (2d Cir. 2014) (citing *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559, 883 N.Y.S.2d 147, 910 N.E.2d 976 (2009)). "A claim for common law fraud is subject to the particularity pleading requirements of Federal Rule of Civil Procedure 9(b), which requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Id.* (internal citation and quotations omitted). Aurigema argues the complaint is fatally flawed in three ways: failure to plead a strong inference of fraudulent intent, failure to plead false representations, and failure to plead reliance. Each argument fails.

### 1. Strong Inference of Fraudulent Intent

The Second Circuit has required "plaintiffs to plead [a] factual basis which gives rise to a strong inference of fraudulent intent." *IKB Int'l S.A.*, 584 F. App'x at 27. That requirement may be met by "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 27–28.

Notwithstanding Aurigema's arguments that the complaint does not sufficiently plead (1) his knowledge of the misrepresentation of an equity investment or (2) his knowledge of Nazareno's and employee Thomas Plamenco's convictions, the allegations give rise to a strong inference of fraudulent intent. *See* DE 144-1 at 15–16. Aurigema argues that plaintiff fails to allege his knowledge of the double pledging of collateral and payments to PSC. DE 144-1 at 14. However, in the very next sentence Aurigema admits, as he must, that plaintiff alleges "Aurigema knew that Nulook was allowing PSC [to] carry out its daily debit scheme." *Id.* (quoting Comp. at ¶ 137).

Aurigema argues that this allegation is "hollow," but that argument ignores the remaining allegations. Plaintiff provides detailed allegations regarding the double-pledging scheme. *See* Comp. at ¶¶ 41–46 (detailing the double pledging scheme and daily debit operations). Plaintiff then alleges that Aurigema was a part owner and "de facto CFO" who prepared the Borrowing Base reports for plaintiff. *Id.* at ¶¶ 48, 139. Finally, plaintiff attaches an email sent from Aurigema to Nazareno which states:

> Ant told me you were committing a loan this week. [T]hanks for that and we'll make sure you get it back along with the pscf money owed once we get rid of these guys. I prefunded what we needed Friday so we didn't get shut down bc Anthony David you might need a few days. I'm sure he explained how ridiculous these guys have been. [A]ny idea when the funds will be available? [H]e also told me about your convo. [L]ove the idea. [P]ush that if you can. [W]ould love to get everyone paid back and square and have an opportunity to fresh start. [G]ive me a call when you have free time to speak.

*Id.* at ¶ 138, Ex. E. Aurigema explicitly references a loan, which Nulook would pay back, in addition to other money owed. *Id.* Plaintiff then alleges that Aurigema "hid" the existence of these loans from plaintiff until "we get rid of these guys." *Id.* Thus, "drawing all reasonable inferences in favor of the non-moving party," plaintiff sufficiently alleges Aurigema's knowledge of the double pledging and payments to PSC. *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

As a result, the complaint sufficiently pleads a strong inference of fraudulent intent. *See Pension Ben. Guar. Corp. ex rel. Vincent Catholic Med. Ctrs. Retirement Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 732 (2d Cir. 2013) ("[I]t is well settled that a complaint must be read as a whole, not parsed piece by piece to determine whether an allegation, in isolation is plausible.") (internal citation and quotations omitted).

### 2. Nature of Misrepresentations

Aurigema next argues that the Borrowing Base reports are simply excel spreadsheets and that the Borrowing Base template only called for certain items to be included. DE 144-1 at 17–18. However, this information is outside the four-corners of the complaint and is not appropriate for consideration on a motion to dismiss. *See id.* (directing the reader to pp. 6–7 which provide citations to declaration exhibits not in the complaint); *see Garces v. N.Y.C. Housing Auth.*, No. 16-cv-2811-LTS, 2017 WL 3025888 at *1, n.1 (refusing to consider evidentiary submission on a motion to dismiss because it "is outside the proper scope of the record for this motion practice.").

### 3. Reliance

Finally, Aurigema argues that plaintiff has failed to sufficiently plead reliance on any misrepresentations. DE 144-1 at 18. This argument is only partially correct. Plaintiff cannot argue that it relied "by not acting sooner to foreclose on its Loan." *Id.* (citing Comp. at ¶ 140); *see Physicians Mut. Ins. Co. v. Greystone Serv. Corp.*, No. 07-cv-10490, 2009 WL 855648 at *6 (S.D.N.Y. Mar. 25, 2009) (reasoning that delaying legal action is not sufficient to plead reliance). However, the Court dismissed as duplicative any fraud claims relating to the Credit Agreement. *See supra*, at II(A). But Plaintiff also makes reliance arguments related to the Forbearance Agreement. Comp. at ¶¶ 128–29 (alleging reliance on misrepresentations from Aurigema in entering the Forbearance Agreement). As a result, plaintiff sufficiently pleads reliance on misrepresentations made by Aurigema.

In sum, Aurgiema's motion to dismiss the fraudulent misrepresentation claim against him is granted in part, with prejudice, and denied in part.

## III.    NEGLIGENT MISREPRESENTATION

Aurigema argues that plaintiff's negligent misrepresentation claim, must be dismissed as the pleading does not state a claim upon which relief can be granted.  Because Plaintiff cannot show that Aurgiema had a duty to give correct information, this motion is granted.

 "Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as the result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment."  *Tears v. Boston Sci. Corp.*, 17 Civ. 9793 (AJN), 2018 WL 4760659 at *9 (S.D.N.Y. Sept. 29, 2018) (quoting *Hydro Inv'rs, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 21 (2d Cir. 2000)).

"While New York courts have recognized that a business relationship can give rise to a special relationship between parties, this occurs only where 'the requisite high degree of dominance and reliance existed *prior* to the transaction giving rise to the alleged wrong, and not as a result of it.'"  *M&T Bank Corp. v. LaSalle Bank Nat'l Ass'n.*, 852 F. Supp. 2d 324, 337 (W.D.N.Y. 2012) (citing *Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes v. Salomon Bros. Int'l,* 251 A.D.2d 137, 138, 674 N.Y.S.2d 648 (1st Dep't 1998) (emphasis in original).  In particular, there is no special relationship "arising out of the contractual arms-length debtor and creditor legal relationship between a borrower and a bank which would give rise to a cause of action for negligent misrepresentation."  *Vill. on Canon v. Bankers Trust Co.*, 920 F. Supp. 520, 531–32 (S.D.N.Y. 1996) (citation and quotations omitted).

Plaintiff primarily relies on *Suez Equity Investors, L.P. v. Toronto-Dominion Bank* in arguing to the contrary, but the facts from that case are dissimilar. There, the Second Circuit applied the *Kimmell* three factor test to determine whether a special relationship existed:

> In determining whether justifiable reliance exists in a particular case, a fact finder should consider whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.

*Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 103 (citing *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264, 652 N.Y.S.2d 715, 675 N.E.2d 240 (1996)). The Second Circuit held that the "complaint implie[d] a relationship between the parties that extended beyond the typical arm's length business transaction: defendants initiated contact with plaintiffs, induced them to forebear from performing their own due diligence, and repeatedly vouched for the veracity of the allegedly deceptive information." *Id.* "Moreover, to the extent that a 'special relationship of trust' [was] sparsely pled, the complaint emphatically alleges the other two factors enunciated in *Kimmell*." *Id.*

Plaintiff's attempts to analogize to the facts of this case are misplaced. Plaintiff relies on the fact that Aurigema is a Certified Public Accountant ("CPA"), DE 163 at 12, but makes no credible allegation that it believed Aurigema was *its* CPA. *See* DE 169 at 8. Plaintiff also cannot rely on Aurigema's "superior knowledge of the particulars of [his] own business practices . . . to show a special relationship." *See Levantino v. Starwood Mortg. Capital LLC*, 15CV5349(DLC), 2015 WL 7430860, at *6 (S.D.N.Y. Nov. 20, 2015) (citation omitted). Nor can Plaintiff rely on Aurigema's statement that he holds himself "to the highest fiduciary standards." DE 163 at 16 (citing Comp. at ¶ 123). Plaintiff has provided no authority to support the argument that using the label "fiduciary" would cause a fiduciary duty to attach, and would be contrary to case law requiring the court to consider the substance of the relationship. *See Suez Equity*, 250 F.3d at 103.

Even if Plaintiff did sufficiently allege a special relationship, it does not "emphatically allege the other two factors." *See Suez Equity*, 250 F.3d at 103. The same facts analyzed also undermine a finding of unique or special expertise. Thus, plaintiff has failed to plead a duty, as the result of a special relationship, and this claim must be dismissed with prejudice.

## IV.     TORTIOUS INTEFERENCE WITH CONTRACTS

Defendants Heiser and Heiser Enterprises move to dismiss the tortious interference of contract claim against them, arguing the complaint fails to state a claim upon which relief can be granted.

A tortious interference with contract claim under New York law requires: "(i) the existence of a contract; (ii) defendants' knowledge of that contract; (iii) defendants' intentional inducement of a breach of that contract; (iv) a breach; (v) but for the defendants' actions, that contract would not have been breached; and (vi) damages." *Conte v. Emmons*, 895 F.3d 168, 171 (2d Cir. 2018). "[T]he heightened pleading standards of Rule 9(b) apply to torts that are premised on the defendants' alleged fraudulent actions." *TIC Park Centre 9, LLC v. Wojnar*, 16-CV-4302 (ARR) (JO), 2017 WL 7733134, at *6 (E.D.N.Y. Apr. 7, 2017); *see also Silverman Partners, L.P v. First Bank*, 687 F. Supp. 2d 269, 288 (E.D.N.Y. 2010) (citing *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)). "Thus, tortious interference with [] contract [claims] . . . must also be pled with specificity when the underlying acts are allegedly fraudulent." *Wojnar*, 2017 WL 7733134, at * 6.

Here, Rule 9(b) applies to plaintiffs' claim for tortious interference with contracts because that claim is premised on the theory that Heiser and Heiser Enterprises fraudulently diverted funds from Nulook to which plaintiff was entitled. *See* Comp. at ¶¶ 28–46; *see also* ¶¶ 74 (alleging Heiser and Heiser Enterprises are members of a RICO enterprise).

Heiser and Heiser Enterprises argue that plaintiff failed to allege that they knew about the

contracts or that they induced Nulook into breaching the contracts.  DE 160-1 at 19–20.  Heiser

Enterprises correctly argues that the only allegation of its knowledge is that it, and almost every

other defendant, arranged the six factor agreements between PSC and Nulook, and that it was

"knowing, intentional and unjustified" interference with plaintiff's contractual relationships with

Nulook.  Comp. at ¶¶ 163, 165.  That, standing alone, cannot survive scrutiny under Rule 9(b) or

even Rule 8(a).  *See Iqbal*, 556 U.S. at 578 (Rule 8(a) "does not require 'detailed factual

allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me

accusation").

Plaintiff provides more than conclusory recitations against Heiser, but has failed to properly

allege Heiser's knowledge of Nulook's contracts with plaintiff or an intentional inducement of a

breach of those contracts.  While plaintiff alleges that Nazareno and PSC were aware of the

contracts between Nulook and plaintiff because of the Collection Subordination Agreement, there

are no such allegations relating to Heiser.  *See* Comp. at ¶¶ 22–27.  Plaintiff attempts to allege

Heiser's knowledge and intent to induce a breach of the contracts by pointing to an email Nazareno

sent to Heiser stating:

> As far as Nulook I have been dealing with Anthony all day about it. "Surprise!"
> We took over….It's all good he understands just needs reporting and figuring
> a way that he can deal with the credit facility [GWG]. Their [sic] probably going
> to want to talk to someone at PSC. I told him to direct the call to corporate and
> we'll handle it as such. The game plan is of course to run it as long as we can
> to grab the rest of the money he owes and move on he has no issues with that.

*Id.* at ¶ 68.  But this email cannot establish Heiser's intent because he did not author it—Nazareno

did.  Further, the text of the email does not necessarily evidence fraudulent intent of the recipient.

Thus, plaintiff's only allegations against Heiser are the same allegations as Heiser Enterprises,

which, as explained *supra*, are insufficient.

Thus, the tortious interference with contracts claim against Heiser and Heiser Enterprises is

dismissed, without prejudice.[3]

## V.    CONVERSION

Finally, Heiser and Heiser Enterprises move to dismiss the conversion claim against them for failure to state a claim upon which relief can be granted.[4]

"To withstand a motion to dismiss in a conversion claim, a plaintiff must allege: (1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *In re MF Global Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 183 – 84 (S.D.N.Y. 2014) (citation and quotations omitted). "When money, rather than a chattel, is the property at issue is must be specifically identifiable." *In re Bernard Madoff Inv. Securities LLC*, 458 B.R. 87, 133 (S.D.N.Y. 2011) (citation omitted).

Where, as here, the complaint "does not seek a specific amount of money converted from a particular account, but rather 'an award of [] damages in an amount to be determined at trial' it fails to state a claim for conversion under New York law." *See id.*; *see also* Comp. at 45 (praying for an award of "damages in an amount to be determined at trial"). Plaintiff has presented no persuasive argument to the contrary. The cases upon which Plaintiff relies all relate to bank, investment, or personal accounts. Because the plaintiffs in those cases sought damages for funds converted from *those specific accounts* they were able to successfully plead a conversion claim.

---

[3] Because the Court granted the motion to dismiss on these grounds, it need not consider the arguments regarding the economic interest defense. DE 160-1 at 26.

[4] Nazareno and Nulook also request that this court decline to exercise supplemental jurisdiction over the remaining state law claims pending against them. DE 152 at 21. The Court need not consider this argument though. Plaintiff also invokes diversity jurisdiction in the complaint. *See* Comp. at ¶ 12 (showing complete diversity), at ¶¶ 36, 139(d) (alleging damages in excess of $1.6 million and $300,000 respectively).

*See In re MF Global Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d at 184 (individual investment accounts); *Lawson v. Full Tilt Poker Ltd.*, 930 F. Supp. 2d 476, 487–88 (individual poker accounts); *In re Treiling*, 21 B.R. 940, 943 (E.D.N.Y. 1982) (escrow account); *In re Schreibman*, 211 A.D.2d 836, 836–37, 621 N.Y.S.2d 153 (3d Dep't 1995) (client funds in an attorney's account); *In re Kaye*, 194 A.D.2d 99, 100, 604 N.Y.S.2d 117 (1st Dep't 1993) (client funds in an attorney's account). By contrast, plaintiff's conversion claim seeks "all Nulook Merchant collateral accounts pledged as collateral to [Plaintiff] in connection with the Loan." Comp. at ¶ 168.

Plaintiff attempts to rescue its conversion claim by arguing the Borrowing Base reports make the funds specifically identifiable, DE 165 at 24, but the Borrowing Base reports, standing alone, do not sufficiently identify specific accounts.

Therefore, the conversion claim must be dismissed, without prejudice.

## MOTION TO STRIKE PARAGRAPH 39

The Nulook Defendants move to strike the allegations of paragraph 39 pursuant to Rule 12(f). DE 149 at 19–20. That paragraph states:

> PSC, Nulook, Aurigema, Mannino, and Nazareno all participated in negotiating the terms of the Collection and Subordination Agreement. **In fact, on May 22, 2014 Randall Jacobs, Esq., emailed a copy of the Collection and Subordination Agreement to Nazareno, Mannino, and Aurigema.** This was the first evidenced, uncovered to date, of collusion among Aurigema, Mannino, and Nazareno, **aided and abetted by Jacobs, who purports to represent Mannino in this matter**. **Plaintiff believes that Jacobs has a fatal and non-waivable conflict of interest and that Jacobs will either be named as a party in this case at a later date, or will be called as a fact witness.**

Comp. at ¶ 39 (emphasis added). Attorney Jacobs is not a named defendant, nor are any other facts set forth specifying the bases for accusing him of aiding and abetting collusion. While plaintiff ostensibly opposes this motion, it cites no legal authority to support its position.

Under Rule 12(f), the court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "'Immaterial' matter is that which has no essential or important relationship to the claim for relief, and 'impertinent' material consists of statements that do not pertain to, and are not necessary to resolve, the disputed issues." *Brady v. Basic Research, L.L.C.*, 101 F. Supp. 3d 217, 225 (E.D.N.Y. 2015) (internal quotations and citation omitted). "A scandalous allegation is one that reflects unnecessarily on the defendant's moral character, or uses repulsive language that detracts from the dignity of the court." *Id.* Of course, in this case, the challenged allegations not only reflect on the character of the defendants, but on a non-party, who is largely without recourse.[5]

"Motions to strike are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation." *Id.* To prevail on a motion under Rule 12(f), the movant must show that: "(1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." *Id.*

Motions to strike are frequently filed and often miss the point. That the Nulook Defendants may have "colluded" appears amply supported by the allegations and certainly is a fair issue for the introduction of evidence at trial. Thus, seen through this lens, such evidence may be admissible and relevant to the proceeding. Therefore, there is no basis to strike the allegation as it directly affects these parties. *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (motion to strike under 12(f) "will be denied, unless it can be shown that no evidence in support of

---

[5] Technically speaking, Jacobs could have intervened to file a motion to strike. However, his client has offered this argument on his behalf. *See, e.g., N.Y. News, Inc. v. Kheel*, 972 F.2d 482, 489 (2d Cir. 1992) (discussing such a motion by a non-party attorney alleged to have participated in an unlawful conspiracy). Given the already complex history of this matter, the Court will resolve this question without his formal intervention.

the allegation would be admissible").

The language set forth in bold above presents different questions. First, evidence of plaintiff's "belief" that Jacobs may be laboring under a conflict or may be named as a party or called as a witness could not, under any circumstances, be admissible at trial. Thus, that allegation is both immaterial and sufficiently prejudicial to Mr. Jacobs, and by extension his clients, to warrant granting the motion to strike as to the final sentence of the paragraph. *Huang v. GW of Flushing I, Inc.*, No. 17-CV-3181 (PKC) (JO), 2019 WL 145528, at *8 (E.D.N.Y. Jan. 9, 2019) (striking allegations against non-parties which served "no legitimate purpose"). For avoidance of doubt, nothing in this decision should be read as preventing plaintiff from seeking relief concerning any purported conflict, adding a party or offering any particular evidence.[6] *See generally*, *Ricketts v. City of Hartford*, 74 F.3d 1397, 1415 (2d Cir. 1996), *as amended on reh'g in part* (Feb. 14, 1996) (finding that improvidently granted motion to strike did not constitute reversible error where district court permitted evidence of purported conspiracy).

The second question presented arises from the allegation that Jacobs aided and abetted unlawful collusion among the defendants. Remarkably, the sum total of the facts alleged in support of this significant claim consists of his transmission, via email, of a legal document to three parties. These allegations, which would clearly fail scrutiny under Rule 9(b) if Jacobs were a party, would equally permit charging a mail clerk with aiding and abetting collusion based on the unwitting delivery of documents that facilitated that conspiracy.

Being accused of illegal collusion in federal court pleadings is a serious matter, particularly for an officer of the court. There is an issue of fundamental fairness that arises when an attorney, who is not a party to the proceeding, and is therefore not afforded the opportunity to defend

---

[6] The Court does note, however, that after two years of extensive litigation plaintiff has neither moved to add Jacobs as a defendant nor sought to have him disqualified.

himself, has been accused of such activity, particularly when the allegations fail to suggest whether such supposed participation was knowing or willful. *Lynch v. Southampton Animal Shelter Found. Inc.,* 278 F.R.D. 55, 68 (E.D.N.Y. 2011) (partially granting motion to strike where "the complaint is void of any allegation that [non-party witness] was aware . . . of alleged misconduct"). Striking these scandalous assertions would not have any negative impact on plaintiff, who is free to reallege such matters when—and if—it comes into evidence of the same. *Ricketts*, 74 F.3d at 1415.

Based on the foregoing, the motion to strike is granted in part, namely the portions of paragraph 39 set forth in bold above are stricken from the complaint.

## MOTION TO DISQUALIFY COUNSEL

The last motion before the Court is Nazareno's motion to disqualify attorney Stone as counsel for Plaintiff. DE 152 at 21–24. For the reasons that follow, that motion is denied.

"Disqualification is viewed with disfavor in this Circuit . . . because it impinges on a client's right to freely choose his counsel." *Finkel v. Frattarelli Bros., Inc.*, 740 F. Supp. 2d 368, 372 (E.D.N.Y. 2010) (quoting *Bennett Silvershein Assoc. v. Furman*, 776 F. Supp. 800, 802 (S.D.N.Y. 1991) and *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983)) (internal quotations omitted). Rule 3.7 of the New York Rules of Professional Conduct provides that "[a] lawyer shall not act as an advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact." N.Y. Rules Prof'l Conduct R. 3.7(a); *see also* E.D.N.Y. Local Rule 1.5(b)(5) (incorporating the New York Rules of Professional Conduct). That rule is "triggered only when the attorney actually serves as an advocate before the jury." *Finkel*, 740 F. Supp. 2d at 373 (citation omitted). Even more, "[d]isqualification is warranted only where the testimony given by counsel is 'necessary.'" *Id.* In considering whether testimony is "necessary," the "court should examine factors such as the significance of the matters, weight of the testimony, and availability of other evidence." *Id.*

Nazareno presents two arguments: (1) Stone was a director of Plaintiff during the relevant time period and (2) Stone was an active participant in the strict foreclosure of assets of PSC. Both arguments fail to satisfy the high burden required.

First, despite being a director, Stone was not "at the epicenter" of many factual determinations. *See* DE 152 at 22. While Nazareno attempts to set forth a list of facts known only to Stone, the list essentially boils down to what Plaintiff knew and when. *See id.* at 22–23. Nazareno has provided no facts to indicate that Stone has any more first-hand knowledge than the other three directors listed on Plaintiff's Securities and Exchange Commission ("SEC") filing. *See* DE 151, Ex. C at 1–2. Also, Stone states that he was an outside director of Plaintiff, and the SEC filing suggests the same because Stone is the only director who was not simultaneously an executive officer. DE 162-1 at ¶ 5; DE 151, Ex. C at 1–2. Therefore, even assuming that a director of Plaintiff is a necessary witness, there would be other directors who could present the same testimony.

Second, Nazareno cannot use an issue not yet in this case in support of his motion to disqualify. Nazareno argues that the strict foreclosure "will play a central role in [his] defense and counterclaims of this matter," but Nazareno has not yet brought that defense or counterclaim. *See* DE 152 at 24. As a result, the Court is unable to weigh any of the required factors. As Stone correctly points out, Nazareno presents no facts that show that Stone's testimony would be necessary in relation to any purported defense or counterclaims.

Therefore, the motion to disqualify is denied.

## CONCLUSION

Based on the foregoing, it is hereby ORDERED that:

1. The RICO claims are dismissed without prejudice;

2. The fraudulent misrepresentation claim is dismissed, in part, with prejudice;

3. The negligent misrepresentation claim is dismissed with prejudice;

4. The tortious interference with contracts claim is dismissed without prejudice;

5. The conversion claim is dismissed without prejudice;

6. The motion to strike is granted in part;

7. The motion to disqualify is denied.

The parties are directed to meet and confer and file a joint status report within 14 days of the date of this order.

Dated: Central Islip, New York
March 7, 2019

/s/ Gary R. Brown
GARY R. BROWN
United States Magistrate Judge