**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------ x
GWG MCA CAPITAL, INC.                               :
                                                    :     Case No.  17-cv-1724- GRB
                        Plaintiff,                  :
                                                    :
        vs.                                         :     **SECOND AMENDED COMPLAINT**
                                                    :
NULOOK CAPITAL, LLC,                                :
ROBERT AURIGEMA, JOHN GUZZETTI,                     :     **JURY TRIAL DEMANDED**
ANTHONY MANNINO, JOEL NAZARENO,                     :
H. RUSSELL HEISER, and HEISER                       :
ENTERPRISES, LLC,                                   :
                                                    :
                        Defendants.                 :
------------------------------------------------------ x

        Plaintiff GWG MCA Capital, Inc. ("**GWG**" or "**Plaintiff**") by and through its undersigned

attorneys, for its Second Amended Complaint against defendants Nulook Capital, LLC ("**Nulook**

**Capital**"); Robert Aurigema ("**Aurigema**"); John Guzzetti ("**Guzzetti**"); Anthony Mannino

("**Mannino**"); Joel Nazareno ("**Nazareno**"); H. Russell Heiser ("**Heiser**"); and Heiser Enterprises,

LLC ("**Heiser Enterprises**") (collectively, "**Defendants**") hereby alleges as follows:

## I.   PRELIMINARY STATEMENT

        1.      GWG is a commercial lending company that suffered millions of dollars in losses

due to Defendants' fraudulent schemes including: (i) the Daily Debit Scheme; (ii) the Diversion

Scheme; and (iii) the Post-Receivership Scheme.

        2.      In 2014, Nulook borrowed money from GWG's predecessor for the purpose of

making merchant cash advances.  Nulook would make these lump-sum advances to merchants

(typically small to mid-sized businesses), that in exchange would permit Nulook to debit money

from their bank accounts on a daily or weekly basis, as repayment for the advances.  Typically,

merchant cash deals permit the funding company to recoup a multiple of the amount advanced for

a period of 4-6 months.  For example, a merchant advanced $100,000, at a multiple of 1.4 times

the amount advanced, would permit a lender (like Nulook) to debit its account daily, until the lender collected $140,000.  Here, Nulook pledged its accounts receivable (the daily debits owed to it by merchants) to GWG's predecessor as security for a revolving credit agreement.

3.      Shortly after borrowing $3.75 Million from GWG's predecessor, two of Nulook's principals (Mannino and Guzzetti) conspired with Nazareno and Heiser of International Professional Services, Inc. ("**PSC**") – the company Nulook used to service its merchant cash advance deals – to use PSC's technology to run a scam described herein as the "**Daily Debit Scheme**."

4.      Approximately 18 months later, after Nulook defrauded GWG into a Forbearance Agreement, the Daily Debit Scheme had run its course.  Certain Defendants then used PSC's technology to run a new scheme, the "**Diversion Scheme**," to steal more money from GWG and others.

5.      After the instant litigation abruptly ended the Diversion Scheme, Nazareno then defrauded GWG through the "**Post-Receivership Scheme**."  PSC's technology was so instrumental to the Defendants' schemes that even after a receiver had been appointed over PSC, Nazareno continued his nefarious activities.  With the help of his former employees and agents, he stole PSC's intellectual property and sold it to new would-be merchant cash advance platforms.

6.      For years, PSC's technology, and control over information and the flow of money, were the beating heart of a criminal enterprise running myriad schemes against PCS's clients, their lenders, and unsuspecting merchants across the county.  The criminal enterprise includes three schemes: (i) the Daily Debit Scheme; (ii) the Diversion Scheme; and (iii) the Post-Receivership Scheme, the last of which continues to this day.

## II. THE PARTIES

7.     Plaintiff GWG is a Delaware corporation, with its principal place of business in Minneapolis, Minnesota.  On February 15, 2016, it purchased all assets of MCA Capital, LLC, including the Loan to Nulook at the core of this dispute.   Any references to GWG herein include MCA Capital, LLC by virtue of GWG's acquisition of its assets.

8.     Defendant Nulook is a New York Limited Liability Company owned by Defendants Aurigema, Guzzetti, and, Mannino, with a principal place of business at 25 Hemmingway Drive, Melville, NY 11747.

9.     Defendant Mannino is a citizen of New York, residing at 243 Harbor Lane, Massapequa, NY 11762.  Mannino was the CEO of Nulook.

10.     Defendant Guzzetti is a citizen of New York, residing at 25 Hemmingway Drive, Melville, New York 11746.  Guzzetti was the COO of Nulook.

11.     Defendant Aurigema is a citizen of New York, residing at 2731 Landing Avenue, Bellmore, New York 11710.

12.     Defendant Nazareno is a citizen of New York, residing at 21 Cherry Lane, Port Jefferson Station, New York.  Nazareno was the Executive Director of PSC.[1]  He was the alter-ego of PSC, using the corporation and its technology as an instrumentality of fraud, and using its bank accounts as his own personal piggybank.

---

[1] GWG dropped PSC as a defendant herein after it settled with the Receiver. Continuing to litigate against PSC would have meant that GWG would fund its own litigation, as well as PSC's defense. PSC was also dropped as a defendant in the lawsuit filed by America's Business Capital against Nazareno, PSC, and Thomas Plamenco originally filed in the Southern District of New York.  The case, styled as *America's Business Capital, LLC v. International Professional Services*, *et al.* Case No. 1:18-cv-01819-RRM-LB (EDNY 2017) (the "**ABC Action**"), was transferred to the Eastern District of New York.

13.    Defendant Heiser is a citizen of Florida, residing at 200 E. Palmetto Park Road, Apt. 417, Boca Raton, FL 33432. He was the CEO of PSC. He also created and managed a financing division within PSC that PSC referred to as PSC Financial or "**PSCF**." Heiser made advances to Nulook and other merchants through this division. He used his and Nazareno's control over PSC's technology to jump in front of GWG, taking collateral from Nulook that was properly pledged to GWG as first priority lien holder.

14.    Defendant Heiser Enterprises is a Florida limited liability company.

## III.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over GWG's federal law claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) and (d). It has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because they are so closely related to the federal claims so as to form part of the same case or controversy.

16.    This Court also has subject matter jurisdiction based on diversity of citizenship, pursuant to 28 U.S.C. § 1332. Plaintiff is a Delaware corporation with its principal place of business located in Minnesota. Defendants Nulook, Aurigema, Guzzetti, Mannino, and Nazareno are located in, reside in, or have their principal places of business in New York. Heiser resides in Florida. Heiser Enterprises has its principal place of business in Florida. The exercise of personal jurisdiction over all Defendants is reasonable and proper because Defendants either reside in New York, regularly transact business therein, or committed tortious acts therein. The amount in controversy exceeds $75,000.00, exclusive of costs and interest.

17.    Personal jurisdiction is proper pursuant to C.P.L.R. § 302 (a)(1) and § 302 (a)(3), 18 U.S.C. § 1965 (b), and Federal Rule of Civil Procedure 4(k).

18.    Venue is proper pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(2).  The acts and transactions complained of occurred in this District; Defendants reside or conduct business herein; and most Defendants have consented or waived objection to venue herein.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### *The Nulook Business*

19.    Nulook made short-term financing available to small to mid-sized businesses that were not creditworthy.  In exchange for lump-sum merchant cash advances, these businesses ("**Nulook Merchants**"), allowed Nulook to debit money from their bank accounts on a daily or weekly basis in repayment of these advances using an Automated Clearing House ("**ACH**") processor.  These merchant cash advances were structured as a sale of a portion of future receivables, instead of as a loan.  By doing this, Nulook was not bound by state usury laws that prohibit lenders from charging high interest rates and was not subject to any regulatory oversight whatsoever.

20.    The merchant cash advance industry serves as a source of funds for businesses that cannot obtain funds from more traditional sources like banks and has a significant effect on interstate commerce. Nulook Merchants were located in more than forty-four (44) states throughout the United States.

21.    At all times relevant hereto, Defendants Aurigema, Guzzetti, and Mannino each owned one-third of Nulook.

### *The Nulook Loan*

22.    On May 22, 2014 Nulook borrowed $2.5 Million (the "**Loan**") from MCA Capital, LLC ("**Lender**") to make merchant cash advances to the Nulook Merchants.

23.    The Loan was amended twice, increasing the borrowing limit each time.  By December 22, 2014, Nulook owed $3.75 Million to Lender.

24.     MCA Capital, LLC (Lender), with offices in Delray Beach, Florida, funded Nulook

by wiring funds from its account at Bank of America (headquartered in Charlotte, NC) to Nulook's

bank account at TD Bank (headquartered in Cherry Hill, NJ), beginning with an initial wire transfer

of $49,680.00 on June 3, 2014.  From May 2014 through February 2016, Lender wired Nulook an

aggregate amount exceeding $3.7 Million in multiple wire transfers.

25.     The Loan was secured by a first priority perfected security interest in and to:

All of Debtor's right, title and interest in and to the following, whether now owned
or hereafter arising, acquired or created (collectively, "Collateral"):(i) all FRPAs
securing Lender's Funded MCAs, (ii) all MCAs, whether or not they constitute
Eligible MCAs, pertaining to such FRPAs, (iii) all "General Intangibles" pertaining
to such FRPAs and (iv) all products and "Proceeds" (including "Cash Proceeds")
with respect to any of the forgoing.

The following terms have the following meanings:
The terms "General Intangibles," "Proceeds" and "Cash Proceeds" shall have the
meanings ascribed to them in the Uniform Commercial Code of the State of New
York ("UCC").
The term "Eligible MCAs" means those MCAs underwritten within the Program
criteria and according to underwriting procedures of the Debtor.
The term "FRPA" means Future Receivables Purchase Agreement between Debtor
and a Merchant.
The term "Lender" means MCA Capital, LLC.
The term "Lender's Funded MCAs" means the MCAs funded by Lender.
The term "MCA" means Merchant cash advances.
The term "Merchant" means a merchant or other small business.
The term "Program" means Debtor's business of making Merchant cash advances
to purchase future receivables at a discount from Merchants originated and selected
by the Debtor pursuant to a FRPA.

26.     To document its lien on the Collateral (as defined in Paragraph 25 above), Lender

filed a UCC-1 financing statement against Nulook in New York on May 23, 2014 (Filing Number

201405235537443).

27.     On February 15, 2016, GWG purchased all of Lender's assets, including the Nulook

Loan at the core of this dispute.  On February 18, 2016, Lender's UCC-1 was assigned to GWG

by UCC-3 Filing Number 201602188065365.  (Hereinafter, the terms "**Lender**" and "**GWG**" are used interchangeably, except where separate identification is necessary).

28.    At all times, GWG's security interest extended to and included "**Proceeds**" and "**Cash Proceeds**" as defined in Section 9-102 of New York's Uniform Commercial Code ("**UCC**"). Both Proceeds and Cash Proceeds include the incoming daily payments from Nulook Merchants of a portion of their daily receivables (these incoming payments are hereafter referred to as "**Receivables**"). Very often a secured party (as did GWG) desires to maintain a security interest not only in its original collateral, but also in the proceeds generated from the disposition of this collateral.  Article 9 of the UCC provides that security interests continue in "identifiable proceeds" of original collateral.  N.Y. UCC § 9-315 (a)(2). "Cash Proceeds" consist of "money, checks, deposit accounts, or the like." N.Y. UCC § 9-102 (a)(9).[2]

### *Nulook Hires PSC To Service Its Merchant Cash Advance Business*

29.    Nulook hired PSC to perform all back-office servicing for its portfolio of merchant cash advances.

30.     Most importantly, Nulook hired PSC to debit the bank accounts of Nulook Merchants, using an ACH processing company called T$$ LLC dba ACHWorks ("**ACHWorks**"), and to remit those payments to Nulook.

### *The Collection Subordination Agreement*

31.    At all times relevant herein, PSC knew about GWG's loan to Nulook. As part of the Nulook Loan documentation, Lender, Nulook, and PSC entered into a Collection Subordination Agreement pursuant to which:

---

[2] In this litigation, Nulook has asserted that it had receivables that were not pledged to GWG.  On numerous occasions from February 2016 through December 2016, Defendant Aurigema made representations to GWG to the contrary. *See e.g. infra* ¶ 95. To date, Nulook has been unable to identify any receivables not pledged to GWG.

a)     PSC was informed of Lender's security interest in Nulook's receivables, including Cash and Cash Proceeds; and

b)     PSC specifically agreed to be bound by the provisions of that agreement, and recognize Lender's security interest in, and priority rights to proceeds from, the Collateral, which included the Receivables from Nulook Merchants.

32.     The Collection Subordination Agreement was executed by Nazareno, as Executive Director of PSC:

The undersigned, IPS, Inc., a New York corporation, being the Servicer named in the foregoing Collection Subordination Agreement, hereby accepts and consents hereto and agrees to be bound by all of the provisions hereof and to recognize all priorities and other rights granted thereby to MCA Capital, LLC ("Lender") and Nulook Capital, LLC ("Borrower") and to deposit Collections received pursuant hereto in accordance with the RCA, a copy of which it acknowledges has been provided to it.

INTERNATIONAL PROFESSIONAL SERVICES, INC.

By: _____

Joel Nazareno,
Executive Director
Dated: May 22, 2014

**_PSC's Operations_**

33.     PSC held itself out to the public as a service provider of "front, middle and back office software platforms for the Merchant Cash Advance Industry."[3]

34.     From 2012 through August 4, 2017:

a)     PSC operated an online platform (the "**Platform**") that enabled merchant cash advance companies like Nulook to identify merchants in need of short-term cash advances, and provide funding to them.  PSC referred to companies that paid monthly fees to join the Platform as "**Members**."   PSC also acted as an

---

[3] *See* https://debanked.com/2015/09/psc-board-of-directors-appoints-new-ceo/.

intermediary, soliciting merchant cash advance companies to participate in jointly funded transactions commonly referred to as "syndications."

b)       PSC performed back-office servicing functions for its Members, described as a "front-end-to-back-end relationship management solution system."

c)       Through PSCF (PSC Financial), a financing division created, administered, and funded by and through Heiser and Heiser Enterprises, Heiser advertised, solicited, and provided cash advances to PSC Members that needed funding to make additional cash advances to merchants.

d)       Together with two individuals from Nulook, Anthony Mannino and John Guzzetti, PSC operated "**The Marketplace**." The Marketplace was a platform "powered by PSC" where information regarding merchants looking for cash advances could be posted, and merchant cash advance companies (known as "funders") could find "deals" to fund.   Nazareno, Mannino, and Guzzetti received commissions on deals funded through The Marketplace.

35.     PSC's back-office servicing system gave it access to confidential bank account information for Members (and their merchants and syndicates) and allowed PSC to control the flow of cash for its Members (and their merchants and syndicates) through the automated clearing house (ACH) system. This confidential information included bank account details, credit reports, UCC filings, and the identity, viability, and financial condition of all of the underlying merchants who entered into merchant cash advance agreements with Nulook and other Members.

36.     The Platform was a web-based, electronic system hosted in the cloud using Amazon Web Services, GoDaddy.com, Twilio.com, and Rackspace.  Servers for these systems were located

in Irvine, CA; Clifton, NJ; Farmingdale, NY; Dallas, TX; Chicago, IL; Hong Kong, London, and Sydney, Australia. Members accessed the Platform via a username and password.

37. PSC Members like Nulook used the Platform to upload and download documents, manage merchant accounts, produce reports, and authorize PSC to give daily debiting instructions to ACH processors, including ACHWorks, headquartered in Gold River, CA, and The ACH Processing Company, headquartered in Dallas, TX ("**ACH Processing**").

38. The Platform allowed Nazareno and Heiser to control all cash transactions, allocations, and collections electronically using the ACH network.

39. Nazareno is a convicted felon. In 2001, he was convicted in *United States v. Robert Cotaggio et al.*, (98-CR-01129 (EDNY)) for his role in a massive "pump and dump" securities fraud scheme, was ordered to pay $10 Million in restitution, and was sentenced to five years in a federal penitentiary with three years of supervised release.

40. PSC's former Director of Development, Thomas Plamenco, was also convicted as his co-conspirator.

41. The principal of one PSC Member – Mark Mancino of American Funding Group, pled guilty to charges in connection with the same *Cotaggio* "pump and dump" scheme and was sentenced to 18 months in prison. Mancino was also recently sued by Yellowstone Capital LLC, which alleged that he ran a scam that deceived merchants into breaching their merchant cash advance agreements (the "**Mancino Yellowstone Scam**").[4] The Mancino Yellowstone Scam allegedly resulted in funders losing their entire investment.

---

[4] *Yellowstone Capital LLC and EBF Partners, LLC v. Corporate Bailout, LLC, Mark D. Guidubaldi & Associates, LLC d/b/a Protection Legal Group, PLG Servicing, LLC, American Funding Group, Coast to Coat Funding LLC, ROC Funding Group, LLC, ROC South LLC, and Mark Mancino* (New York Supreme, Index No. 656079/2017).

42.     Nazareno and Heiser used the Platform to carry out two of the fraudulent schemes detailed below– the Daily Debit Scheme and the Diversion Scheme.  Nazareno then stole the PSC's intellectual property in the Post-Receivership Scheme.

43.     Nazareno and Heiser also used the Platform to defraud a company called America's Business Capital ("**ABC**").  In that scheme Nazareno and Plamenco led ABC to invest with Mancino, their convicted felon friend, who both encouraged merchants to default, and put together the deals that provided the merchants with advances. Nazareno did not disclose to ABC his own criminal history or that of Mancino or Plamenco.

44.     The mechanics of the scheme to defraud ABC were identical to the Diversion Scheme used to defraud GWG a short time later.  Attached hereto as **Exhibit A** is the ABC Action hearing transcript wherein the court held that plaintiffs stated a claim for civil conspiracy.

45.     The Platform was tailor-made for fraud because it had total control over the flow of information and money related to all MCA deals.

46.     In short, the Platform was an instrumentality of fraud, used for many years to perpetrate various scams.

### *Russell Heiser Becomes the Chief Executive Officer of PSC*

47.     Hoping to capitalize on Heiser's ability to bring in institutional investors, Nazareno and Heiser named Heiser as PSC's Chief Executive Officer on or about May 30, 2015.

48.     As CEO, Heiser had imputed knowledge of PSC's business dealings, including the Nulook Loan and the Collection Subordination Agreement, that imposed obligations on PSC and detailed GWG's priority security interest in all of Nulook's Receivables. *See supra* ¶¶ 31-32.

49.     Heiser regularly held himself out to the public and to PSC employees and business associates as PSC's CEO:

a) On July 7, 2015 he signed a Mutual Non-Disclosure Agreement with Atalaya Capital Management LP, identifying himself as the CEO of International Professional Services Inc. d/b/a PSC Inc.:

International Professional Services Inc.

d/b/a PSC Inc

By:

Name: H Russell Heiser Jr.

Title: CEO

As part of Heiser's negotiations with Atalaya, he sent Nulook's data to Alex Wang of Atalaya in response to Wang's request for information on "1-2 accounts…to approach with a leverage offer." Heiser also had discussions with two of Nulook's principals regarding financing from Atalaya. *See infra* ¶ 58.

b) On July 13, 2015, former PSC employee and Director of Business Development, Thomas Plamenco emailed Jeff Reece of Yellowstone Capital, LLC introducing Heiser as the new CEO:

On Jul 13, 2015, at 6:32 PM, Tom Plamenco <tom@PSCNY.US> wrote:

Jeff,

I was present with Tom Nix at your offices on June 4th. My goodness how time flies! Just touching base to see if we can set up a meeting with you and our new CEO Russ Heiser. I felt it might be better if you speak directly to the decision maker rather than I relaying everything. PSC is a Silver Sponsor at next week's Alt Lend 2015. Will you be attending? If not, can we set up a meeting Tuesday or Thursday of next week?

c) On September 29, 2015, PSC issued a press release announcing the appointment of Heiser as Chief Executive Officer, quoting Heiser himself:

**PSC Board of Directors Appoints New CEO**

*Russell Heiser chosen to manage PSC's exponential growth in the Merchant Cash Advance Industry*

PORT WASHINGTON, NY (PRWEB) September 29, 2015 -- PSC, a technology leader in providing front, middle and back office software platforms for the Merchant Cash Advance Industry, announced today that their Board of Directors has appointed H. Russell Heiser Jr. to the position of CEO. Mr. Heiser has extensive experience advising family offices in venture and private equity investments in companies across a variety of sectors. In many cases, he ended up in operational roles within these companies. In addition, Mr. Heiser was an investment banker at both UBS Investment Bank and Bear Stearns after receiving his MBA from Columbia Business School.

In the second quarter of 2015, Mr. Heiser led an investment group that obtained a stake in PSC. In tandem with the equity investment, PSC received a significant debt commitment to provide funding to the MCA companies utilizing the PSC platform.

"The PSC platform, with its seamless deal management software and in-depth reporting, was already an effective vehicle for our members to launch and grow a Merchant Cash Advance business," Heiser said. "By layering in additional functionality and access to growth capital for its members, the PSC platform provides even more value to its members."

"PSC conducted an exhaustive search to find the right individual to deliver our new products and manage our growth," PSC's Vice President of Operations Andrew Ragavanis stated. "Russ has the full support of the executive management team, as well as, the Board of Directors and I am excited to see PSC continue to grow under his leadership."

PSC is a full-service solutions provider specializing in the Merchant Cash Advance Industry. The Company provides the support staff and MCA software to facilitate direct funding from start to finish via a secure platform, a syndication platform across its membership, impartial deal provisioning of opportunities directed to the PSC platform and growth financing. Our staff of seasoned professionals has significant experience throughout the alternative financing sector. The Company's information is available on its website: http://www.pscny.us or through salessupport@pscny.us.

d)  At her deposition on November 10, 2017, PSC employee Erin Kim ("**Kim**") (Nazareno's assistant), was questioned about Heiser's role at PSC. Kim confirmed that Heiser "came on board as the CEO":

> Q   Um, did you know a Russel Heiser?
> A   Yes.
> Q   What was his role?
> A   He came on board as the CEO, I think, yeah, to manage, um, PSC.

e)  At his deposition on January 11, 2018, Nazareno was questioned about Heiser's relationship with PSC and also confirmed that Heiser was the CEO[5]:

---

[5] Copies of Kim and Nazareno's deposition transcripts will be made available upon request.

> Q   Who is Russ Heiser?
> A   He was the CEO of the company at that time.
> Q   At that time you received the receivership order?
> A   Yeah, he was -- yes.

## THE FIRST CONSPIRACY: NULOOK CONSPIRES WITH PSC TO STEAL FROM GWG THROUGH THE DAILY DEBIT SCHEME

50.     In early 2015, Nazareno, Heiser, and Heiser Enterprises implemented a plan to offer financing to PSC's Members.  This financing division (which they referred as PSCF) provided cash advances to Members such as Nulook, that in turn, made merchant cash advances to retail businesses.

51.     Heiser controlled this financing division from the start.  He directed advertising to PSC Members regarding the availability of funds, performed underwriting, decided which applicants to fund, and provided the funding either (i) directly from a Heiser Enterprises bank account to merchant cash advance entities like Nulook; or (ii) indirectly, by wiring money to a PSC account for further distribution to PSC's Members. *See infra* ¶¶ 56-57.

52.     This program launched on May 29, 2015, with Heiser using interstate wires to send funds directly from Heiser Enterprises' bank account at Wells Fargo to three PSC Members, including Nulook.

53.     In late May 2015, Nulook emailed Lender to ask if it could "enter into a factor agreement with PSC for $200k."  Given that, at that point in time, the Nulook Loan was in good standing, Lender confirmed that Nulook could proceed with a factor agreement with PSC for $200,000.00.  The actual terms of the Nulook factor agreement were never disclosed to Lender.

54.    If Nulook had disclosed that it was attempting to pledge the same collateral to PSC that it had already pledged to Lender, Lender would never have agreed to release its lien on Nulook's collateral, and it never would have agreed to Nulook entering into a factor agreement with PSC.

55.    Heiser knew that Nulook's collateral was already pledged to a lender based on (i) his imputed knowledge of the Collection Subordination Agreement between PSC, Nulook and Lender (which spelled out Lender's security interest); and (ii) through his discussions with Atalya and Nulook regarding bringing in Atalaya to fund Nulook. *See supra* ¶ 49(a). Upon information and belief, the Nulook data provided to Atalaya included advances made to merchants, outstanding receivables, and information on the Nulook Loan.

56.    Despite all of this, on May 29, 2015 Nulook entered into a factor agreement with Heiser's financing division, taking a $200,000.00 cash advance, permitting PSC to debit the Nulook bank account at TD Bank $967.00 on a daily basis, which agreement provided that Nulook:

> sells, assigns and transfers to PSCF (making PSCF the absolute owner) … all of [Nulook's] future accounts, contract rights and other obligations arising from or relating to the payment of monies form the [Nulook's] customers….

This was the very same collateral that had been pledged to Lender.  The funds ($200,000.00 less a wire fee) were sent to Nulook, using interstate wires, directly by Heiser from a bank account at Wells Fargo in the name of Heiser Enterprises.

57.    From May 2015 – May 2016, Heiser provided more funds to his financing division at PSC, via interstate wires, from Heiser Enterprises' Wells Fargo bank account to PSC's bank account at Bank of America as follows:  $740,200.00 on July 28, 2015, and $500,000.00 on November 2, 2015.

58.    Heiser also brought in funds for his financing division from MM Funding LLC, a Florida limited liability company owned by Marc Malaga, an apparent friend and business associate of Heiser who once worked with him at Flexshopper, Inc.[6]

59.    Unbeknownst to GWG, and without notice to or permission from Lender, Nulook entered into five (5) additional factor agreements with Heiser's finance division as follows:

(i) On July 29, 2015, Nulook accepted a $350,000.00 advance from Heiser's finance division and pledged to repay it $420,000.00, permitting PSC to debit $1,750.00 from its bank account on a daily basis;

(ii) On October 30, 2015, Nulook accepted a $150,000.00 advance from Heiser's finance division and pledged to repay it $175,500.00, permitting PSC to debit $731.25 from its bank account on a daily basis;

(iii) On November 5, 2015, Nulook accepted a $150,000.00 advance from Heiser's finance division and pledged to repay it $175,500.00, permitting PSC to debit $731.25 from its bank account on a daily basis;

(iv) On January 19, 2015, Nulook accepted a $100,000.00 advance from Heiser's finance division and pledged to repay it $116,000.00 to PSC, permitting PSC to debit $483.33 from its bank account on a daily basis; and

(v) On April 29, 2016, Nulook accepted a $500,000.00 advance from Heiser's finance division and pledged to repay it $555,000.00, permitting PSC to debit $6,937.50 from its bank account on a daily basis.

60.    Nulook never provided the factor agreements to Lender, and Nulook never disclosed the daily debits that were secretly routed to PSC.[7]

61.    Neither Lender nor GWG ever released or relinquished its security interest in the Collateral or terminated its UCC-1 financing statement.

---

[6] MM Funding LLC wired $500,000 to Heiser's PSC bank account on May 5, 2016. MM Funding LLC received at least $474,086 from Heiser through his PSC bank account.

[7] It was not until just before this litigation began (March 2017) that Mannino provided copies of the six factoring agreements to GWG.

62.     Neither Lender nor GWG entered into any form of inter-creditor agreement, participation agreement, carve-out agreement, or other arrangement with respect to GWG's first priority perfected security interest in the Collateral.

63.     In total, Nulook "double-pledged" $1,450,000.00 of receivables that had been previously pledged exclusively to GWG, and committed to repaying Heiser's finance division (PSCF) $1,674,000.00 pursuant to the factor agreements dated May 29, 2015, July 29, 2015, October 30, 2015, November 6, 2015, January 19, 2016, and April 29, 2016 (collectively the "**Heiser Agreements**").

64.     On January 10, 2017, Heiser Enterprises filed a UCC-1 Financing Statement, Filing Number 201701108014071 against Nulook, describing the lender for the collateral therein as "Heiser Enterprises, LLC d/b/a "PSCF."" A copy of this UCC-1 Financing Statement is attached hereto as **Exhibit B**. Any UCC search Heiser made before filing this UCC against Nulook would have revealed GWG's prior lien.

65.     In connection with the Heiser Agreements, funds were sent, using interstate wires, as follows:

| Date | From | Bank | To | Bank | Amount |
|------|------|------|-----|------|--------|
| May 29, 2015 | Heiser Enterprises | Wells Fargo Bank, N.A. (San Francisco, CA) | Nulook | TD Bank (Cherry Hill, NJ) | $199,970.00 |
| July 30,2015 | PSC | Bank of America (Charlotte, NC) | Nulook | TD Bank (Cherry Hill, NJ) | $349,970.00 |
| November 2, 2015 | PSC | Bank of America (Charlotte, NC) | Nulook | TD Bank (Cherry Hill, NJ) | $149,970.00 |
| November 6, 2015 | PSC | Bank of America (Charlotte, NC) | Nulook | TD Bank (Cherry Hill, NJ) | $149,970.00 |
| January 21, 2016 | PSC | Bank of America (Charlotte, NC) | Nulook | TD Bank (Cherry Hill, NJ) | $99,970.00 |
| April 29, 2016 | PSC | Bank of America (Charlotte, NC) | Nulook | TD Bank (Cherry Hill, NJ) | $499,970.00 |

66.     Each of the Heiser Agreements provided that Nulook:

sells, assigns and transfers to PSCF (making PSCF the absolute owner) …all of [Nulook's] future accounts, contract rights and other obligations arising from or relating to the payment of monies form the [Nulook's] customers….

67.     Nulook did not disclose the terms of any of the Heiser Agreements to GWG because Nulook knew that GWG would not permit Nulook to "sell" receivables that had been pledged to it pursuant to the Nulook Loan.

68.     Nulook did not disclose to Lender or GWG that these Heiser Agreements permitted PSC to debit its operating account on a daily basis in repayment of these agreements. The daily debits from Nulook's bank account were in pre-set dollar amounts and not tied to specific merchant advances.  Co-mingled Cash Proceeds were simply secreted from Nulook's bank account in derogation of GWG's rights.

69.     Nulook knew that these Receivables had already been pledged to Lender and that there was no good faith basis for the sale or double pledge of its Receivables to PSC.

70.     Mannino or Guzzetti signed the Heiser Agreements and emailed the Agreements and related debit authorizations back to PSC. This was done on or about May 29, 2015, July 29, 2015, October 30, 2015, November 6, 2015, January 19, 2016, and April 29, 2016. PSC electronically sent these debit authorizations to Nulook's TD Bank account (headquartered in Cherry Hill, NJ).

71.     Using interstate wires, TD Bank debited funds from Nulook's account and wired the money to PSC's bank account at Bank of America (headquartered in Charlotte, NC) using the services of ACH Processing, headquartered in Dallas, Texas.

72.     These payments occurred over 1,300 times (from May 29, 2015 through January 24, 2017), as set forth in **Exhibit C** hereto (detailing the date, amount, debiting bank account, and depositing bank account).

73.    In total, $1,361,769.34 was stolen from GWG pursuant to this fraudulent scheme – the Daily Debit Scheme.

74.    In an effort to feign legitimacy, a PSC representative called Nulook to confirm their agreement with the terms of each Heiser Agreement.  The telephone calls were recorded.

75.    In each call, PSC asked either Mannino or Guzzetti the following question: "DO YOU UNDERSTAND THAT THIS IS NOT A LOAN AND THAT THIS IS A MERCHANT CASH ADVANCE AND WE'RE ACTUALLY PURCHASING YOUR FUTURE RECEIVABLES?"

76.    A transcript of the call from PSC employee, Kevin Carrigan, to Guzzetti made on or about April 29, 2016, and associated with the Heiser Agreement dated April 29, 2016 is attached hereto as **Exhibit D.**   In that call, Kevin Carrigan posed the above question to Guzzetti and he answered "Yes."

```
        KEVIN:  And you do understand that this is not a
    loan and that this is a merchant cash advance and we're
    actually purchasing your future receivables?
        MR. GUZZETTI:  Yes.
```

77.    PSC and Nulook (and their principals) disguised the daily bank debits by using a notation that made them look like any other Nulook Merchant debit on Nulook's bank statements.

78.    For example, the debits for legitimate fees associated with one Nulook Merchant, Roland Super Taco, appear on Nulook's bank statements under the notation "CCD Debit, International PR 6878."

79.    PSC used a similar notation to conceal the Daily Debit Scheme from GWG by using the notation "CCD Debit, International PR Deal_96" when debiting Nulook's account under the fraudulent Heiser Agreements.

80.    An example of these two, almost identical, notations is set forth below:

> CCD DEBIT, INTERNATIONAL PR DEAL_96
> CCD DEBIT, INTERNATIONAL PR 6878

Each debit in **Exhibit C** used the same or similar notation to conceal the Daily Debit Scheme.

81.    PSC, Nulook, Nazareno, Mannino, and Guzzetti took further steps to hide these transactions from GWG by using ACH Processing (headquartered in Dallas, TX) to make the debits for the Heiser Agreements rather than ACHWorks.  GWG was unaware that Nulook had ever authorized ACH Processing to debit its bank account until after this litigation began.

82.    In fact, GWG, PSC, Nulook and ACHWorks entered into a multi-party agreement where ACHWorks acknowledged GWG's security interest and priority lien on Nulook's Collateral and agreed not to take any action that would interfere with GWG's rights in and to the Collateral.

83.    PSC and Nulook knowingly circumvented GWG's rights by secretly using ACH Processing rather than ACHWorks to debit Nulook in connection with the Daily Debit Scheme.

84.    Heiser successfully circumvented GWG and profited handsomely from the Daily Debit Scheme:

| Date | From | To | Amount |
|---|---|---|---|
| 5/19/2016 | PSC Bank Account X6088 (Bank of America) | Heiser Enterprises (Wells Fargo) | $800,000.00 |
| 10/16/2016 | PSC Bank Account X6088 (Bank of America) | Heiser Enterprises (Wells Fargo) | $725,000.00 |
| 1/23/2017 | PSC Bank Account X6088 (Bank of America) | Heiser Enterprises (Wells Fargo) | $150,000.00 |
| 3/8/2017 | PSC Bank Account X6088 (Bank of America) | Heiser Enterprises (Wells Fargo) | $80,000.00 |
| 3/31/2017 | PSC Bank Account X6088 (Bank of America) | Heiser Enterprises (Wells Fargo) | $40,000.00 |
|  |  | Total | **$1,795,000.00** |

**THE SECOND CONSPIRACY: NULOOK CONSPIRES TO DEFRAUD GWG INTO A FORBEARANCE AGREEMENT**

85.    In early 2016, shortly after purchasing the Nulook Loan, GWG identified a number of material deficiencies and irregularities with respect to the Loan.

86.    From March 2016 – July 2016, GWG attempted to resolve the Loan deficiencies.

87.    During this time, GWG emailed with Nulook, corresponding primarily with Aurigema, who acted as Nulook's de-facto Chief Financial Officer.

88.    During this time, Aurigema was Nulook's point person, responding to GWG's due diligence requests regarding Nulook's financial condition and its ability to repay the Loan.

89.    Aurigema's involvement in the Nulook business was integral to the decision of GWG's predecessor to loan money to Nulook. GWG representative Adam Connors had previously worked with Aurigema (while serving as an executive recruiter).  In late 2013, Connors introduced Aurigema to Patrick Preece ("**Preece**"), who worked for GWG's predecessor, MCA Capital, and later for GWG.  Aurigema, a certified public accountant, and the Chief Operating Officer of Balyasny Asset Management L.P., held himself out as a sophisticated businessman with "skin in the game." He negotiated the original credit facility with MCA Capital, handled all of Nulook's financial reporting, and supervised and interfaced with Nulook's accountants. MCA Capital would not have loaned money to Nulook if Aurigema had not been an active member of the management team. Preece relied on Aurigema's skills, reputation, and experience when he backed MCA Capital's decision to lend to Nulook, and again when negotiating forbearance.

90.    To induce GWG's predecessor to loan Nulook money, Aurigema emailed with Preece over a period of several months, providing Preece with: (i) biographies of himself, Mannino, and Guzzetti; (ii) a summary of Nulook's business plan; (iii) answers to a due diligence questionnaire; (iv) Nulook financials for the year 2013; and (v) a "deal outline" that stated that

"The members of Nulook include 2 principals [Mannino and Guzzetti] with over 3 decades of combined sales and underwriting experience and a third member [Aurigema] with over 20 years in key roles in the financial services industry including the roles of Chief Financial, Chief Operating and Chief Compliance Officer. All 3 understand the importance of customers and investors and hold themselves to the highest of fiduciary standards."

91.    Aurigema regularly communicated with GWG about the value of the underlying Nulook Collateral and the steps Nulook was allegedly taking to cure the loan default, such as bringing in equity investors and locating take-out financing, so that GWG would be repaid in full.

92.    GWG could not independently gather the information necessary to evaluate Nulook's financial condition; it had to rely on information provided by Aurigema.  Most importantly, Aurigema knew about the Heiser Agreements and the massive outflow of cash to Heiser's financing division (PSCF), and GWG did not.

93.    As demonstrated below, Aurigema (i) provided demonstrably false and misleading information to GWG, (ii) failed to disclose the Heiser Agreements and the Daily Debit Scheme to GWG, and (iii) actively hid, concealed, and failed to disclose the Daily Debit Scheme that was taking over $100,000 per month from Nulook and directing it to Heiser's bank account at PSC.

94.    Many of Aurigema's emails to GWG from March 2016 – December 2016 contained affirmative false and misleading representations as to Nulook's financial condition and/or omitted material information relevant to Nulook's financial condition, including continually hiding the outflow of funds from Nulook to Heiser's finance division from the Daily Debit Scheme.

95.    On March 29, 2016 Aurigema sent the following email to Preece at GWG:

**From:** Robert Aurigema, CPA [mailto:RAurigema@BAMFUNDS.COM]
**Sent:** Tuesday, March 29, 2016 2:01 PM
**To:** Patrick Preece <patrick@gwgmca.com>
**Cc:** Anthony Mannino <amannino@nulookcapital.com>
**Subject:** Borrow Base 02282016_v2.xlsx

Pat,

Gregg is correct.  When I added the column to the BB report to account for profits collected on pledged deals, for whatever reason, I didn't drag the formula to the end.  I've now changed it to include the entire column for both data tab (deals we pledged against the lines originally) and pledged tab (deals we funded with a combination of recycled cash and pledged to make sure you were well collateralized ).  So, from a top level here is what the borrow base is telling us:

1. The collateral pledged originally, as we were taking money from the line, still holds a ~$2MM balance due to Nulook from merchants and is made up of original advance plus fronted commissions as per Sandeep and Anthony's agreement.
2. The pledged deals represents another ~$4MM from deals we funded using recycled cash (or deals that Nulook funded using its own money but pledged to collateralize the line).  Again this is advance plus comms.
3. We have accounted for $405K in known defaults on deals from the data tab.  We update that periodically and will be updating again once we finalize year end and have a clear sense of the accrual for bad debt and a linear relationship between that and the deals we funded using the credit line.  Keep in mind when you review the financials that the accrual is cumulative and a decent portion relates to our Greenlight days and early funding experiences using our own or F&F money.  When I made changes to clean up the report last time the formulaic relationships got blown out so I simply inputted a hard number and will rebuild the formulaic tie back once I get all deals as not to have to do it twice.
4. The Net of 1-3 = eligible receivables and 90% of that, plus cash in bank (we pledge all accounts, including our main operating accounts to MCAC), represents our Capital Limit.  Now that we have corrected for the profits on pledged deals, the Capital Limit is well above the line face of $3.75M and we are more than happy to keep it there for the benefit of all involved.
5. The Facility Amount is simply the amount borrowed plus accrued interest which is tracked on the Borrow tracker tab.
6. The Strats Tab was added by Sandeep for his own analysis purposes but then he stopped focusing on it so we stopped maintaining.  We can re-implement if it's important to you but I'd have to review the assumptions and report filters to make sure we are apples to apples.
7. The collections tabs are simply the collections for Nulook on pledged deals split between our conceptual 10% and your 90%.  We refer to your account as Nulook Capital Operations and ours as simply Nulook at PSC.  Not sure the rationale but it is how they have set it up.

In short, what was missing per Gregg's observation, was an additional $800K in pledged deals which brings the total surplus in the borrow base to ~$1.7MM.

I apologize for the error.  The borrow base concept was new to us originally and has evolved a bit over time.  This just happened to be a silly oversight and completely my fault.

Also per our discussion, we will inform the accountants (Sheehan & Co) that they really have to tighten up the timing of issuance of quarterly estimated financials and year end financials distribution to 30 and 120 days, respectively.

Let me know if Gregg has time tomorrow for an introduction and for me to answer any outstanding questions that he may have.

This email makes clear that <u>Nulook pledged all of its receivables to GWG</u>, including receivables from "deals [Nulook] funded using recycled cash" and "deals that Nulook funded using its own money but pledged to collateralize the line." *See supra* ¶ 28, fn. 2.

96.    Aurigema's representation in this March 29, 2016 email that "the total surplus in the borrow base" is "~$1.7MM" is false. Aurigema knew it was false because it did not account for the money being paid to Heiser's financing division on a daily basis in the Daily Debit Scheme.

97.    Mannino was copied on the March 29, 2016 email. Mannino also knew that Aurigema's representation about the borrowing base surplus was false because it did not account for the money being paid to Heiser's financing division in the Daily Debit Scheme. At no time did Mannino correct the misrepresentation that Nulook had a borrowing base surplus.

98.    On April 26, 2016 Aurigema sent the following email to Preece of GWG, with more false assurances regarding the adequacy of the Collateral securing GWG's loan:

---

From: Robert Aurigema <RAurigema@BAMFUNDS.COM
Sent: Tuesday, April 26, 2016 10:42 PM
To: Patrick Preece <patrick@gwgmca.com>
Subject:

your mailbox is full. I have to leave so if you need, speak with Anthony on his cell. I spoke to the guys. they think we're in better shape than MN thinks but to be safe we are doing 3 things 1) working on about 400-500k in cash deposit to be parked in yhe account 2 ) packaging up active deals to sell them off at a discount. the net profits will increase the pledge and 3) these guys have been super active on collections and we had several deals pay off and several others agree to payment plans going forward to get back on track. we need the next few days to put this all together. tell these guys to seriously fuck off for a week. there have been half a dozen conversations about the fact that ant was away this week, what we have been working on etc. they keep waiting a day and freaking out over and over. I don't want the original line pulled but I'm not sure I personally want more money from these guys. Anthony and John may disagree but I want an equity injection. I want nothing to do with more credit.

---

99.     On April 28, 2016 Aurigema sent the following email to Preece, explaining that Nulook had over $8,000,000 in RTR[8], more than half of which it would collect on, providing GWG with collateral well in excess of the loaned amount.  However, Aurigema's statement was wildly inaccurate because it did not account for the co-mingled funds that Nulook was using to pay Heiser's financing division, or for the true, low value of the millions in older-aged receivables.

> **From:** Robert Aurigema, CPA [mailto:RAurigema@BAMFUNDS.COM]
> **Sent:** Thursday, April 28, 2016 3:29 PM
> **To:** Patrick Preece <patrick@gwgmca.com>
> **Subject:** Copy of Collections Example (2).xlsx
>
> This is 4/21 versus 3/31.  Items that PSC adjusted would have fallen off bc it shows payments.  This is net, what is left right now and why we think its ok.  Some we fully expect to collect but can't pledge it to you bc you guys look at things differently (items in red of approx. $290K).  BTW, there are also defaulted deals from prior reports that are now back on and some that have paid off during this month.  I know these guys are really skittish on this but the reality is we have ~8-9MM in outstanding RTR.  Even if we said, we won't collect half of it (which would be extreme), you guys still have excess collateral.  I understand they don't care and want this all to fit in a box but I can honestly say they're in the wrong business.
>
> I also think its stupid to look at this in isolation because so much of the other factors have changed over the course of a month.  Tell them to knock themselves out but if they want more info, call anthony on his cell 516 510 2700.  Im done with this for the last 3 weeks.  I wont even look at this again until Monday when I start putting together the April 30 BB and scrub this yet again.  Also, we've gotten payments as recently as today so even some of the items attached could get added back in if the collections agencies (Mas, WCS) are successful in getting these merchants back up.

100.     Nulook represented to GWG that Nulook had secured an equity investment from an owner of PSC and that proceeds from the equity investments would be used to cure the Loan deficiencies and shore-up Nulook's financial condition.  This was not true.

101.     On June 20, 2016 Nulook made a $500,000 payment by wire transfer to GWG to reduce the Loan balance. The purpose of the wire transfer was to deceive GWG into believing that

---

[8] RTR is an acronym for "Right to Receive," used in the merchant cash industry to reflect receivables owed to the lender under an advance agreement.

the $500,000 was an "equity" investment from PSC.   This was not the case; there was no equity

investor in Nulook. GWG later discovered that Nulook borrowed the $500,000 from Heiser's

finance division as part the Daily Debit Scheme described in detail at Paragraphs 50-84, *supra*.

102.    On July 11, 2016, Aurigema emailed Preece and reiterated that (i) collections were

going up and costs were going down, (ii) management fees for syndicated deals and expense

reduction would reduce the deficit over a four-month period by at least 45%, and (iii)  Nulook

could add $80k towards reducing the deficit per month. He then noted, once again, that Nulook

expected to recover far more money than it owed to GWG:

> Nulook has a total uncollected RTR [Right to Receive] of around $8.5M in addition
> to a cash balance. Even if half of that (50%) was bad deals (which it's not), that's
> still around $4/5M in assets needed to pay down a $3.2M line.

103.    In that same email, Aurigema detailed that Nulook collected $800,000 per month,

would need $150-$200k for expenses, and would fund $200-250k per month in new deals, stating:

"That leaves $400k per month we'd like to start using to pay down GWG."

104.    All of these  representations made by Aurigema on July 11, 2016 were knowingly

and materially false because he knew, but did not disclose in his emails or calculations, that the

Daily Debit Scheme was diverting thousands of dollars on a daily basis from Nulook's bank

account, which left far less than "400k per month … to pay down GWG."

105.    In fact, the Daily Debit Scheme took $113,861.20 from Nulook in May 2016,

$93,106.26 in June 2016, and $110,958.60 in July 2016, making Aurigema's representation to

GWG that $400,000 was available to pay down Nulook's Loan debt false. His failure to include

these massive payments in his July 11th email calculations was an outright lie about a material

outgoing payment stream that was most certainly ***not*** available "to start using to pay down GWG."

106.    This July 11, 2016 email and other earlier emails constituted a direct (and successful) attempt by Aurigema to mislead GWG by providing false information and omitting material information, designed to induce GWG into entering into the Forbearance Agreement. This July 11, 2016 email and earlier emails from Aurigema went outside of his or Nulook's contractual obligation to provide Borrowing Base Reports to GWG.[9]

107.    On July 13, 2016, Preece sent the below email to the GWG team, memorializing a conversation that he had with Nulook, in which Preece relayed that Nulook had "a financial commitment from their original 'friends and family' investors to guarantee the capital infusion over time to pay down the deficit by $125,000 per month."

---

**From:** Patrick Preece [mailto:patrick@gwgmca.com]
**Sent:** Wednesday, July 13, 2016 4:45 PM
**To:** Jon Sabes <jsabes@gwglife.com>; Bill Acheson <bacheson@gwglife.com>
**Subject:** Nulook Solution

Jon / Bill,

Nulook has confirmed what my calculations showed; there will not be enough funds to pay down the deficit as scheduled with funding reductions shorting collections in the later months.

But, they now have a financial commitment from their original "friends and family" investors to guarantee the capital infusion over time to pay down the deficit by $125,000 per month.  This goes back to the original letter format.  Please review the attached draft that Nulook is prepared to sign tonight.

Patrick

---

[9] Under the Loan agreements, Nulook was obligated to provide GWG with regular reports on Nulook's Receivables, cash balances, defaults and collection efforts, which were referred to as "**Borrowing Base Reports**."

27

108.    On July 19, 2016, via the email set forth below, Aurigema provided more false assurances to GWG, telling it that Nulook had a "facility [that] begins august 15" and "that's when we can start drawing up to 125k per month":

> **From:** Robert Aurigema [mailto:raurigema@gmail.com]
> **Sent:** Tuesday, July 19, 2016 4:43 PM
> **To:** Adam Connors <adam@gwgmca.com>
> **Cc:** Patrick Preece <patrick@gwgmca.com>; <amannino@nulookcapital.com> <amannino@nulookcapital.com>
> **Subject:** Re: Updated Borrowing Base Notice
>
> thanks adam. a few quick things to note. first, great they are willing to work with us. thanks for pushing. the deficit we observed was slightly under 500k. how did it become $1mm since then? second, our facility begins august 15 as discussed with Pat. that's when we can start drawing up to 125k per month to deposit into the account. this note mandates the first 125k reduction at August 1st.  please advise on both as they are a concern to me in the short term.   everything else was as discussed and perfectly acceptable to me.
>
> also we worked with PSC on the reporting. I think the borrow base will be easily constructed and with no risk of converting multiple files leading to mistakes going forward. I expect their final product in the next few hours with which I can build a better BB report and one we can easily replicate on demand.

109.    Eventually, GWG determined that the value of pledged Collateral had deteriorated to the point where Nulook's Receivables, in combination with the amount of cash in the Nulook bank account, no longer supported the amount borrowed by Nulook.

110.    Unable to reconcile the Nulook Loan deficiencies, on July 28, 2016 GWG notified Nulook that it was in default under the Loan.  At that time, GWG had the option of taking over the Collateral and the servicing of the Collateral. Instead, based upon Aurigema's false representations about the value of the Collateral, and Aurigema's claim that Nulook was able to make good on the amounts owed to GWG, Plaintiff opted to forbear on foreclosing on the Loan Collateral and provided Nulook with an opportunity to cure its Loan defaults.

111.    GWG and Nulook commenced negotiating a forbearance agreement.  GWG requested documentation to evaluate Nulook's ability to pay back GWG.  GWG also requested that Nulook provide a Deposit Account Control Agreement ("**DACA**") for its bank account that

would have protected GWG in the event of Nulook's default under the Forbearance Agreement. Despite assurances from Nulook that it was making arrangements for the DACA, Nulook did not deliver a DACA to GWG.  In hindsight, Nulook's failure to deliver the promised DACA was deliberately calculated to perpetuate the Daily Debit Scheme. GWG did not independently have the ability to gather the information necessary to evaluate Nulook's financial condition, and it relied on information provided by Aurigema.  However, Aurigema actively hid from, concealed, and failed to disclose to GWG, any existence of the Daily Debit Scheme that was taking over $100,000 per month from Nulook and directing it to Heiser's bank account at PSC.

112.    Aurigema's knowledge of the Daily Debit Scheme is clear from his September 19, 2016 email to Nazareno wherein he refers to both past and future financial commitments from PSCF (Heiser) and/or Nazareno:

> Ant [Mannino] told me you were committing a loan this week. thanks for that and we'll make sure you get it back along with the pscf money owed once we get rid of these guys [GWG]. . I prefunded what we needed Friday so we didn't get shut down … I'm sure he [Mannino] explained how ridiculous these guys [GWG] have been.

This reference to "pscf" is a reference to the Heiser Agreements.  The "loan" was not a loan at all, but rather a merchant cash advance being repaid through the Daily Debit Scheme.

113.    Aurigema's note that he "prefunded what we needed" references his $47,000 wire to Nulook (from his personal J.P. Morgan account), which reduced the Borrowing Base deficiency. His email proves his intimate involvement with Nulook's finances, including knowledge of the money owed to Heiser's finance division, and Nulook's daily payments to PSC under the Daily Debit Scheme.

114.    Each of the above emails from Aurigema contained misrepresentations about the adequacy of the Collateral, and omitted material information regarding the Heiser Agreements, to cover up the Daily Debit Scheme and induce GWG into entering into a forbearance agreement

with Nulook. Despite his knowledge of the money being routed to Heiser's finance division, Aurigema hid or concealed the Daily Debit Scheme from these "ridiculous" guys (referring to GWG). GWG reasonably and justifiably relied on Aurigema to provide honest and accurate information in connection with the Forbearance Agreement negotiations, and more specifically about the value and collectability of the Collateral securing GWG's Loan.

115.    By late November 2016, GWG and Nulook had agreed to a forbearance plan, and Mannino emailed the terms to GWG:

---

**From:** Anthony Mannino [mailto:amannino@nulookcapital.com]
**Sent:** Monday, November 28, 2016 5:07 PM
**To:** Adam Connors <adam@gwgmca.com>; Patrick Preece <patrick@gwgmca.com>
**Cc:** Robert Aurigema <RAurigema@BAMFUNDS.COM>; John Guzzetti <jguzzetti@nulookcapital.com>
**Subject:** Nulook plan

Gentlemen,

In response to your request for our plan to repay the outstanding debt. Here are the key thematic points for your review:

1. We are actively pursuing external lenders and pairing them with pending renewals and new renewals they come up. This will result in advanced repayment rates as new funders would pay off existing balances.
2. Currently, we are receiving an average net daily ACH of $25K per day.
3. Outside of ACH, we are also receiving weekly / monthly  and some varied frequency payments from collection agencies, credit card processing companies and thru our own efforts  in the collections process. It's difficult to calculate an average but a range could be $0-6 figures per month depending on collections coming in.
4. So on a weekly basis it's safe to assume a minimum of $125K and up, assume $500K per month at the least.
5. As far as minimum bill pay required, they are as follows:

    a. John and Anthony weekly salary of $1500, each, assume $12K per month.

    b. $3000 monthly in rent and utilities.

    c. Working on reducing our accounting to as close to zero as possible. We do need to close out the year and produce K1s but will lock a number in this week when we speak with them.

    d. On the high side, we'd assume $20K in monthly bills as a outlined in a-c, or a net cash inflow of $480k minimum per month assuming no other collections but ACH.

Please let me know if you have questions or if you'd like to review.

Thanks
Anthony

---

116.    At the time the above email was sent to Preece and Connors, all of the Nulook principals (Mannino, Guzzetti, and Aurigema) were aware of the Daily Debit Scheme, yet none disclosed it to GWG.  The above email outlining the forbearance terms makes no reference to the $100,000 per month being secretly routed to Heiser.  This glaring omission was material and fraudulent.  Despite the falsity of the above email, neither Aurigema, Mannino, nor Guzzetti provided GWG with corrected financial disclosures about how Nulook's cash flow was impacted by the Daily Debit Scheme.  Instead, they simply pushed forward the Forbearance Agreement that was built upon this and other false representations and omissions.

117.    In reality, much of the revenue that Nulook claimed would be available to pay down the Loan was already going to pay off Heiser's financing division, making the aforesaid misrepresentations and omissions material.

118.    In fact, as a result of the Daily Debit Scheme, Nulook's financial picture was far bleaker than reported by Defendants Nulook, Mannino, Guzzetti, and Aurigema.

119.    As demonstrated by the emails below, Aurigema was actively involved in the negotiation of the Forbearance Agreement.

-----Original Message-----
From: Patrick Preece [mailto:patrick@gwgmca.com]
Sent: Tuesday, December 20, 2016 10:12 PM
To: Robert Aurigema <raurigema@gmail.com>; Anthony Mannino <amannino@nulookcapital.com>
Cc: Adam Connors <adam@gwgmca.com>
Subject: Nulook

Gentlemen,

Although I expressed the urgency of the situation, I did not receive any comments from you or your attorney tonight regarding the Forbearance Agreement.  In addition, the informal understanding we have with Nulook is that Nulook would keep a total of $20,000 total per month to pay all expenses and salaries and we would be receive the rest twice a week AND be able to verify these numbers.

At this point, I need:

1) An executed Forbearance Agreement;
2) The BB we have been requesting; and
3) The first "tie out" of the wind down (the amount that came in by source minus the amount that went out to what source).

By 5:00 pm tomorrow or my immediate recommendation will be that GWG notify PSC / ACH Works that we are pulling servicing and move it to MN.

Patrick

Aurigema responded and said:

-----Original Message-----
From: Robert Aurigema [mailto:RAurigema@BAMFUNDS.COM]
Sent: Tuesday, December 20, 2016 11:44 AM
To: Patrick Preece <patrick@gwgmca.com>
Cc: Anthony Mannino <amannino@nulookcapital.com>; Adam Connors <adam@gwgmca.com>
Subject: RE: Document

I agree. Unfortunately, the holidays wreak havoc with scheduling and capacity.  He emailed to let us know he read thru and is around later to discuss. He may have comments.  He may not.  We'll let you know immediately after the call.   Assume you'll get some comments or a signed doc by COB today (and if the comments are reasonable, perhaps we still get it all done today working thru it together).

The attorney referred to in these emails was later identified by Aurigema to be Randall S.D. Jacobs, Esq.  The Forbearance Agreement was signed by Mannino and emailed to GWG the next day, on December 21, 2016.

    120.    In December 2016, GWG directed Nulook to shut off all automatic debits from its bank account.  With the automatic debits shut off, the Daily Debit Scheme ceased.  Not content

with the money they had already taken from GWG by virtue of the Daily Debit Scheme, Mannino, Guzzetti, Nazareno, and Heiser then implemented a new scheme to defraud GWG, using the interstate wires to execute it.

**THE THIRD CONSPIRACY: PSC, NAZARENO AND HEISER IMPLEMENT THE DIVERSION SCHEME**

121.    In November 2016, while seemingly busy negotiating the Forbearance Agreement with GWG, two of Nulook's principals, Mannino and Guzzetti, were instead closing down Nulook's offices, paying off insiders, and preparing to go into business with PSC.

122.    PSC and Nulook intended to operate "The Marketplace" out of PSC's offices, which was essentially a web-based platform where merchant cash advance funders could view merchant "deals" in need of financing.  The Marketplace logo read "powered by PSC."



123.    On November 18, 2016, a PSC employee (Andrew Ragavanis) emailed Guzzetti stating: "Desks come in on Wednesday the 23rd and Chairs on the 28th.  You can bring in your computers on Wednesday…."

124.    Without disclosing anything to GWG about its plans to shut down Nulook and go into business with PSC, Nulook signed off on the Forbearance Agreement on December 21, 2016.

125.    For a few weeks, GWG received regular payments from Nulook which served to reduce the Loan balance.

126.    In early February 2017, the payments ceased.

127.    Unbeknownst to GWG, in January 2017, Nazareno and Heiser (with Mannino's knowledge) devised and implemented a scheme to steal _all_ of the daily incoming Nulook Merchant receivables using a new ACH processor – referred to herein as the Diversion Scheme.

128.    The Diversion Scheme relied on Nazareno and Heiser's control over functions available on the Platform that allowed them to (i) stop ACHWorks from debiting Nulook Merchants and remitting those funds to Nulook, and  (ii) instead have another company, ACH Processing, debit Nulook Merchants and, at Nazareno and Heiser's instruction, remit the funds to Heiser's bank account at PSC. This flip of the ACH processor "switch" made their deception complete.

129.    In two January 2017 emails, Heiser and Nazareno describe in clear detail the method they would use to redirect incoming merchant monies from their rightful recipients to Heiser.

130.    A January 13, 2017 email from Nazareno to Heiser lays out the mechanics of how these Defendants could use the Platform to divert money intended for one entity to another.  In this case, the "mechanics" involved taking over "all merchant debits" from another PSC Member,

America's Business Capital ("**ABC**"), and direct a new ACH processor to remit those merchant debits to Heiser's bank account at PSC.

On Jan 13, 2017, at 5:33 PM, Joel Nazareno <jn@PSCNY.us> wrote:

Russ,

We have taken over all merchant debits from American Business Capital all deposits from their merchants are now being deposited into the PSCF account. I have reviewed the entire process with staff and everything is up to par. To facilitate this we eliminated their ACH provider from the equation and directly switched over their accounts by changing their MID's in the system to PSCF's. ACH processing is now pulling from their merchants as opposed to their provider fedchex (doing it this way they cannot stop the pulls through their provider). All syndicate payouts for their deals will still go out to syndicates as money is settled. I think this should stay the way it is so that the syndicates can continue to get paid (and we avoid any legal hassles) but if you think otherwise let me know and we'll make the necessary changes. Also, do you think it's prudent to tell  all of their syndicates that we have taken over ABC's collections due to a breach of their contract with PSCF but will still honor the syndicates on their deals to be paid out? Let me know thanks.

Best Regards,

Joel Nazareno

131.    Three days later, Heiser emailed Nazareno regarding Nulook, stating that he did not want to "wait too long" or he would "never get paid back." Heiser directed Nazareno to implement the Diversion Scheme, using the same process used with ABC to divert incoming cash receipts from Nulook Merchants to Heiser's bank account at PSC.

On Jan 16, 2017, at 9:13 AM, Russell Heiser <rheiser@PSCNY.us> wrote:

> Joel,
>
> I hate that it has come to this but I think we should make the same change for nulook. They owe about 320k. Looks like they are getting 15k and they haven't done a new deal in 2 months. Anthony won't return calls. No way negotiating a new facility should have taken 7 months. I feel like if we wait too long, I will never get paid back. Then it would be pursuing a fraud charge because they said that didn't have other liens in the documents. Don't feel like all of that noise at the moment.
>
> Hope your tests went well.
>
> Best,
> Russ

132.    The January 16th email refers to Nulook negotiating a new [credit] facility," reiterating Heiser's knowledge that Nulook already had a credit facility. Despite his knowledge of GWG's priority lien, Heiser directed Nazareno to use the Platform to redirect the incoming Nulook Merchant Receivables to his bank account at PSC. Paragraphs 49(a) and 58, *supra*, also outline Heiser's knowledge of GWG's priority lien.

133.    As CEO of PSC, a company that signed the Collection Subordination Agreement, promising to honor the MCA/GWG lien, Heiser is imputed with knowledge of GWG's lien on the very Nulook assets Heiser used the Platform to surreptitiously take in the Diversion Scheme.

134.    In a February 18, 2017 email, Heiser notes to Nazareno that the diversion has been successful, but complains that he is receiving only $10,000 a day from the Diversion Scheme, and asks about other ways to increase its pace:

On Feb 18, 2017, at 12:14 AM, Russell Heiser <rheiser@PSCNY.us> wrote:

Btw, it looks like we are only netting 10k a day from nulook. A lot of payments must come to them through other methods. Is the plan to suck those out from NuLook and be done in 20 days or spend the next 33 days collecting in smaller increments?

Also was the 23k that PSC borrowed get put back this week?  I didn't get an email.

135.    On February 21, 2017, Nazareno emailed Heiser, confirming that he:

(i)      had followed through on Heiser's directions to "take over" Nulook;
(ii)     had discussed the diversion with Mannino;
(iii)    was alerting Heiser to the fact that Mannino "understands just needs reporting and figuring a way that he [Mannino] can deal with the credit facility [GWG]….;" and
(iv)     had told Mannino to direct GWG to call "corporate":

| | |
|---|---|
| **From:** | Joel Nazareno |
| **Sent:** | Tuesday, February 21, 2017 4:52 PM |
| **To:** | Russell Heiser |
| **Cc:** | lmbbcf@gmail.com |
| **Subject:** | Re: La Casa De Los Pastelillos |

Thank you it was a nice weekend was able to spend time with family and catch up on some work.
Oh boy sorry to hear about your parents we just went through that flu epidemic as well in my house it's crazy this year.

Ok I will look into the syndicate payments but I doubt it remember we only pay on what's settled but I will have them double check.
I will also get erin on the AR's from HE to PSCF and work on docs no problem.
I agree with getting MM back monies fast so they can reinvest it would be nice if they can do broadway.

As far as Nulook I have been dealing with Anthony all day about it. "Surprise!" We took over ….It's all good he understands just needs reporting and figuring a way that he can deal with the credit facility. Their probably going to want to talk to someone at PSC. I told him to direct the call to corporate and we'll handle it as such.
The game plan of course is to run it as long as we can to grab the rest of the money he owes and move on he has no issues with that.
I am in a meeting now and can catch up later around 6-7 if you want, if not I'm available after 8 tonight or tomorrow is fine.
In the meantime I have everything under control.
Let me know if you need anything else.

JN

136.    To carry out the Diversion Scheme, Nazareno (at Heiser's direction) intentionally and deliberately ceased, or caused others to intentionally and deliberately cease, sending daily debit instructions via the Platform to Nulooks' disclosed ACH processor, ACHWorks.

137.    Instead, Nazareno and Heiser, or individuals acting in concert with them, used the Platform to send daily debit instructions to a new ACH processor, ACH Processing, to carry out the Diversion Scheme to steal the receivables from the Nulook Merchants and pay them into Heiser's bank account at PSC.

138.    By February 21, 2017 Nulook knew that PSC had "taken over" the Nulook receivables, based on the email from Nazareno to Heiser set out in Paragraph 135, *supra*, that describes a discussion Nazareno had with Mannino: "Surprise! We took over…it's all good he [Mannino] understands just needs reporting and figuring out a way he can deal with the credit facility [GWG]. Their [sic] probably going to want to talk to someone at PSC. I told him to direct the call to corporate and we'll handle it as such."

139.    Nulook did not take any steps to stop PSC from diverting their Receivables, and only a month later on March 15th, despite sharing an office with Nazareno, did Mannino finally take an orchestrated and contrived step, following Nazareno's advice to notify "corporate" by sending an email to Accounting@PSCNY.us as follows:

**From:** Anthony Mannino
**Sent:** Wednesday, March 15, 2017 2:35 PM
**To:** Accounting <Accounting@PSCNY.us>
**Cc:** 'Patrick Preece' <patrick@gwgmca.com>
**Subject:** RE: Nulook Collections

To Whom it May Concern,

As you are aware, MCA Capital LLC has a perfected security interest in all Nulook receivables.  A copy of MCA Capital's UCC-1 financing statement is attached hereto.

It appears that on or about February 17, 2017 all cash sweeps that were previously directed to the Nulook account ceased:

Prior to February 17, 2017, Nulook Capital was receiving approximately $14,000.00 per business day.

Please take all steps to direct all Nulook originated receivables, including but not limited all MCA's, FRPA's, General Intangibles, Proceeds and Cash Proceeds (as such terms are generally known in the merchant cash advance industry or as defined by the Uniform Commercial Code of the State of New York) to the Nulook account.

Please send copies of any instructions that you may have given to ACHWorks, or any third party regarding Nulook's receivables to my attention immediately.

Please note that all of MCA Capital's rights are expressly reserved.

Anthony Mannino
Nulook Capital LLC
Phone:516-444-3499 ext.1001
Toll Free:888-484-1004
Fax:516-765-9184
amannino@nulookcapital.com
www.nulookcapital.com

140.    In early March 2017, when GWG questioned why the flow of approximately $14,000 per day from Nulook Merchants had abruptly gone to zero, Nulook claimed that "This situation has been completely out of Nulook's control." This was not true.  As demonstrated by the email set forth in Paragraph 135 above, Nulook was aware of the Diversion Scheme and knew

all along that Heiser and Nazareno were diverting all payments from Nulook Merchants to Heiser's account at PSC.

141.    Mannino also received emails from Kevin Carrigan outlining the amounts "pulled" by each ACH processor for certain Nulook Merchants.  Excerpts from of one of these emails shows that for one Nulook Merchant, Jalisco Jap Inc., $19,500 was appropriately debited from this merchants account using ACHWorks, and $1,950 was "diverted" to Heiser's bank account at PSC using ACH Processing:

---

**Kevin Carrigan**

From:        DealManagement
Sent:        Tue 3/07/2017 2:50 PM (GMT-00:00)
To:          Christina Igoe
Cc:          Anthony Mannino; DealManagement
Bcc:
Subject:     Jalisco Jap Inc. - Taqueria Jalisco #3 #7479 - Account Reconciliation
Attachments: Jalisco Jap Inc. - Taqueria Jalisco #3 - DEAL #7479 Account Transactio....xlsx


**Jalisco Jap Inc. - Taqueria Jalisco #3  #7479**


| | |
|---|---|
| Total Advance | $15,000.00 |
| Total RTR | $21,450.00 |
| Total Fees | $0.00 |

| | |
|---|---|
| Total Funds Collected (ACH Works) | $19,500.00 |
| (log attached) | |

| | |
|---|---|
| ACH Processing | $1,950.00 |

| | |
|---|---|
| Payoff | $0.00 |

| | |
|---|---|
| Total Funds Collected | $21,450.00 |

---

142.    Using the Platform, and following Heiser's instructions, Nazareno (or a PSC employee or agent acting at his direction), sent debit instructions to the Nulook Merchants' banks directing ACH Processing to use the interstate wires to debit the Nulook Merchants' bank accounts and remit the funds to Heiser's bank account at PSC.

143.    The Nulook Merchants whose bank accounts were debited by ACH Processing in the Diversion Scheme on a daily basis from February 16, 2017 – April 30, 2017 are set forth below. These Nulook Merchants have businesses and bank accounts in at least the following states: Alabama, New York, Texas, Virginia, Florida, Minnesota, Georgia, Ohio, Iowa.

| Merchant Name | Amount Stolen |
|---|---|
| 4 Wheel Junkies | 5,800.00 |
| A-1 Heating And Air LLC | 4,330.00 |
| AA & BR Inc. #8 | 2,428.55 |
| Aii Staffing Solutions #2 | 600.00 |
| Aire Serv of Northern VA #3 | 7,880.88 |
| Aire Serv of Northern VA #4 | 11,476.71 |
| All State | 3,450.00 |
| Awnings by Coversol | 4,623.20 |
| B & P Transport | 3,416.26 |
| Baby Dolls Cajun Cafe | 11,203.66 |
| Barnes Logistics Solutions, Inc | 3,075.00 |
| Budd Optical Inc. | 6,150.00 |
| Chic Nail Spa | 512.92 |
| Clinton Cycles | 3,475.00 |
| Cordova Collision #10 | 1,155.00 |
| Custom Logistics Inc #5 | 14,812.00 |
| Danielle's | 5,190.76 |
| Dr. Phil's Auto Clinic | 3,707.16 |
| Eaheart Excavating Inc | 7,506.86 |
| Eastman Trucking & Excavation #2 | 1,230.00 |
| Emmett Golden Hunt Memorial Chapel | 2,112.50 |
| Epic | 425.00 |
| Future Generation Youth Services #7 | 16,423.32 |
| Infinite Autos | 16,919.79 |
| Integrative Health Consults LLC | 308.88 |
| Iron Work Design LLC #2 | 2,496.00 |
| Jiffy Mart Foods #2 | 4,100.00 |
| JM2 Construction | 1,500.00 |
| Kedra A Flowers CPA PC #3 | 1,022.46 |
| LFT Enterprises LLC | 4,000.00 |
| Mohawk Services, Inc #3 | 25,892.72 |
| North Beach Bar & Grill #10 | 2,050.00 |
| North Beach Bar & Grill #9 | 2,050.00 |
| Occupational Medical Center Inc | 3,590.40 |
| Patriot Express #3 | 6,800.00 |
| Patty Gal Christian Learning Center and Day | 2,400.00 |
| Printarama | 400.00 |
| Richard Rizzo Agency | 1,820.00 |
| Ricks Paving & Sealing #2 | 11,196.75 |
| S.K. Rogers Funeral Home #6 | 24,777.28 |
| SER Roofing & Siding LLC | 7,530.00 |
| Taqueria Jalisco #3 | 1,950.00 |
| Terald's Delivery Service LLC #3 | 3,443.51 |
| The Den Theatre #4 | 16,000.00 |
| The SFE Collections #2 | 2,300.00 |
| US Rail Corporation Of Ohio #3 | 4,532.13 |
| VSIS #9 | 11,815.00 |
| Workplace Occupational #10 | 4,865.00 |
| Total Collections by Merchant | 284,744.70 |

144.   In total $284,744.70 was stolen from GWG using the Diversion Scheme.

## *GWG Files Suit, and Nulook Files for Bankruptcy Protection*

145.    Plaintiff filed its original Complaint on March 28, 2017. [DE 1].

146.    On April 4, 2017 Nulook filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code (the "**Nulook Bankruptcy**").  *In re Nulook*, Case No. 8-17-72013 (EDNY).

147.    On April 10, 2017, by order to show cause in the instant matter, Plaintiff moved to have a receiver appointed over PSC. [DE 17].

148.    A hearing on Plaintiff's order to show cause was held before Judge Arthur D. Spatt on April 20, 2017.  Nulook was represented at the hearing by Randall S. D. Jacobs, Esq.  PSC did not appear at the hearing.

149.    On April 26, 2017 this Court appointed Michael Cardello III, Esq. as Receiver of PSC ("**Receiver**"). [DE 38].

150.    On April 27, 2017, pursuant to a Stipulation so-ordered by Judge Louis Scarcella in the Nulook Bankruptcy, Nulook turned over to GWG all "receivables" ever pledged by Nulook to GWG as collateral (the "**Bankruptcy Stipulation**"). [DE 149-2 at p. 14; DE 149-12]; *In re Nulook*, Dkt. 33. The Bankruptcy Stipulation is attached hereto as **Exhibit E**.

151.    During the Nulook Bankruptcy proceedings, Nulook repeatedly made the false assertion that there was "adequate protection" for GWG's Loan because the "collateral base is worth $6.2 million and the loan is $2.2 [million]" and included that information on its schedule of assets filed in the Nulook Bankruptcy.  *In re Nulook*, Dkt. 13:



Nulook's accountants, Sheehan & Company, also submitted a letter to the court in the Nulook Bankruptcy falsely stating that: "Currently Nulook has over $6,500,000 in outstanding accounts receivable. In re *Nulook*, Dkt. 19 at p. 2. A copy of this letter is attached hereto as **Exhibit F**.

152.    These representations turned out to be false.    Just days later, on May 2, 2017 counsel for Nulook (Randall S.D. Jacobs, Esq.) emailed GWG a list showing that Nulook had just $251,923.25 in current, non-defaulted, receivables. That list is set forth below:

| Deal ID | Name | Amount | Balance |
|---------|------|--------|---------|
| 2152 | Eastman Trucking and E | 30 | $9,448.20 |
| 7292 | Lindjoe Inc | 546.51 | $6,716.35 |
| 7463 | VSIS Inc. | 347.5 | $7,868.56 |
| 7522 | S.K. Rogers Funeral Ho | 608.57 | $608.57 |
| 7526 | B and P Transport LLC | 79.42 | $239.46 |
| 7675 | Custom Logistics Inc | 368 | $9,796.56 |
| 3072 | Southern Florida Enter | 100 | $3,945.55 |
| 7774 | Weird Dolls LLC | 273.26 | $6,284.44 |
| 7776 | Iron Work Deisgn LLC | 156 | $6,208.00 |
| 7376 | Jiffy Mart | 100 | $15,649.56 |
| 4152 | The Den Theatre Chicag | 400 | $7,306.96 |
| 7703 | North Beach Bar and Gr | 50 | $22,976.05 |
| 7162 | Barnes Logistics Solut | 75 | $21,950.71 |
| 6022 | Epic Cheer and Dance C | 25 | $25,923.68 |
| 6841 | Budd Optical INC | 150 | $22,314.00 |
| 7564 | North Beach Bar and Gr | 50 | $20,877.50 |
| 7508 | 4 Wheel Junkies | 200 | $37,420.42 |
| 7403 | Printarama Inc | 100 | $21,925.00 |
| 7538 | Awnings by Coversol | 118.52 | $118.52 |
| 7221 | Atlas Recycling LLC | 192.28 | $4,345.16 |
| | | | $251,923.25 |

153.    On August 15, 2017 Judge Scarcella granted GWG's motion for permanent relief from the automatic stay for the purpose of continuing the instant action. [DE 156 at p. 12]; *In re Nulook*, Dkt. 72.

154.    Nulook's bankruptcy was formally dismissed on September 20, 2017. [DE 156 at p. 12]; *In re Nulook*, Dkt. 81.

155.    The Loan balance as of May 31, 2019 is $1,875,607.07[10]  and has been entirely written off by GWG. Collections from Nulook Merchants over the past two months have been just $3,270.93 and all but one of the "active" deals are now closed.  *See supra* ¶ 152. GWG expects any additional collections from Nulook Merchants to be *de minimis*.

### *The Receivership*

156.    On April 28, 2017, the Receiver terminated (i) PSC's employment of Nazareno as Executive Director; and (ii) PCS's employment of Russell Heiser as CEO.

157.    On May 3, 2017 the Receiver's counsel interviewed Nazareno. At that time, Nazareno informed the Receiver that PSC did not have sufficient cash on hand to meet its May 5, 2017 payroll obligations, which covered pay periods prior to May 5, 2017.  Nazareno advised the Receiver that he "would neither provide any of the funding nor would he assist the Receiver in finding an alternative source of funding" to meet these obligations. [DE 69 at pp. 1-2]. This payroll crisis was so severe that the Receiver was faced with "the choice of either immediately shutting down PSC's operations or seeking outside funding to cover PSC's operating shortfall and fund its payroll." [DE 96 (the "**Receiver's First Report**") at p. 10].

158.    On May 3, 2017, the Receiver exercised his authority to borrow money from GWG to cover PSC's operating shortfalls. From May 2017 – August 2017, PSC periodically borrowed funds from GWG to cover payroll and operating expenses. To secure these loans, the Receiver pledged all of PSC's assets as collateral. [DE 69 at p. 2; *Receiver's First Report* at p. 10].

159.    On June 6, 2017, the Receiver engaged Marcum LLP to conduct a forensic review of PSC's books and records and to assess the value of PSC's business and assets. [*Receiver's First Report* at p. 17].  Marcum's forensic review revealed a failing company:

---

[10] This Loan balance does not include the costs of collection which are chargeable to Nulook under the terms of the Forbearance Agreement.

From at least January 2013 forward, the business was insolvent because it had no ability to generate sufficient cash flow to fund its monthly operating expenses and it had no means for satisfying its obligations to creditors. PSC's management appears to have masked the poor financial condition of the Company by: (i) borrowing from other related entities to cover cash shortfalls; (ii) failing to contemporaneously record certain transactions; and (iii) failing to account for the true liabilities associated with the business it conducted. (emphasis added).

[*Receiver's First Report*, *Ex. G*, DE 97-1 at p. 4].

160.    In response to Nazareno's request that the Receiver hire him to run PSC in Receivership, on June 29, 2017 the Receiver wrote to Nazareno's counsel to apprise him that:

While Mr. Nazareno may have a unique understanding of PSC's business operations, he left PSC's books and records in deplorable condition. The Receiver has also been able to determine that there were substantial movements of funds from PSC to other entities that are [were] not recorded in PSC's books and records, including transfers of funds from PSC to companies known to be owned by or otherwise affiliated with Mr. Nazareno…. In addition, Mr. Nazareno routinely used funds from PSC's operating account to pay his personal expenses and borrowed large sums of money from PSC which he has not repaid.

[DE 69 at pp. 6-8].

161.    On August 24, 2017, the Receiver submitted the Receiver's First Report to Judge Spatt.  In this First Report, the Receiver concluded that:

[I]t appears that Mr. Nazareno caused PSC to transfer at least $1,103,113 to himself personally, members of his family and to entities that are known to be owned or controlled by Mr. Nazareno. These transactions are highly suspect and the failure by Mr. Nazareno to record these transactions in the company's accounting records suggest that these transactions may be fraudulent in nature….Moreover, the MCA Platform and, indeed, its business model appear to have been designed so that none of these potentially illegal transfers, including the types described in GWG and ABC's complaints, would pass through PSC's accounts and, therefore, do not appear on bank statements or other reliable third party financial records. To the extent transactions involving merchant accounts are recorded on the MCA Platform, Mr. Nazareno and certain other people working for Mr. Nazareno had the ability change the records stored on the MCA Platform to hide evidence of malfeasance…. Based on the forgoing, I am concerned that Mr. Nazareno and individuals working with him may have used the MCA Platform to perpetrate a scheme to defraud some of PSC's Members, including GWG and ABC. A forensic review of transactions that passed through the MCA Platform would be required to determine if the platform was used as part of a fraudulent scheme.

*GWG Forecloses on Its Loan to the Receiver*

162.    On June 29, 2017 and subsequent dates, the Receiver advised GWG that despite GWG's loans, PSC was in dire financial condition and that the Receiver would have to terminate PSC's business operations, placing GWG's collateral in jeopardy.  [DE 69 at pp. 2-3; 6-8].

163.    On July 14, 2017, pursuant to New York UCC §§ 9-620 and 9-621, GWG sent a written proposal to the Receiver with an unconditional offer to accept the collateral in full satisfaction of PSC in Receivership's obligations to GWG effective on August 3, 2017 ("**Strict Foreclosure**").  [DE 69 at p. 3].

164.    In accordance with New York UCC §§ 9-620 and 9-621, the Strict Foreclosure was effective on August 3, 2017.

**THE FOURTH CONSPIRACY: THE POST-RECEIVERSHIP SCHEME**

165.    On August 4, 2017, upon taking possession of the collateral pledged by the Receiver, GWG found a complete mess.

166.    The Receiver had fired Joel Nazareno but didn't take away his login access to the Platform.

167.    The Receiver did not fire Noel Nazareno, Joel Nazareno's brother.

168.    During the Receivership, Noel Nazareno continued to collect a paycheck from PSC (which was funded by GWG during the Receivership) while Noel Nazareno worked for a competing merchant cash advance company by the name of Epic Capital Enterprises.

169.    During the Receivership, Noel Nazareno logged into the Platform on a daily basis and regularly provided PSC's confidential and proprietary information to Joel Nazareno.

170.    On the very day that GWG took over PSC, Christopher Hunt-Walker (PSC's technology consultant) changed the login credentials for the Platform and locked GWG out.  This

lock-out continued for months.  In November 2017 the Court ordered Hunt-Walker to turn over the login credentials, but it was not until December 2017 that the Platform was fully accessible to GWG. Plaintiff's forensic experts later obtained logs showing that Nazareno and others working with him accessed the Platform (and the Amazon servers hosting the Platform) continually until GWG was finally able to secure all outside access to the Platform and the Amazon servers in early January 2018.

171.     Eventually GWG discovered that Nazareno, Mannino, and Guzzetti had figured out a way to continue stealing during the Receivership (the "**Post-Receivership Scheme**"). As set forth in detail below, the Post-Receivership Scheme involved:

(i)     Sabotaging the Platform by holding the login credentials hostage and logging into the Platform or "hacking" into it both during the Receivership and after the Strict Foreclosure (*see supra* ¶ 170);

(ii)    Stealing emails and data from the Receiver and GWG on two hard drives (*see infra* ¶¶ 172-174);

(iii)   The physical taking of documents from PSC's former offices at 330 Motor Parkway (*see infra* ¶¶ 175-178);

(iv)    Continued operation of The Marketplace by Nazareno, Mannino, and Guzzetti, despite the Receivership Order (*see infra* ¶¶ 179-182);

(v)     The sale and/or use of confidential and proprietary intellectual property and data to Epic Capital Enterprises LLC ("**EPIC**") (*see infra* 183-184); and

(vi)    The sale and/or use of confidential and proprietary intellectual property and data to Banana Funding Group LLC, and Banana Exchange LLC (collectively "**Banana**") (*see infra* ¶¶ 185-188).

### *Theft of Data and Emails Copied onto Hard Drives*

172.     During the Receivership, at Nazareno's direction, two former PSC employees, Kevin Carrigan("**Carrigan**") and Erin Kim ("**Kim**") orchestrated the purchase of hard drives that were used to copy all of the PSC and Summit emails, files, and other confidential business records that were on PSC's server.  This is evidenced by the email exchange below:

**Kevin Carrigan**

From:    erin kim
Sent:    Tue 7/11/2017 4:18 PM (GMT-00:00)
To:      freddy Medina; Kevin Carrigan; Joel Nazareno
Cc:
Bcc:
Subject: RE: two hard drives for backups

Order placed for the two hard drives.
Will be delivered by Thursday.

Erin Kim
Executive Administrator



The information contained in this Email, including any attachment(s) is intended solely for use by the named addressee(s). If you are not the intended recipient, or a person designated as responsible for delivering such message(s) to the intended recipient, you are not authorized to disclose, copy, distribute or retain this message, in whole or in part, without written authorization from Interactive Partners, Inc. This Email may contain proprietary, confidential or privileged information. If you have received this message in error, please notify the sender immediately. Thank you for your cooperation.

**From:** freddy Medina
**Sent:** Friday, July 07, 2017 1:02 PM
**To:** erin kim <ekim@sylo.us>; Kevin Carrigan <kc@jnmmgmt.com>; Joel Nazareno <jn@sylo.us>
**Subject:** two hard drives for backups

Hey Erin and Kevin

These are the external hard drives I need to get what we spoke about done.

This is what we discussed
https://www.amazon.com/Seagate-Backup-Portable-External-STDR2000100/dp/B00FRHTSK4/ref=sr_1_1?s=pc&ie=UTF8&qid=1499445800&sr=1-1-spons&keywords=external%2Bhard%2Bdrives&th=1
The first hard drive I am going to copy every file onto this hard drive and also emails so you can do quick access from this hard drive connected to a pc as needed and I will remove any company files other than PSC from our server. Emails will still be on server until we relocate email accounts to office 365.

https://www.amazon.com/DREVO-P1-Aluminium-Portable-3-0-Silver/dp/B071XNR5QJ/ref=sr_1_2?s=pc&ie=UTF8&qid=1499445800&sr=1-2-spons&keywords=external+hard+drives&psc=1
This second hard drive will be all of Summit capital files that Erin will keep on her computer so she can access files on there.

Once these backups are done we can focus on moving all emails off server that are not PSC to Microsoft 365 under the SYLO name. once we are complete only thing on server will be psc related.

Remember Our tape backs up are for disaster recovery and we would need a server to restore from tape backups and this solution is to give us backups we can access quickly without a server anything new added to server after we create this backup will not be on these backups.

Best Regards

Freddy Medina

Technical Support Specialist

E-mail Freddy@sylo.us

Ph:516 362-2725

173.    The hard drives referenced in the email in Paragraph 172 above were given to Carrigan, who continued to work with Nazareno at Banana.

174.    Kim and Carrigan blatantly discussed their theft of the hard drives in a series of text message exchanges on August 4, 2017:

| | |
|---|---|
| **Kim to Carrigan**: | And ed stone gave me a copy of the court order which states employees cannot remove any psc files, properties, fils, etc |
| **Carrigan to Kim**: | Lmao [laughing my ass off] |
| **Kim to Carrigan**: | So i guess were in trouble? Lol [laughing out loud] |
| **Carrigan to Kim**: | They don't know anything. |
| **Kim to Carrigan**: | They'll know because theres nothing on my desktop. |
| **Carrigan to Kim**: | Tell them you save everything to the drives. |
| **Kim to Carrigan**: | Ok |
| **Carrigan to Kim**: | They cant prove anything Erin |
| **Carrigan to Kim**: | I already spoke to Fred [Alfredo Medina] man to man about the drives were okay. |
| **Kim to Carrigan**: | R u ok? |
| **Carrigan to Kim**: | Yea Im good |
| **Carrigan to Kim**: | Are you? |
| **Kim to Carrigan**: | Im ok:) |
| **Carrigan to Kim**: | If you worried about them catching on to this with your desktop being empty just save some files quick when your at your desk and fill it up |
| **Carrigan to Kim**: | Fuck them Erin |
| **Kim to Carrigan**: | Yes fuck them!! |

### _Physical Theft of PSC Files by former Employee Erin Kim and Attorney Stephen Ghee_

175.    Just after GWG took over the assets of PSC in the Strict Foreclosure, Kim entered the premises at 330 Motor Parkway, Hauppauge, New York where PSC had operated its business (the "**Premises**") on August 8, 2017 and took many boxes of files, which now belonged to GWG.

176.    On August 15, 2017, Kim returned to the Premises with Attorney Stephen Ghee (who represents Joel Nazareno) and took additional files and other items.

177.    Despite seeking court intervention in the way of an emergency injunction motion made on August 15, 2017 [DE 84], efforts by GWG and the Receiver to have all of these files and other items returned were unsuccessful.

178.    A subsequent contempt motion made by GWG seeking to hold Kim and Christopher Hunt-Walker in contempt for violating the Receivership Order yielded discovery in the way of depositions of Kim, Joel Nazareno, Christopher Hunt-Walker, and the turn-over of certain text messages on Kim's cell phone. [DE 98].

***Continued Operation of The Marketplace***

179.    GWG discovered that after the appointment of the Receiver, Mannino, Guzzetti, and Nazareno continued to operate The Marketplace, diverting business prospects and payments away from PSC (whose assets GWG now owned).  Mannino, Guzzetti, and Nazareno directed these business prospects and payments towards another entity controlled by Mannino and Guzzetti: JJ & AA Enterprises LLC ("**JJ & AA**").[11]

180.    Evidence of the continued operation of The Marketplace is found in two emails sent to GWG from merchant cash advance companies who sought refunds for money they accidentally paid to PSC instead of JJ & AA:

> **From:** Jake Winograd [mailto:jake@ufsfunding.com]
> **Sent:** Monday, September 11, 2017 3:45 PM
> **To:** Brenda Lidke
> **Cc:** raven huang ; Eli Ghoori
> **Subject:** Re: payments into PSC BofA accounts
> HI
> On sep 8th we sent you a payment of $800 to account (0654) by mistake it was ment to go to marketplace
> On sep 5th we sent you a payment of $500 to account (0654) by mistake it was ment to go to marketplace
> please send them both back to us account info attached, you can deduct whatever wiring costs you may incur

and:

---

[11] Under the terms of the Receivership Order, Nazareno was to "immediately turn over PSC Defendants businesses and all assets to the Receiver." [DE 38].  He did not do so.

---

**From:** Anthony Collin [mailto:anthony@smartbusinessfunder.com]
**Sent:** Wednesday, September 6, 2017 12:44 PM
**To:** Brenda Lidke <blidke@gwglife.com>
**Subject:** $3,200.00 Credit/ Debit
Hi Brenda,
Thank you for taking the time today to address this issue.
PSC (The Marketplace) referred 2 merchants to us for funding:
1) Big O Bundles (Funded on 08/24/2017)
2) Outdoor Advertising (Funded on 08/25/2017)
PSC (The Marketplace) was due a commission for these 2 referrals in the amount of $3,200.00.
On 08/29/2017 PSC (The Marketplace) were paid the commissions into the International Professional Services account by error. (Please see the attached batch report) We used to pay PSC commissions into the International Professional Services account until July 19th and after July 19th we are paying PSC in the JJ & AA Account. However, these 2 deals ($3,200.00) were paid to the old International Professional Services account by error. On 08/30/2017 PSC The Marketplace said they didn't get the money and they don't have access to that account. We then paid the JJ&AA account the $3,200.00 and make sure specifically on a number of occasions to have PSC inform International Professional Services that we are deducting the $3,200.00 commissions that were paid. Unfortunately, PSC didn't inform your company and the deduction was stopped.

---

181.    Funds for The Marketplace transaction with Jake Winograd of Unique Funding were wired to PSC using interstate wires, from Unique Funding's bank account at Cross River Bank (headquartered in Fort Lee, NJ) to PSC's bank account at Bank of America (headquartered in Charlotte, NC) on September 5th and 8th, 2017.

182.    Upon information and belief, funds for The Marketplace transaction with Anthony Collins of Smart Business Funder were wired to JJ & AA using interstate wires, from Collins' bank account to JJ & AA's bank account at TD Bank (headquartered in Cherry Hill, NJ).

### *Sale of Stolen Intellectual Property to EPIC*

183.    On or about May 19, 2017, June 2, 2017, June 12, 2017, and June 23, 2017 Nazareno took data and proprietary information from the Platform that he stole in the Post-Receivership Scheme and used and/or sold it to EPIC, a business venture involving himself, his brother Noel Nazareno, Christopher Hunt-Walker, and Sevda Imranova.

52

184.    Nazareno also used the interstate wires to steal business prospects from the Receiver and GWG for merchant cash advance deals involving, *inter-alia*, Hernanadez Furniture (Holyoke, MA); Woodsmith Services LLC (Vero Beach, FL); and Por Ti Colombia (Virginia Beach, VA).  Documentation for these transactions was emailed and/or faxed to Kevin Carrigan on or about June 26, 2017 (during the Receivership), and upon information and belief, was turned over to EPIC shortly thereafter.

### *Sale of Stolen Intellectual Property to Banana*

185.    On or about June 28, 2017, June 29, 2017,  June 30, 2017, July 3, 2017, July 5, 2017, and July 20, 2017, Nazareno (or persons working for or at the direction of Nazareno) also took data and proprietary information from the Platform that he stole in the Post-Receivership Scheme and used it and/or sold it to Banana, a business venture involving Nazareno, Kevin Carrigan, Erin Kim, Christopher Hunt- Walker, and Eyal Levy.

186.    After taking the data and intellectual property from PSC on hard drives and by hacking into the Platform, Nazareno used it to assist Banana, and its principal, Eyal Levy ("**Levy**"), in creating an "exchange" that mimics the PSC Platform, found online at https://www.bananaexchange.com/.   The Banana "exchange" was created using intellectual property owned by GWG.  Email exchanges between Nazareno, Carrigan, and Levy in June and July 2017 demonstrate that Nazareno was negotiating the sale of software to Banana. On June 28, 2017 (during the Receivership), with Nazareno's knowledge, Carrigan set up a system demo of the PSC Platform:

On 28 Jun 2017, at 17:06, Kevin Carrigan <kc@jnmmgmt.com> wrote:

Hi Eyal,

It was nice meeting you the other day below you will find system login credentials. The security code is set up to be emailed to you at this email. Tomorrow I am only available between 9-10:15 AM to do a system demo via joinme as I have a funeral to attend. Is there a number I can reach you at?

On July 2, 2017, Levy emailed Nazareno:

> From: Eyal Levy [mailto:eyal@platinumart.com]
> Sent: Sunday, July 2, 2017 2:43 PM
> To: Joel Nazareno <jn@jnmmgmt.com>
> Subject: Things to be done
>
> The software guys have to talk.
> Your lawyer should send my lawyer the law suit.
> I have to meet several MCA or ISOs that are willing to get $500,000 and have RTR of over $1M.
> I should get the spreadsheets of the investments over 12 months.
> We have to agree on the final deal details.
> Next week is coming soon. I am scheduled to fly back this Thursday if there is no major progress until then.
> Please advise where are we.
>

Later that same day (July 2, 2017) Nazareno responded to Levy:

> On 2 Jul 2017, at 17:51, Joel Nazareno <jn@jnmmgmt.com> wrote:
>
> Call with Software guys will be set up tomorrow please relay me his info (email, Phone) so I can set it up.
> I will send you detailed email in regard to lawsuit complete with motions and answers just so you know what's going on. Also just to make you feel more comfortable (me as well) I have been speaking to lawyers on my end as well as patent attorneys in regard to the model no matter what happens with PSC none of the software is patent filed so for someone to come in and address a lawsuit for being in competition with them it's highly unlikely. Basically it would be dumb, they cant prevent me from getting a job im not guilty of anything even if I lost the civil litigation still doesn't prevent me from working or building another platform.

187.     Nazareno also stole business from GWG by directing PSC Members to Banana. On July 6, 2017 Nazareno emailed Levy to set up a meeting with Phil Defonte of Broadway Advance LLC, a former PSC Member.

```
From:        Joel Nazareno
Sent:        Thu 7/06/2017 1:19 AM (GMT-00:00)
To:          Eyal Levy
Cc:
Bcc:
Subject:     Meeting
Attachments: Broadway Advance.pptx


Eyal,

You will be meeting Phil Defonte he is one of the owners (Majority owner) of Broadway Advance. The
meeting is scheduled for 10 a.m. He is in the middle of trying to get 2mm as a credit facility now. See
attached power point so you have an idea of what they have. I have not looked at it.
```

Through a UCC search, GWG discovered that in September 2017, Banana made merchant cash advances and/or loans to Broadway Advance LLC.  The UCC's evidencing this are attached hereto as **Exhibit G**.

188.     Nazareno also failed to turn over the assets of one of its affiliates, Affinity Member Services, and pledged the assets of that affiliate to Banana as evidenced by the UCC financing statement attached hereto as **Exhibit H**.

189.     All of this occurred during the Receivership despite the Court's order [DE 38 at pp. 3-4] that provided:

> IT IS FURTHER ORDERED that upon the Court's appointment of a Receiver, PSC Defendants, their agents, servants, representatives, employees, assigns, affiliates, subsidiaries and their affiliates' and subsidiaries agents, servants, representatives, employees, assigns and nominees shall immediately turn over PSC Defendants businesses and all assets to the Receiver, together with all contracts, subcontracts, and other documents, records, files and other materials relating thereto, and the foregoing individuals and entities shall fully cooperate with and respond to all reasonable requests of Receiver….

> In addition, the forgoing individuals shall not:

>1.    Possess or manage or attempt to manage any of PSC's Defendants' property in any way….
>
>4.    Remove from the Premises or destroy any property belonging to the PSC Defendants whether at the Premises or otherwise….
>
>7.    Destroy any documents.  PSC Defendants shall provide the Receiver with a list of any PSC Defendants' business records that may have been destroyed on or after May 22, 2014.

190.    The activities of the corrupt enterprise are clear.  First, Nulook and PSC (Nazareno and Heiser) conspired to steal collateral pledged to GWG through the Daily Debit Scheme; then, Nulook fraudulently induced GWG into entering into the Forbearance Agreement.  During this time, Nulook merged into The Marketplace and operated out of PSC's offices.  Nazareno and Heiser (with Nulook's knowledge) stole more from GWG through the Diversion Scheme.  Not content with merely those crimes, Nazareno, Mannino, and Guzzetti continued stealing data, documents, and proprietary information in the Post-Receivership Scheme.  Meanwhile, the millions of dollars in merchant cash advance proceeds pledged to secured GWG's Loan vanished.

191.    The conspiracy to harm GWG, unsuspecting merchants, and the general public has been ongoing continuously since at least May 2015, and continues to date.

## COUNT I
## VIOLATIONS OF 18 U.S.C. § 1962 (c) THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")

### Against Nulook, Mannino, Guzzetti, Nazareno, Heiser, and Heiser Enterprises

192.    GWG repeats and realleges all allegations above as though fully set forth herein.

193.    At all relevant times, Plaintiff was and is a person within the meaning of 18 U.S.C. § 1961(3) and § 1962(c).

194.    At all relevant times, each of Nulook, Mannino, Guzzetti, Nazareno, Heiser, and Heiser Enterprises were and are, each a person within the meaning of 18 U.S.C. § 1961(3) and § 1962(c).

195.    At all relevant times, each of Nulook, Nazareno, Mannino, Guzzetti, Heiser, and Heiser Enterprises, was, and is, a person that exists separate and distinct from the RICO enterprise.

196.    Each of the corporate entities, Nulook and Heiser Enterprises, are distinct entities, each with their own independent existence and functions.

### *RICO Violations Through the Daily Debit Scheme and the Diversion Scheme*

197.    Through the Daily Debit Scheme and the Diversion Scheme, Nulook, Mannino, Guzzetti, Nazareno, Heiser, and Heiser Enterprises violated 18 U.S.C. § 1962(c), which states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

198.    The Daily Debit Scheme and the Diversion Scheme constitute a "pattern" of racketeering activity which began in May 2015 and continued through April 2017.

199.    The Daily Debit Scheme affected interstate commerce because it used the Platform (with servers located in several states) and interstate wires (with ACH processing companies located in Texas and California) to steal GWG's collateral.

200.    The Daily Debit Scheme is detailed in Paragraphs 50-84, *supra*.

201.    The Daily Debit Scheme involved more than 1,300 instances of the use of the wires to send funds in furtherance of a fraudulent scheme. **Exhibit C** sets forth the transfers, dates of fraudulent debits, debited accounts, and depositing accounts.

202.    Damages to GWG from the Daily Debit Scheme total $1,361,769.34.

203.    The Diversion Scheme affected interstate commerce and used the Platform (with servers located in several states) and interstate wires to take funds destined for Nulook and divert them to Heiser's Bank of America (headquartered in Charlotte, SC) account at PSC, which was

used for the PSCF finance division.  These stolen funds were then sent to Heiser Enterprise's Florida Wells Fargo (headquartered in San Francisco, CA) account.

204.    The Diversion Scheme is described herein in detail at Paragraphs 121-144, *supra*.

205.    The Diversion Scheme involved more than 1,190 instances of the use of interstate wires to send funds in furtherance of a fraudulent scheme. **Exhibit I** attached sets forth these transfers, including the name of the Nulook Merchant debited, the debit dates, and amount debited. All funds from the debits were deposited into Heiser's Bank of America bank account at PSC.

206.    Damages to GWG from this Diversion Scheme total $284,744.70.

207.    As noted in Paragraphs 43-44; 130, *supra*, Nazareno, Heiser, and Heiser Enterprises used a similar scheme to defraud ABC.

208.    Each of Nulook, Mannino, Guzzetti, Nazareno, Heiser, and Heiser Enterprises had knowledge of the Daily Debit Scheme and the Diversion Scheme.

209.    As a direct and proximate cause of Nulook, Mannino, Guzzetti, Nazareno, Heiser, and Heiser Enterprises violation of 18 U.S.C. § 1962(c), GWG has been injured in its business and property.

210.    Accordingly, Plaintiff demands judgment against Nulook, Mannino, Guzzetti, Nazareno, Heiser, and Heiser Enterprises, pursuant to 18 U.S.C. § 1964(c), for damages incurred as a result of the Daily Debit Scheme, amounting to $1,361,769.34, trebled to $4,085,308.02, plus attorneys' fees, costs, and pre-judgment interest.

211.    Accordingly, Plaintiff demands judgment against Nulook, Mannino, Guzzetti, Nazareno, Heiser, and Heiser Enterprises, pursuant to 18 U.S.C. § 1964(c), for damages incurred as a result of the Diversion Scheme, amounting to $284,744.70, trebled to $866,234.10, plus attorneys' fees, costs, and pre-judgement interest.

### *RICO Violations Through the Post-Receivership Scheme*

212.    Through the Post-Receivership Scheme Nazareno, Mannino, and Guzzetti violated 18 U.S.C. § 1962(c), which states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

213.    In part, Nazareno, Mannino, and Guzzetti operated JJ & AA to carry out the Post-Receivership Scheme.

214.    The Post-Receivership Scheme constituted a "pattern" of racketeering activity which continued after the appointment of a Receiver over PSC thwarted the continued operation of the Daily Debit Scheme and the Diversion Scheme.

215.    The Post-Receivership Scheme affected interstate commerce because it used the mails and wires to sabotage the Platform, hack into the Platform, steal emails and data from the Receiver and GWG, and deliver emails, data, and other stolen intellectual property to certain entities including JJ & AA, EPIC, and Banana.

216.    The Post-Receivership Scheme is detailed at Paragraphs 165-189, *supra*.

217.    As a direct and proximate cause of Nazareno, Mannino, and Guzzetti's violation of 18 U.S.C. § 1962(c), Plaintiff has been injured in its business and property.

218.    Accordingly, Plaintiff demands judgment against Nazareno, Mannino, and Guzzetti pursuant to 18 U.S.C. § 1964(c), for damages it incurred as a result of the Post-Receivership Scheme in excess of $500,000, to be proven at trial, trebled at $1,500,000, plus attorneys' fees, costs, and pre-judgement interest.

## COUNT II
## VIOLATIONS OF 18 U.S.C. § 1962 (d) THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")

### Against Nulook, Mannino, Guzzetti, Nazareno, Heiser, and Heiser Enterprises

219.    GWG repeats and realleges all allegations above as though fully set forth herein.

220.    18 U.S.C. § 1962(d) states, in pertinent part: "It shall be unlawful for any person to conspire to violate subsection (c) of this section." (internal punctuation omitted).

221.    Nulook, Mannino, Guzzetti, Nazareno, Heiser, and Heiser Enterprises conspired to carry out the Daily Debit Scheme and the Diversion Scheme.

222.    Each of Nulook, Mannino, Guzzetti, Nazareno, Heiser, and Heiser Enterprises had knowledge of the Daily Debit Scheme and the Diversion Scheme.

223.    As a direct and proximate cause of Nulook, Mannino, Guzzetti, Nazareno, Heiser, and Heiser Enterprises' conspiracy to violate 18 U.S.C. § 1962(c) in connection with the Daily Debit Scheme and the Diversion Scheme, GWG has been injured in its business and property.

224.    Accordingly, Plaintiff demands judgment be entered against Nulook, Mannino, Guzzetti, Nazareno, Heiser, and Heiser Enterprises, pursuant to 18 U.S.C. § 1964(c), for damages it incurred as a result of the Daily Debit Scheme amounting to $1,361,769.34, trebled to $4,085,308.02, plus attorneys' fees, costs, and pre-judgement interest.

225.    Accordingly, Plaintiff demands judgment be entered against Nulook, Mannino, Guzzetti, Nazareno, Heiser, and Heiser Enterprises, pursuant to 18 U.S.C. § 1964(c), for damages it incurred as a result of the Diversion Scheme in the amount of $284,744.70, trebled to $866,234.10 plus attorneys' fees, costs, and pre-judgement interest.

226.    Defendants Mannino, Guzzetti, and Nazareno conspired to carry out the Post-Receivership Scheme.

227.    As a direct and proximate cause of Nazareno, Mannino, and Guzzetti's conspiracy to violate 18 U.S.C. § 1962(c) in connection with the Post-Receivership Scheme, Plaintiff has been injured in its business and property.

228.    Accordingly, Plaintiff demands judgment be entered against Defendants Nazareno, Mannino, and Guzzetti pursuant to 18 U.S.C. § 1964 (c), for damages it incurred as a result of the Post-Receivership Scheme in an amount in excess of $500,000 to be proven at trial, trebled to $1,500,000, plus attorneys' fees, costs, and pre-judgement interest.

## COUNT III
## CONVERSION

**Against Nazareno, Heiser, and Heiser Enterprises in the Daily Debit Scheme**

229.    GWG repeats and realleges all allegations above as though fully set forth herein

230.    Nazareno, Heiser, and Heiser Enterprises exercised dominion and control over certain of Nulook's Receivables which were encumbered by GWG's first priority perfected lien in connection with the Daily Debit Scheme. The Daily Debit Scheme is described herein in detail at Paragraphs 50-84, *supra*.

231.    The Nulook Receivables in the aggregate amount of $1,361,769.34, over which Nazareno, Heiser, and Heiser Enterprises exercised dominion and control, are specifically identifiable and are set forth on **Exhibit C**.

232.    The conduct of Nazareno, Heiser, and Heiser Enterprises in connection with the Daily Debit Scheme was deliberate and intentional. *See supra* ¶¶ 59, 70-72, 74-83.

233.    Plaintiff suffered damages in the amount of $1,361,769.34 as a result of the actions of Nazareno, Heiser, and Heiser Enterprises in converting specifically identifiable funds from GWG through the Daily Debit Scheme.

## COUNT IV
## AIDING AND ABETTING CONVERSION

### Against Aurigema, Mannino and Guzzetti in the Daily Debit Scheme

234.    GWG repeats and realleges all allegations above as though fully set forth herein.

235.    Aurigema, Mannino and Guzzetti provided substantial assistance to Nazareno, Heiser, and Heiser Enterprises in their exercise of dominion and control over Nulook's Receivables which were encumbered by GWG's first priority perfected lien in connection with the Daily Debit Scheme. *See supra* ¶¶ 60, 63, 67-70, 75-76.  Among other things, Aurigema, Mannino, and Guzzetti agreed to provide Plaintiff with a Deposit Account Control Agreement ("**DACA**") but failed to follow through with this. Their failure to provide GWG with the DACA allowed the Daily Debit Scheme to continue.  *See supra* ¶ 111.

236.    Aurigema, Mannino, and Guzzetti had actual knowledge of the Daily Debit Scheme. *See supra* ¶¶ 54, 61-63, 70-76. Notwithstanding this knowledge, they actively concealed it from GWG.

237.    The Nulook Receivables in the aggregate amount of $1,361,769.34 converted by Nazareno, Heiser, and Heiser Enterprises through the Daily Debit Scheme, aided and abetted by Aurigema, Mannino, and Guzzetti, are specifically identifiable and are set forth in **Exhibit C**.

238.    Plaintiff suffered damages amounting to $1,361,769.34 as a result of the actions of Aurigema, Mannino, and Guzzetti in aiding and abetting Nazareno, Heiser, and Heiser Enterprises in converting specifically identifiable funds from GWG through the Daily Debit Scheme.

## COUNT V
## CONVERSION

### Against Nazareno, Heiser, and Heiser Enterprises in the Diversion Scheme

239.    GWG repeats and realleges all allegations above as though fully set forth herein.

240.    Nazareno, Heiser, and Heiser Enterprises exercised dominion and control over Nulook's Receivables encumbered by GWG's first priority perfected lien in connection with the Diversion Scheme. The Diversion Scheme is detailed in Paragraphs 121-144, *supra*.

241.    The conduct of those defendants in connection with the Diversion Scheme was deliberate and intentional. Heiser knew of the Loan from his work with Nulook and Atalaya. *See supra* ¶ 49(a). Heiser and Nazareno, were CEO and Executive Director, respectively, of a company that signed an agreement acknowledging the Loan and GWG's lien. *See supra* ¶¶ 31, 47-49. Heiser affirmatively acknowledged the Loan in an email to Nazareno, identified specific funds, and then directed Nazareno to implement the Diversion Scheme, diverting those specific funds from GWG to his own bank account. *See supra* ¶¶ 128-132, 134-135.

242.    As detailed in **Exhibit I**, the Nulook Receivables converted through Nazareno, Heiser, and Heiser Enterprises' Diversion Scheme (totaling $284,744.70) are specifically identifiable.

243.    GWG suffered damages of $284,744.70, resulting from Nazareno, Heiser, and Heiser Enterprises' scheme to convert GWG's funds.

**COUNT VI**
**AIDING AND ABETTING CONVERSION**

**Against Mannino and Guzzetti in the Diversion Scheme**

244.    GWG repeats and realleges all allegations above as though fully set forth herein.

245.    Mannino and Guzzetti provided substantial assistance to Nazareno, Heiser, and Heiser Enterprises in their exercise of dominion and control over Nulook's Receivables, which were encumbered by GWG's first priority perfected lien. Among other things, they were informed of the Diversion Scheme by Nazareno, and received email updates on the merchant funds being diverted. *See supra* ¶¶ 138-139, 141.

246.    Mannino and Guzzetti had actual knowledge of the Diversion Scheme.  *See supra* ¶¶ 135, 140-141.

247.    The Nulook Receivables converted by Nazareno, Heiser, and Heiser Enterprises in the amount of $284,744.70, aided and abetted by Mannino and Guzzetti, are specifically identifiable. *See* **Exhibit I**.

248.    Plaintiff suffered damages of $284,744.70, resulting from the actions of Mannino and Guzzetti in aiding and abetting Nazareno, Heiser, and Heiser Enterprises in converting funds from GWG through the Diversion Scheme.

**COUNT VII**
**CONVERSION**

**Against Nazareno in the Post-Receivership Scheme**

249.    GWG repeats and realleges all allegations above as though fully set forth herein.

250.    Nazareno exercised dominion and control over certain data, electronic files, and intellectual property belonging to Plaintiff through the Post-Receivership Scheme.  *See supra* ¶¶ 172-73, 175-188.

251.    Nazareno's conduct in connection with the Post-Receivership Scheme (converting GWG's property) was deliberate and intentional.  *See generally supra* ¶¶ 165-91.

252.    The property Nazareno converted through this scheme is specifically identifiable.

253.    GWG suffered damages in excess of $500,000, in an amount to be proven at trial, as a result of Nazareno's conversion of GWG's data, electronic files, intellectual property through the Post-Receivership Scheme.

**COUNT VIII**
**TORTIOUS INTERFERENCE WITH CONTRACT**

**Against Nazareno**

254.    GWG repeats and realleges all allegations above as though fully set forth herein.

255.    GWG entered into a valid, binding and enforceable contracts with Nulook, including the Loan, the Collection Subordination Agreement, and the Forbearance Agreement.

256.    Among other things, the Loan prohibited Nulook from pledging its Collateral to any third party, incurring any other material indebtedness or transferring substantially all of its assets to another entity without the written consent of GWG.

257.    At all times relevant herein, Nazareno knew of the Loan, the Collection Subordination Agreement, the Forbearance Agreement, and GWG's security interest in the Collateral. *See supra* ¶¶ 31-32.  In fact, the Diversion Scheme commenced immediately after GWG instructed Nulook to shut off all automatic debits from its bank account.  It was the act of shutting off the automatic debits that ended the Daily Debit Scheme. *See supra* ¶ 120.

258.    Nazareno intentionally and deliberately interfered with the Loan and Collection Subordination Agreement by entering into factoring agreements with Nulook and implementing the Daily Debit Scheme. *See supra* ¶¶ 59, 65, 70-72.

259.    Nazareno also intentionally and deliberately interfered with the Loan, Collection Subordination Agreement, and Forbearance Agreement by stealing funds owed to Plaintiff through the Diversion Scheme.  *See supra* ¶¶ 121-144.

260.    As a result of Nazareno's interference with the Loan and Collection Subordination Agreement, Plaintiff has been damaged in the amount of $1,646,514.04.

**COUNT IX**
**TORTIOUS INTERFERENCE WITH CONTRACT**

**Against Heiser and Heiser Enterprises**

261.    GWG repeats and realleges all allegations above as though fully set forth herein.

262.    Plaintiff entered into valid, binding and enforceable contracts with Nulook, including the Loan, Collection Subordination Agreement, and Forbearance Agreement.

263.    Among other things, the Loan prohibited Nulook from pledging its Collateral to any third party, incurring any other material indebtedness or transferring substantially all of its assets to another entity without GWG's written consent.

264.    At all times relevant herein, Heiser and Heiser Enterprises had knowledge of the Loan, the Collection Subordination Agreement, the Forbearance Agreement, and GWG's security interest in the Collateral.  *See supra* ¶¶ 48, 49(a), 55, 64, 131, 133, 138.

265.    Heiser and Heiser Enterprises intentionally and deliberately interfered with the Loan and Collection Subordination Agreement by entering into factoring agreements with Nulook and implementing the Daily Debit Scheme. *See supra* ¶¶ 59, 63, 65-66, 70-72.

266.    Heiser and Heiser Enterprises also intentionally and deliberately interfered with the Loan, Collection Subordination Agreement, and Forbearance Agreement by stealing funds owed to Plaintiff through the Diversion Scheme.  *See supra* ¶¶ 121-144.

267.    As a result of Heiser and Heiser Enterprise's interference with these agreements, GWG suffered $1,646,514.04 in damages.

## COUNT X
## FRAUD

### Against Nulook, Mannino, and Guzzetti

268.    GWG repeats and realleges all allegations above as though fully set forth herein.

269.     Nulook, Mannino, and Guzzetti made repeated false misrepresentations or omitted material facts to Plaintiff in connection with the Daily Debit Scheme (detailed *supra* in ¶¶ 50-84) and the Diversion Scheme (detailed *supra* in ¶¶ 121-144).

270.    Nulook, Mannino, and Guzzetti made false misrepresentations and omitted material facts deliberately and with the intent to defraud Plaintiff in connection with the Daily Debit Scheme and the Diversion Scheme.

271.    Plaintiff reasonably relied upon the false misrepresentations and omissions of material facts by Nulook, Mannino, and Guzzetti in connection with the Daily Debit Scheme and the Diversion Scheme.

272.    Plaintiff suffered damages by the false misrepresentations and omissions of material fact by Nulook, Mannino and Guzzetti in connection with the Daily Debit Scheme and the Diversion Scheme in the amount of $1,646,514.04.

## COUNT XI
## FRAUD

### Against Nazareno, Heiser, and Heiser Enterprises

273.    GWG repeats and realleges all allegations above as though fully set forth herein.

274.    Nazareno, Heiser, and Heiser Enterprises each had knowledge of the Nulook Loan, and Plaintiff's lien on the Collateral and made repeated false misrepresentations or failed to disclose material facts to Plaintiff in connection with the Daily Debit Scheme (detailed *supra* in ¶¶ 50-84) and the Diversion Scheme (detailed *supra* in ¶¶ 121-144).

275.    Nazareno, Heiser, and Heiser Enterprises made false misrepresentations and failed to disclose material facts deliberately and with the intent to defraud Plaintiff in connection with the Daily Debit Scheme and the Diversion Scheme.

276.    Plaintiff reasonably relied upon the false misrepresentations and omissions of material facts by Nazareno, Heiser, and Heiser Enterprises in connection with the Daily Debit Scheme and the Diversion Scheme.

277.    Plaintiff suffered damages by way of the false misrepresentations and omissions of material fact by Nazareno, Heiser, and Heiser Enterprises in connection with the Daily Debit Scheme and the Diversion Scheme, amounting to $1,646,514.04.

## COUNT XII
## FRAUDULENT MISREPRESENTATION

### Against Aurigema

278.    GWG repeats and realleges all allegations above as though fully set forth herein.

279.    Aurigema made repeated false misrepresentations to Plaintiff in connection with the Forbearance Agreement.  These misrepresentations falsely portrayed Nulook's financial condition and the steps it took to cure the Loan default. *See supra* ¶¶ 85-120.

280.    Aurigema knew these representations were false.  *See supra* ¶¶ 92, 99, 104, 111-112, 116.

281.    Aurigema made these false representations with the intent to persuade or induce Plaintiff to enter into the Forbearance Agreement. *See supra* ¶¶ 110-111; *see generally supra* ¶¶ 85-120.

282.    Plaintiff reasonably relied upon the false misrepresentations made by Aurigema and entered into the Forbearance Agreement with Nulook.  *See supra* ¶¶ 110-111, 119.

283.    Plaintiff was damaged by Aurigema's false misrepresentations in an amount including, but not limited to, its losses from the Daily Debit Scheme of $1,646,514.04.

## COUNT XIII
## FRAUDULENT CONCEALMENT AND/OR OMISSION

### Against Aurigema

284.    GWG repeats and realleges all allegations above as though fully set forth herein.

285.    Aurigema fraudulently concealed and failed to disclose material facts to Plaintiff in connection with the Forbearance Agreement.  *See generally supra* ¶¶ 85-119.

286.    Aurigema possessed special facts not available to GWG, namely the existence of the payments from "pscf" to Heiser stemming from the Heiser Agreements and the Daily Debit

Scheme, and failed to disclose these facts to Plaintiff. In fact, he actively hid them from GWG. *See supra* ¶¶ 93, 111, 114, 116.

287.    GWG reasonably relied upon the omissions of material facts by Aurigema and entered into the Forbearance Agreement with Nulook.  *See supra* ¶¶ 110-111, 119.

288.    GWG was damaged by Aurigema's omissions of material facts. Its losses include, but are not limited to, its losses from the Daily Debit Scheme in the amount of $1,361,769.34.

**COUNT XIV**
**FRAUDULENT CONVEYANCES**
**UNDER § 273-276 OF THE NEW YORK DEBTOR CREDITOR LAW**

**Against Nulook**

289.    GWG repeats and realleges all allegations above as though fully set forth herein.

290.     On or about July 13, 2016, Nulook was notified, in writing, of the existence of an Event of Default under the Loan.

291.    Again, on July 28, 2016, Nulook was notified, in writing, of the continuing Borrowing Base Deficit and Event of Default under the Loan.

292.    After receiving notice of an Event of Default under the Loan, and without GWG's knowledge or consent, Nulook made the following non-ordinary course payments:

| Date | To | Amount | Wire # |
|---|---|---|---|
| 11/16/2016 | Vito Dragonetti | $100,616.44 | 700099233 |
| 11/17/2016 | Nick Dragonetti | $100,698.63 | 700011937 |
| 11/18/2016 | Calkidso Trust | $102,013.69 | 700047502 |
| **TOTAL AMOUNT** | | **$303,328.76** | |

293.    These payments were made when Nulook was insolvent or Nulook was rendered insolvent by virtue of these payments.

294.    These payments left Nulook with unreasonably small capital to carry out its business, and were made with actual intent to hinder, delay, or defraud GWG.

295.    Accordingly, under §§ 273-275 of the New York Debtor Creditor law, the aforementioned transfers were fraudulent as to GWG, and GWG is entitled to recover damages from the transferees, Vito Dragonetti, Nick Dragonetti, and the Calkidso Trust in the amount of $303,328.76, plus punitive damages from Nulook for fraud.

### COUNT XV
### FRAUDULENT CONVEYANCES
### UNDER § 273-276 OF THE NEW YORK DEBTOR CREDITOR LAW

#### Against Nulook

296.    GWG repeats and realleges all allegations above as though fully set forth herein.

297.    Payments were made by Nulook to PSC as set forth in **Exhibit C** in connection with the fraudulent Daily Debit Scheme described in detail in Paragraphs 50-84, *supra*.

298.    After deposit into Heiser's (PSCF) bank account at PSC, this money was then paid to Heiser Enterprises and MM Funding. *See supra*, ¶¶ 58, 84.

299.    These payments were made with actual intent to hinder, delay, or defraud GWG.

300.    In addition, the Daily Debit Scheme left Nulook with unreasonably small capital to carry out its business.

301.    Accordingly, under §§ 273-275 of the New York Debtor Creditor law, the aforementioned transfers were fraudulent as to GWG and GWG is entitled to recover damages from PSC and any other transferee, including but not limited to Heiser, Heiser Enterprises, and MM Funding, in the amount of $1,361.769.34, plus punitive damages from Nulook.

### COUNT XVI
### FRAUDULENT CONVEYANCES
### UNDER § 273-276 OF THE NEW YORK DEBTOR CREDITOR LAW

#### Against Nazareno, Heiser, and Heiser Enterprises

302.    GWG repeats and realleges all allegations above as though fully set forth herein.

303.    Payments were made by PSC to Heiser as follows: (i) $800,000 on May 19, 2016; (ii) $725,000 on October 16, 2016; (iii) $150,000 on January 23, 2017; (iv) $80,000 on March 8, 2017; and (v) $40,000 on March 31, 2017, each of which was made while PSC was insolvent, or else PSC was rendered insolvent by virtue of these payments. *See Receiver's First Report* at p. 4, 10; *see also supra* ¶ 159.

304.    By virtue of its loans to the Receiver, GWG was a creditor of PSC.

305.    These payments left PSC with unreasonably small capital to carry out its business and constitute fraudulent conveyances as to creditors.

306.    These payments were made with actual intent to hinder, delay, or defraud creditors and/or future creditors, including GWG.

307.    Accordingly, under §§ 273-276 of the New York Debtor Creditor law, the transfers were fraudulent as to GWG, and GWG is entitled to recover damages from the transferees in the amounts of $1,795,000.00, plus punitive damages from Nazareno, Heiser, and Heiser Enterprises.

## COUNT XVII
## BREACH OF CONTRACT – THE LOAN AND THE FORBEARANCE AGREEMENT
### Against Nulook

308.    GWG repeats and realleges all allegations above as though fully set forth herein

309.    On March 16, 2017, Plaintiff sent a demand to Nulook for payment of all amounts due under the Loan. As of that date, the amount owed under the Loan was $2,073,398.13.

310.    In addition, default interest is due under the terms of the Loan.

311.    Under the Loan, Section XVI of the Revolving Credit Agreement, Nulook is also responsible for paying all costs of collection, including reasonable attorneys' fees and court costs, incurred or paid by Plaintiff in collecting amounts due under the Loan.

312.    Despite receiving demand for payment, Nulook has failed to pay the amount due and owing to Plaintiff under the Loan.

313.    After foreclosing on the Collateral pursuant to Nulook's short lived bankruptcy (*see supra* ¶¶ 145-155), Plaintiff attempted to collect from various Nulook Merchants and has applied the $248,528.00 it received from said Nulook Merchants through May 31, 2019 to the Loan balance. The Loan balance as of May 31, 2019 is $1,875,607.07.

314.    GWG has fully written off the Loan and expects any further payments from Nulook Merchants to be *de minimis*.

315.    Under the Forbearance Agreement, Nulook agreed to indemnify GWG "of and from all damage, loss, claims (including both direct claims and third-party claims), demands, liabilities, obligations, actions and causes of action whatsoever that any third party may now have or claim to have . . . whether presently known or unknown, and of every nature and extent whatsoever on account of or in any way touching, concerning, relating to, arising out of or founded upon the Loan . . . that may arise as a consequence of the dealings between the Parties . . . ."

316.    All conditions precedent to the maintenance of this action have been met.

317.    Accordingly, Nulook is liable to Plaintiff for all damages and expenses incurred in connection with the Loan and all damages and expenses incurred in prosecuting or defending this action, including, but not limited to the costs and expenses associated with the appointment of the Receiver and all of Plaintiff's expenses, including its attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in its favor as follows:

A.    Damages against Nulook, Mannino, Guzzetti, Heiser, and Heiser Enterprises on Count I (RICO, 18 U.S.C. § 1962(c)) of $2,146,514.04, trebled to $6,439,542.12, plus attorneys' fees, litigation costs and expenses according to statute;

B.  Damages against Nulook, Mannino, Guzzetti, Heiser, and Heiser Enterprises on Count II (RICO, 18 U.S.C. § 1962(d)) of $2,146,514.04, trebled to $6,439,542.12 plus attorneys' fees, litigation costs and expenses according to statute;

C.  Damages against Nazareno, Heiser, and Heiser Enterprises on Count III (Conversion - Daily Debit Scheme) of $1,361,769.34;

D.  Damages against Mannino, Guzzetti, and Aurigema on Count IV (Aiding and Abetting Conversion - Daily Debit Scheme) of $1,361,769.34

E.  Damages against Nazareno, Heiser, and Heiser Enterprises on Count V (Conversion - Diversion Scheme) of $284,744.70;

F.  Damages against Mannino and Guzzetti on Count VI (Aiding and Abetting Conversion - Diversion Scheme) of $284,744.70;

G.  Damages against Nazareno on Count VII (Conversion – Post Receivership Scheme) of $500,000.00;

H.  Damages against Nazareno on Count VIII (Tortious Interference with Contract) of $1,646,514.04;

I.  Damages against Heiser and Heiser Enterprises on Count IX (Tortious Interference with Contract) of $1,646,514.04;

J.  Damages against Nulook, Mannino, and Guzzetti on Count X (Fraud) of $1,646,514.04;

K.  Damages against Nazareno, Heiser, and Heiser Enterprises on Count XI (Fraud) of $1,646,514.04;

L.  Damages against Aurigema on Count XII (Fraudulent Misrepresentation) in excess of $1,361,769.34, in an amount of to be proven at trial;

M.    Damages against Aurigema on Count XIII (Fraudulent Concealment and/or Omission) in excess of $1,361,769.34, in an amount to be proven at trial;

N.    Damages against Nulook on Count XIV (Fraudulent Conveyances) of $303,328.76, plus punitive damages for fraud in an amount to be determined at trial;

O.    Issuance of a declaratory judgment on Count XIV (Fraudulent Convenyance), adjudging and declaring that Plaintiff can execute directly against Vito Dragonetti, Nick Dragonetti, and the Calkidso Trust;

P.    Damages against Nulook on Count XV (Fraudulent Conveyances of $1,361,769.34, plus punitive damages in an amount to be determined at trial;

Q.    Issuance of a declaratory judgment on Count XV (Fraudulent Conveyance), adjudging and declaring that Plaintiff can execute directly against Heiser, Heiser Enterprises, and MM Funding;

R.    Damages against Nazareno, Heiser, and Heiser Enterprises on Count XVI (Fraudulent Conveyances) of $1,795,000.00, plus punitive damages in an amount to be determined at trial.

S.    Issuance of a declaratory judgment on Count XVI (Fraudulent Conveyance), adjudging and declaring that Plaintiff can execute directly against Nazareno, Heiser, and Heiser Enterprises;

T.    Damages against Nulook on Count XVII (Breach of Contract – Loan Agreement and Forbearance Agreement) of $1,875,607.07;

U.    Judgment against Nazareno, Heiser, Mannino, and Guzzetti, personally for fraud on Counts X and XI;

V.    Punitive damages against Nulook, Mannino, and Guzzetti for aiding and abetting conversion, and fraud on Counts IV, VI, and X,

W.    Punitive damages against Nazareno for conversion, aiding and abetting conversion, tortious interference with contract, and fraud on Counts III, V, VII, VIII, and XI;

X.    Punitive damages against Heiser, and Heiser Enterprises for conversion, aiding and abetting conversion, tortious interference with contract, and fraud on Counts III, V, IX, and XI;

Y.    Punitive damages against Aurigema on Count IV for aiding and abetting conversion, and fraud on Counts XII and XIII;

Z.    Pre-judgment interest; and

AA.    Such other equitable relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands trial by jury.

DATED this 17th day of June, 2019

*/s/ Edward S. Stone*
_____
EDWARD STONE LAW P.C.
Edward S. Stone, Esq.
*Attorneys for Plaintiff*
300 Park Avenue, 12th Floor
New York, New York 10022
Tel: (646) 933-3143
Fax: (203) 348-8477
Email: eddie@edwardstonelaw.com