**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------- x

GWG MCA CAPITAL, INC.                          :
                                               :    Case No.  17-cv-1724- SIL
                    Plaintiff,                 :
                                               :
        vs.                                    :    **FOURTH AMENDED COMPLAINT**
                                               :
NULOOK CAPITAL, LLC,                           :
JOHN GUZZETTI, ANTHONY MANNINO,                :    **JURY TRIAL DEMANDED**
JOEL NAZARENO,                                 :
H. RUSSELL HEISER, and HEISER                  :
ENTERPRISES, LLC,                              :
                                               :
                    Defendants.                :
----------------------------------------------------- x

      Plaintiff GWG MCA Capital, Inc. ("**GWG**" or "**Plaintiff**") by and through its undersigned attorneys, for its Fourth Amended Complaint against defendants Nulook Capital, LLC ("**Nulook**"); John Guzzetti ("**Guzzetti**"); Anthony Mannino ("**Mannino**"); Joel Nazareno ("**Nazareno**"); H. Russell Heiser ("**Heiser**"); and Heiser Enterprises, LLC ("**Heiser Enterprises**") (collectively, "**Defendants**") hereby alleges as follows:

**I.  THE PARTIES**

      1.    Plaintiff GWG is a Delaware corporation, with its principal place of business in Minneapolis, Minnesota.

      2.    Defendant Nulook is a New York Limited Liability Company with a principal place of business at 25 Hemmingway Drive, Melville, NY 11747.

      3.    Defendant Mannino is a citizen of New York, residing at 243 Harbor Lane, Massapequa, NY 11762.  Mannino was the Chief Executive Officer of Nulook, and a one-third owner of Nulook.

1

4. Defendant Guzzetti is a citizen of New York, residing at 25 Hemmingway Drive, Melville, New York 11746. Guzzetti was the Chief Operating Officer of Nulook, and a one-third owner of Nulook.

5. Defendant Nazareno is a citizen of New York, residing at 21 Cherry Lane, Port Jefferson Station, New York. Nazareno was the Executive Director of International Professional Services Inc. d/b/a PSC ("**PSC**").

6. Defendant Heiser is a citizen of Florida, residing at 200 E. Palmetto Park Road, Apt. 417, Boca Raton, FL 33432. On or about September 29, 2015, he was appointed as the Chief Executive Officer ("**CEO**") of PSC.[1] He created and managed a financing division within PSC that PSC referred to as PSC Financial or "**PSCF**." PSCF was not a separate company, it was

---

[1] In a self-promoting press release, PSC stated: "PSC, a technology leader in providing front, middle and back office software platforms for the Merchant Cash Advance Industry, announced today that their Board of Directors has appointed H. Russell Heiser Jr. to the position of CEO. Mr. Heiser has extensive experience advising family offices in venture and private equity investments in companies across a variety of sectors. In many cases, he ended up in operational roles within these companies. In addition, Mr. Heiser was an investment banker at both UBS Investment Bank and Bear Stearns after receiving his MBA from Columbia Business School.

In the second quarter of 2015, Mr. Heiser led an investment group that obtained a stake in PSC. In tandem with the equity investment, PSC received a significant debt commitment to provide funding to the MCA companies utilizing the PSC platform.

'The PSC platform, with its seamless deal management software and in-depth reporting, was already an effective vehicle for our members to launch and grow a Merchant Cash Advance business,' Heiser said. 'By layering in additional functionality and access to growth capital for its members, the PSC platform provides even more value to its members.'

'PSC conducted an exhaustive search to find the right individual to deliver our new products and manage our growth,' PSC's Vice President of Operations Andrew Ragavanis stated.[sic] 'Russ has the full support of the executive management team, as well as, the Board of Directors and I am excited to see PSC continue to grow under his leadership.'"

*See* https://debanked.com/2015/09/psc-board-of-directors-appoints-new-ceo/ and https://www.prweb.com/releases/2015/09/prweb12988888.htm. Retrieved on July 7, 2020.

merely a "division" of PSC. At all times relevant to this litigation, Heiser held himself out to the public as the CEO of PSC.

7.      Defendant Heiser Enterprises is a Florida limited liability company.

## II.      JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction based on diversity of citizenship, pursuant to 28 U.S.C. § 1332.  Plaintiff is a Delaware corporation with its principal place of business located in Minnesota.  Defendants Nulook, Guzzetti, Mannino, and Nazareno are located in, reside in, or have their principal places of business in New York.  Heiser resides in Florida. Heiser Enterprises has its principal place of business in Florida. The exercise of personal jurisdiction over all Defendants is reasonable and proper because Defendants either reside in New York, regularly transact business therein, or committed tortious acts therein. The amount in controversy exceeds $75,000.00, exclusive of costs and interest.

9.      Personal jurisdiction is proper pursuant to C.P.L.R. § 302 (a)(1) and § 302 (a)(3), 18 U.S.C. § 1965 (b), and Federal Rule of Civil Procedure 4(k).

10.      Venue is proper pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(2).  The acts and transactions complained of occurred in this District; Defendants reside or conduct business in this District; and most Defendants have consented or waived objection to venue in this District.

## III.      PRELIMINARY STATEMENT

11.      GWG first commenced this lawsuit over three years ago, in March of 2017. [DE 1].

12.      Beginning in 2014, GWG's predecessor loaned Nulook $3.75 Million Dollars through a series of advances (the "**Nulook Loan**").  GWG purchased the Nulook Loan, along with other assets from MCA Capital, LLC on February 15, 2016.

13.     Nulook was in the business of making merchant cash advances to small to mid-sized businesses. In exchange for a cash advance from Nulook, these businesses ("**Nulook Merchants**") would agree to allow Nulook to debit money from their bank accounts on a daily or weekly basis, in repayment of the cash advances.[2]  Mannino and Guzzetti were one-third owners of Nulook, along with Robert Aurigema ("**Aurigema**"), who is no longer a defendant in this case.

14.     Nulook used PSC to service its portfolio of merchant cash advances, including collecting the daily debits from Nulook Merchants and directing the deposits of those daily debits into Nulook's bank account.

15.     Shortly after purchasing the Nulook Loan, GWG uncovered inconsistencies in the Nulook Loan showing that Nulook did not have enough receivables coming in to pay back the Nulook Loan and began investigating accounting irregularities.

16.     On July 28, 2016, GWG notified Nulook that it was in default under the Nulook Loan. GWG attempted, unsuccessfully, to work with Nulook to remedy the various issues uncovered throughout 2016.

17.     By December 2016, GWG and Nulook had agreed to enter into a Forbearance Agreement, the terms of which allowed Nulook to $20,000 of the approximately $400,000 of incoming receivables each month to pay certain employees and expenses and required Nulook to turn over the remaining  proceeds from all Nulook Merchants to GWG.

18.     In connection with this Forbearance Agreement, Nulook affirmatively covenanted to direct all cash it received each and every month from all Nulook Merchants in excess of $20,000

---

[2] Typically, merchant cash advance deals permit the funding company to recoup a multiple of the amount advanced for a period of 4-6 months.  For example, a merchant advanced $100,000, at a multiple of 1.4 times the amount advanced, would permit a merchant cash advance company (like Nulook) to debit its account daily based on a percentage of incoming funds, until the merchant cash advance company collected $140,000.

to GWG. After entering into the Forbearance Agreement, GWG was given "read only" access to view Nulook's bank account online.

19.     Shortly after executing the Forbearance Agreement, GWG noticed automatic debits pulling money from Nulook's bank account and instructed Nulook to turn off all such debits consistent with the Forbearance Agreement.

20.     For a short time, the Forbearance Agreement worked to pay down Nulook's debt to GWG, with Nulook receiving approximately $14,000 in cash each day, which was turned over to GWG twice each month.

21.     On or about February 17, 2017, GWG noticed that all regular, ordinary course payments into Nulook's bank account had stopped. This led to an investigation by GWG that revealed the "**Diversion Scheme**" described herein at ¶¶ 46 – 76.  As described in more detail herein at ¶¶ 52 - 66, Nazareno and Heiser intentionally and deliberately redirected Nulook Merchants' payments that should have gone to Nulook into PSCF's bank account.

22.     On March 3, 2017, Mannino told GWG that Nulook had borrowed $1,450,000.00 from PSCF pursuant to six (6) factor agreements. Mannino falsely represented to GWG that these transactions had been approved by GWG's predecessor. This led to further investigation by GWG, which revealed the "**Daily Debit Scheme**" described herein at ¶¶ 77 – 112.

23.     Armed with the knowledge that approximately $14,000 per day was being diverted by PSC, GWG filed this lawsuit against Nulook, PSC,  PSC Financial (a division of PSC), Nazareno, Mannino, Aurigema[3], and Guzzetti on March 28, 2017, and immediately moved to have a receiver appointed over PSC. [DE 17].

---

[3] Aurigema was dropped as a defendant in this lawsuit before GWG filed its Third Amended Complaint.

5

24.    On April 26, 2017, the Honorable Arthur D. Spatt appointed a Receiver over PSC, Michael Cardello, Esq. (the "**Receiver**"). [DE 38].

### *PSC Dropped as A Defendant in this Lawsuit*

25.    Before filing its Second Amended Complaint in this litigation, GWG dropped PSC as a defendant after reaching a settlement with the Receiver. Under the terms of the Receivership Order [DE 38], GWG was required to pay the Receiver's expenses. Continuing to litigate against PSC would have meant that GWG would fund its own litigation, as well as PSC's defense.

26.    As a result of the same settlement, PSC was dropped as a defendant in a separate lawsuit filed by another merchant cash advance company originally styled as *America's Business Capital, LLC v. International Professional Services d/b/a PSC, Inc., Joel Nazareno, Thomas Plamenco, Case No. 1:17-cv-01308(VEC)* (the "**ABC Action**"). That lawsuit contained allegations that PSC and others engaged in a fraudulent scheme to divert incoming merchant daily debits from ABC to entities controlled by PSC that were not entitled to such daily debits. Before the ABC Action was transferred to the Eastern District of New York in March 2018, the Honorable Valerie Caproni denied PSC's motion to dismiss, finding that the plaintiff had stated a claim for fraud, and civil conspiracy, and that under New York law "A corporate officer may be liable for torts committed by or for the benefit of the corporation if the officer participated in their commission." *See* **Exhibit A** attached hereto containing relevant portions of transcript of March 16, 2018 hearing on the motion to dismiss in the ABC Action before Judge Caproni.

## IV.    FACTUAL ALLEGATIONS SPECIFIC TO THE DIVERSION SCHEME AND THE DAILY DEBIT SCHEME

### *The Nulook Loan*

27.    The Nulook Loan was evidenced by a Revolving Credit Agreement ("**RCA**"), and was secured by a first priority perfected security interest in and to:

All of Debtor's right, title and interest in and to the following, whether now owned or hereafter arising, acquired or created (collectively, "Collateral"): (i) all FRPAs securing Lender's Funded MCAs, (ii) all MCAs, whether or not they constitute Eligible MCAs, pertaining to such FRPAs, (iii) all "General Intangibles" pertaining to such FRPAs and (iv) all products and "Proceeds" (including "Cash Proceeds") with respect to any of the forgoing.

The following terms have the following meanings:
The terms "General Intangibles," "Proceeds" and "Cash Proceeds" shall have the meanings ascribed to them in the Uniform Commercial Code of the State of New York ("UCC").
The term "Eligible MCAs" means those MCAs underwritten within the Program criteria and according to underwriting procedures of the Debtor.
The term "FRPA" means Future Receivables Purchase Agreement between Debtor and a Merchant.
The term "Lender" means MCA Capital, LLC.
The term "Lender's Funded MCAs" means the MCAs funded by Lender.
The term "MCA" means Merchant cash advances.
The term "Merchant" means a merchant or other small business.
The term "Program" means Debtor's business of making Merchant cash advances to purchase future receivables at a discount from Merchants originated and selected by the Debtor pursuant to a FRPA.

28.    To document its lien on the Collateral (as defined in ¶ 27 *supra*), Lender filed a UCC-1 financing statement against Nulook in New York on May 23, 2014 (Filing Number 201405235537443).

29.    On February 15, 2016, GWG purchased all of Lender's assets, including the Nulook Loan at the core of this dispute.  On February 18, 2016, Lender's UCC-1 was assigned to GWG by UCC-3 Filing Number 201602188065365.  Hereinafter, the terms "**Lender**" and "**GWG**" may be used interchangeably, except where separate identification is necessary.

30.    At all times, GWG's security interest extended to and included "**Proceeds**" and "**Cash Proceeds**" as defined in Section 9-102 of New York's Uniform Commercial Code ("**UCC**"). Both Proceeds and Cash Proceeds encompass incoming daily payments from Nulook

Merchants, including each and every payment made by Nulook Merchants from February 17 – April 30, 2017 (these incoming payments are hereafter referred to as "**Nulook Receivables**").[4]

31.    Nulook did not make any advances to ___any___ merchants that were not pledged to GWG.  This fact is evidenced by an email from one of Nulook's principals, Aurigema (with a copy to Mannino), sent to Patrick Preece ("**Preece**"), who was working with GWG, on March 29, 2016 confirming that Nulook's pledge of its receivables to GWG extended to "deals we pledged against the lines originally" and "deals we funded with a combination of recycled cash and pledged to make sure you were well collateralized" and "deals Nulook funded using its own money but pledged to collateralize the line." *See infra* ¶ 114, Ex. F.

32.    All of Nulook's merchant cash advance deals were pledged to GWG.

33.    Each and every dollar and every payment collected from Nulook Merchants was pledged to GWG and was subject to GWG's lien.

34.    On a regular basis Nulook provided GWG with reports, called "**Borrowing Base Reports**" showing the Receivables pledged to GWG by merchant name, address, account number, the amounts Nulook had advanced to each merchant, how much money each merchant owed Nulook, and how much money of each of these deals was pledged to GWG. These Borrowing Base Reports also showed the cash in Nulook's bank account, which was also pledged to GWG as collateral for the Nulook Loan.

---

[4] Very often a secured party (as did GWG) desires to maintain a security interest not only in its original collateral, but also in the proceeds generated from the disposition of this collateral.  Article 9 of the UCC provides that security interests continue in "identifiable proceeds" of original collateral.  N.Y. UCC § 9-315 (a)(2). "Cash Proceeds" consist of "money, checks, deposit accounts, or the like." N.Y. UCC § 9-102 (a)(9).

### *Nulook Used PSC to Service its Merchant Cash Advance Business*

35.     Nulook hired PSC to perform all back-office servicing for its portfolio of merchant cash advances.

36.      Most importantly, Nulook hired PSC to debit the bank accounts of Nulook Merchants, using a specific ACH processing company called T$$ LLC dba ACHWorks ("**ACHWorks**"), and to remit those payments to Nulook.

### *The ACH Works Agreement*

37.     As part of the Nulook Loan documentation, Nulook, Lender, and ACHWorks entered into an agreement (the "**ACHWorks Agreement**") that allowed Nulook to use ACHWorks, (and only ACHWorks), to debit the Nulook Merchants. The ACHWorks Agreement provided that, if Nulook was in default under the Nulook Loan, Lender had authorization to direct ACHWorks to deposit funds into its account instead of Nulook's bank account.

38.     The ACHWorks Agreement was an important component to the Nulook Loan because it provided security to GWG that if Nulook was in default under the Loan, GWG could immediately take possession of any incoming Nulook Merchants' Receivables by instructing ACHWorks to deposit all incoming Nulook Merchants' Receivables directly into GWG's bank account.

### *The Collection Subordination Agreement*

39.     As part of the Nulook Loan documentation, Lender, Nulook, and PSC entered into a Collection Subordination Agreement ("**CSA Agreement**") pursuant to which:

a)     PSC was informed of Lender's security interest in all Nulook Merchants' receivables, including all Cash and Cash Proceeds; and

b)     PSC specifically agreed to be bound by the provisions of that agreement, and recognize Lender's security interest in, and priority rights to proceeds from, the Collateral, which included the Receivables from Nulook Merchants.

40.    Nazareno personally knew that PSC was required to remit all proceeds from the Collateral to Nulook because he personally executed the CSA Agreement as Executive Director of PSC.  A copy of the CSA Agreement is attached hereto as **Exhibit B.**

41.    Heiser was intimately familiar with the operations of Nulook, one of PSC's biggest clients.  Nulook represented a substantial and material component of PSC's business, and Heiser and Nazareno communicated regularly about Nulook.  In 2015, before his appointment as the CEO of PSC, Heiser led an investment group that obtained a stake in PSC. *See supra* ¶ 6, fn. 1.

42.    This CSA Agreement was an important component to the Nulook Loan. The CSA Agreement provided security to GWG that PSC as servicer, would make sure all of the funds it deducted from the bank accounts of Nulook Merchants would be deposited into Nulook's bank account, or GWG's bank account if it declared the Nulook Loan in default, and nowhere else. Each and every dollar from Nulook Merchants that ran through the PSC Platform was subject to the CSA, the ACHWorks Agreement, and GWG's lien.  Nazareno (PSC's Executive Director) and Heiser, (PSC's CEO) knew that as Nulook's first secured creditor, GWG was protected by these agreements, and understood that PSC had acknowledged and agreed to abide by the terms of these agreements.

### *PSC's Operations*

43.    PSC held itself out to the public as a service provider of "front, middle and back office software platforms for the Merchant Cash Advance Industry."  From 2012 through August 4, 2017, PSC operated an online platform (the "**PSC Platform**"). PSC referred to companies that paid monthly fees to join the PSC Platform as "**PSC Members**."  PSC performed back-office servicing functions for PSC Members.  Nulook was a PSC Member.  The PSC Platform was a

web-based, electronic system hosted in the cloud using Amazon Web Services. PSC Members accessed the PSC Platform via a username and password.

44.    Nulook used the PSC Platform to upload and download documents, manage merchant accounts, produce reports, and authorize PSC to give daily debiting instructions to ACH Works to debit the bank accounts of the Nulook Merchants and remit the funds to Nulook.

45.    The PSC Platform allowed Nazareno[5] and Heiser to control all of Nulook's collections electronically.

### *The Diversion Scheme*

46.    In November 2016, while seemingly busy negotiating the Forbearance Agreement with GWG, two of Nulook's principals, Mannino and Guzzetti, were instead closing down Nulook's offices, paying off insiders, and preparing to go into business with PSC.

47.    Without disclosing anything to GWG about having already shut down Nulook to go into business with PSC, and having moved into PSC's offices, Nulook signed off on the Forbearance Agreement on December 21, 2016.  *See infra* ¶ 127.

48.    Shortly after executing the Forbearance Agreement, GWG noticed automatic debits from Nulook's bank account in excess of the $20,000 permitted by the Forbearance Agreement, including a daily debit by PSCF in the amount of $2,800 and instructed Nulook to turn off all such debits consistent with the terms of the Forbearance Agreement.

49.    For a few weeks, GWG received regular payments from Nulook which served to paydown the Loan balance.

---

[5] Nazareno is a convicted felon. In 2001, he was convicted in *United States v. Robert Cotaggio et al.*, (98-CR-01129 (EDNY)) for his role in a massive "pump and dump" securities fraud scheme, was ordered to pay $10 Million in restitution, and was sentenced to five years in a federal penitentiary with three years of supervised release.

50.     On February 16, 2017, GWG noticed that all deposits into Nulook's bank account via ACHWorks had stopped.

51.     Unbeknownst to GWG, in January 2017, Nazareno and Heiser (with Mannino's assistance and cooperation) orchestrated and implemented a scheme to steal the daily incoming Nulook Merchant receivables by switching the ACH processor used to debit the Nulook Merchants from ACHWorks to a company by the name of ACH Processing. To do this, Nazareno and Heiser took the affirmative steps of shutting off ACHWorks and giving electronic instructions to ACH Processing to debit all of the Nulook Merchants instead (the "**Diversion Scheme**").  The chart below demonstrates the flow of monies before and after the implementation of the Diversion Scheme.



*__Heiser and Nazareno Orchestrate and Implement the Diversion Scheme__*

52.     The Diversion Scheme relied on Nazareno's and Heiser's control over functions available on the PSC Platform that allowed them to:

(i)      stop ACHWorks from debiting Nulook Merchants;

(ii)     hire another company, ACH Processing, to electronically debit the bank accounts of the Nulook Merchants without GWG's knowledge; and

(iii)    send electronic instructions via the PSC Platform to ACH Processing to debit Nulook Merchants and remit those funds to PSCF instead of Nulook.

53.      This flip of the ACH processor "switch" made Heiser's and Nazareno's deception undetectable and complete.

54.      Just before Heiser and Nazareno implemented the Diversion Scheme, Heiser and Mannino emailed back and forth. Heiser questioned Mannino as to why the PSCF payments had stopped, and expressed his frustration that all of Nulook's receivables are subject to GWG's lien:

> From: Russell Heiser [mailto:rheiser@PSCNY.us]
> Sent: Tuesday, January 03, 2017 9:33 AM
> To: Anthony Mannino <amannino@nulookcapital.com>
> Subject: Re: Nulook PSCF payments
>
> …What is the latest on the credit facility? Why did the PSCF payments stop? ....

Three days later, Heiser responded to Mannino's request to put off speaking with him for a few days and stated:

> From: Russell Heiser [mailto:rheiser@PSCNY.us]
> Sent: Friday, January 06, 2017 11:05 PM
> To: Anthony Mannino <amannino@nulookcapital.com>
> Subject: Re: Nulook PSCF payments
>
> …I have put off filing the UCC because I thought it might facilitate faster repayment [of the Heiser Agreements]. Obviously that isn't the case. I will file on Tuesday afternoon for the full outstanding amounts if I haven't heard from you....*when you/your partner signed for the advances, the documents state that your receivables are not encumbered*….
>
> The guidance I am receiving is to pursue a civil RICO case against your entity and its owners…. I hope our call helps facilitate repayment in a timely manner.

55.     In two January 2017 emails, Heiser and Nazareno describe in clear detail the method they would (and did) use to allow Heiser to step in front of GWG by redirecting incoming monies from Nulook Merchants directly to the PSCF bank account controlled by Heiser. First, on January 13, 2017 an email from Nazareno to Heiser lays out the mechanics of how the PSC Platform can be used to secretly divert money intended for one entity to another. In this case, the "mechanics" involved taking over "all merchant debits" from another PSC Member, America's Business Capital, and directing a new ACH processor to remit those merchant debits to the PSCF bank account.[6]

> On Jan 13, 2017, at 5:33 PM, Joel Nazareno <jn@PSCNY.us> wrote:
>
> Russ,
>
> We have taken over all merchant debits from American Business Capital all deposits from their merchants are now being deposited into the PSCF account. I have reviewed the entire process with staff and everything is up to par. To facilitate this we eliminated their ACH provider from the equation and directly switched over their accounts by changing their MID's in the system to PSCF's. ACH processing is now pulling from their merchants as opposed to their provider fedchex (doing it this way they cannot stop the pulls through their provider). All syndicate payouts for their deals will still go out to syndicates as money is settled. I think this should stay the way it is so that the syndicates can continue to get paid (and we avoid any legal hassles) but if you think otherwise let me know and we'll make the necessary changes. Also, do you think it's prudent to tell all of their syndicates that we have taken over ABC's collections due to a breach of their contract with PSCF but will still honor the syndicates on their deals to be paid out? Let me know thanks.
>
> Best Regards,
>
> Joel Nazareno

56.     Three days later, Heiser emailed Nazareno regarding Nulook, stating that he did not want to "wait too long" or he would "never get paid back." Heiser directed Nazareno to begin the Diversion Scheme, which involved implementing the same process used to divest funds from ABC (as described in the email above) to shut down the approximately $14,000 per day of

---

[6] America's Business Capital sued Nazareno and PSC over this. *See supra* at ¶ 26.

incoming cash receipts from Nulook Merchants and divert those monies instead to PSCF's bank

account controlled by Heiser.

> On Jan 16, 2017, at 9:13 AM, Russell Heiser <rheiser@PSCNY.us> wrote:
>
> Joel,
>
> I hate that it has come to this but I think we should make the same change for nulook. They owe about 320k. Looks like they are getting 15k and they haven't done a new deal in 2 months. Anthony won't return calls. No way negotiating a new facility should have taken 7 months. I feel like if we wait too long, I will never get paid back. Then it would be pursuing a fraud charge because they said that didn't have other liens in the documents. Don't feel like all of that noise at the moment.
>
> Hope your tests went well.
>
> Best,
> Russ

57.    Heiser knew[7] about Nulook's Loan from GWG (fn.7 (i) – (iii)).  Heiser knew that

GWG was Nulook's senior secured lender with a security interest in all of the Nulook Merchant

Receivables (fn.7 (iv)).  Despite his knowledge of GWG's senior security interest and priority lien

---

[7]Heiser's prior knowledge of GWG's lien on Nulook's collateral is demonstrated by these emails:

(i)    On December 28, 2015, Aurigema emailed Heiser and Nazareno and stated:

Hey guys,
We are still very interested in PSC and feel this will be a perfect match for both sides . . . but **_can't fund an acquisition with our credit line [from GWG]_**. …

(ii)    On June 13, 2016, Mannino emailed Heiser and stated:

Russ,
…As you know we are **_negotiating some terms with our current lender [GWG]_** which we are hopeful should [sic] be too much longer however when we spoke I told you I didn't want to promise an exact date unless I knew 100% it would be completed by that date. **_We are requesting for our payments to be cut in half of the normal amounts until we close with our lender [GWG]_**.

(emphasis added).

in all of Nulook's Receivables, Heiser intentionally and deliberately directed Nazareno to use the PSC Platform to secretly redirect the incoming Nulook Merchant Receivables that were expressly pledged to GWG to the PSCF bank account.

58.     In a February 18, 2017 email, Heiser notes to Nazareno that the diversion has been successful, but still complains that he is receiving only $10,000 a day from Nulook, and asks about other ways to "suck out" money out of Nulook even faster:

> On Feb 18, 2017, at 12:14 AM, Russell Heiser <rheiser@PSCNY.us> wrote:
>
> Btw, it looks like we are only netting 10k a day from nulook. A lot of payments must come to them through other methods. Is the plan to suck those out from NuLook and be done in 20 days or spend the next 33 days collecting in smaller increments?
>
> Also was the 23k that PSC borrowed get put back this week?  I didn't get an email.

59.     On February 21, 2017, Nazareno sent the email below to Heiser, confirming that he:

(i)      had followed through on Heiser's directions to "take over" Nulook;

(ii)     had discussed the diversion with Mannino;

(iii)    was alerting Heiser to the fact that Mannino "understands just needs reporting and figuring a way that he [Mannino] can deal with the credit facility [GWG]….;" and

(iv)     had told Mannino to direct GWG to call "corporate:"

16

| | |
|---|---|
| **From:** | Joel Nazareno |
| **Sent:** | Tuesday, February 21, 2017 4:52 PM |
| **To:** | Russell Heiser |
| **Cc:** | lmbbcf@gmail.com |
| **Subject:** | Re: La Casa De Los Pastelillos |

Thank you it was a nice weekend was able to spend time with family and catch up on some work.
Oh boy sorry to hear about your parents we just went through that flu epidemic as well in my house it's crazy this year.

Ok I will look into the syndicate payments but I doubt it remember we only pay on what's settled but I will have them double check.
I will also get erin on the AR's from HE to PSCF and work on docs no problem.
I agree with getting MM back monies fast so they can reinvest it would be nice if they can do broadway.

As far as Nulook I have been dealing with Anthony all day about it. "Surprise!" We took over ....It's all good he understands just needs reporting and figuring a way that he can deal with the credit facility. Their probably going to want to talk to someone at PSC. I told him to direct the call to corporate and we'll handle it as such.
The game plan of course is to run it as long as we can to grab the rest of the money he owes and move on he has no issues with that.
I am in a meeting now and can catch up later around 6-7 if you want, if not I'm available after 8 tonight or tomorrow is fine.
In the meantime I have everything under control.
Let me know if you need anything else.

JN

60.     To carry out the Diversion Scheme, Nazareno and Heiser hired a new ACH processing company by the name of "ACH Processing" to debit the Nulook Merchants. Using the PSC Platform, and following Heiser's instructions, Nazareno sent electronic debit instructions to the Nulook Merchants' banks directing ACH Processing (rather than ACHWorks with whom GWG was in privity of contract) to debit the Nulook Merchants' bank accounts and remit the funds to PSCF's bank account.

61.     Heiser and Nazareno did not disclose to GWG that PSC had engaged ACH Processing to conceal the Diversion Scheme. This was a material fraudulent omission, inconsistent with the CSA Agreement and in direct violation of GWG's rights in the Nulook Collateral.

62.     Heiser and Nazareno concealed the ACH processor "switch" from GWG.

63.     From February 16 – April 13, 2017, $284,744.70 was deposited into PSCF's bank account using ACH Processing to debit Nulook Merchants and route the payments to PSCF instead

of Nulook. Each and every one of the $284,744 dollars taken through the Diversion Scheme was owed to GWG, and but for the Diversion Scheme would be in the possession of GWG.

64.     The receivables of each of the Nulook Merchants listed below were pledged by Nulook to GWG in the Diversion Scheme, Heiser and Nazareno used the PSC Platform to debit these Nulook Merchants and route the funds to PSCF's account instead of to Nulook's bank account. **Exhibit C** attached hereto shows the date and amount of each and every debit from these Nulook Merchants from February 16 – April 13, 2017.

| Merchant Name | ID | Amount Collected |
|---|---|---|
| 4 Wheel Junkies | 7508 | 5,800.00 |
| A-1 Heating And Air LLC | 7607 | 4,330.00 |
| AA & BR Inc. #8 | 7100 | 2,428.55 |
| Aii Staffing Solutions #2 | 4261 | 600.00 |
| Aire Serv of Northern VA #3 | 7291 | 7,880.88 |
| Aire Serv of Northern VA #4 | 7292 | 11,476.71 |
| All State | 7303 | 3,450.00 |
| Awnings by Coversol | 7538 | 4,623.20 |
| B & P Transport | 7526 | 3,416.26 |
| Baby Dolls Cajun Cafe | 7774 | 11,203.66 |
| Barnes Logistics Solutions, Inc | 7162 | 3,075.00 |
| Budd Optical Inc. | 6841 | 6,150.00 |
| Chic Nail Spa | 7388 | 512.92 |
| Clinton Cycles | 7480 | 3,475.00 |
| Cordova Collision #10 | 6997 | 1,155.00 |
| Custom Logistics Inc #5 | 7675 | 14,812.00 |
| Danielle's | 7530 | 5,190.76 |
| Dr. Phil's Auto Clinic | 7730 | 3,707.16 |
| Eaheart Excavating Inc | 7396 | 7,506.86 |
| Eastman Trucking & Excavation #2 | 2152 | 1,230.00 |
| Emmett Golden Hunt Memorial Chapel | 7232 | 2,112.50 |
| Epic | 6022 | 425.00 |
| Future Generation Youth Services #7 | 7067 | 16,423.32 |
| Infinite Autos | 7699 | 16,919.79 |
| Integrative Health Consults LLC | 7674 | 308.88 |
| Iron Work Design LLC #2 | 7776 | 2,496.00 |
| Jiffy Mart Foods #2 | 7376 | 4,100.00 |

| | | |
|---|---|---|
| JM2 Construction | 6564 | 1,500.00 |
| Kedra A Flowers CPA PC #3 | 7341 | 1,022.46 |
| LFT Enterprises LLC | 6540 | 4,000.00 |
| Mohawk Services, Inc #3 | 7599 | 25,892.72 |
| North Beach Bar & Grill #10 | 7703 | 2,050.00 |
| North Beach Bar & Grill #9 | 7564 | 2,050.00 |
| Occupational Medical Center Inc | 7672 | 3,590.40 |
| Patriot Express #3 | 7807 | 6,800.00 |
| Patty Gal Christian Learning Center and Daycare | 7405 | 2,400.00 |
| Printarama | 7403 | 400.00 |
| Richard Rizzo Agency | 7437 | 1,820.00 |
| Ricks Paving & Sealing #2 | 7430 | 11,196.75 |
| S.K. Rogers Funeral Home #6 | 7522 | 24,777.28 |
| SER Roofing & Siding LLC | 7486 | 7,530.00 |
| Taqueria Jalisco #3 | 7479 | 1,950.00 |
| Terald's Delivery Service LLC #3 | 7262 | 3,443.51 |
| The Den Theatre #4 | 4152 | 16,000.00 |
| The SFE Collections #2 | 3072 | 2,300.00 |
| US Rail Corporation Of Ohio #3 | 7531 | 4,532.13 |
| VSIS #9 | 7463 | 11,815.00 |
| Workplace Occupational #10 | 7443 | 4,865.00 |
| **Total Merchant Collections** | | **284,744.70** |

65.     But for the Diversion Scheme described herein, all of the Nulook Merchant collections routed to PSCF via ACH Processing would have gone to Nulook, and in turn would have been paid to GWG under the terms of the Forbearance Agreement.

66.     In total Nazareno and Heiser stole $284,744.70 from GWG using the Diversion Scheme.

***Mannino Covers Up the Diversion Scheme***

67.     On February 17, 2017, GWG noticed all payments into Nulook's bank account from PSC had stopped.

68.     On February 20, 2017, Preece of GWG questioned Mannino about why the payments had stopped. Mannino told Preece that he did not know what was happening but would

follow up with ACHWorks. This statement was false, material, and relied upon by GWG to its detriment.

69.     On or about February 27, 2017, Mannino told Preece that the money had been "frozen" by ACHWorks because Nulook owed ACHWorks money. This statement was false, misleading, material, and relied upon by GWG to its detriment.

70.     In a subsequent conversation, on or about February 27, 2017, Mannino told Preece that ACHWorks told him that there were no transactions for Nulook since February 16, 2017. Mannino told Preece he did not know why there were no transactions. This statement was false, misleading, material, and relied upon by GWG to its detriment.

71.     On or about March 1, 2017, Mannino told Preece that "possibly the cash from ACHWorks was going to PSC instead of Nulook" but the situation was completely out of Nulook's control. This statement was false, misleading, material, and relied upon by GWG to its detriment.

72.     Mannino knew that the money that was being diverted by PSC was being taken by Nazareno and Heiser to repay the concealed factor deals (the Heiser Agreements, defined *infra* at ¶ 83). Mannino falsely told Preece that he did not know why the payments had stopped.

73.     Mannino deliberately concealed from GWG the fact that he knew PSC was taking the money, preventing GWG from taking legal action to stop the Diversion Scheme, allowing $284,744.70 that should have been paid to GWG to go to PSCF instead. This was a material fraudulent omission that caused harm to GWG.

74.     Mannino knew that PSC had "taken over" the Nulook receivables.  An email from Nazareno to Heiser (set out in full in ¶ 59 *supra*) describes a conversation Nazareno had with Mannino on February 21, 2017 where Nazareno tells Mannino about the Diversion Scheme:

> "As far as Nulook I have been dealing with Anthony [Mannino] all day about it. Surprise! We took over…it's all good he [Mannino] understands [sic] just needs reporting and figuring out a way he can deal with the credit facility [GWG]. Their [sic] probably going to want to talk to someone at PSC. I told him to direct the call to corporate and we'll handle it as such."

75.    Mannino did not take any steps to stop PSC from diverting the Nulook Merchant Receivables, and only a month later on March 15th, despite sharing an office with Nazareno (*see supra* ¶¶ 46-47), and disclosing to Preece that PSC had been diverting GWG's funds to PSCF (*see supra* ¶ 71), did Mannino finally take an orchestrated and contrived step, following Nazareno's advice to notify "corporate" by sending the email set forth below, not directly to Nazareno or Heiser, with whom he regularly communicated, but instead to Accounting@PSCNY.us.  This deliberate obfuscation and delay by Mannino allowed Heiser and Nazareno to continue diverting funds from Nulook Merchants to PSCF.

**From:** Anthony Mannino
**Sent:** Wednesday, March 15, 2017 2:35 PM
**To:** Accounting <Accounting@PSCNY.us>
**Cc:** 'Patrick Preece' <patrick@gwgmca.com>
**Subject:** RE: Nulook Collections

To Whom it May Concern,

As you are aware, MCA Capital LLC has a perfected security interest in all Nulook receivables.  A copy of MCA Capital's UCC-1 financing statement is attached hereto.

It appears that on or about February 17, 2017 all cash sweeps that were previously directed to the Nulook account ceased:

Prior to February 17, 2017, Nulook Capital was receiving approximately $14,000.00 per business day.

Please take all steps to direct all Nulook originated receivables, including but not limited all MCA's, FRPA's, General Intangibles, Proceeds and Cash Proceeds (as such terms are generally known in the merchant cash advance industry or as defined by the Uniform Commercial Code of the State of New York) to the Nulook account.

Please send copies of any instructions that you may have given to ACHWorks, or any third party regarding Nulook's receivables to my attention immediately.

Please note that all of MCA Capital's rights are expressly reserved.


Anthony Mannino
Nulook Capital LLC
Phone:516-444-3499 ext.1001
Toll Free:888-484-1004
Fax:516-765-9184
amannino@nulookcapital.com
www.nulookcapital.com

76.    From February 16, 2017 – April 13, 2017, Mannino also regularly received emails from Kevin Carrigan, a PSC employee, outlining the amounts "pulled" by each ACH processor for certain Nulook Merchants.  An excerpt from of one of these emails shows that for one Nulook Merchant (pledged to GWG), Jalisco Jap Inc., $19,500 was appropriately debited from this merchants bank account using ACHWorks, and $1,950 was "diverted" to Heiser's bank account at PSC using ACH Processing. Mannino did not disclose this to GWG. This was a material, fraudulent omission.

**Kevin Carrigan**

From:        DealManagement
Sent:        Tue 3/07/2017 2:50 PM (GMT-00:00)
To:          Christina Igoe
Cc:          Anthony Mannino; DealManagement
Bcc:
Subject:     Jalisco Jap Inc. - Taqueria Jalisco #3 #7479 - Account Reconciliation
Attachments: Jalisco Jap Inc. - Taqueria Jalisco #3 - DEAL #7479 Account Transactio....xlsx

**Jalisco Jap Inc. - Taqueria Jalisco #3  #7479**

| | | |
|---|---|---|
| Total Advance | $15,000.00 | |
| Total RTR | $21,450.00 | |
| Total Fees | $0.00 | |
| Total Funds Collected (ACH Works) | | $19,500.00 |
| (log attached) | | |
| ACH Processing | | $1,950.00 |
| Payoff | | $0.00 |
| Total Funds Collected | | $21,450.00 |

### The Daily Debit Scheme

77.     In early 2015, Nazareno, Heiser, and Heiser Enterprises began offering financing to PSC's Members through a division of PSC known as "**PSCF**." Even though PSCF called this financing a "merchant cash advance" it was really a loan because it called for a fixed repayment schedule over a finite period of time.   A true merchant cash advance is paid back by a percentage of a merchant's daily or monthly sales, rather than on a set installment schedule.

78.     Together, Heiser and Nazareno advertised, solicited, and provided what they called merchant cash advances to PSC Members that needed funding to make additional cash advances to merchants.

79.     Heiser controlled PSCF from the start.  Heiser was brought into PSC to specifically implement the PSCF financing division. (See supra ¶ 6, fn.1). Heiser:

> (i)  directed advertising to PSC Members regarding the availability of funding;

> (ii) performed the underwriting;

> (iii) decided which applicants to fund; and

> (iv) provided all of the financing for the PSCF financing division either directly from a Heiser Enterprises bank account or indirectly, by wiring money to a PSCF account for further distribution to PSC's Members.[8]

80.     This program launched on May 29, 2015, with Heiser initially sending funds directly from Heiser Enterprises' bank account to three PSC Members, including Nulook.

81.     On May 29, 2015, Nulook entered into the first of six (6) factor agreements with PSCF, taking a $200,000.00 cash advance, and permitting PSC to debit $967.00 from Nulook's bank account on a daily basis until Nulook had paid Heiser a total of $232,000.00. The $967.00 per day was not tied to any specific Nulook receivables it was simply a set payment amount debited from Nulook's bank account.

---

[8] Heiser Enterprises bankrolled the entire PSCF financing division, funding the first three "loans" directly from the Heiser Enterprises bank account on May 29, 2015 in the aggregate amount of $500,000.

Heiser then contributed $740,000 to PSCF on July 28, 2015, and $500,000 on November 2, 2015, and brought in a partner, MM Funding on May 5, 2016 that contributed an additional $500,000.

82.    Without disclosing them to GWG, and without notice to or permission from Lender,[9] Nulook entered into five (5) additional concealed factor agreements with Heiser's finance division, PSCF. Failure to disclose these agreements to GWG was a material act of concealment which led to the erosion in value of GWG's collateral through the Daily Debit Scheme.

83.    In total, Nulook "double-pledged" $1,674,000.00 of GWG's collateral to PSCF pursuant to the six factor agreements listed below (collectively the "**Heiser Agreements**").  Not one of the Heiser Agreements was ever disclosed to GWG by Nulook, Mannino, Guzzetti, Nazareno, or Heiser at the time they were entered into.

(i)    On May 29, 2015, Nulook accepted a $200,000.00 advance from Heiser's finance division and pledged to repay it $232,000.00, permitting PSC to debit $967.00 from its bank account on a daily basis and route those funds to PSCF;

(ii)    On July 29, 2015, Nulook accepted a $350,000.00 advance from Heiser's finance division and pledged to repay it $420,000.00, permitting PSC to debit $1,750.00 from its bank account on a daily basis and route those funds to PSCF;

(iii)    On October 30, 2015, Nulook accepted a $150,000.00 advance from Heiser's finance division and pledged to repay it $175,500.00, permitting PSC to debit $731.25 from its bank account on a daily basis and route those funds to PSCF;

(iv)    On November 5, 2015, Nulook accepted a $150,000.00 advance from Heiser's finance division and pledged to repay it $175,500.00, permitting PSC to debit $731.25 from its bank account on a daily basis and route those funds to PSCF;

---

[9] In late May 2015, Mannino emailed Lender to ask if it could "enter into a factor agreement with PSC for $200k."  Given that, at that point in time, the Nulook Loan was in good standing, Lender confirmed that Nulook could proceed with a factor agreement with PSC for $200,000.00.  The actual terms of the Nulook factor agreement were never disclosed to Lender by Nulook, Mannino, Guzzetti, Nazareno, or Heiser. If Nulook had disclosed the actual terms of the factoring agreement, Lender would not have approved it. Neither Lender nor GWG ever released or relinquished its security interest in the Collateral or terminated its UCC-1 financing statement.  Neither Lender nor GWG entered into any form of inter-creditor agreement, participation agreement, carve-out agreement, or other arrangement with respect to GWG's first priority perfected security interest in the Collateral.

(v)  On January 19, 2016, Nulook accepted a $100,000.00 advance from Heiser's finance division and pledged to repay it $116,000.00, permitting PSC to debit $483.33 from its bank account on a daily basis and route those funds to PSCF; and

(vi)  On April 29, 2016, Nulook accepted a $500,000.00 advance from Heiser's finance division and pledged to repay it $555,000.00, permitting PSC to debit $6,937.50 from its bank account on a daily basis and route those funds to PSCF.

84.    Subsequent to the commencement of this litigation, GWG learned that each of these agreements provided that Nulook:

> sells, assigns and transfers to PSCF (making PSCF the absolute owner) … all of [Nulook's] future accounts, contract rights and other obligations arising from or relating to the payment of monies from the [Nulook's] customers….

85.    However, such an assignment is void *ab-initio* since "[Nulook's] future accounts, contract rights and other obligations arising from of relating to the payment of monies from the [Nulook] customers" had already been pledged to Lender. Mannino knew this. Guzzetti knew this. Nazareno knew this, and Heiser knew this.  It is axiomatic that a party to a contract cannot assign that which it does not own.

86.    Mannino and Guzzetti both actively participated in the Daily Debit Scheme. Mannino executed the Heiser Agreements listed in ¶ 83 (i), (ii), (iii), and (iv), Guzzetti executed the Heiser Agreement listed in ¶ 83 (vi). Both Mannino and Guzzetti participated in recorded calls with Kevin Carrigan, a PSC employee, acknowledging the terms of the Heiser Agreements set forth in ¶ 83 (ii) – (vi).

87.    Mannino did not disclose the Heiser Agreements to GWG. This failure to disclose material agreements and the improper and hidden debiting of Nulook's bank account by PSCF were fraudulent, material omissions by Mannino that ultimately led to the erosion in value of GWG's Collateral.

88.    Guzzetti did not disclose the Heiser Agreements to GWG. This failure to disclose material agreements and the improper and hidden debiting of Nulook's bank account by PSCF were fraudulent, material omissions by Guzzetti and led to the erosion in the value of GWG's Collateral.

89.    To conceal the Heiser Agreements from GWG, PSC immediately began debiting Nulook's bank account in "repayment" of these cash advances (the "**Daily Debits**") using an undisclosed ACH processing company. After the commencement of this litigation GWG learned that this ACH company was ACH Processing. Neither Heiser nor Nazareno (or any PSC representatives) disclosed this to GWG. The Daily Debits were in direct violation of the CSA Agreement, whereby PSC agreed to "recognize all priorities and other rights granted" to GWG.

90.    Heiser, Nazareno, Mannino, and Guzzetti deliberately circumvented GWG's rights and concealed the Daily Debits using this "new" ACH processor because they knew that GWG had the ability to enforce its rights in the Nulook Collateral by directing ACHWorks to route payments to GWG pursuant to the ACHWorks Agreement.  Heiser, Nazareno, Mannino and Guzzeti also knew that the use of ACH Processing violated the RCA and the CSA Agreement.

91.    Mannino and Guzzetti specifically authorized ACH Processing to debit Nulook's bank account.  In fact, ACH Processing could not have debited Nulook's bank account without Nulook's express authorization.

92.    Mannino did not disclose to GWG that Nulook had authorized ACH Processing to debit its bank account for the Daily Debits. This was a material, fraudulent omission.

93.    Guzzetti did not disclose to GWG that Nulook had authorized ACH Processing to debit its bank account for the Daily Debits.  This was a material, fraudulent omission.

94.     GWG would never have approved the use of ACH Processing in connection with the Daily Debit Scheme.  Heiser, Nazareno, Mannino, and Guzzetti each knew that had GWG been informed about the Daily Debit Scheme and the improper installation of ACH Processing, GWG would have taken steps to protect its rights in the Nulook Collateral.

95.     Nazareno, Heiser, Mannino, and Guzzetti further disguised and concealed the daily bank debits by using a notation that made them look like any other Nulook Merchant debit on Nulook's bank statements and did not disclose this to GWG (the use of an undisclosed ACH processor and the debiting of Nulook's bank account in derogation of GWG's rights in the Nulook Collateral in the aggregate amount of $1,361,769.34 taken together constitute the "**Daily Debit Scheme**").

96.     By way of example, the debits for legitimate transactions associated with one Nulook Merchant, Roland Super Taco, appear on Nulook's bank statements under the notation "CCD Debit, International PR 6878."

97.     Heiser, Nazareno, Mannino, and Guzzetti used a similar notation to conceal the Daily Debit Scheme from GWG by using the notation "CCD Debit, International PR Deal_96" when debiting Nulook's account under the fraudulent Heiser Agreements.

98.     An example of these two, almost identical, notations is set forth below:

CCD DEBIT, INTERNATIONAL PR DEAL_96
CCD DEBIT, INTERNATIONAL PR 6878

99.     Each concealed debit used the same or similar notation to conceal the Daily Debit Scheme from GWG.  Each of these concealed debits were "authorized" by Mannino and Guzzetti and were "initiated" by Nazareno and Heiser electronically using ACH Processing and the PSC Platform to give electronic instructions to ACH Processing that were concealed from GWG. Attached hereto as **Exhibit D** is a spreadsheet showing each of these concealed debits, detailing

the date, amount, debiting bank account (Nulook), and depositing bank account (PSCF). Each of these concealed debits was a fraudulent act in furtherance of the Daily Debit Scheme.

100.    Nazareno knew that Nulook's receivables were pledged to GWG to secure repayment of the RCA because Nazareno executed the CSA.

101.    Heiser, the CEO of PSC also knew that Nulook's receivables were pledged to GWG.  His knowledge of GWG's priority lien is demonstrated by these emails:

(i)    On December 28, 2015, Aurigema emailed Heiser and Nazareno and stated:

> Hey guys,
> We are still very interested in PSC and feel this will be a perfect match for both sides . . . ***but can't fund an acquisition with our credit line [from GWG]***. …

(ii)    On June 13, 2016, Mannino emailed Heiser and stated:

> Russ,
>     …As you know we are negotiating some terms with ***our current lender [GWG]*** which we are hopeful should [sic] be too much longer however when we spoke I told you I didn't want to promise an exact date unless I knew 100% it would be completed by that date. ***We are requesting for our payments to be cut in half of the normal amounts until we close with our lender [GWG]***.

(iii)    On January 6, 2017, Mannino emailed Heiser and stated:

> Russ,
> ***I have a conference call with my lenders [GWG]*** Monday afternoon. I would appreciate it if I can touch base with you on Tuesday. Thank you.

(iv)    Heiser responded to Mannino that same day (January 6, 2017) and stated:

> …I have put off filing the UCC because I thought it might facilitate faster repayment [of the Heiser Agreements].  Obviously that isn't the case. I will file on Tuesday afternoon for the full outstanding amounts if I haven't heard from you….***when you/your partner signed for the advances, the documents state that your receivables are not encumbered***….The guidance I am receiving is to pursue a civil RICO case against  your entity and its owners.

(emphasis added).

102.    On January 10, 2017, just four days after expressing his frustration with Nulook, Heiser filed the UCC he referred to in his January 6, 2017 email to Mannino describing the "lender" for the collateral therein as "Heiser Enterprises, LLC d/b/a "PSCF."" A copy of this UCC-1 Financing Statement is attached hereto as **Exhibit E**.

103.    Mannino and Guzzetti did not disclose to GWG that these Heiser Agreements permitted PSC to debit its operating account on a daily basis in repayment of these agreements. The daily debits from Nulook's bank account were in pre-set dollar amounts and not tied to specific merchant advances. *See infra* ¶ 83.

104.    There was no separate "collateral" pledged to PSCF by Nulook. Nor was any such "collateral" available to pledge.

105.    Nulook had no receivables whatsoever that had not already been pledged to GWG.

106.    Each and every Nulook Merchant receivable was pledged to GWG, and was reflected on the Borrowing Base Reports submitted to GWG on a regular basis.

107.    Mannino and Guzzetti did not disclose, and actively concealed the fact that they had authorized PSC to use ACH Processing to debit Nulook's bank account in order to conceal the Daily Debit Scheme. This failure to disclose and active concealment of the Daily Debit Scheme was material and prevented GWG from taking steps to enforce its rights in the Nulook Collateral.

108.    Heiser and Nazareno did not disclose to GWG that PSC had engaged ACH Processing to conceal the Daily Debit Scheme. This was a material, fraudulent omission, and was inconsistent with, and in violation of the CSA Agreement and GWG's rights which were known to Heiser and Nazareno.

109.    Heiser and Nazareno, and Mannino and Guzzetti knowingly circumvented GWG's rights by secretly using ACH Processing rather than ACHWorks to debit Nulook's bank account in connection with the Daily Debit Scheme.

110.    These concealed debits from Nulook's bank account occurred over 1,300 times (from May 29, 2015 through January 24, 2017), as set forth in **Exhibit D** hereto, detailing (i) the date of the debit, (ii) amount, (iii) debiting bank account (Nulook), and (iv) depositing bank account (PSCF).  Neither Mannino nor Guzzetti disclosed these Daily Debits to GWG. Each of these debits was a fraudulent act in furtherance of the Daily Debit Scheme. The failure to disclose the daily debiting by PSCF was material and prevented GWG from taking legal action to protect its rights in the Nulook Collateral.

111.    Neither Heiser nor Nazareno disclosed these Daily Debits to GWG.

112.    In total, $1,361,769.34 that should have gone to GWG to paydown Nulook's Loan was intentionally funneled to PSCF instead.

## V.    FACTUAL ALLEGATIONS SPECIFIC TO THE FRAUD SURROUNDING THE FORBEARANCE AGREEMENT

### *Mannino's Fraud Surrounding the Forbearance Agreement*

113.    In early 2016, shortly after purchasing the Nulook Loan, GWG identified a number of material deficiencies and irregularities with respect to the Loan. From March 2016 – July 2016, GWG attempted to understand and resolve the Loan deficiencies.

114.    On March 29, 2016, Aurigema sent an email to Preece at GWG stating that Nulook had a borrowing base surplus of $1,700,000.00.  This was false.  Mannino was copied on this email.  At no time did Mannino correct the material misrepresentation that Nulook had a borrowing base surplus. A copy of this email is attached hereto as **Exhibit F**.

115.    The same March 29, 2016 email confirmed that <u>Nulook pledged all of its receivables to GWG</u>, including receivables from:

- "deals [Nulook] pledged against the lines originally"
- "deals [Nulook] funded with a combination of recycled cash and pledged to make sure you were well collateralized"
- "deals Nulook funded using its own money but pledged to collateralize the line."

116.    At no time during the negotiations of the Forbearance Agreement did Mannino or Guzzetti tell GWG that Nulook had also borrowed $1,450,000.00 from PSCF and allowed them to debit Nulook's collections account daily in repayment of these "advances" from PSC. This was a material, fraudulent omission.

117.    On July 11, 2016, Aurigema emailed Preece (with a copy to Mannino) and reiterated that (i) collections were going up and costs were going down, (ii) management fees for syndicated deals and expense reduction would reduce the deficit over a four-month period by at least 45%, and (iii)  Nulook could add $80k towards reducing the deficit per month. He then noted, once again, that Nulook expected to recover far more money than it owed to GWG.  In that same email, Aurigema detailed that Nulook collected $800,000 per month, would need $150-$200k for expenses, and would fund $200-250k per month in new deals, stating: "That leaves $400k per month we'd like to start using to pay down GWG."

> Nulook has a total uncollected RTR [Right to Receive][10] of around $8.5M in addition to a cash balance. Even if half of that (50%) was bad deals (which it's not), that's still around $4/5M in assets needed to pay down a $3.2M line.

118.    All of the representations in this July 11, 2016 email were false because they did not disclose that the Daily Debit Scheme was diverting thousands of dollars on a daily basis from

___

[10] RTR is an acronym for "Right to Receive," used in the merchant cash industry to reflect receivables owed to the lender under an advance agreement.

Nulook's bank account, which left far less than "400k per month … to pay down GWG."  At no time did Mannino correct any of these false misrepresentations. This was a material, fraudulent omission by Mannino that prevented GWG from taking legal action to stop the Daily Debit Scheme and assert its rights in the Nulook Collateral.

119.    On July 19, 2016, Aurigema emailed GWG (with a copy to Mannino), telling GWG that Nulook had a "facility [that] begins august 15" and "that's when we can start drawing up to 125k per month."  This was false.  There was no other credit facility in place for Nulook. Mannino was copied on this email and at no time corrected this false misrepresentation. This was a material, fraudulent omission by Mannino that caused harm to GWG and prevented GWG from taking legal action to stop the Daily Debit Scheme and assert its rights in the Nulook Collateral.

120.    On July 28, 2016, GWG notified Nulook that it was in default under the Loan.  At that time, GWG had the option of taking over the Collateral and the servicing of the Collateral. Instead, based upon Nulook's and Mannino's false representations and material omissions about the value of the Collateral, and Nulook's and Mannino's false claims that Nulook had uncollected RTR of $8.5 Million, and would be able to make good on the amounts owed to GWG, Plaintiff opted to forbear on foreclosing on the Nulook Loan and provided Nulook with an opportunity to cure its Loan defaults.

121.    When GWG and Nulook commenced negotiating a forbearance agreement, GWG requested documentation to evaluate Nulook's ability to pay back GWG.  GWG also requested that Nulook provide a Deposit Account Control Agreement ("**DACA**") for its bank account that would have protected GWG in the event of Nulook's default under the Forbearance Agreement. Despite assurances from Mannino that he was making arrangements for the DACA, Nulook did not deliver a DACA to GWG.  In hindsight, Nulook's failure to deliver the promised DACA was

deliberately calculated to perpetuate the Daily Debit Scheme. GWG did not independently have the ability to gather the information necessary to evaluate Nulook's financial condition. However, Mannino and Guzzetti actively hid from, concealed, and failed to disclose to GWG the existence of the Heiser Agreements and the Daily Debit Scheme that was taking over $100,000 per month from Nulook and directing it to the PSCF bank account controlled by Heiser.

122.    By late November 2016, GWG and Nulook had agreed to a forbearance plan, and Mannino emailed the terms to GWG, copying Guzzetti:

---

**From:** Anthony Mannino [mailto:amannino@nulookcapital.com]
**Sent:** Monday, November 28, 2016 5:07 PM
**To:** Adam Connors <adam@gwgmca.com>; Patrick Preece <patrick@gwgmca.com>
**Cc:** Robert Aurigema <RAurigema@BAMFUNDS.COM>; John Guzzetti <jguzzetti@nulookcapital.com>
**Subject:** Nulook plan

Gentlemen,

In response to your request for our plan to repay the outstanding debt.  Here are the key thematic points for your review:

1.  We are actively pursuing external lenders and pairing them with pending renewals and new renewals they come up.  This will result in advanced repayment rates as new funders would pay off existing balances.
2.  Currently, we are receiving an average net daily ACH of $25K per day.
3.  Outside of ACH, we are also receiving weekly / monthly  and some varied frequency payments from collection agencies, credit card processing companies and thru our own efforts  in the collections process.  It's difficult to calculate an average but a range could be $0-6 figures per month depending on collections coming in.
4.  So on a weekly basis it's safe to assume a minimum of $125K and up, assume $500K per month at the least.
5.  As far as minimum bill pay required, they are as follows:

    a.  John and Anthony weekly salary of $1500, each, assume $12K per month.

    b.  $3000 monthly in rent and utilities.

    c.  Working on reducing our accounting to as close to zero as possible.  We do need to close out the year and produce K1s but will lock a number in this week when we speak with them.

    d.  On the high side, we'd assume $20K in monthly bills as a outlined in a-c, or a net cash inflow of $480k minimum per month assuming no other collections but ACH.

Please let me know if you have questions or if you'd like to review.

Thanks
Anthony

---

123.    When Mannino sent the above email to Preece at GWG, Mannino and Guzzetti knew about the Heiser Agreements and the Daily Debit Scheme, yet neither disclosed it to GWG. The above email outlining the forbearance terms makes no reference to the $100,000 per month being secretly routed to Heiser. This glaring omission was material and fraudulent. Despite the falsity of the above email, neither Mannino, nor Guzzetti provided GWG with corrected financial disclosures about how Nulook's cash flow was impacted by the Daily Debit Scheme. Instead, they simply pushed forward the Forbearance Agreement that was built upon this and other material, false representations and omissions.

124.    In reality, much of the revenue that Nulook claimed would be available to pay down the Loan was already going to pay off Heiser's financing division, making the aforesaid misrepresentations and omissions even more deceptive.

125.    In fact, as a result of the Daily Debit Scheme, Nulook's financial picture was far bleaker than reported by Defendants Nulook, Mannino, and Guzzetti.

126.    The day before entering into the Forbearance Agreement, the parties exchanged the following emails:

-----Original Message-----
From: Patrick Preece [mailto:patrick@gwgmca.com]
Sent: Tuesday, December 20, 2016 10:12 PM
To: Robert Aurigema <raurigema@gmail.com>; Anthony Mannino <amannino@nulookcapital.com>
Cc: Adam Connors <adam@gwgmca.com>
Subject: Nulook

Gentlemen,

Although I expressed the urgency of the situation, I did not receive any comments from you or your attorney tonight regarding the Forbearance Agreement.  In addition, the informal understanding we have with Nulook is that Nulook would keep a total of $20,000 total per month to pay all expenses and salaries and we would be receive the rest twice a week AND be able to verify these numbers.

At this point, I need:

1) An executed Forbearance Agreement;
2) The BB we have been requesting; and
3) The first "tie out" of the wind down (the amount that came in by source minus the amount that went out to what source).

By 5:00 pm tomorrow or my immediate recommendation will be that GWG notify PSC / ACH Works that we are pulling servicing and move it to MN.

Patrick

Aurigema responded and said:

-----Original Message-----
From: Robert Aurigema [mailto:RAurigema@BAMFUNDS.COM]
Sent: Tuesday, December 20, 2016 11:44 AM
To: Patrick Preece <patrick@gwgmca.com>
Cc: Anthony Mannino <amannino@nulookcapital.com>; Adam Connors <adam@gwgmca.com>
Subject: RE: Document

I agree. Unfortunately, the holidays wreak havoc with scheduling and capacity.  He emailed to let us know he read thru and is around later to discuss. He may have comments.  He may not.  We'll let you know immediately after the call.   Assume you'll get some comments or a signed doc by COB today (and if the comments are reasonable, perhaps we still get it all done today working thru it together).

127.    The attorney referred to in these emails was later identified by Aurigema to be Randall S.D. Jacobs, Esq.  The Forbearance Agreement was signed by Mannino and emailed to GWG the next day, on December 21, 2016.

128.    Mannino and Guzzetti did not disclose to GWG that instead of working to wind-down the Nulook portfolio of merchant cash advances as per the terms of the Forbearance

Agreement, they had gone into business with Nazareno and were operating "The Marketplace"[11] out of PSC's offices.  Mannino and Guzzetti continued to collect a "salary" from Nulook under the terms of the Forbearance Agreement while working with The Marketplace and did not disclose this to GWG. This was a material fraudulent omission.

129.    On December 23, 2016, Michael Ciprello of GWG questioned Mannino about a $2,800 debit from Nulook's collections account by PSC.  Mannino told Ciprello that it was "approved by Sandeep." At no time did Mannino reveal to Ciprello that Nulook had borrowed not just $200,000.00 from PSC in May 2015 (which had been repaid in 2015) but had borrowed an additional $1,250,000.00 from July 2015 – April 2016. This was a material fraudulent omission that prevented GWG from taking immediate action to protect its rights in the Nulook Collateral.

130.    After finding out that money was still being debited from the Nulook bank account, on December 23, 2016, GWG directed Nulook to shut off all automatic debits from its bank account, consistent with the terms of the Forbearance Agreement.  With the automatic debits shut off, the Daily Debit Scheme ceased.

## VI.    FACTUAL ALLEGATIONS SPECIFIC TO THE NULOOK BANKRUPTCY

### *Nulook's False Representations in Connection with Its Failed Bankruptcy*

131.    Plaintiff filed its original Complaint on March 28, 2017. [DE 1].

132.    On April 4, 2017 Nulook filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code (the "**Nulook Bankruptcy**").  *In re Nulook*, Case No. 8-17-72013 (EDNY).

133.    On April 10, 2017, by order to show cause in the instant matter, Plaintiff moved to have a receiver appointed over PSC. [DE 17].

---

[11] The Marketplace was run on the PSC Platform and provided a platform where merchant cash advance funders could view merchant "deals" in need of financing and participate in those merchant financings via the PSC Platform.

134.    A hearing on Plaintiff's order to show cause was held before Judge Arthur D. Spatt on April 20, 2017.  Nulook was represented at the hearing by Randall S. D. Jacobs, Esq.  PSC did not appear at the hearing.

135.    On April 26, 2017 this Court appointed Michael Cardello III, Esq. as Receiver of PSC ("**Receiver**"). [DE 38].

136.    On April 27, 2017, pursuant to a Stipulation so-ordered by Judge Louis Scarcella in the Nulook Bankruptcy, Nulook turned over to GWG all "receivables" ever pledged by Nulook to GWG as collateral (the "**Bankruptcy Stipulation**"). [DE 149-2 at p. 14; DE 149-12]; *In re Nulook*, Dkt. 33.

137.    During the Nulook Bankruptcy proceedings, Nulook repeatedly made the false assertion that there was "adequate protection" for GWG's Loan because the "collateral base is worth $6.2 million and the loan is $2.2 [million]" and included that information on its schedule of assets filed in the Nulook Bankruptcy.  *In re Nulook*, Dkt. 13:



Nulook's accountants, Sheehan & Company, also submitted a letter to the court in the Nulook Bankruptcy falsely stating that: "Currently Nulook has over $6,500,000 in outstanding accounts receivable. In re *Nulook*, Dkt. 19 at p. 2. A copy of this letter is attached hereto as **Exhibit G.**

138.    These representations turned out to be false.  Just days later, on May 2, 2017 counsel for Nulook (Randall S.D. Jacobs, Esq.) emailed GWG a list showing that Nulook had just $251,923.25 in current, non-defaulted, receivables. That list is set forth below:

| Deal ID | Name | Amount | Balance |
|---|---|---|---|
| 2152 | Eastman Trucking and E | 30 | $9,448.20 |
| 7292 | Lindjoe Inc | 546.51 | $6,716.35 |
| 7463 | VSIS Inc. | 347.5 | $7,868.56 |
| 7522 | S.K. Rogers Funeral Ho | 608.57 | $608.57 |
| 7526 | B and P Transport LLC | 79.42 | $239.46 |
| 7675 | Custom Logistics Inc | 368 | $9,796.56 |
| 3072 | Southern Florida Enter | 100 | $3,945.55 |
| 7774 | Weird Dolls LLC | 273.26 | $6,284.44 |
| 7776 | Iron Work Deisgn LLC | 156 | $6,208.00 |
| 7376 | Jiffy Mart | 100 | $15,649.56 |
| 4152 | The Den Theatre Chicag | 400 | $7,306.96 |
| 7703 | North Beach Bar and Gr | 50 | $22,976.05 |
| 7162 | Barnes Logistics Solut | 75 | $21,950.71 |
| 6022 | Epic Cheer and Dance C | 25 | $25,923.68 |
| 6841 | Budd Optical INC | 150 | $22,314.00 |
| 7564 | North Beach Bar and Gr | 50 | $20,877.50 |
| 7508 | 4 Wheel Junkies | 200 | $37,420.42 |
| 7403 | Printarama Inc | 100 | $21,925.00 |
| 7538 | Awnings by Coversol | 118.52 | $118.52 |
| 7221 | Atlas Recycling LLC | 192.28 | $4,345.16 |
| | | | $251,923.25 |

139.    On August 15, 2017 Judge Scarcella granted GWG's motion for permanent relief from the automatic stay for the purpose of continuing the instant action. [DE 156 at p. 12]; *In re Nulook*, Dkt. 72.

140.    The Nulook Bankruptcy was formally dismissed on September 20, 2017. [DE 156 at p. 12]; *In re Nulook*, Dkt. 81.

141.    The Nulook Loan balance as of May 31, 2019 was $1,875,607.07.[12]

## VII.    FACTUAL ALLEGATIONS SPECIFIC TO THE POST-RECEIVERSHIP FRAUD

### *The Receivership*

142.    On April 28, 2017, the Receiver terminated (i) PSC's employment of Nazareno as Executive Director; and (ii) PCS's employment of Russell Heiser as CEO.

---

[12] This balance does not include the costs of collection which are chargeable to Nulook under the terms of the Forbearance Agreement.

143.    On May 3, 2017, the Receiver's counsel interviewed Nazareno. At that time, Nazareno informed the Receiver that PSC did not have sufficient cash on hand to meet its May 5, 2017 payroll obligations.  Nazareno advised the Receiver that he "would neither provide any of the funding nor would he assist the Receiver in finding an alternative source of funding" to meet these obligations. [DE 69 at pp. 1-2]. This payroll crisis was so severe that the Receiver was faced with "the choice of either immediately shutting down PSC's operations or seeking outside funding to cover PSC's operating shortfall and fund its payroll." [DE 96 (the "**Receiver's First Report**") at p. 10].

144.    On May 3, 2017, the Receiver exercised his authority to borrow money from GWG to cover PSC's operating shortfalls. From May 2017 – August 2017, PSC periodically borrowed funds from GWG to cover payroll and operating expenses. To secure these loans, the Receiver pledged all of PSC's assets as collateral. [DE 69 at p. 2; *Receiver's First Report* at p. 10].

145.    On June 6, 2017, the Receiver engaged Marcum LLP to conduct a forensic review of PSC's books and records and to assess the value of PSC's business and assets. [*Receiver's First Report* at p. 17].  Marcum's forensic review revealed a failing company:

> From at least January 2013 forward, the business was insolvent because it had no ability to generate sufficient cash flow to fund its monthly operating expenses and it had no means for satisfying its obligations to creditors. PSC's management appears to have masked the poor financial condition of the Company by: (i) borrowing from other related entities to cover cash shortfalls; (ii) failing to contemporaneously record certain transactions; and (iii) failing to account for the true liabilities associated with the business it conducted. (emphasis added).

[*Receiver's First Report*, *Ex. G*, DE 97-1 at p. 4].

146.    In response to Nazareno's request that the Receiver hire him to run PSC in Receivership, on June 29, 2017 the Receiver wrote to Nazareno's counsel to apprise him that:

> While Mr. Nazareno may have a unique understanding of PSC's business operations, he left PSC's books and records in deplorable

> condition. .... In addition, Mr. Nazareno routinely used funds from PSC's operating account to pay his personal expenses and borrowed large sums of money from PSC which he has not repaid.

[DE 69 at pp. 6-8].

147.    On August 24, 2017, the Receiver submitted the Receiver's First Report to Judge Spatt.  In this First Report, the Receiver concluded that:

> [T]he MCA Platform and, indeed, its business model appear to have been designed so that none of these potentially illegal transfers, including the types described in GWG and ABC's complaints, would pass through PSC's accounts and, therefore, do not appear on bank statements or other reliable third party financial records. To the extent transactions involving merchant accounts are recorded on the MCA Platform, Mr. Nazareno and certain other people working for Mr. Nazareno had the ability change the records stored on the MCA Platform to hide evidence of malfeasance.... Based on the forgoing, I am concerned that Mr. Nazareno and individuals working with him may have used the MCA Platform to perpetrate a scheme to defraud some of PSC's Members, including GWG and ABC.

[*Receiver's First Report*, DE 96 at p. 21].

148.    On October 3, 2018 the Receiver filed his second report [DE 217, *et seq*. the "**Receiver's Second Report**"] [confirming that his investigation uncovered evidence that:

(i)    Nazareno used PSC's assets to operate a competing business after the Receivership Order was entered [*Receiver's Second Report*, DE 217 at pp. 5 -7];

(ii)    Nazareno may have sold PSC's assets in July/August 2017 without the Receiver's knowledge or consent [*Receiver's Second Report*, DE 217 at pp. 7-10];

(iii)    At Nazareno's direction, former employees of PSC assisted him in concealing his use of PSC's assets for competing businesses [*Receiver's Second Report*, DE 217 at pp. 10];

(iv)    At Nazareno's direction, employees of PSC destroyed PSC's data [*Receiver's Second Report*, DE 217 at pp. 10-11]; and

(v)    At Nazareno's direction, a former PSC employee, Erin Kim, and Nazareno's counsel, Stephen Ghee, Esq., entered PSC's office on two occasions and took files and documents [*Receiver's Second Report*, DE 217 at pp. 11-12].

149.    The Receiver concluded in his Second Report that Nazareno violated the Receivership Order by doing the foregoing, but since PSC was no longer an operating entity there

were no funds available to finance litigation against Nazareno, and since "GWG foreclosed on its

liens against substantially all of PSC's assets, GWG may also be able to independently assert the

same claims." [*Receiver's Second Report*, DE 217 at pp.13-14].

### *GWG Forecloses on Its Loan to the Receiver*

150.    On June 29, 2017 and subsequent dates, the Receiver advised GWG that despite

GWG's loans, PSC was in dire financial condition and that the Receiver would have to terminate

PSC's business operations, placing GWG's collateral in jeopardy.  [DE 69 at pp. 2-3; 6-8].

151.    On July 14, 2017, pursuant to New York UCC §§ 9-620 and 9-621, GWG sent a

written proposal to the Receiver with an unconditional offer to accept the collateral in full

satisfaction of PSC in Receivership's obligations to GWG effective on August 3, 2017 ("**Strict

Foreclosure**").  [DE 69 at p. 3].

152.    In accordance with New York UCC §§ 9-620 and 9-621, the Strict Foreclosure was

effective on August 3, 2017.

### *Nazareno Steals from GWG Following the Appointment of the Receiver*

153.    On August 4, 2017, upon taking possession of the PSC's assets, GWG found a

complete mess. Judge Spatt had ordered Nazareno to turn over all PSC assets to the Receiver.

GWG discovered that instead of complying with the Order, Nazareno, with the help of his former

and current employees working at his direction, stole essentially all of PSC's assets during the

Receivership.  GWG now, rightfully seeks damages from Nazareno for these stolen assets.

154.    The Receiver fired Joel Nazareno but didn't take away his login access to the PSC

Platform.

155.    The Receiver did not fire Noel Nazareno, Joel Nazareno's brother, who continued to collect paychecks from PSC, funded by GWG, while working for a competing merchant cash advance company named Epic Capital Enterprises.

156.    From April 28, 2017 – August 4, 2017, at the direction of Joel Nazareno, Noel Nazareno logged into the PSC Platform on a daily basis and took PSC's data and gave it to Joel Nazareno and Epic Capital Enterprises.

157.    On May 3, 2017, May 9, 2017, May 10, 2017, and June 27, 2017, Joel Nazareno logged into the PSC Platform without authorization from the Receiver and took PSC's data for his own use.

158.    On August 4, 2017, the very day that GWG took over PSC, Christopher Hunt-Walker (PSC's technology consultant) changed the login credentials for the PSC Platform and locked GWG out.  This lock-out continued for months.  During this time, GWG had no access to the PSC Platform.  Nazareno and Hunt-Walker are partners in a PSC affiliate known as "SYLO." *See infra* ¶ 161, where Nazareno uses an email address at SYLO.  In November 2017 the Court ordered Hunt-Walker to turn over the login credentials, but it was not until December 2017 that the servers that hosted the PSC Platform were fully accessible to GWG.

159.    Plaintiff's forensic experts later obtained logs showing that Nazareno and others working with him accessed the PSC Platform (and the Amazon servers hosting the Platform) continually until GWG was finally able to secure all outside access to the PSC Platform and the Amazon servers in early January 2018.

160.    All data on the PSC Platform was taken by Nazareno, and individuals working at Nazareno's direction. This data was never returned to GWG. GWG was never able to access the

data on the PSC Platform because the "public interface" of the PSC Platform had been destroyed while GWG was locked out of the PSC Platform and its servers.

### *Theft of Data and Emails Copied onto Hard Drives*

161.    During the Receivership, at Nazareno's direction, two former PSC employees, Kevin Carrigan ("**Carrigan**") and Erin Kim ("**Kim**") purchased hard drives and orchestrated the copying of all of the PSC emails, files, and other confidential business records that were on PSC's server, as well as the emails and files of a related entity, Summit Capital Partners.  The hard drives were later given to Carrigan, who continued to work with Nazareno at a new business that was virtually identical to PSC using PSC's data and a clone of the PSC Platform. *See infra* ¶¶ 172-177.

**Kevin Carrigan**

From:     erin kim
Sent:     Tue 7/11/2017 4:18 PM (GMT-00:00)
To:       freddy Medina; Kevin Carrigan; Joel Nazareno
Cc:
Bcc:
Subject: RE: two hard drives for backups


Order placed for the two hard drives.
Will be delivered by Thursday.


Erin Kim
Executive Administrator



The information contained in this Email, including any attachment(s) is intended solely for use by the named addressee(s). If you are not the
intended recipient, or a person designated as responsible for delivering such message(s) to the intended recipient, you are not authorized to
disclose, copy, distribute or retain this message, in whole or in part, without written authorization from Interactive Partners, Inc. This Email
may contain proprietary, confidential or privileged information. If you have received this message in error, please notify the sender
immediately. Thank you for your cooperation.


**From:** freddy Medina
**Sent:** Friday, July 07, 2017 1:02 PM
**To:** erin kim <ekim@sylo.us>; Kevin Carrigan <kc@jnmmgmt.com>; Joel Nazareno <jn@sylo.us>
**Subject:** two hard drives for backups


Hey Erin and Kevin


These are the external hard drives I need to get what we spoke about done.


This is what we discussed
https://www.amazon.com/Seagate-Backup-Portable-External-
STDR2000100/dp/B00FRHTSK4/ref=sr_1_1?s=pc&ie=UTF8&qid=1499445800&sr=1-1-
spons&keywords=external%2Bhard%2Bdrives&th=1
The first hard drive I am going to copy every file onto this hard drive and also emails so you can do
quick access from this hard drive connected to a pc as needed and I will remove any company files other
than PSC from our server.  Emails will still be on server until we relocate email accounts to office 365.


https://www.amazon.com/DREVO-P1-Aluminium-Portable-3-0-Silver/dp/B071XNR5QJ/ref=sr_1_2?
s=pc&ie=UTF8&qid=1499445800&sr=1-2-spons&keywords=external+hard+drives&psc=1
This second hard drive will be all of Summit capital files that Erin will keep on her computer so she can
access files on there.


Once these backups are done we can focus on moving all emails off server that are not PSC to Microsoft
365 under the SYLO name.  once we are complete only thing on server will be psc related.



Remember Our tape backs up are for disaster recovery and we would need a server to restore from tape
backups and this solution is to give us backups we can access quickly without a server anything new
added to server after we create this backup  will not be on these backups.


Best Regards

Freddy Medina

Technical Support Specialist

E-mail Freddy@sylo.us

Ph:516 362-2725

162.    Kim and Carrigan blatantly discussed their theft of the hard drives in a series of text message exchanges on August 4, 2017:

| | |
|---|---|
| **Kim to Carrigan**: | And ed stone gave me a copy of the court order which states employees cannot remove any psc files, properties, fils, etc |
| **Carrigan to Kim**: | Lmao [laughing my ass off] |
| **Kim to Carrigan**: | So i guess were in trouble? Lol [laughing out loud] |
| **Carrigan to Kim**: | They don't know anything. |
| **Kim to Carrigan**: | They'll know because theres nothing on my desktop. |
| **Carrigan to Kim**: | Tell them you save everything to the drives. |
| **Kim to Carrigan**: | Ok |
| **Carrigan to Kim**: | They cant prove anything Erin |
| **Carrigan to Kim**: | I already spoke to Fred [Alfredo Medina] man to man about the drives were okay. |
| **Kim to Carrigan**: | R u ok? |
| **Carrigan to Kim**: | Yea Im good |
| **Carrigan to Kim**: | Are you? |
| **Kim to Carrigan**: | Im ok:) |
| **Carrigan to Kim**: | If you worried about them catching on to this with your desktop being empty just save some files quick when your at your desk and fill it up |
| **Carrigan to Kim**: | Fuck them Erin |
| **Kim to Carrigan**: | Yes fuck them!! |

163.    The data on the hard drives were never returned to GWG.

### *Physical Theft of Files by former Employee Erin Kim and Attorney Stephen Ghee*

164.    Just after GWG took over the assets of PSC in the Strict Foreclosure, Kim entered the premises at 330 Motor Parkway, Hauppauge, New York where PSC had operated its business (the "**Premises**") on August 8, 2017 and took many boxes of files, which belonged to GWG.

165.    On August 15, 2017, Kim returned to the Premises with Attorney Stephen Ghee (who represents Joel Nazareno) and took additional files and other items. Security video of the events of August 8, 2017 and August 15, 2017 can be viewed at this link: https://drive.google.com/file/d/0B-sT5QYTCUc_MjF5bFRPZ2RkdDg/view

46

166.    A subsequent contempt motion made by GWG seeking to hold Kim and Christopher Hunt-Walker in contempt for violating the Receivership Order yielded discovery in the way of depositions of Kim, Joel Nazareno, Christopher Hunt-Walker, and the turn-over of certain text messages on Kim's cell phone. [DE 98].

167.    While a number of files were returned to the Receiver and GWG, no inventory was prepared and GWG has no way of knowing what was taken and what was returned. *See* DE 84, 84-1, 85, 88.

### *Continued Operation of The Marketplace*

168.    GWG discovered that after the appointment of the Receiver and the Strict Foreclosure, Mannino, Guzzetti, and Nazareno continued to operate The Marketplace, diverting business prospects and payments away from PSC (whose assets GWG now owned).  Mannino, Guzzetti, and Nazareno directed these business prospects and payments towards another entity controlled by Mannino and Guzzetti: JJ & AA Enterprises LLC ("**JJ & AA**").[13] Mannino, Guzzetti, and Nazareno concealed this from GWG, who now owned all of PSC's assets.

169.    Evidence of the continued operation of The Marketplace and the diverting of funds owed to PSC by Nazareno, Mannino and Guzzetti is found in two emails sent to GWG from merchant cash advance companies who sought refunds for money they accidentally paid to PSC instead of JJ & AA. The companies explained plainly that PSC (The Marketplace) was owed a commission, but PSC (The Marketplace) said they did not get their money, so they paid the money to JJ & AA instead.

---

[13] Under the terms of the Receivership Order, Nazareno was to "immediately turn over PSC Defendants businesses and all assets to the Receiver." [DE 38].  He did not do so.

From: Jake Winograd [mailto:jake@ufsfunding.com]
Sent: Monday, September 11, 2017 3:45 PM
To: Brenda Lidke
Cc: raven huang ; Eli Ghoori
Subject: Re: payments into PSC BofA accounts
HI
On sep 8th we sent you a payment of $800 to account (0654) by mistake it was ment to go to marketplace
On sep 5th we sent you a payment of $500 to account (0654) by mistake it was ment to go to marketplace
please send them both back to us account info attached, you can deduct whatever wiring costs you may incur

and:

From: Anthony Collin [mailto:anthony@smartbusinessfunder.com]
Sent: Wednesday, September 6, 2017 12:44 PM
To: Brenda Lidke <blidke@gwglife.com>
Subject: $3,200.00 Credit/ Debit
Hi Brenda,
Thank you for taking the time today to address this issue.
PSC (The Marketplace) referred 2 merchants to us for funding:
1) Big O Bundles (Funded on 08/24/2017)
2) Outdoor Advertising (Funded on 08/25/2017)
PSC (The Marketplace) was due a commission for these 2 referrals in the amount of $3,200.00.
On 08/29/2017 PSC (The Marketplace) were paid the commissions into the International Professional Services account by error. (Please see the attached batch report) We used to pay PSC commissions into the International Professional Services account until July 19th and after July 19th we are paying PSC in the JJ & AA Account. However, these 2 deals ($3,200.00) were paid to the old International Professional Services account by error. On 08/30/2017 PSC The Marketplace said they didn't get the money and they don't have access to that account. We then paid the JJ&AA account the $3,200.00 and make sure specifically on a number of occasions to have PSC inform International Professional Services that we are deducting the $3,200.00 commissions that were paid. Unfortunately, PSC didn't inform your company and the deduction was stopped.

### *Sale of Stolen Data and the PSC Platform Program to EPIC*

170.    On or about May 19, 2017, June 2, 2017, June 12, 2017, and June 23, 2017 Nazareno logged into the PSC Platform and took data from the PSC Platform and used and/or sold it to EPIC, a business venture involving himself, his brother Noel Nazareno, Christopher Hunt-Walker, and Sevda Imranova.  Nazareno did not return this data.

171.    Nazareno also stole business prospects from the Receiver and GWG for merchant cash advance deals involving, *inter-alia*, Hernanadez Furniture (Holyoke, MA); Woodsmith Services LLC (Vero Beach, FL); and Por Ti Colombia (Virginia Beach, VA).  Documentation for these transactions was emailed and/or faxed to Kevin Carrigan on or about June 26, 2017 (during the Receivership), and upon information and belief, was turned over to EPIC shortly thereafter.

*Sale of Stolen Data to Banana*

172.    On or about June 28, 2017, June 29, 2017,  June 30, 2017, July 3, 2017, July 5, 2017, and July 20, 2017, Nazareno (or persons working for or at the direction of Nazareno) also took data and proprietary information from the PSC Platform and used it and/or sold it to Banana, a business venture involving Nazareno, Kevin Carrigan, Erin Kim, Christopher Hunt- Walker, and Eyal Levy.  Nazareno did not return this data.

173.    After taking the data from PSC on hard drives and by hacking into the PSC Platform, Nazareno used it to assist Banana, and its principal, Eyal Levy ("**Levy**"), in creating an "exchange" that mimics the PSC Platform, found online at https://www.bananaexchange.com/. The Banana "exchange" was created using business templates, data, and software (the PSC Platform) owned by GWG.  Email exchanges between Nazareno, Carrigan, and Levy in June and July 2017 demonstrate that Nazareno was negotiating the sale of software to Banana. On June 28, 2017 (during the Receivership), with Nazareno's knowledge, Carrigan set up a system demo of the PSC Platform, without the knowledge and consent of the Receiver:

> On 28 Jun 2017, at 17:06, Kevin Carrigan <kc@jnmmgmt.com> wrote:
>
> Hi Eyal,
>           It was nice meeting you the other day below you will find system login credentials. The security code is set up to be emailed to you at this email. Tomorrow I am only available between 9-10:15 AM to do a system demo via joinme as I have a funeral to attend. Is there a number I can reach you at?

On July 2, 2017, Levy emailed Nazareno:

> From: Eyal Levy [mailto:eyal@platinumart.com]
> Sent: Sunday, July 2, 2017 2:43 PM
> To: Joel Nazareno <jn@jnmmgmt.com>
> Subject: Things to be done
>
> The software guys have to talk.
> Your lawyer should send my lawyer the law suit.
> I have to meet several MCA or ISOs that are willing to get $500,000 and have RTR of over $1M.
> I should get the spreadsheets of the investments over 12 months.
> We have to agree on the final deal details.
> Next week is coming soon. I am scheduled to fly back this Thursday if there is no major progress until then.
> Please advise where are we.

Later that same day (July 2, 2017) Nazareno responded to Levy:

> On 2 Jul 2017, at 17:51, Joel Nazareno <jn@jnmmgmt.com> wrote:
>
> Call with Software guys will be set up tomorrow please relay me his info (email, Phone) so I can set it up.
> I will send you detailed email in regard to lawsuit complete with motions and answers just so you know what's going on. Also just to make you feel more comfortable (me as well) I have been speaking to lawyers on my end as well as patent attorneys in regard to the model no matter what happens with PSC none of the software is patent filed so for someone to come in and address a lawsuit for being in competition with them it's highly unlikely. Basically it would be dumb, they cant prevent me from getting a job im not guilty of anything even if I lost the civil litigation still doesn't prevent me from working or building another platform.

174.    Nazareno also stole business from GWG by directing PSC Members to Banana. On July 6, 2017 Nazareno emailed Levy to set up a meeting with Phil Defonte of Broadway Advance LLC, a former PSC Member. Through a UCC search, GWG discovered that in September 2017, Banana made merchant cash advances and/or loans to Broadway Advance LLC. The UCC's evidencing this are attached hereto as **Exhibit H**.

175.    Nazareno also failed to turn over the assets of one of its affiliates to the Receiver, Affinity Member Services, and pledged the assets of that affiliate to Banana as evidenced by the UCC financing statement attached hereto as **Exhibit I**.

176.    All of this occurred during the Receivership despite the Court's order [DE 38 at pp. 3-4] that provided:

> IT IS FURTHER ORDERED that upon the Court's appointment of a Receiver, PSC Defendants, their agents, servants, representatives, employees, assigns, affiliates, subsidiaries and their affiliates' and subsidiaries agents, servants, representatives, employees, assigns and nominees shall immediately turn over PSC Defendants businesses and all assets to the Receiver, together with all contracts, subcontracts, and other documents, records, files and other materials relating thereto….
>
> In addition, the forgoing individuals shall not:
>
> > 1.    Possess or manage or attempt to manage any of PSC's Defendants' property in any way….
> >
> > 4.    Remove from the Premises or destroy any property belonging to the PSC Defendants whether at the Premises or otherwise….
> >
> > 7.    Destroy any documents.  PSC Defendants shall provide the Receiver with a list of any PSC Defendants' business records that may have been destroyed on or after May 22, 2014.

177.    GWG discovered all of Nazareno's theft related to the Post-Receivership fraud after taking over PSC's assets from the Receiver.

## COUNT I
## FRAUD AS TO THE DIVERSION SCHEME
### Against Heiser

178.    GWG repeats and realleges all allegations above as though fully set forth herein.

179.    Heiser had knowledge of the Nulook Loan, the CSA Agreement, the ACHWorks Agreement and Plaintiff's lien on the Nulook Collateral.

180.    Specifically, Heiser knew that ACHWorks was receiving daily electronic instructions via the PSC Platform to debit the bank accounts of Nulook Merchants and deposit that cash in Nulook's bank account.

181.    Notwithstanding this knowledge, Heiser acting in concert with Nazareno implemented a concealed scheme to defraud GWG by using the PSC Platform to change debiting instructions that would have been given to ACHWorks in the ordinary course and instead directed the use of ACH Processing to debit Nulook Merchants' bank accounts directly and route those cash collections to PSCF's bank account.

182.    As set forth *supra* in ¶ 56, Heiser directed Nazareno to install ACH Processing to replace ACHWorks so collections from the Nulook Merchants could be undetected and routed directly to the PSCF account Heiser and Nazareno controlled.

183.    After Heiser discussed the plan to switch processors with Nazareno on January 16, 2017, and unbeknownst to GWG, on February 17, 2017 ACH Processing started debiting Nulook Merchants directly based on instructions that were sent electronically via the PSC Platform and routed the monies  from all Nulook Merchants directly to PSCF's bank account that was controlled by Heiser and Nazareno. *See supra* ¶¶ 60-63.

184.    As set forth *supra* at ¶¶ 56 -57, Heiser took deliberate steps in furtherance of the scheme to defraud GWG through the Diversion Scheme by knowingly and intentionally directing Nazareno to use the PSC Platform to give electronic instructions to ACH Processing from February 16 – April 13, 2017 that were wholly inconsistent with GWG's rights in the Nulook Collateral. Each and every electronic debit instruction that was sent via the PSC Platform to ACH Processing at Heiser's direction constitutes a separate and independent act by Heiser in furtherance of the Diversion Scheme. *See* **Exhibit C** attached hereto.

185.    Heiser intentionally failed to disclose material facts to Plaintiff in connection with the Diversion Scheme and Heiser actively concealed the fraudulent installation of ACH Processing (detailed *supra* in ¶¶ 46 - 66).

186.    Heiser knowingly and actively concealed and failed to disclose material facts to Plaintiff deliberately and with the specific intent to defraud Plaintiff in connection with the Diversion Scheme.

187.    But for the deliberate acts and omissions of material fact by Heiser and Nazareno acting in concert, the Diversion Scheme would not have taken place.

188.    Plaintiff is entitled to damages in connection with the Diversion Scheme in the amount of $284,744.70, plus punitive damages for fraud in the amount of $1,000,000.00 plus its costs and expenses of this action, including reasonable attorneys' fees.

## COUNT II
## FRAUD AS TO THE DIVERSION SCHEME
### Against Nazareno

189.    GWG repeats and realleges all allegations above as though fully set forth herein.

190.    Nazareno had knowledge of the Nulook Loan, the CSA Agreement, the ACHWorks Agreement, and Plaintiff's lien on the Nulook Collateral.

191.    Specifically, Nazareno knew that ACHWorks was receiving daily electronic instructions via the PSC Platform to debit the bank accounts of Nulook Merchants and deposit that cash in Nulook's bank account.

192.    Notwithstanding this knowledge, Nazareno, acting in concert with Heiser, implemented a concealed scheme to defraud GWG by using the PSC Platform to change debiting instructions that would have been given to ACHWorks in the ordinary course and instead directed the use of ACH Processing to debit Nulook Merchants' bank accounts directly and route those cash collections to the PSCF bank account he controlled along with Heiser.

193.    As set forth *supra* at ¶¶ 56, 60 – 63, at the direction of Heiser, Nazareno installed ACH Processing to debit Nulook Merchants' accounts so that those funds could be secretly deposited into PSCF's bank account instead of Nulook's bank account, without GWG's knowledge, consent, or authorization.

194.    After discussing the plan to switch ACH processors with Heiser on January 16, 2017, unbeknownst to GWG, on February 17,2017, ACH Processing began debiting Nulook Merchants based on the electronic instructions  that were sent via the PSC Platform routing cash to the PSCF bank account controlled by Nazareno and Heiser.

195.    As set forth *supra* at ¶¶ 55-56, 59-64, at Heiser's direction, Nazareno took deliberate steps in furtherance of the scheme to defraud GWG through the Diversion Scheme by using the PSC Platform to give electronic instructions to ACH Processing from February 16 – April 13, 2017 that were wholly inconsistent with GWG's rights in the Nulook Collateral. Each and every electronic debit instruction that was sent via the PSC Platform to ACH Processing by Nazareno, as directed by Heiser constitutes a separate and independent act by Nazareno in furtherance of the Diversion Scheme. *See* **Exhibit C** attached hereto.

196.    Nazareno failed to disclose material facts to Plaintiff in connection with the Diversion Scheme and Nazareno actively concealed the fraudulent installation of ACH Processing (detailed *supra* at ¶¶ 46 - 66).

197.    Nazareno actively concealed and failed to disclose material facts to Plaintiff deliberately and with the intent to defraud Plaintiff in connection with the Diversion Scheme.

198.    But for the deliberate acts and omissions of material fact by Heiser and Nazareno the Diversion Scheme would not have taken place.

199.    Plaintiff should be awarded damages in connection with the Diversion Scheme in the amount of $284,744.70, plus punitive damages for fraud in the amount of $1,000,000, plus its cost and expenses of this action, including reasonable attorneys' fees.

## COUNT III
## AIDING AND ABETTING FRAUD AS TO THE DIVERSION SCHEME
### Against Nulook and Mannino

200.    GWG repeats and realleges all allegations above as though fully set forth herein.

201.    Nulook and Mannino each had knowledge of the Nulook Loan and Plaintiff's lien on the Nulook Collateral.

202.    Nulook and Mannino provided substantial assistance to Nazareno and Heiser in connection with the Diversion Scheme whereby Nazareno and Heiser stole $284,744.70 of Nulook Merchant receivables by diverting them from Nulook's bank account to a bank account at PSCF controlled by Heiser, and made false representations or failed to disclose material facts to Plaintiff in connection with the same Diversion Scheme (detailed *supra* at ¶¶ 46-66).

203.    Specifically, Nulook and Mannino knew and authorized ACH Processing to debit Nulook's bank account and failed to take any corrective measures to stop such debiting.  Nulook and Mannino also lied to GWG regarding why ACHWorks was no longer pulling cash from the Nulook Merchants. *See supra* ¶¶ 68 - 71.

204.    Nulook and Mannino each made false representations or failed to disclose material facts to Plaintiff deliberately and with the intent to defraud Plaintiff in connection with the Diversion Scheme and Nulook and Mannino enabled Heiser and Nazareno to direct funds from Nulook Merchants to PSCF that should have gone to GWG instead. *See supra* ¶¶ 67 – 76.

205.    Plaintiff suffered damages by way of the substantial assistance provided to Heiser and Nazareno by Nulook and Mannino in connection with the Diversion Scheme in the amount of $284,744.70.

## COUNT IV
## FRAUD AS TO THE DAILY DEBIT SCHEME
### Against Nulook, Mannino, and Guzzetti

206.    GWG repeats and realleges all allegations above as though fully set forth herein.

207.    Nulook, Mannino, and Guzzetti each had knowledge of the Nulook Loan and Plaintiff's lien on the Nulook Collateral.

208.    Nulook, Mannino, and Guzzetti each made repeated false representations or failed to disclose material facts to Plaintiff in connection with the Daily Debit Scheme (detailed *supra* at ¶¶ 77 – 112.

209.    Nulook, Mannino, and Guzzetti each made these false representations or failed to disclose material facts to Plaintiff deliberately and with the intent to defraud Plaintiff in connection with the Daily Debit Scheme.

210.    Most importantly, Nulook, Mannino, and Guzzetti each knew about the specific terms of the Heiser Agreements and the use of ACH Processing to debit the Nulook account in pre-set amounts at pre-determined times. Notwithstanding this knowledge, Nulook, Mannino, and Guzzetti failed to disclose these material matters to GWG until March 3, 2017 by which time in excess of $1,361,769.34 had been secretly routed to the PSCF bank account controlled by Heiser through the Daily Debit Scheme.

211.    But for the false representations and omissions of material fact by Nulook, Mannino, and Guzzettt, the Daily Debit Scheme would not, and could not, have taken place.

212.    Plaintiff reasonably relied upon the false representations and omissions of material facts by Nulook, Mannino, and Guzzetti in connection with the Daily Debit Scheme to its detriment.

213.    Plaintiff suffered damages by way of the false representations and omissions of material fact by Nulook, Mannino, and Guzzetti in connection with the Daily Debit Scheme in the amount of $1,361,769.34. Plaintiff also seeks an award of punitive damages in the amount of $1,000,000.00, plus all costs and expenses of this action, including reasonable attorneys' fees against Mannino and Guzzetti for their fraudulent statements and omissions related to the Daily Debit Scheme.

## COUNT V
## FRAUD AS TO THE DAILY DEBIT SCHEME
### Against Nazareno

214.    GWG repeats and realleges all allegations above as though fully set forth herein.

215.    Nazareno had knowledge of the Nulook Loan and Plaintiff's lien on the Nulook Collateral.

216.    Nazareno made repeated false representations or failed to disclose material facts to Plaintiff in connection with the Daily Debit Scheme (detailed *supra* at ¶¶ 77 – 112).

217.    Nazareno made these false representations or failed to disclose material facts to Plaintiff deliberately and with the intent to defraud Plaintiff in connection with the Daily Debit Scheme.

218.    Nazareno knew that GWG had a perfected security interest in the Nulook Collateral, an agreement in place with ACHWorks to debit Nulook's account and protect GWG's rights, the CSA Agreement which Nazareno himself signed and Nazareno further knew that GWG expected PSC to adhere to and respect GWG's lien priorities having provided Nazareno with a

copy of the RCA along with the CSA Agreement prior to lending money to Nulook. Notwithstanding the forgoing, Nazareno knowingly and intentionally arranged for the covert installation of ACH Processing to debit Nulook's account without disclosing same to GWG.

219.    Through the PSC Platform, Nazareno then gave repeated electronic instructions to ACH Processing to debit Nulook's account in pre-set amounts as contemplated by the undisclosed Heiser Agreements and to deposit funds directly into a PSCF account controlled by Nazareno and Heiser in derogation of GWG's rights.

220.    But for the affirmative acts, and false representations and omissions of material fact by Nazareno, the Daily Debit Scheme would not have taken place.

221.    Plaintiff reasonably relied upon the false representations and omissions of material facts by Nazareno to its detriment.

222.    Plaintiff suffered damages by way of the false representations and omissions of material fact by Nazareno in connection with the Daily Debit Scheme in the amount of $1,361,769.34, plus punitive damages for fraud in the amount of $1,000,000.00 plus Plaintiff's costs and expenses associated with this action, including reasonable attorneys' fees.

## COUNT VI
## AIDING AND ABETTING FRAUD AS TO THE DAILY DEBIT SCHEME
### Against Heiser and Heiser Enterprises

223.    GWG repeats and realleges all allegations above as though fully set forth herein.

224.    Heiser and Heiser Enterprises each had knowledge of the Nulook Loan and Plaintiff's lien on the Nulook Collateral.

225.    Heiser and Heiser Enterprises provided substantial assistance to Nulook, Mannino, and Guzzetti in connection with the Daily Debit Scheme whereby Nulook, Mannino, and Guzzetti

double-pledged collateral belonging to GWG, with Heiser and Heiser Enterprises providing all of the money for the PSCF operations. *See supra* at ¶¶ 78 – 80, ¶ 79, fn. 8.

226.    Heiser wired money directly to Nulook from Heiser Enterprises in connection with the first Heiser Agreement, *supra* ¶¶ 80, 83 (i). Heiser decided whether or not Nulook got funding pursuant to the Heiser Agreements, and at what rate that financing was provided, *supra* ¶¶ 79 (ii)-(iv).

227.    Plaintiff suffered damages as a result of the substantial assistance Heiser and Heiser Enterprises provided to Nulook, Mannino, and Guzzetti in connection with the Daily Debit Scheme in the amount of $1,361,769.34.

**COUNT VII**
**FRAUDULENT INDUCEMENT AS TO FORBEARANCE AGREEMENT**

**Against Mannino, and Guzzetti**

228.    GWG repeats and realleges all allegations above as though fully set forth herein.

229.    Mannino and Guzzetti possessed material, special facts not available to GWG, namely the existence of the payments to PSCF stemming from the Heiser Agreements and the Daily Debit Scheme, and failed to disclose these facts to Plaintiff. In fact, Mannino and Guzzetti actively hid these material, special facts from GWG. *See supra* at ¶¶ 116, 121, 123 – 124.

230.    Mannino and Guzzetti made material, false representations to Plaintiff in connection with the Forbearance Agreement.  These misrepresentations falsely portrayed and Nulook's financial condition and the steps it purportedly took to cure the Nulook Loan default. *See supra* at ¶¶ 114, 117 - 118, 123.

231.    Most importantly, Mannino and Guzzetti failed to disclose the Heiser Agreements and the Daily Debit Scheme. *See supra* at ¶¶ 116, 121, 123 – 124.

232.    Mannino and Guzzetti made these material, false representations with the intent to persuade or induce Plaintiff to enter into the Forbearance Agreement. *See supra* at ¶¶ 113 – 130.

233.    Plaintiff reasonably relied upon the false misrepresentations and omissions of material facts by Mannino and Guzzetti and entered into the Forbearance Agreement with Nulook. *See supra* at ¶¶ 127.

234.    Plaintiff was damaged by Mannino's and Guzzetti's false representations and omissions leading up to the execution of the Forbearance Agreement in an amount including, but not limited to its losses from the Daily Debit Scheme, in the amount of $1,361,769.34; its losses from the Diversion Scheme in the amount of $284,744.70; plus punitive damages for fraud in the amount of $1,000,000.00, and an award of  all costs and expenses associated with this action including GWG's reasonable attorneys' fees.

## COUNT VIII
## CONVERSION

### Against Nazareno

235.    GWG repeats and realleges all allegations above as though fully set forth herein.

### *Conversion as to the Diversion Scheme*

236.    Nazareno exercised dominion and control over certain of Nulook Merchant Receivables in connection with the Diversion Scheme that were encumbered by GWG's first priority perfected security interest and lien. The Diversion Scheme is described herein in detail in ¶¶ 46 – 76.

237.    The specifically identifiable funds debited from the Nulook Merchants' accounts and deposited into the PSCF bank account instead of the Nulook bank account are set forth on **Exhibit C** attached hereto and are identified by (i) merchant name, (ii) deal identification number,

(iii) date of debit, and (iv) amount debited. The aggregate amount converted by Nazareno in the amount of $284,744.70 is shown by Nulook Merchant name in ¶ 64 *supra*.

238.    When Nazareno learned that Nulook had shut off all automatic debits pursuant to the Forbearance Agreement and as requested by GWG (insert paragraphs) Nazareno used the PSC Platform as described in greater detail herein to change debiting instructions and installed ACH Processing to debit Nulook's account instead in order to "jump in front" of GWG and take specifically identifiable cash that belonged to GWG.

239.    Plaintiff suffered damages in the amount of $284,744.70, resulting from the conversion of these monies by Nazareno in the Diversion Scheme.

### *Conversion as to the Daily Debit Scheme*

240.    Nazareno exercised dominion and control over Nulook Merchant Receivables in connection with the Daily Debit Scheme that were encumbered by GWG's first priority perfected security interest and lien. The Daily Debit Scheme is described herein in detail in ¶¶ 77 – 112.

241.    Plaintiff had a perfected security interest in all Nulook Receivables. The specifically identifiable funds, debited from the Nulook's bank account and deposited into the PSCF bank account are set forth on **Exhibit D** attached hereto, and are identified by amount, debited bank account (Nulook), and credited bank account (PSCF). The aggregate amount converted by Nazareno was $1,361,769.34.

242.    Nazareno used the PSC Platform to send electronic instructions to ACH Processing to debit Nulook's bank account in pre-set amounts at predetermined times as detailed in **Exhibit D**. Each and every time that Nazareno used the PSC Platform to debit Nulook's account in specific amounts on specific dates identified in **Exhibit D**, he exercised dominion and control over funds that rightfully belonged to GWG.

243.    Plaintiff suffered damages in the amount of $1,361,769.34 resulting from the conversion of these monies by Nazareno in the Daily Debit Scheme.

*__Conversion as to the Post-Receivership Scheme__*

244.    Nazareno did not comply with the Receivership Order [DE 38]. He did not turn over all of the assets of PSC and any of PSC's affiliates to the Receiver.

245.    During the Receivership and after the Receiver transferred all of PSC's assets to Plaintiff, Nazareno took PSC's data, including customer lists, databases, physical files and other business information and used them for his own purposes in a manner that was inconsistent with GWG's interests and the Orders of this Court.

246.    Nazareno exercised complete dominion and control over GWG's property, all of which was acquired following the Strict Foreclosure and Nazareno prevented GWG from using the PSC Platform in all respects.

247.    Accordingly, Nazareno should be held liable for conversion and should be required to pay damages to GWG equal to the amount paid to the Receiver in protective advances leading up to the Strict Foreclosure in the amount of $51,066.71, plus the value of the business property taken by Nazareno as described herein in in an amount to be proven at trial but believed to be in excess of $100,000, plus punitive damages for conversion and the costs and expenses of this action including reasonable attorneys' fees.

## COUNT IX
## BREACH OF CONTRACT – THE LOAN AND THE FORBEARANCE AGREEMENT
### Against Nulook

248.    GWG repeats and realleges all allegations above as though fully set forth herein.

249.    On March 16, 2017, Plaintiff sent a demand to Nulook for payment of all amounts due under the Loan. As of that date, the amount owed under the Loan was $2,073,398.13.

250.    In addition, default interest became due under the terms of the Loan.

251.    Under the Nulook Loan, Section XVI of the Revolving Credit Agreement, Nulook is also responsible for paying all costs of collection, including reasonable attorneys' fees and court costs, incurred or paid by Plaintiff in collecting amounts due under the Nulook Loan.

252.    Despite receiving demand for payment, Nulook has failed to pay the amount due and owing to Plaintiff under the Loan.

253.    After foreclosing on the Collateral pursuant to Nulook's short lived bankruptcy (*see supra* ¶¶ 145-155), Plaintiff attempted to collect from various Nulook Merchants and has applied the $274,083.47 it received from said Nulook Merchants to the Nulook Loan balance.

254.    Under the Forbearance Agreement, Nulook agreed to indemnify GWG "of and from all damage, loss, claims (including both direct claims and third-party claims), demands, liabilities, obligations, actions and causes of action whatsoever that any third party may now have or claim to have . . . whether presently known or unknown, and of every nature and extent whatsoever on account of or in any way touching, concerning, relating to, arising out of or founded upon the Loan . . . that may arise as a consequence of the dealings between the Parties . . . ."

255.    All conditions precedent to the maintenance of this action have been met.

256.    Accordingly, Nulook is liable to Plaintiff for all damages and expenses incurred in connection with the Loan and all damages and expenses incurred in prosecuting or defending this action, including, but not limited to the costs and expenses associated with the appointment of the Receiver and all of Plaintiff's expenses, including its reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in its favor as follows:

A.    Count I (Fraud Against Heiser as to the Diversion Scheme):  Damages in the amount of $284,744.70; punitive damages in the amount of $1,000,000 for fraud, together with Plaintiff's costs, expenses, and reasonable attorneys' fees;

B.    Count II (Fraud Against Nazareno as to the Diversion Scheme): Damages in the amount of $284,744.70; punitive damages in the amount of $1,000,000 for fraud, together with Plaintiff's costs, expenses, and reasonable attorneys' fees

C.    Count III (Aiding and Abetting Fraud Against Nulook and Mannino as to the Diversion Scheme): Damages against Nulook and Mannino in the amount of $284,744.70, punitive damages in the amount of $1,000,000 for aiding and abetting fraud, together with Plaintiff's costs, expenses, and reasonable attorneys' fees;

D.    Count IV (Fraud Against Nulook, Mannino, and Guzzetti as to the Daily Debit Scheme): Damages in the amount of $1,361,769.34, punitive damages in the amount of $1,000,000 for fraud, together with Plaintiff's costs, expenses, and reasonable attorneys' fees;

E.    Count V (Fraud Against Nazareno as to the Daily Debit Scheme): Damages in the amount of $1,361,769.34, punitive damages in the amount of $1,000,000 for fraud, together Plaintiff's with costs, expenses, and reasonable attorneys' fees;

F.    Count VI (Aiding and Abetting Fraud Against Heiser and Heiser Enterprises as to the Daily Debit Scheme): Damages in the amount of $1,361,769.34, punitive damages in the amount of $1,000,000 for aiding and abetting fraud, together with Plaintiff's costs, expenses, and reasonable attorneys' fees;

G.    Count VII (Fraudulent Inducement As to the Forbearance Agreement Against Mannino and Guzzetti) actual damages in the amount of $1,646,514.04, punitive damages in the

amount of $1,000,000 for fraudulent inducement, together with Plaintiff's costs, expenses, and reasonable attorneys' fees;

H.  Count VIII (Conversion with Respect to the Diversion Scheme, the Daily Debit Scheme, and the Post-Receivership Scheme Against Nazareno): Damages in an amount to be proven at trial but in excess of $1,646,514, punitive damages in the amount of $1,000,000 for conversion, together with Plaintiff's costs, expenses, and reasonable attorneys' fees;

I.  Count IX (Breach of Contract Against Nulook): actual damages in the amount of $1,875,607.07;

J.  Pre-judgment interest; and

K.  Such other and further relief as the Court deems just, proper, and equitable.

## JURY DEMAND

Plaintiff hereby demands trial by jury.

DATED this 28th day of July, 2020

/s/ Edward S. Stone

_____

EDWARD STONE LAW P.C.
Edward S. Stone, Esq.
*Attorneys for Plaintiff*
300 Park Avenue, 12th Floor
New York, New York 10022
Tel: (646) 933-3143
Fax: (203) 348-8477
Email: eddie@edwardstonelaw.com