UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
GWG MCA CAPITAL, INC.

                              Plaintiff,           **MEMORANDUM AND ORDER**

    -against-                                      17-cv-1724 (SIL)

NULOOK CAPITAL, LLC, ANTHONY
MANNINO, JOEL NAZARENO, JOHN
GUZZETTI, H. RUSSELL HEISER, and
HEISER ENTERPRISES LLC,

                             Defendants.
------------------------------------------------------------------x

**STEVEN I. LOCKE, United States Magistrate Judge:**

By way of Complaint filed on March 28, 2017, Plaintiff GWG MCA Capital, Inc. ("GWG" or "Plaintiff") commenced this action against Nulook Capital, LLC ("Nulook"), John Guzzetti ("Guzzetti"), Anthony Mannino ("Mannino" and collectively with Nulook and Guzzetti, the "Nulook Defendants"), Joel Nazareno ("Nazareno"), H. Russell Heiser ("Heiser") and Heiser Enterprises LLC[1] ("Heiser Enterprises" and together with Heiser, the "Heiser Defendants") (the Nulook Defendants, Nazareno and the Heiser Defendants collectively, "Defendants"), alleging federal law claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (c)-(d) and various related state law claims. *See* Docket Entry ("DE") [1]. Subsequently, Plaintiff filed a First Amended Complaint, a Second Amended Complaint, a Third Amended Complaint and a Fourth Amended Complaint. *See* DEs

---

[1] While Heiser Enterprises LLC appears as "Hesier Enterprises LLC" in the initial case caption, subsequent filings indicate that this is a typographical error, and the correct spelling is "Heiser Enterprises LLC."

1

[114], [240], [257], [273]. GWG's Fourth Amended Complaint alleges state law claims of fraud, aiding and abetting fraud, fraudulent inducement, conversion, and breach of contract, and is properly before this Court pursuant to its diversity jurisdiction. *See* Fourth Amended Complaint, DE [273], ¶¶ 178-256; 28 U.S.C. § 1332  Presently before the Court, pursuant to 28 U.S.C. § 636(c), *see* DE [216],[2] is the Heiser Defendants' motion to dismiss Plaintiff's Fourth Amended Complaint as to them, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) (the "Heiser Motion" or "Heiser Mot."), DE [278].  For the reasons set forth below, the Court grants the Heiser Motion in its entirety and dismisses the claims against the Heiser Defendants with prejudice.

## I. BACKGROUND[3]

Unless otherwise indicated, the facts set forth herein are taken from the Fourth Amended Complaint ("FAC") and are accepted as true for purposes of the instant motion.

### A. The Parties and the Underlying Transactions

GWG is a commercial lending company, incorporated in Delaware, with its principal place of business in Minnesota.  FAC ¶¶ 1, 12.  Defendant Nulook is a New York limited liability company owned, in part, by Defendants Guzzetti and Mannino, who are both New York citizens.  *Id.* at ¶¶ 3-4, 13.[4]  Nulook provides merchant cash

---

[2] The Honorable Judge Gary R. Brown presided over this action until it was reassigned to the undersigned on January 17, 2020. *See* Case Reassignment, dated January 17, 2020.

[3] As the parties' familiarity with the extensive procedural history of this litigation is presumed, the Court sets forth only background material that is directly relevant to the instant motion.

2

advances to small businesses that are not otherwise creditworthy. *Id*. at ¶¶ 2, 13. In exchange for these cash advances, businesses ("Nulook Merchants") allow Nulook to debit money from their bank accounts on a daily or weekly basis using an Automated Clearing House ("ACH") processor. *Id* at ¶ 13. These merchant cash advances are not structured as loans, but instead as sales "of a portion of future receivables[.]" *Id* at ¶ 27. To finance its operations, in 2014, Nulook borrowed $3.75 million from MCA Capital, LLC ("MCA") (the "Nulook Loan"). *Id*. at ¶ 12. Nulook and MCA executed a revolving credit agreement (the "Credit Agreement") to memorialize the terms of the Nulook Loan. *Id*. at ¶ 27. The Nulook Loan was secured by a first priority perfected security interest in and to all of Nulook's collateral ("Nulook's Collateral") which is defined as Nulook's "right, title and interest in and to[,]" among other things, all future receivables purchase agreements between Nulook and the Nulook Merchants. *Id*. To document its lien on Nulook's Collateral, MCA filed a UCC-1 financing statement against Nulook. *Id*. at ¶ 28. As part of the Nulook Loan documentation, Nulook, MCA and non-party ACHWorks entered into an agreement (the "ACHWorks Agreement") that allowed Nulook to use ACHWorks, (and only ACHWorks), to debit the Nulook Merchants's accounts. The ACHWorks Agreement also provided that, if Nulook was in default under the Nulook Loan, MCA had authorization to direct ACHWorks to deposit funds into its account instead of Nulook's bank account. *Id*. at ¶ 37.

---

[4] At all relevant times, Guzzetti and Mannino each owned one-third of Nulook. *Id*. at ¶ 13. Former defendant Robert Aurigema ("Aurigema") owned the remaining third. *Id*.

To issue the merchant cash advances, Nulook contracted with International Professional Services, Inc. ("PSC"),[5] which performed "all back-office servicing for its portfolio[.]" *Id.* at ¶ 35. Defendant Nazareno is a citizen of New York and was the Executive Director of PSC. *Id.* at ¶ 5. Defendant Heiser, a citizen of Florida, was the CEO of PSC and created and managed the financing division within PSC, called PSC Financial,[6] through Heiser Enterprises, a Florida limited liability company. *Id.* at ¶¶ 6-7.[7]

From 2012 to 2017, PSC operated an online platform with Mannino and Guzzetti called "The Marketplace"[8] that enabled merchant cash advance companies like Nulook to identify merchants in need of short-term cash advances and provide funding to them. *Id.* at ¶¶ 43-44. Merchant cash advance companies that joined The Marketplace were referred to as "PSC Members." *Id.*

At some point after Nulook contracted with PSC, MCA, Nulook and PSC executed a subordination agreement (the "Collection Subordination Agreement"),

---

[5] While Plaintiff initially named PSC as a defendant in this action, it dropped the claims against it, and it was dismissed with prejudice on October 14, 2017. *See* DE [113].

[6] Plaintiff initially named PSC Financial as a defendant in this action, but as it did with PSC, GWG dropped the claims against PSC Financial, and it was dismissed with prejudice on October 14, 2017. *See* DE [113].

[7] Heiser was named CEO of PSC on or about September 29, 2015. FAC ¶ 6.

[8] Although Plaintiff uses two different defined terms to refer to an online platform operated by PSC, the Court understands both terms to refer to the same online platform. Initially, Plaintiff defines a platform that allows users to "upload and download documents, manage merchant accounts, produce reports, and authorize PSC to give daily debiting instructions to ACHWorks to debit the bank accounts of" the user's merchants and remit the funds to the user. *Id.* at ¶ 44. Plaintiff later avers that The Marketplace "was run on the PSC Platform and provided a platform where merchant cash advance funders could view merchant 'deals' in need of financing and participate in those merchant financings via the PSC Platform." *Id.* at ¶ 128. Finding no difference between these two descriptions of the online platform, the Court refers only to "The Marketplace" in this Memorandum and Order.

4

pursuant to which PSC "was informed of [MCA's] security interest" in Nulook's Collateral, which included the daily incoming payments from Nulook Merchants of a portion of their daily receivables. *Id.* at ¶ 39(a). Nazareno executed the Collection Subordination Agreement on behalf of PSC. *Id.* at ¶ 40. On February 15, 2016, GWG purchased all of MCA's assets including the Nulook Loan, and on February 18, 2016, MCA's UCC-1 was assigned to GWG. *Id.* at ¶¶ 12, 29.

### B. The Alleged Conspiracies

Plaintiff alleges four interrelated conspiracies: (i) the "Daily Debit Scheme"; (ii) the "Forbearance Agreement Scheme"; (iii) the "Diversion Scheme"; and (iv) the "Post-Receivership Scheme." *Id.* at ¶¶ 46-177; *see also* Plaintiff's Memorandum of Law in Opposition to Defendants H. Russell Heiser and Heiser Enterprises, LLC's Motion to Dismiss the Fourth Amended Complaint ("Plaintiff's Opposition" or "Pl. Opp."), DE [278-6], 3-9.

#### i. The Daily Debit Scheme

The Daily Debit Scheme began in early 2015, when Nazareno, Heiser and Heiser Enterprises began offering financing to PSC Members through PSC Financial. FAC ¶ 77. As noted above, PSC Members used these cash advances to make merchant cash advances to retail businesses that they found through The Marketplace. *Id.* at ¶ 78.

Through PSC Financial, Heiser "directed advertising to PSC Members regarding the availability of funding; performed the underwriting; [and] decided which applicants to fund[.]" *Id.* at ¶ 79(i)-(iii). Heiser provided the funding either

directly from a Heiser Enterprises bank account to merchant cash advance entities or indirectly, by wiring money to a PSC account for further distribution to PSC Members. *Id.* at ¶ 79(iv).

On or about May 29, 2015, Nulook "entered into the first of six (6) factor agreements with [PSC Financial.]" *Id.* at ¶ 81. Nulook did not disclose the terms of its agreement with PSC to MCA. *Id* at ¶ 82. Through this factor agreement, PSC Financial gave Nulook $200,000.00 – wired from a bank account in the name of Heiser Enterprises – in exchange for permission to debit Nulook's bank account $967.00 on a daily basis. *Id.* at ¶ 81. Subsequently, without notice to or permission from MCA, Nulook entered into five additional factor agreements with PSC Financial, as follows: (i) on July 29, 2015, Nulook accepted a $350,000.00 advance from PSC Financial and pledged to repay it $420,000.00; (ii) on October 30, 2015, Nulook accepted a $150,000.00 advance from PSC Financial and pledged to repay it $175,500.00; (iii) on November 5, 2015, Nulook accepted a $150,000.00 advance from PSC Financial and pledged to repay it $175,500.00; (iv) on January 19, 2016, Nulook accepted a $100,000.00 advance from PSC Financial and pledged to repay it $116,000.00; and (v) on April 29, 2016, Nulook accepted a $500,000.00 advance from PSC Financial and pledged to repay it $555,000.00. *Id.* at ¶¶ 82-83.

Neither MCA nor GWG ever relinquished its security interest in Nulook's Collateral or terminated its UCC-1 financing statement. *Id.* at ¶ 82. Further, neither MCA nor Plaintiff "entered into any form of inter-creditor agreement, participation agreement, carve-out agreement, or other arrangement with respect to GWG's first

6

priority perfected security interest in [the Nulook] Collateral." *Id.* In total, Nulook "double-pledged" $1,450,000.00 of receivables that had been previously pledged exclusively to MCA and committed to repaying PSC Financial $1,674,000.00 pursuant to the factor agreements dated May 29, 2015, July 29, 2015, October 30, 2015, November 6, 2015, January 19, 2016 and April 29, 2016 (collectively, the "Heiser Agreements").[9] *Id.* at ¶ 83. At no point did Nulook disclose the terms of the Heiser Agreements to MCA or GWG. *Id.* To conceal funds paid to PSC, Nulook and PSC Financial engaged an unauthorized ACH processing company, called ACH Processing, to debit Nulook's bank account and remit the funds to PSC Financial's bank account. *Id.* at ¶¶ 60-66. PSC debited Nulook more than 1,300 times, taking a total of $1,361,769.34 from the Nulook Collateral, of which Plaintiff was the secured creditor. *Id.* at ¶¶ 110-12.

    ii.    <u>The Forbearance Agreement Scheme</u>

In early 2016, shortly after purchasing the Nulook Loan, GWG "identified a number of material deficiencies and irregularities" with respect to the loan. *Id.* at ¶ 113. From March 2016 to July 2016, Plaintiff attempted to resolve these deficiencies. *Id.* During this time, Nulook – through former defendant and one-third owner of Nulook, Robert Aurigema ("Aurigema") – represented that it had more than enough money to pay off the Nulook Loan. *Id.* at ¶¶ 113-17. This was not true, however, as "the Daily Debit Scheme was diverting thousands of dollars on a daily basis from Nulook's bank account[.]" *Id.* at ¶ 118.

---

[9] Mannino and Guzzetti signed the Heiser Agreements. *Id.* at ¶ 86.

7

Eventually, GWG determined that Nulook would be unable to pay off the Nulook Loan and notified Nulook that it was in default. *Id.* at ¶¶ 119-20. Nonetheless, based upon Nulook's claims that it could repay the Nulook Loan, Plaintiff provided Nulook with an opportunity to cure its default. *Id.* at ¶ 110. Accordingly, GWG and Nulook commenced negotiating a forbearance agreement (the "Forbearance Agreement")., which was executed by Mannino on Nulook's behalf. *Id.* at ¶¶ 114, 120. In so doing, Plaintiff requested documentation to evaluate Nulook's ability to repay GWG, as Plaintiff did not independently have the ability to gather the information necessary to evaluate Nulook's financial condition. *Id* at ¶ 121. Further, GWG requested a Deposit Account Control Agreement ("DACA") that would have protected Plaintiff in the event of Nulook's default under the Forbearance Agreement. *Id.* Nulook did not, however, deliver a DACA to GWG. *Id.* Moreover, Nulook "actively hid from, concealed, and failed to disclose to GWG, the existence of the Heiser Agreements and the Daily Debit Scheme that was taking over $100,000 per month from Nulook and directing it to the [PSC Financial] bank account controlled by Heiser." *Id.* At no point did Mannino or Guzzetti provide Plaintiff with financial disclosures regarding how Nulook's cash flow was impacted by the Daily Debit Scheme – namely, that "much of the revenue that Nulook claimed would be available to pay down the [Nulook] Loan was already going to pay off [PSC Financial]." *Id.* at ¶¶ 123-24.

In November 2016, Mannino and Guzzetti began closing Nulook's offices and preparing to go into business with PSC. *Id.* at ¶ 128. PSC and Nulook intended to

8

operate The Marketplace out of PSC's offices. *Id.* Without disclosing to GWG its plans to shut down Nulook and go into business with PSC, Nulook signed off on the Forbearance Agreement on December 21, 2016. *Id.* at ¶ 127. Plaintiff then directed Nulook to shut off all automatic debits from its bank account, at which point the Daily Debit Scheme ceased. *Id.* at ¶ 130.

    iii.    The Diversion Scheme

The third conspiracy commenced within two months of the execution of the Forbearance Agreement when Nulook ceased making payments to Plaintiff in early February 2017. *Id.* at ¶¶ 21, 49-50. From February 16, 2017 to April 30, 2017, Nazareno and Heiser (with Mannino's knowledge) engaged ACH Processing to redirect all receivables from Nulook Merchants from Nulook's bank account to Heiser's PSC Financial bank account. *Id.* at ¶¶ 50-51, 63-65. By February 21, 2017, Nulook knew that Heiser and Nazareno were diverting all payments from Nulook Merchants to PSC Financial. *Id.* at ¶¶ 50-51, 54, 58, 68. In total, $284,744.70 was stolen from GWG using the Diversion Scheme. *Id.* at ¶ 66.

On March 28, 2017, Plaintiff filed its Complaint, and on April 4, 2017, Nulook filed for Chapter 11 bankruptcy (the "Nulook Bankruptcy"). *Id.* at ¶¶ 131-32. On April 27, 2017, pursuant to a So Ordered stipulation in the Nulook Bankruptcy, Nulook turned over to GWG "all receivables ever pledged by Nulook to GWG as collateral" (the "Bankruptcy Stipulation"). *Id.* at ¶ 136. During the Nulook Bankruptcy, "Nulook repeatedly made the false assertion that there was 'adequate protection' for [the Nulook Loan] because the 'collateral base is worth $6.2 million

9

and the [Nulook Loan] is $2.2 [million.]'" *Id.* at ¶ 137. On May 2, 2017, however, Nulook's counsel informed GWG that Nulook actually had only $251,923.25 in receivables. *Id.* at ¶ 138. The Nulook Bankruptcy was dismissed on September 20, 2017. *Id.* at ¶ 140. As of May 2019, the Nulook Loan balance was $1,875,607.07. *Id.* at ¶ 141.

    iv.    The Post-Receivership Scheme

On April 26, 2017, following a hearing sought by Plaintiff, the Honorable Arthur D. Spatt[10] appointed a receiver for PSC (the "Receiver"). *Id.* at ¶¶ 133-35. The Receiver terminated PSC's employment of Nazareno and Heiser. *Id.* at ¶ 142. Subsequently, upon learning that PSC did not have sufficient cash to cover its May 2017 payroll obligations, the Receiver exercised his authority to borrow money from GWG to cover PSC's operating shortfalls. *Id.* at ¶¶ 143-44. To secure these loans, the Receiver pledged all of PSC's assets as collateral. *Id.* at ¶ 144.

During the receivership, Nazareno, Mannino and Guzzetti continued to operate The Marketplace and divert assets, technology and business prospects away from PSC – whose assets were now owned by GWG – to another entity controlled by Mannino and Guzzetti called JJ&AA Enterprises LLC ("JJ&AA"). *Id.* at ¶¶ 168-69. Subsequently, on or about May, June and July 2017, Nazareno took the proprietary information from The Marketplace that he had stolen and sold it to other business ventures, with which he was involved – Epic Capital Enterprises LLC and Banana Exchange LLC. *Id.* at ¶¶ 170-75.

---

[10] Judge Spatt presided over this action until April 25, 2018. *See* DE [199].

10

On June 29, 2017, the Receiver advised GWG that PSC "was in dire financial condition and that the Receiver would have to terminate PSC's business operations[.]" *Id.* at ¶ 150. Consequently, pursuant to New York UCC §§ 9-620 and 9-621, GWG accepted the collateral in full satisfaction of PSC's receivership obligations. *Id.* at ¶¶ 151-52. It was at this point that GWG learned of the Post-Receivership Scheme. *Id.* at ¶ 177.

## C. Procedural History

On March 28, 2017, Plaintiff filed a Complaint against Defendants Nulook, Mannino and Nazareno, as well as PSC, PSC Financial, and Aurigema. *See* DE [1]. With leave of the court, DE [113], GWG filed its First Amended Complaint on October 16, 2017. DE [114]. Plaintiff's First Amended Complaint dropped the claims against PSC and PSC Financial and named Defendants Guzzetti, Heiser and Heiser Enterprises. DE [114]. Between November and December 2017, Aurigema and all Defendants moved to dismiss the First Amended Complaint, *see* DEs [144], [149], [150], [160], and on March 7, 2019, Judge Brown granted the motions in part and denied them in part.[11] *See* DE [231]. Judge Brown then held a hearing on June 10, 2019, where, among other things, he granted Plaintiff permission to file a Second Amended Complaint, and GWG did so on June 17, 2019. *See* Minute Order, dated June 10, 2019; DE [240]. Shortly thereafter, Plaintiff and Aurigema filed a stipulation of dismissal pursuant to Fed. R. Civ. P. 41(a)(1), DE [254], and on August

---

[11] Judge Brown was the Magistrate Judge originally assigned to this case, and as noted above, the parties consented to his jurisdiction prior to his ruling on Defendants' motions to dismiss the First Amended Complaint. *See* DE [216].

11

1, 2019, Aurigema was terminated as a defendant. *See* Stipulation and Order, dated August 1, 2019. Accordingly, on August 9, 2019, GWG filed a Third Amended Complaint, with Defendants' consent, which no longer named Aurigema. *See* DEs [255], [257].

The Nulook Defendants and Nazareno moved to dismiss the Third Amended Complaint on September 6, 2019, *see* DEs [263], [264], and the Heiser Defendants did so as well on October 18, 2019. *See* DE [270]. On June 28, 2020, this Court granted those motions in part and denied them in part, and dismissed – with prejudice – Plaintiff's RICO claims, and state law claims for: (i) conversion and tortious interference against the Heiser Defendants; and (ii) fraudulent conveyance against the Nulook Defendants and Nazareno. *See id.* As to the claims that the Court dismissed without prejudice, Plaintiff was granted leave "to file a fourth and final amended complaint on or before July 28, 2020," and was advised that such a deadline "[would] not be extended absent exceptional circumstances." *Id.*

On July 28, 2020, GWG filed its Fourth Amended Complaint, *see* DE [273], which the Heiser Defendants moved to dismiss on October 14, 2020. *See* Heiser Mot. Discovery commenced following the filing of the Heiser Motion. For the reasons set forth below, the Court grants the Heiser Motion in its entirety and dismisses the claims against the Heiser Defendants with prejudice.

## II. LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1940 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1975 (2007)). A claim is considered plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (citation omitted).

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must accept as true all allegations in the complaint and "'draw all inferences in the non-moving party's favor.'" *U.S. ex rel. Siegel v. Roche Diagnostics Corp.*, 988 F. Supp. 2d 341, 343 (E.D.N.Y. 2013) (quoting *LaFaro v. N.Y. Cardiothoracic Grp.*, 570 F.3d 471, 475 (2d Cir. 2009)). Nevertheless, "threadbare recitals of the elements of a cause of action" that are supported by "conclusory" statements and mere speculation are inadequate and subject to dismissal. *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks and citation omitted); *see Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). The court may consider only the factual allegations in the complaint, documents incorporated by reference or attached as an exhibit to the complaint, matters of which judicial notice may be taken and documents that are integral to the complaint and upon which the complaint relies heavily. *Lockwood v. Town of Hempstead*, No. 16-cv-3756, 2017 WL 3769253, at *2 (E.D.N.Y. Aug. 28, 2017) (citations omitted).

## III. DISCUSSION

The Heiser Defendants move to dismiss the Fourth Amended Complaint as to them. *See generally* Heiser Mot. Plaintiff asserts state law claims against the Heiser Defendants for: (i) fraud with respect to the Diversion Scheme (Count I), *id.* at ¶¶ 178-88; and (ii) aiding and abetting fraud with respect to the Daily Debit Scheme (Count VI), *id.* at ¶¶ 223-27. GWG's state law claims against the Heiser Defendants must be pled with specificity as required by Fed. R. Civ. P. 9(b) because they are predicated on the theory that Defendants fraudulently diverted funds from Nulook to which Plaintiff was entitled. *See TIC Park Ctr. 9, LLC v. Wojnar*, No. 16-cv-4302, 2017 WL 7733134, at *6 (E.D.N.Y. Apr. 7, 2017) ("[T]he heightened pleading standards of Rule 9(b) apply to torts that are premised on the defendant's alleged fraudulent actions.") (internal quotation marks and citations omitted). For the reasons set forth below, the Court grants the Heiser Motion in its entirety and dismisses the claims against the Heiser Defendants with prejudice.

### A. Plaintiff's Fraud Claim

Initially, in Count I, GWG asserts a fraud claim against Heiser individually, alleging that he: (i) "had knowledge of the Nulook Loan, the [Collection Subordination Agreement], the ACHWorks Agreement and Plaintiff's lien on the Nulook Collateral"; (ii) "act[ed] in concert with Nazareno" to implement a scheme to divert funds from Nulook Merchants' bank accounts to PSC Financial's bank account; and (iii) knowingly and intentionally failed to disclose material facts to Plaintiff in connection with the Diversion Scheme. FAC ¶¶ 178, 181, 185-86.

14

To establish fraud, a plaintiff must allege that the defendant made a "material misrepresentation," knowing that it was false and intending to induce reliance, and that the plaintiff justifiably relied on the misrepresentation and suffered damages as a result. *See IKB Int'l S.A. v. Bank. of Am. Corp.*, 584 F. App'x 26, 27 (2d Cir. 2014) (internal quotation marks and citation omitted). Moreover, as set forth here, GWG's fraud claim is subject to a heightened pleading requirement pursuant to Fed. R. Civ. P. 9(b). *See TIC Park Ctr. 9, LLC*, 2017 WL 7733134, at *6 (citations omitted). Thus, with respect to these claims, the Fourth Amended Complaint must state with particularity the circumstances constituting fraud, meaning that it must: "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *IKB Int'l S.A.*, 584 F. App'x at 27-28 (internal quotation marks and citation omitted). Further, while Defendants' knowledge may be "averred generally," the Fourth Amended Complaint must allege facts "giving rise to a strong inference that Defendants knew the statements to be false and intended to defraud [Plaintiff]" at the time they were made." *N.Y. State Catholic Health Plan, Inc. v. Acad. O & P Assocs.*, 312 F.R.D. 278, 299 (E.D.N.Y. 2015) (internal quotation marks and citations omitted). A strong inference of fraudulent intent may be established either by alleging facts (a) showing that defendants "had both motive and opportunity to commit fraud," or (b) constituting "strong circumstantial evidence of conscious misbehavior or

15

recklessness." *IKB Int'l S.A.*, 584 F. App'x at 27-28 (internal quotation marks and citations omitted).

Applying these standards, the Court concludes that GWG has failed to sufficiently allege facts to support its fraud claim against Heiser. Specifically, Plaintiff has not established that: (i) Heiser owed a duty to disclose to GWG such that any failure to disclose would support a fraud claim; or (ii) Plaintiff relied on any purported omission by Heiser. The absence of one – let alone both – of these elements is fatal to GWG's fraud claim.

The duty to disclose based upon superior knowledge, which Plaintiff looks to ascribe to Heiser, typically arises "in the context of business negotiations where parties are entering a contract," *see Harbinger Capital Partners LLC v. Deere & Co.*, 632 F. App'x 653, 657 (2d Cir. 2015) (citing *Ray Larsen Assocs., Inc. v. Nikko Am., Inc.*, No. 89-cv-2809, 1996 WL 442799, at \*5 (S.D.N.Y. Aug. 6, 1996)), and cannot serve as the basis for a fraud action where the alleged fraud occurs after the relevant contract has been formed. *See id*.

Yet, the Fourth Amended Complaint fails to allege that Heiser participated in the negotiation or execution of any of the agreements at issue, namely the Collection Subordination Agreement, the Revolving Credit Agreement, or the Nulook Loan, or that Plaintiff and Heiser had any business relations at all. *See generally* FAC. Further, Heiser's alleged omissions occurred after the relevant contracts had been executed, thus establishing that Heiser had no duty to disclose based on "superior

16

knowledge." *See Harbinger Capital Partners LLC*, 632 F. App'x at 657. Accordingly, Heiser's alleged failure to disclose cannot support GWG's fraud cause of action.

Moreover, Plaintiff fails to set forth facts that establish its reliance on Heiser's purported omissions. While GWG cites case law to in an attempt to remedy its failure to plead reliance, *see* Pl. Opp. at 17, its failure to include this fundamental element renders its fraud claim untenable. *See Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 31 N.Y.3d 569, 579, 81 N.Y.S.3d 816, 822 (2018).

Accordingly, Plaintiff's fraud cause of action against Heiser is dismissed. Because GWG has failed to cure its prior deficiencies as to this cause of action in multiple Complaints, this claim is dismissed with prejudice.

### B. Plaintiff's Aiding and Abetting Fraud Claim

Plaintiff next asserts, in Count VI, a cause of action against the Heiser Defendants for aiding and abetting fraud, alleging that they "provided substantial assistance to Nulook, Mannino and Guzzetti" in "double-pledging collateral belonging to GWG" and "providing all of the money for the [PSC Financial] operations" in connection with the Daily Debit Scheme. *Id.* at ¶¶ 225, 227. Under New York law, to state a claim for aiding and abetting, a plaintiff must allege "facts sufficient to support an inference of (1) the existence of a[n underlying tort]; (2) [the] defendant's knowledge of the [underlying tort]; and (3) that the defendant provided substantial assistance to advance the [underlying tort's] commission." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 172 (2d Cir. 2012) (internal quotation marks and citations omitted). A party alleging substantial assistance must show that: (1) "a defendant affirmatively

17

assist[ed], help[ed] conceal, or by virtue of failing to act when required to do so enable[d] the fraud to proceed"; and (2) "the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *Rosner v. Bank of China*, No. 06-cv-13562, 2008 WL 5416380, at \*5 (S.D.N.Y. Dec. 18, 2008), *aff'd* 349 F. App'x 637 (2d Cir. 2009); *see also Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 284 (2d Cir. 1992). With respect to the knowledge requirement, New York requires actual, rather than constructive knowledge of the wrongful conduct. *Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 02-cv-2561, 2006 WL 335357, at \*5 (S.D.N.Y. Feb. 15, 2006) (citations omitted).

Under these standards, the Court concludes that GWG's claim for aiding and abetting fraud fails for two reasons: (i) Plaintiff has not alleged facts establishing that the Heiser Defendants provided "substantial assistance" to advance the Daily Debit Scheme; and (ii) GWG has failed to allege that the Heiser Defendants had actual, rather than merely constructive, knowledge of the Daily Debit Scheme. At the outset, the Court notes that the two cases upon which Plaintiff relies upon to support its claim – *Phifer v. Home Savers Consulting Corp.*, and *UniCredito Italiano SpA v. JPMorgan Chase Bank* – actually undercut its arguments because they support the proposition that a plaintiff alleging a claim for aiding and abetting fraud must establish facts that the alleged aider/abettor took actions in furtherance of the fraud. *See* No. 06-cv-3841, 2007 WL 295605, at \*5 (E.D.N.Y. Jan. 30, 2007); 288 F. Supp. 2d 485, 502 (S.D.N.Y. 2003). Plaintiff, however, fails to provide facts that

18

establish how the Heiser Defendants' financing of PSC Financial's operation substantially assisted the alleged underlying Daily Debit Scheme.

Moreover, the Court concludes that GWG's aiding and abetting fraud claim fails because Plaintiff has not alleged that the Heiser Defendants had actual knowledge of the Daily Debit Scheme. This claim is instead based on a vague allegation that the Heiser Defendants "had knowledge of the Nulook Loan and Plaintiff's lien on the Nulook Collateral." FAC ¶ 224. This allegation, without more factual support, is insufficient to establish the Heiser Defendants' actual knowledge of the underlying Daily Debit Scheme for pleading purposes. *See Heinert v. Bank of Am. N.A.*, 835 F. App'x 627, 631 (2d Cir. 2020) (citing *Mazzaro de Abreu v. Bank of America Corp.*, 525 F. Supp. 2d 381, 388 (S.D.N.Y. 2007)).

Accordingly, GWG's aiding and abetting fraud claim is dismissed. Because GWG has again failed to cure its deficiency in this cause of action, despite multiple attempts, this claim is dismissed with prejudice.

### IV. CONCLUSION

For the reasons set forth above, the Court grants the Heiser Motion in its entirety and dismisses the claims against the Heiser Defendants with prejudice.

Dated:    Central Islip, New York
          August 13, 2021

**SO ORDERED**

/s/ Steven I. Locke
STEVEN I. LOCKE
United States Magistrate Judge